# EXHIBIT 5

Page 1

1                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
2

                        CASE NO.:  24-cv-6563 (LJL)
3

     RUBY FREEMAN and WANDREA' MOSS,
4

          Plaintiffs,
5

     -vs-
6

     RUDOLPH W. GIULIANI,
7

          Defendant.
8    _____/

9

10                       West Palm Beach Marriott
                        1001 Okeechobee Blvd.
11                       West Palm Beach, FL 33401

12

                        DATE:  Friday, December 27, 2024
13                       TIME:  9:12 a.m. - 5:28 p.m.

14

15

               VIDEO DEPOSITION OF RUDOLPH W. GIULIANI
16

17

18

19

20

21               Taken on behalf of the PLAINTIFFS before
22   Jennifer L. Bush, RPR, Notary Public in and for the State
23   of Florida at Large, pursuant to Notice of Taking
24   Deposition in the above cause.
25

Page 2

```
 1                    A P P E A R A N C E S
 2    APPEARING ON BEHALF OF THE PLAINTIFFS:
 3
                 Aaron Nathan, Esquire
 4               Joanna Lamberta, Esquire
                 Meryl Governski, Esquire
 5               Willkie Farr & Gallagher LLP
                 1875 K Street NW
 6               Washington, DC 20006
                 202-303-1016
 7               Anathan@willkie.com
 8
 9    APPEARING ON BEHALF OF THE DEFENDANT:
10
                 Joseph M. Cammarata, Esquire
11               Cammarata & DeMeyer PC
                 456 Arlene Street
12               Staten Island, NY 10314
                 718-447-0020
13               Joe@cdlawpc.com
14    APPEARING ON BEHALF OF ANDREW GIULIANI:
15               Scott B. McBride, Esquire
                 Lowenstein Sandler LLP
16               One Lowenstein Drive
                 Roseland, New Jersey 07068
17               973-597-6136
18    Also Present:
19               Daniel Ragland, Videographer
20
21
22
23
24
25
```

Page 3

1                    INDEX OF PROCEEDINGS
2

3    VIDEO DEPOSITION OF RUDOLPH W. GIULIANI
4    DIRECT EXAMINATION BY MR. NATHAN:                    5
5

     CERTIFICATE OF NOTARY PUBLIC                       347
6    ERRATA SHEET                                       348
     CERTIFICATE OF OATH OF WITNESS                     344
7    CERTIFICATE OF REPORTER                            345
     READ LETTER                                        346
8
9
10

                       GIULIANI EXHIBITS
11

       Number              Description              Page
12

     Exhibit 1    Defendant Rudolph W.Giuliani's      17
13                Pretrial Disclosures
     Exhibit 2    Interrogatories                     205
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           THE VIDEOGRAPHER:  We are now on the record

2      on -- at 9:12 a.m. on December 27th, 2024.

3           Please note that the microphones are

4      sensitive and may pick up whispering and private

5      conversations.

6           Please mute your phones at this time.

7           Audio and video recording will continue to

8      take place unless all parties agree to go off the

9      record.

10          This is Media Unit 1 of the video-recorded

11     deposition of Rudolph W. Giuliani, taken by

12     counsel for plaintiff in the matter of Ruby

13     Freeman versus (sic) Wandrea' Moss versus Rudolph

14     W. Giuliani.

15          My name is Daniel Ragland, the videographer

16     representing Veritext.  The court reporter is

17     Jennifer Bush from the firm Veritext.

18          Will counsel please announce their

19     appearances for the record, after which the court

20     reporter will swear in the witness.

21          MR. NATHAN:  Aaron Nathan, Willkie Farr &

22     Gallagher.  I am counsel for plaintiffs.

23          MS. LAMBERTA:  Joanna Lamberta, Willkie

24     Farr & Gallagher.  I am counsel for plaintiffs.

25          MS. GOVERNSKI:  Meryl Governski, Wilkie

```
                                               Page 5

  1          Farr & Gallagher, also counsel for plaintiffs.

  2                  MR. CAMMARATA:  Joseph Cammarata, Cammarata

  3          & DeMeyer PC, attorney for Rudolph W. Giuliani.

  4                  MR. MCBRIDE:  Scott McBride, Lowenstein

  5          Sandler for intervener, Defendant Andrew Giuliani.

  6  WHEREUPON,

  7                      RUDOLPH W. GIULIANI,

  8  called as a witness on behalf of the PLAINTIFFS, after

  9  having been first duly sworn, was examined and testified

 10  as follows:

 11                  THE WITNESS:  I do.

 12                      DIRECT EXAMINATION

 13  BY MR. NATHAN:

 14          Q.    Mr. Mayor --

 15          A.    Yes.

 16          Q.    -- thank you for making time for us today.

 17  I know you have done this before.  I apologize for the

 18  boring introduction, but I've got to run through some

 19  housekeeping.

 20                  Could you please state your full name for

 21  the record?

 22          A.    Rudolph, R-u-d-o-l-p-h, W., middle initial

 23  for William, Giuliani, G-i-u-l-i-a-n-i.

 24          Q.    Thank you.

 25                  You've been deposed before, right?
```

```
                                                    Page 6
 1            A.    Yes, sir.

 2            Q.    So you understand how this works?

 3            A.    I do.

 4            Q.    And you understand you are under oath?

 5            A.    I do.

 6            Q.    You understand that your testimony today

 7   carries the same weight as testimony in court?

 8            A.    Yes, sir.

 9            Q.    Is there any reason you might not be able

10   to give accurate testimony today?

11            A.    I couldn't hear the first part.

12            Q.    Is there any reason you might not be able

13   to give accurate testimony today?

14            A.    No.

15            Q.    Is there any reason your memory might be

16   less than sharp -- less sharp than usual today?

17            A.    No, sir.

18            Q.    Do you have any physical or mental

19   conditions that would prevent you from giving your best

20   testimony today?

21            A.    No, sir.

22            Q.    If I ask a question that is unclear to you,

23   will you let me know?

24            A.    Yes, sir, I will.

25            Q.    And if you need a break, please let me
```

Page 7

```
1   know.

2           A.    I will.

3           Q.    You can take one.

4                 How did you prepare for this deposition?

5           A.    I talked to my lawyers.  I reviewed some

6   documents to refresh my recollections that I could think

7   of that would come up possibly.  That's about it.

8           Q.    What documents did you review?

9           A.    Some of the motions -- I can't remember

10  really which documents.  I looked through a group of

11  documents that relate to the case when I -- different,

12  yeah, mostly memorandum in the case, memoranda in the

13  case.

14          Q.    In addition to any filings in this case,

15  did you review any of your own communications?

16          A.    No, sir, I don't think so.  Maybe

17  sporadically, not -- not in a regular kind of way.

18          Q.    Okay.  Did you speak with anyone other than

19  your attorneys in preparation for the deposition?

20          A.    Not in preparation for the deposition, no.

21          Q.    Who did you speak to?

22                MR. CAMMARATA:  Objection to the form.

23                THE WITNESS:  I spoke to -- to Joe and I

24          spoke to -- what attorneys did I speak to?

25                (Simultaneously speaking.)
```

Page 8

1    BY MR. NATHAN:

2         Q.    Excuse me.  I asked, other than your --

3    other than your attorneys, did you speak for -- did you

4    speak to anyone in preparation for the deposition?  You

5    said "not in the preparation of the deposition"?

6         A.    No.  I spoke about the fact of the

7    deposition with a number of people --

8         Q.    Okay.

9         A.    -- that I was going to be deposed today.

10        Q.    Okay.  And who were those people?

11        A.    Oh, my gosh.  Anybody who wanted to have an

12   appointment today.  Friends that called me for Christmas,

13   who asked me if I was going to be deposed.  It is quite

14   well known.

15        Q.    Fair enough.  Thanks for helping me get

16   that out of the way.

17              All right.  Where were you born?

18        A.    I was born in Brooklyn, New York.

19        Q.    And did you grow up in the city?

20        A.    For the first seven years in New York City.

21   For the next 14 years or so in Nassau County, although I

22   commuted to the city every day from the time I was 13,

23   and then I went to college in the city.  But my home was

24   in Nassau County.

25        Q.    In Nassau County.  And then where did you

Page 9

```
 1   go to law school?
 2           A.    I went to NYU.
 3           Q.    And that's also in New York City?
 4           A.    Yes, I -- that's right.
 5           Q.    I'm just taking a stab in the dark here,
 6   but I believe you also served as US attorney for the
 7   Southern District?
 8           A.    I did.
 9           Q.    And mayor of New York City?
10           A.    That is correct.
11           Q.    And it's fair to say that you are a
12   lifelong New Yorker?
13           A.    Well, up until a year and a half ago, yeah.
14           Q.    Okay.
15           A.    Well, no, actually, let me make clear.  I
16   lived in Washington for six of the years that you are
17   talking about at three different times -- at two
18   different times.  I'm sorry.
19           Q.    Okay.  Let's -- let's pin that down.
20                 When did you live in Washington the first
21   time?
22           A.    I lived in Washington from 1974 to 1977.
23   And I lived in Washington from 1980 to 1983.
24           Q.    And from 1974 to 1977, why were you living
25   in Washington?
```

```
                                                    Page 10

 1          A.    I was the associate deputy attorney

 2     general, which is a -- one of the two chiefs of staff for

 3     the deputy attorney general.

 4          Q.    Okay.  And the deputy attorney general, the

 5     associate deputy attorney general is a role at the

 6     Justice Department in Washington DC?

 7          A.    Yeah, the department -- I was an assistant

 8     US attorney before that and then I went to Washington to

 9     be one of the two chiefs of staff to Judge Harold Tyler

10     who became the associate attorney general.

11          Q.    Okay.  And then from 19 -- I believe the --

12     from 1980 to 19- --

13          A.    1981, actually --

14          Q.    Okay.

15          A.    -- the official appointment --

16          Q.    Okay.

17          A.    -- to '83.

18          Q.    Okay.  1981 was when the Reagan

19     administration began?

20          A.    Correct, and I was the associate attorney

21     general which is that third-ranking position of the

22     Justice Department.

23          Q.    The third ranking -- and what aspects of

24     the Justice Department did you supervise as associate

25     attorney general?
```

```
                                                    Page 11

 1              A.    I -- I supervised the criminal divisions of

 2     the Justice Department, both the criminal division and

 3     the criminal divisions and the civil division, anti-trust

 4     division, the civil rights division, the environmental.

 5              I supervised US Marshals; and in those

 6     days, Immigration and Nationalization Service, the Bureau

 7     of Prisons, the pardon attorney, anything having to do

 8     with criminal matters that reported to the attorney

 9     general reported through my office.

10              Anything that had to do with civil matters

11     and the budget reported -- and Congress reported to the

12     Deputy Attorney General's Office.  So that's the way we

13     divided.

14              Q.    Okay.

15              A.    Other justice departments divided -- just

16     divided differently.

17              Q.    Did you have any -- did you supervise the

18     Office of the United States Trustee?

19              A.    United States Attorneys?

20              Q.    Trustee.

21              A.    No, I believe the deputy did.  That would

22     have been a civil function.  I'm not actually sure.  I

23     don't remember.

24              Q.    Okay.  Only if you recall.

25              A.    It would make sense to me that the deputy
```

Page 12

```
 1   attorney general would do that.
 2          Q.    Okay.  All right.  Based on that, it sounds
 3   like you have quite a bit of experience as a lawyer in
 4   many different jobs.
 5                At this point, you know your way around
 6   litigation?
 7          A.    Yes, sir.
 8          Q.    And you understand what civil discovery is?
 9          A.    I do.
10          Q.    You responded to some discovery in this
11   case?
12          A.    Oh, my gosh, many, not just yours but
13   thousands of others.
14          Q.    Sure.  And in this case, the case that's
15   captioned Freeman versus Giuliani in the Southern
16   District of New York, you understand it has two different
17   docket numbers?
18          A.    I know there are two different cases, yeah.
19          Q.    Okay.  All right.  You know that there is a
20   case with the docket number -- a miscellaneous docket
21   number 24 miscellaneous-353?
22          A.    That number doesn't mean anything to me,
23   but...
24          Q.    That doesn't?  Okay.  All right.  Well, I
25   don't want to ask you to talk about something you're not
```

```
                                            Page 13
 1   aware of.

 2                But you responded to discovery requests

 3   from the plaintiffs in this litigation over the question

 4   of your homestead?

 5        A.    Yes.

 6        Q.    Okay.  And you also responded to discovery

 7   in this litigation over enforcement of the plaintiffs'

 8   judgment against you?

 9                MR. CAMMARATA:  Objection.

10                You can answer.

11                THE WITNESS:  Yes.

12   BY MR. NATHAN:

13        Q.    Okay.  And the discovery responses that you

14   provided to the plaintiffs in this case have been

15   truthful?

16        A.    To the best of my ability.

17        Q.    Some of those responses were -- did you

18   respond to any interrogatories?

19        A.    I believe I did.

20        Q.    And your --

21        A.    I get them confused.  You have to

22   understand that your case is one of, at times, four or

23   five massive discovery requests I get at once from

24   different cases.  I'm involved in a dozen, maybe more

25   than a dozen litigations in which four or five are very
```

Page 14

```
 1   active.
 2            Q.    I understand.  And you take each of them
 3   seriously, right?
 4            A.    As serious as I can, being inundated.
 5   There are only 24 hours in a day.
 6            Q.    When you get a discovery request from the
 7   plaintiffs, you do your best to answer it completely and
 8   fully?
 9            A.    Yes, sir.
10            Q.    Okay.  And you answered interrogatories in
11   this case under oath?
12            A.    If that's what it says.
13            Q.    Okay.  When you receive a document that
14   asks for your responses under oath, you understand that
15   that means that your answers are sworn?
16            A.    Yes, sir.  At the bottom when I sign it,
17   that's what it says, yeah.
18            Q.    Okay.  And you answered the interrogatories
19   in this case truthfully?
20            A.    Yes, sir.
21            Q.    Okay.  Whenever you are under oath, you
22   tell the truth?
23            A.    I do.
24            Q.    And generally when you testify in court,
25   you tell the truth?
```

Page 15

```
 1           A.    Always when I testify in court.  I tell the
 2      truth to the best of my ability.
 3           Q.    Okay.  And when you testify in a
 4      deposition, you tell the truth?
 5           A.    Again, to the best of my ability.
 6           Q.    When you file documents in court, you also
 7      tell the truth?
 8                 MR. CAMMARATA:  Objection.
 9                 THE WITNESS:  Again, to the best of my
10                 ability, yes.
11      BY MR. NATHAN:
12           Q.    When you say "to the best," is there a
13      reason that you would be unable to answer truthfully?
14           A.    Sure, I don't remember.  I might remember
15      incorrectly.  There are a thousand reasons why you could
16      testify incorrectly rather than untruthfully.  You know
17      that.  Particularly if you are testifying in sometimes
18      simultaneously five cases, six cases.
19           Q.    Okay.  If you testified incorrectly, you'd
20      fix the mistake, right?
21           A.    When it is called to my attention, of
22      course.
23           Q.    Okay.  And if you filed something in court
24      that was inaccurate in any way, you'd fix the mistake?
25           A.    Again, if it was called to my attention.
```

Page 16

1           Q.    Okay.  You'd make an amended filing?

2           A.    Well, I would tell my -- I would tell my

3    lawyer if it came up.  Usually somebody else would

4    discover it, and I would correct it.

5           Q.    Okay.  All right.  Well, as -- as we go

6    forward today, we're going to be talking a lot about two

7    different apartments.  I just want to make sure we can

8    understand ourselves and each other clearly.

9                 So if I say your Palm Beach condo or your

10   condo, will you understand that I'm referring to the

11   condo apartment at 315 South Lake Drive in Palm Beach,

12   Unit 5-D?

13          A.    Yes, sir.

14          Q.    Okay.  And you don't own any other

15   condominium apartment in Florida?

16          A.    I do not.

17          Q.    Okay.  If I talk about your New York

18   apartment, will you understand that I'm referring to the

19   co-op apartment at 45 East 66th Street, apartment 10-W in

20   New York, New York?

21          A.    Yes, sir.

22          Q.    And you don't own any other apartment in

23   New York?

24          A.    I do not.

25          Q.    Okay.  So if we get mixed up or if you

```
                                                    Page 17
 1    don't understand what I'm talking about, please just ask
 2    me to clarify.
 3              A.    I will.
 4              Q.    Okay.  I'm going to hand you and mark as
 5    Giuliani Deposition Exhibit 1, a set of pretrial
 6    disclosures that were served on plaintiffs by your
 7    counsel in this litigation.
 8                   MR. NATHAN:  Is this...
 9                   (Giuliani Exhibit 1, Defendant Rudolph
10    W.Giuliani's Pretrial Disclosures, was marked for
11    identification.)
12                   MR. CAMMARATA:  Thank you.
13    BY MR. NATHAN:
14              Q.    Do you recognize this as a document served
15    in this litigation?
16              A.    I do.
17              Q.    And you see that on the front page it has
18    two docket numbers up in the case caption?
19              A.    I do.
20              Q.    Okay.  It has both the docket numbers for
21    the 24-civil-6563 matter and the docket number for the
22    24- --
23              A.    I see two, yes.
24              Q.    -- mc-353 matter.  Okay.
25                   And you see that in Roman Numeral I
```

Page 18

```
 1    starting on page 1 of this document, you've listed the
 2    following potential trial witnesses for your -- that you
 3    may offer at trial in this matter?
 4            A.    Is that on page 1?
 5            Q.    Page 1 and it continues on to page 3.
 6            A.    I see that, yes.
 7            Q.    Okay.  Did you review this document before
 8    it was served?
 9            A.    I did.
10            Q.    Okay.  Did you review it -- okay.  I would
11    like to review with you the witnesses that you plan to
12    call in this matter.  Are these all of the witnesses that
13    you may offer at trial in -- well, strike that.
14                  When I talk about this litigation, unless I
15    specify, will you understand that I'm just talking about
16    the trial -- excuse me.  Strike that.
17                  Are these all of the witnesses that you
18    intend to rely on at trial in either of the matters that
19    are scheduled for trial in January?
20            A.    I'm sorry?
21            Q.    Excuse me.  Are these all of the witnesses
22    that you intend --
23            A.    I don't know.
24            Q.    You don't know whether these are all the
25    witnesses that you intend --
```

```
                                                   Page 19
 1                  (Simultaneously speaking.)
 2                  THE WITNESS:  I'm not preparing for trial.
 3          My lawyers are.
 4      BY MR. NATHAN:
 5          Q.    Okay.  You told me just now that you
 6      reviewed this document before it was served.
 7          A.    I did.
 8          Q.    Okay.  And did you see that it says that
 9      these are the potential trial witnesses for your case in
10      this matter?
11          A.    As of that date.
12          Q.    As of that date.  Okay.  Let's go to the
13      first witness.  I see you've listed yourself, Rudolph W.
14      Giuliani?
15          A.    Yes, sir.
16          Q.    Okay.  The next witness is Maria Ryan?
17          A.    Yes, sir.
18          Q.    Who is Maria Ryan?
19          A.    Maria Ryan is my part- -- I consider her my
20      partner.  She is technically the president of Standard
21      which is the company, and the CEO, I believe.  She runs
22      it would be the best way to describe it.  And she is in
23      charge of -- she's in charge of my business.
24          Q.    When you say "partner" -- excuse me.
25      Continue.
```

Page 20

```
 1            A.    Yes, she owns part of the business and
 2    she's in charge of it.
 3            Q.    Okay.  When you say "partner," do you mean
 4    business partner?
 5            A.    Yes, I do.
 6            Q.    Okay.  How long have you known her?
 7            A.    Since, well, 2017.  I guess -- it would be
 8    seven years.
 9            Q.    How often do you speak to Maria Ryan?
10            A.    Pretty close to every day but not
11    necessarily every day.
12            Q.    Okay.  How do you communicate with her?
13            A.    In person, on the phone mostly.
14            Q.    Okay.  Do you ever exchange emails with
15    her?
16            A.    Yes.
17            Q.    And when you speak to her or communicate
18    with her, what do you talk about?
19            A.    Beyond this case?
20            Q.    Yeah.
21            A.    Everything.  The way you would with any
22    business partner.
23            Q.    Okay.  And you speak with her about --
24            A.    From who won the latest football game to
25    what the weather is to how our families are doing.  I
```

Page 21

1    mean, many things that have nothing to do with this case.

2         Q.    But you also speak to her about issues that

3    have to do with this case?

4         A.    Sure, yes, as part of everything else.

5         Q.    Okay.  Aside from her role at Standard USA,

6    LLC, what other business roles has she helped for you in

7    the past five years?

8         A.    Well, she was president of my prior

9    company, Giuliani Communications.  She worked with me as

10   a -- she did work for -- when I had it, Giuliani Safety

11   and Security.  That was consulting work.

12              She worked with me on the -- assisted me on

13   the representation of the president in the -- in the

14   litigation regarding the 2020 election.  Probably other

15   roles too.

16              We have done many things together as

17   partners.  We cohosted a radio show for three years on

18   WABC Radio, maybe four years, I don't remember.  And

19   we've cohosted specials on television and on radio.

20         Q.    Okay.  In any of her roles in connection

21   with your companies, did Ms. Ryan -- or Dr. Ryan, excuse

22   me, have access to your email?

23         A.    Yes.

24         Q.    For what purpose?

25         A.    To look at it for messages, to sometimes do

```
                                              Page 22
 1    a message for me.  I get my email and the social media

 2    confused.  But sometimes I'll ask her to do it.  Like if

 3    I'm going to do a communication on X or -- I might ask

 4    her to do it.

 5                   (Reporter asks for clarification.)

 6                   THE WITNESS:  On X, formerly known as

 7            Twitter.  Or any of the others.

 8    BY MR. NATHAN:

 9            Q.    Would you say that was a regular practice

10    that she --

11            A.    Yeah, it's a regular practice with her and

12    with Ted Goodman and the people who came before them.

13            Q.    Does Dr. Ryan -- has Dr. Ryan also had

14    access to your phone?

15            A.    I'm not sure I understand the question.

16                   MR. CAMMARATA:  Objection.

17    BY MR. NATHAN:

18            Q.    Do you have a cell phone?

19            A.    I do.

20            Q.    Do you have more than one cell phone?

21            A.    I do.

22            Q.    And does she have access to those phones?

23            A.    She has access -- I have some cell phones

24    that are not operative, so nobody has access to them,

25    including me.
```

Page 23

1          Q.     How many operative cell phones do you have?

2          A.     Well, I have two really and then I have a

3     third one that's used for the purpose of calling in my

4     show, and only that.

5          Q.     Okay.

6          A.     So if you were to make a call into my show,

7     you would use that number and it is an old iPhone that's

8     dedicated to that.  So everybody has access to that,

9     probably Ted Goodman has most access to that.  But nobody

10    calls me on that.

11              Then I have an iPhone, that is the main

12    iPhone that I use for business mostly, because 24 hours a

13    day is mostly business, but also I would use it for

14    personal.  I would call my children or -- then I have a

15    third cell phone that is used just for videoing, to

16    dedicated -- it's almost -- you almost consider it a

17    camera.

18              But since it has a phone number, somehow

19    people discover it and you get some phone calls on it.  I

20    prefer not to because it would interrupt a broadcast.

21              So I have two operative cell phones and

22    third, a potentially operative, but I never use it.

23          Q.     You told me just a moment ago that Dr. Ryan

24    has access to your email accounts.

25              Which email accounts does she have access

```
                                                    Page 24

 1    to?

 2            A.    Well, I just have -- I just have one that

 3    I -- that I use.  I have some dormant ones but I never

 4    use them.

 5            Q.    Which is the one that you use?

 6                  MR. CAMMARATA:  Objection.

 7                  THE WITNESS:  I'm not going to --

 8                  MR. CAMMARATA:  I believe we have --

 9    BY MR. NATHAN:

10            Q.    You can answer.

11                  MR. CAMMARATA:  I believe we have a

12            protective order with that information.

13    BY MR. NATHAN:

14            Q.    You can answer.

15            A.    I'm -- instruction by counsel, I'm not

16    going to answer.

17                  MR. CAMMARATA:  You can answer the question

18            as to one email.

19                  THE WITNESS:  Well, I do have an email.

20                  MR. CAMMARATA:  That email.

21                  THE WITNESS:  I have one email -- I have

22            one email that I know of that I use.  I've had

23            many emails over the years but I don't use them

24            anymore.

25
```

Page 25

1    BY MR. NATHAN:
2           Q.    Which is the email that you use?
3           A.    I'm not -- I'm not going to disclose that.
4           Q.    Is it truthandjusticeforyou@protonmail.com?
5           A.    I'm not going to disclose it.
6           Q.    Okay.  Are you following your attorney's
7    instruction not to answer that question?
8           A.    Yes, I -- yes.
9           Q.    Okay.  And --
10                MR. CAMMARATA:  Take a break.  There is no
11          question pending.
12   BY MR. NATHAN:
13          Q.    On -- on what basis are you declining to
14   answer the question?
15          A.    It could change -- 99 percent of it
16   contains matters that have nothing to do with this case
17   and a lot of them are privileged.  A lot of them are
18   personal and it would seem to me that it constitutes
19   overbroad discovery, prying into things -- using this
20   litigation for the purpose of prying into things that are
21   frankly none of your business, that have been utilized in
22   the past for leaking, for giving information to other
23   people, so I don't give my email out generally anyway.  I
24   give it out to people that I believe will use it for a
25   proper purpose.

```
                                              Page 26

 1                MR. CAMMARATA:  Can you repeat the

 2         question --

 3                MR. NATHAN:  Yes.

 4                MR. CAMMARATA:  -- as to the email?

 5   BY MR. NATHAN:

 6         Q.    What email address -- what is the address

 7   of the email account that you currently use?

 8         A.    I will -- I will -- no, will not disclose

 9   it.

10                MR. CAMMARATA:  Hold on.  Can I do a

11         follow-up question?

12                MR. NATHAN:  Are you objecting?

13                MR. CAMMARATA:  Can I do a follow-up

14         question?

15                MR. NATHAN:  Are you objecting to the

16         question?

17                MR. CAMMARATA:  I'm objecting to the

18         question.

19                MR. NATHAN:  What's the basis of the

20         objection?

21                MR. CAMMARATA:  Can you repeat the

22         question?

23                MR. NATHAN:  What is the address of the

24         email account that you use?

25                MR. CAMMARATA:  Is it the -- I'm objecting
```

```
                                                    Page 27
 1              to the --
 2                      (Simultaneously speaking.)
 3                      MR. CAMMARATA:  I'm objecting to the
 4              question but is it the email address that -- you
 5              have to be more specific.  Is it the email address
 6              he communicated with your office?
 7                      MR. NATHAN:  The question is for the
 8              witness and you can object if you'd like.  But the
 9              witness is going to need to answer the question.
10                      MR. CAMMARATA:  You can answer the
11              question.  You can answer that question.
12      BY MR. NATHAN:
13              Q.    The question is:  What is the address of
14      the email account that you used?
15              A.    I will not disclose that.
16              Q.    Okay.
17                      MR. NATHAN:  The only basis for the witness
18              not to answer this question would be a privilege
19              objection.
20      BY MR. NATHAN:
21              Q.    Is that the objection -- is that the basis
22      for your refusal to answer this question?
23              A.    I told you my basis.
24              Q.    Okay.
25                      MR. CAMMARATA:  Is there a pending question
```

Page 28

1              right now?

2                   MR. NATHAN:  Okay.  If you are -- if you

3              are going to refuse to answer this question, then

4              at the end of our time here today, I'll hold the

5              deposition open to ensure that we have an

6              opportunity to get your answer but I'll move on

7              right now.

8                   MR. CAMMARATA:  Okay.

9    BY MR. NATHAN:

10             Q.   You described two phone numbers on cell

11   phones that are operative.

12                  You described one that you use only for

13   video and I'd like to know now, because we were

14   discussing Dr. Ryan, does Dr. Ryan have access to the two

15   cell phones that you use for placing phone calls?

16             A.   She has access to it, yes.

17             Q.   Okay.  She knows the password to each

18   phone?

19             A.   I believe she does.  You would have to ask

20   her but I believe she does.

21             Q.   Okay.  Do you maintain an electronic

22   calendar?

23             A.   Not really, no.

24             Q.   Do you maintain a physical calendar?

25             A.   Not in any organized sense, no.

```
                                              Page 29
 1          Q.    Okay.  How do you keep track of your
 2   appointments?
 3          A.    I write them down on pieces of paper.
 4   Sometimes Dr. Ryan writes it down.  Sometimes Ted Goodman
 5   writes it down.  Sometimes Michael Ragusa, who you see
 6   here, and I put it close to my desk in -- that's how I do
 7   it.  And occasionally I'll do an entry in my -- in my
 8   iPhone or iPad but they are very sporadic.
 9          Q.    Okay.  Has Dr. Ryan ever had access to any
10   of your personal bank accounts?
11          A.    She has.
12          Q.    Which bank accounts has she had access to?
13          A.    Oh.  Well, she has access to all the
14   business accounts, for sure.  She has access to my
15   personal accounts if I ask her to do something for me --
16          Q.    Okay.
17          A.    -- in that account.
18          Q.    So for any of the businesses that you've
19   operated over the last five years, Dr. Ryan would have
20   had access to those business accounts?
21          A.    Well, since she's been president of the
22   company, maybe not the beginning.
23          Q.    You mentioned that she's president of
24   Standard USA, LLC.
25                Is that the company that you are referring
```

```
                                                    Page 30
 1   to?
 2           A.    Yes, sir, and the one before it, the one --
 3           Q.    The one before that was Giuliani
 4   Communications LLC.
 5                 And so Dr. Ryan would have had access to
 6   Giuliani Communications' accounts as well?
 7           A.    I'm not sure from the beginning but most of
 8   the time, yes.
 9           Q.    Okay.  Throughout the year 2024, would she
10   have had access to the Giuliani Communications business
11   account?
12           A.    This year.
13           Q.    This year?
14           A.    Yes.
15           Q.    Okay.  Does she also handle any -- strike
16   that.
17                 Does Dr. Ryan assist you with any of your
18   personal financial affairs?
19           A.    She does.
20           Q.    Okay.  How does she do that?  What type of
21   assistance does she provide for your personal financial
22   affairs?
23           A.    She gives me advice about them, about it
24   and then helps me to organize it.
25           Q.    Does she help you manage financial issues?
```

1           A.    Yes.

2           Q.    How does she --

3           A.    The way my -- anywhere from a way a

4     secretary, a personal secretary would, to the way in

5     which a financial advisor for Merrill Lynch would --

6           Q.    So --

7           A.    -- or from the -- from the...

8           Q.    -- she helps -- she assists you with

9     financial trans- -- she assists you with executing

10    financial transactions?

11          A.    Yes, but that's been true in my life for

12    25 years, that somebody does that.

13          Q.    And for the -- for how long has Dr. Ryan

14    played that role for you?

15          A.    I'd have to go back.  Not at the beginning,

16    somewhere along the way.  When I first met her, I had a

17    secretary, a personal secretary, and a special assistant

18    and they all did that.  Over time, that became less.  Her

19    role became more.  So it's hard to say.  So it evolved.

20          Q.    Okay.  This year --

21          A.    Oh, I -- also, I have an accountant,

22    changed accountants, but I've had an accountant all --

23    two of them actually, now one.

24          Q.    Who is your accountant now?

25          A.    Joe Ricci --

Page 32

1          Q.    How long --

2          A.    Joseph Ricci.

3          Q.    How long has Joseph Ricci been your

4    accountant?

5          A.    Oh, he's been the accountant for the

6    businesses, I think, from the beginning.  So that's 20 --

7    20 -- most of 24 years, he's been an accountant for the

8    business.  He also participated in preparing our tax

9    returns and things like that.

10         Q.    How long has he helped -- how long has he

11   been your personal accountant?

12         A.    For about a year and a half or two years.

13         Q.    Okay.  Did he assist you with filing of

14   your tax returns for the tax year 2023?

15         A.    Yes.

16         Q.    Did he assist you in filing your personal

17   tax returns for the tax year 2022?

18         A.    Yes, but he's assisted me for the filing of

19   my tax returns for the last approximately 20 years.  But

20   it was -- there was another principal accountant who

21   actually did it.

22         Q.    Who was that?

23         A.    That was Bob Gilbert for the longest time,

24   and then his assistant, and then the company whose name

25   escapes me.  Gosh, I don't know.  I can't remember right

Page 33

```
 1   now.

 2                   MR. CAMMARATA:  Don't guess.

 3                   THE WITNESS:  If I took a break and checked

 4            my records, I could get you the name.

 5   BY MR. NATHAN:

 6            Q.    Okay.  We can come back to that.  When did

 7   Joe Ricci become your sole personal accountant?

 8            A.    Well, certainly for the 2023 year.  He's

 9   taken over more and more of that role for the last three

10   years.  Now he is, and he was for the last year.

11            Q.    And when we talk about the 2023 year,

12   that's the filing season that extends into 2024, is

13   that -- am I correct?

14            A.    Yes.

15            Q.    Okay.

16            A.    But it might have been sometime in 2023.

17            Q.    In the calendar year 2023 --

18            A.    Yes.  Right, right.

19            Q.    -- as opposed to tax year.  Excuse me.  All

20   right.

21                   And did Dr. Ryan also assist you in

22   preparing your personal taxes?

23                   MR. CAMMARATA:  Objection.

24   BY MR. NATHAN:

25            Q.    You can answer.
```

Page 34

```
 1           A.    Answer?  To some degree.  She played some
 2     role, not -- I mean, in the way a number of people did.
 3           Q.    When you say, "she played some role," can
 4     you describe the role that she played?
 5           A.    Well, she would get information that he
 6     needed or wanted, as would others.
 7           Q.    Okay.  And what would she do with that
 8     information?
 9           A.    Give it to him.
10           Q.    How do you think -- excuse me.  How did she
11     give it to him?
12           A.    Mostly mailing it.
13           Q.    Mailing it.  Did Dr. Ryan ever communicate
14     with Mr. Ricci by email?
15                 MR. CAMMARATA:  Objection.
16                 THE WITNESS:  You'd have to ask her that.
17           You'd have to ask her that.
18     BY MR. NATHAN:
19           Q.    Did you ever communicate with Mr. Ricci by
20     email?
21           A.    Probably but not often.
22           Q.    Would Mr. Ricci send you emails?
23           A.    I'm sure he did.  I don't -- I --
24           Q.    Okay.
25           A.    I don't -- I just don't remember a specific
```

Page 35

1    one right now.

2         Q.    Okay.  Returning to Dr. Ryan's role in your

3    personal financial affairs.  In the -- in terms of the

4    access she had to your financial accounts, did she need

5    your approval to make financial transactions on your

6    behalf?

7              MR. CAMMARATA:  Objection.

8              You can answer.

9              THE WITNESS:  Yes.

10   BY MR. NATHAN:

11        Q.    Okay.  And how did that work?

12        A.    Usually I would get on the telephone and

13   say, yes, she can complete this transaction.

14        Q.    Did she have access to your credit card or

15   to any of your credit cards?

16             MR. CAMMARATA:  Objection.

17             You can answer it.

18             THE WITNESS:  On occasion, not regularly.

19   BY MR. NATHAN:

20        Q.    Okay.  Did she -- did she travel with you?

21        A.    At times she -- yes.

22        Q.    Okay.  When would she travel with you?

23        A.    Whenever she traveled with me.  I don't

24   know when she would travel with me.  That's a very large

25   categorical question.

Page 36

```
 1          Q.    What would have been a reason for her to
 2    travel with you?
 3                MR. CAMMARATA:  Objection.
 4                THE WITNESS:  Oh, that I was going to
 5          give -- I think of the most recent, I was going to
 6          give a speech in Oklahoma to a group of people
 7          that invited me to speak to them.
 8                I do a certain amount of speaking,
 9          sometimes get paid for it.  You know, at one time
10          I used to do 150 a year.  Now I do a lot fewer but
11          I still do speaking.  I'm a paid speaker.
12                I also speak for charitable purposes or for
13          political purposes.  So it would depend on the
14          speech.
15                She -- at this point, she and/or Ted
16          Goodman would accompany me on those speeches
17          recently.  There -- different people have played
18          that role over the last 20 years.
19    BY MR. NATHAN:
20          Q.    Okay.  In any of Dr. Ryan's roles, have you
21    paid her?
22          A.    The business has paid her.
23          Q.    How much?
24          A.    You want a salary?  I'm not sure.
25          Q.    You don't know how much your business has
```

```
                                                        Page 37

 1   paid her?

 2           A.     I would have to be approximating.

 3           Q.     Okay.  Does she draw a salary from each of

 4   your businesses?

 5           A.     Pardon me?

 6                  MR. CAMMARATA:  Objection.

 7   BY MR. NATHAN:

 8           Q.     Does she draw a salary from each of your

 9   businesses?

10           A.     I believe she -- I believe that she and Ted

11   and Mike are paid through Standard, from one place.

12           Q.     Okay.  And when Giuliani Communications --

13   during the period when Giuliani Communications was the

14   entity that operated -- excuse me, strike that.

15                  How long has Standard been in existence?

16           A.     Briefly.  Six months.  I'm guessing.

17           Q.     Okay.  And during that time, Dr. Ryan has

18   drawn a salary from Standard USA?

19           A.     I mean, I don't -- Ryan Medrano would know

20   the answer.  He makes out all the checks, including mine.

21           Q.     Prior to Standard USA, how was Dr. Ryan

22   paid?

23           A.     Pardon me?

24           Q.     Before Standard USA existed, how was

25   Dr. Ryan paid?
```

Page 38

```
 1          A.    Well, I believe it was Giuliani -- I mean,
 2    I would have thought of it as Giuliani Communications but
 3    technically it might have been -- there is a company that
 4    we have for the purpose of paying checks, I think.  So
 5    they may have paid her.  You'd have to ask Ryan.
 6          Q.    Okay.  Ryan --
 7          A.    Ryan Medrano.
 8          Q.    Ryan Medrano?  Who is Ryan Medrano?
 9          A.    Ryan Medrano is -- best description would
10    be the controller of Standard right now.  He's been my
11    controller since the time I left being mayor of every one
12    of the companies that I was part of or owned.
13          Q.    Okay.  I'll ask you a bit about Mr. Medrano
14    in a second.
15              While we're still on the topic of Dr. Ryan,
16    it says on this document that the topics of Dr. Ryan's
17    testimony will be Rudolph W. Giuliani's relocation from
18    his New York City cooperative apartment to his Palm Beach
19    County, Florida, condominium as his homesteaded property.
20              What does Dr. Ryan know about that topic?
21              MR. CAMMARATA:  Objection.
22              You can answer.
23              THE WITNESS:  Many things.  But probably
24        the thing that's describing is she -- she is the
25        one that I asked to find me an agent in order to
```

 1          sell the apartment in New York because I was

 2          relocating to Florida.

 3               And I -- since the issue is homestead, I

 4          discussed that with her many, many times.  And

 5          officially she played the role of searching for

 6          and finding the agent negotiating with them, at

 7          one time discussing several agents, and then we

 8          took on one exclusively.  And she did all that

 9          negotiating.

10  BY MR. NATHAN:

11          Q.    When you say --

12          A.    And then worked out with them, you know,

13  the visits that people would make to the apartment.

14  Since I've always traveled a fair amount a lot of times,

15  it would have to be done when I wasn't there.  So she

16  knows quite a bit about that as well as the -- over time

17  how I moved the things that I needed down here to

18  Florida.

19          Q.    What's the first conversation you recall

20  having with Dr. Ryan about your plans to relocate to

21  Florida?

22          A.    I can't remember the first conversation.

23  Could be right around the first time I met her.

24          Q.    When was that?

25          A.    Well, it would have been '18, 2018, 2019,

Page 40

```
 1    but only sporadically.  In the last three years it would
 2    be, you know, it would be very often.
 3            Q.    Okay.  If Dr. Ryan were to testify in this
 4    matter, you believe she'd testify truthfully?
 5                  MR. CAMMARATA:  Objection.
 6                  You can answer.
 7                  THE WITNESS:  Of course.
 8    BY MR. NATHAN:
 9            Q.    Okay.  You consider her to be an honest
10    person?
11            A.    Yes.
12            Q.    And she would follow the rules of the
13    Court?
14                  MR. CAMMARATA:  Objection.
15                  You can answer it.
16                  THE WITNESS:  I don't understand the
17            propriety of that question, but I'm happy to
18            answer yes.
19    BY MR. NATHAN:
20            Q.    Okay.
21            A.    I would be a character witness for her any
22    time, any place.
23            Q.    Okay.  Okay.  The next witness you've
24    listed here is Ryan Medrano.
25                  Could you -- I know you've spoken about him
```

Page 41

1    before, but just could you say who Ryan Medrano is,

2    please?

3            A.    Ryan Medrano right now is the controller of

4    Standard which means he -- it would be fair to say he

5    handles all of his financial affairs and -- and would be

6    much more knowledgeable about them, even Dr. Ryan or Ted

7    Goodman or me.

8            Q.    Okay.  So you described Mr. Medrano earlier

9    as your controller.  What does that mean to you?

10           A.    It means he handles all the financial

11   affairs.  He keeps all the documents that we're going to

12   need for tax returns.  He keeps all the documents we're

13   going to need to pay, not just salaries, but all the

14   expenses, all of the expenses of the business, the way he

15   always has done.  It's been a very, very -- at one point,

16   a very large role and now it's a much narrower role, but

17   it's still pretty -- pretty busy.

18           Q.    Okay.  Does Mr. Medrano perform that

19   function for you in your personal life as well?

20               MR. CAMMARATA:  Objection.

21               THE WITNESS:  Well, it overlaps somewhat,

22           but, yes, I would say that's true, somewhat.  In

23           other words, the documents from my business he

24           would transmit to my accountant.  My personal

25           documents I would transmit myself.  You know, like

Page 42

```
 1          health documents or the things that come to me
 2          personally, like or the maintenance that I pay.  I
 3          would transmit that myself.
 4               So I think it's fair to say he transmits
 5          the business information that overlaps with
 6          personal life.  I transmit the purely personal
 7          information.  He doesn't handle my personal
 8          finances.
 9   BY MR. NATHAN:
10          Q.   Okay.  How do you communicate with
11   Mr. Medrano?
12          A.   By phone.
13          Q.   And do you communicate with him in any
14   other ways?
15          A.   Rarely.  I mean, I do -- rarely.  I don't
16   use email often, so even if he communicated with me by
17   email, I'd be more likely to communicate back to him on
18   the phone or have Ted or Dr. Maria do it.
19          Q.   Okay.  So he might send you an email?
20          A.   Uh-huh.
21          Q.   But then you might respond by phone rather
22   than write back?
23          A.   Yeah, I'm giving you sort of a general
24   idea.  More often than not, I either respond by phone or
25   somebody else would respond.  Every once in a while I
```

Page 43

```
 1    would.
 2            Q.    Okay.  So even though you might not be
 3    writing him emails, he -- he might write you some emails
 4    and -- okay, excuse me, strike that.
 5                  So just so I'm clear, Mr. Medrano -- would
 6    you say Mr. Medrano emails you regularly?
 7            A.    No, he more regularly would email my staff.
 8            Q.    Your staff, and would -- would Mr. Medrano
 9    ever email you directly?
10            A.    Occasionally, that -- that would be -- yes,
11    occasionally would be the right answer.
12            Q.    Okay.  If he needed to speak to you
13    directly, he would send you an email?
14            A.    Well, he might just call me, but --
15            Q.    I understood --
16                  (Simultaneously speaking.)
17                  THE WITNESS:  His basic -- his basic -- his
18            basic communications over the years, remember, we
19            had a very, very big company, so we're used to
20            that practice, would be that somebody who was
21            working for me, who probably had far more
22            knowledge about it than I did.
23    BY MR. NATHAN:
24            Q.    Okay.  So just again, just so I understand,
25    your testimony is that occasionally Mr. Medrano would
```

Page 44

1  send you an email but that your practice would be maybe

2  to respond by email sometimes but more often return the

3  message by phone?

4          A.    Yeah, I mean, if he responded -- if he

5  communicated by email or text, I'm going to guess that

6  more often than not, it was a personal matter than a

7  business matter.  He usually knew who to go to --

8          Q.    Okay.

9          A.    -- about the business rather than go to me.

10         Q.    But -- but there would have been occasions

11 where Mr. Medrano wanted to communicate with you about a

12 personal matter and so he emailed you directly?

13         A.    I can't remember exactly but he might have

14 called me.  You know, the point that I'm trying to make

15 is, he did not in any way regularly communicate with me

16 about the business.  He regularly communicated with

17 people on my staff.

18             When I would receive an email from him,

19 which would be occasional, as it related to the business,

20 I would probably give it to the staff.

21         Q.    And when you say "give it to the staff,"

22 you would forward it on --

23         A.    Yeah, I would say, "Ted, could you handle

24 this?"

25         Q.    Okay.

Page 45

```
 1          A.    Or --
 2          Q.    Would you do that by forwarding the email
 3    to Ted?
 4          A.    No, I might just show it to him.
 5          Q.    Okay.
 6          A.    Or if it was personal, then I would respond
 7    to it.  Usually I would respond by making a telephone
 8    call.
 9          Q.    Okay.
10          A.    He's been ill for a while, so there are
11    times in which he's calling me about that.
12          Q.    Okay.  Mr. Medrano would also email your
13    staff about business matters?
14          A.    I -- I believe so, yeah.  I mean, I -- I
15    haven't overlooked -- yes, that's what I understand --
16          Q.    If Mr. --
17          A.    -- for years.
18          Q.    If Mr. Medrano wanted some information from
19    you or your staff, he could email Dr. Ryan with a
20    request?
21                MR. CAMMARATA:  Objection.
22                THE WITNESS:  Yeah, you'd have to ask them,
23          if they emailed, called, by mail.  I mean, they
24          communicated every way you can communicate, not
25          just with Dr. Ryan but -- everybody on my staff,
```

Page 46

```
 1              at any level, knows him and feels free to
 2              communicate with him openly.
 3                   He's also a close personal friend of all of
 4              ours and we're very worried about him because he's
 5              not feeling well.
 6    BY MR. NATHAN:
 7         Q.   Okay.  I'm sorry, earlier you testified
 8    that he would more regularly email your staff than he
 9    would email you.
10         A.   I mean, I probably understated that.  It
11    would be much more often.
12         Q.   Much more often.  And when he would email
13    your staff, they would respond on your behalf or with the
14    information that Mr. Medrano was requesting?
15                   MR. CAMMARATA:  Objection.
16                   THE WITNESS:  Again, you would have to ask
17              them.  I mean, I'm sure, I'm sure they did.
18    BY MR. NATHAN:
19         Q.   Okay.
20         A.   But there may be times in which they would
21    have -- they didn't.
22         Q.   Okay.  In Mr. Medrano's roles with your
23    company, did he have access to any of your email
24    accounts?
25                   MR. CAMMARATA:  Objection.
```

Page 47

```
 1              THE WITNESS:  I don't -- I don't know the
 2         answer to that.
 3    BY MR. NATHAN:
 4         Q.    Do you generally know who has access to
 5    your email accounts?
 6              MR. CAMMARATA:  Objection.
 7              THE WITNESS:  I don't know what that means,
 8         "access to my email account."  You mean know --
 9         knows my email?
10    BY MR. NATHAN:
11         Q.    I just -- strike that.
12              Okay.  What does Mr. Medrano know about
13    your -- I'm sorry, here it says, on this witness
14    disclosure list, that Mr. Medrano is going to testify
15    about Rudolph W. Giuliani's relocation from his New York
16    City cooperative apartment to his Palm Beach County,
17    Florida condominium as his homesteaded property.
18              What does Mr. Medrano know about that?
19         A.    I actually don't know what he knows about
20    it.
21         Q.    Okay.  How would he have learned anything
22    about that topic?
23         A.    How would he know about it?
24         Q.    Yeah.
25         A.    You'll have to ask him.
```

Page 48

```
 1          Q.    Okay.  Did you ever speak to him about it?
 2          A.    I probably did but I don't recall.
 3          Q.    Okay.  You don't recall any
 4    conversations --
 5          A.    No.
 6          Q.    -- with Mr. Medrano about --
 7          A.    Not specifically.
 8          Q.    Okay.  And you don't --
 9          A.    I remember general conversations with many
10    people about it, I would assume him, but I can't be sure.
11          Q.    You don't recall ever speaking to him about
12    your intentions to relocate to Florida?
13          A.    Well, I talk to everybody about it, so I
14    must have talked to him about it.
15          Q.    But you don't recall any specific
16    conversations?
17          A.    Correct, I can't -- I can't give you a date
18    or time.
19          Q.    Okay.
20          A.    Nor does one come to mind.
21          Q.    If Mr. Medrano were to testify in this
22    matter, do you suspect he would tell the truth?
23          A.    I know he would.
24          Q.    Do you think he's a credible person?
25          A.    He certainly is.
```

Page 49

```
 1            Q.    He would take his oath seriously?
 2            A.    Yes.
 3            Q.    Okay.  The next witness you've listed here
 4      is Monsignor Alan Placa?
 5            A.    Yes.
 6            Q.    Who -- who's Ms. -- excuse me, who is
 7      Monsignor Placa?
 8            A.    He's been my lifetime friend.  We're -- we
 9      met in high school together and we've been friends
10      since then -- close friends, probably my closest personal
11      friend --
12            Q.    Okay.
13            A.    -- after Peter Powers, who passed away a
14      few years ago, along with Peter Powers.
15            Q.    It says here on this list that Mr. --
16      Monsignor Placa would testify about discussions of
17      Rudolph W. Giuliani's relocation from his New York City
18      cooperative apartment to his Palm Beach County, Florida
19      condominium as his homesteaded property prior to
20      December 31, 2023.
21                  How would Monsignor Placa know about that
22      topic?
23                  MR. CAMMARATA:  Objection.
24                  You can answer.
25                  THE WITNESS:  We have regularly -- we used
```

Page 50

```
 1            to have more when we lived in the same city but
 2            now, again, since I moved here, we'd regularly
 3            have personal conversations.
 4                 And even when we lived apart, we would see
 5            each other quite often.  And for a long period of
 6            time, he worked with my business, so it's hard --
 7            there is not like a specific occasion but I talk
 8            to him about everything.
 9    BY MR. NATHAN:
10            Q.    What did he do for your business?
11            A.    He's my closest friend.
12                 He did legal -- he did -- he did a number
13    of things.  When we had five businesses, he acquired our
14    insurance, negotiated it, particularly our health
15    insurance because he ran a hospital corporation at one
16    time and was very familiar with it.  He worked as a
17    lawyer doing legal research for us on security matters.
18    He helped us draft contracts.  He's also a lawyer, as
19    well as a Catholic priest.
20            Q.    Which businesses did he perform these
21    services for?
22            A.    He did it for Giuliani Security, Giuliani
23    Partners and then he did some for Giuliani Communications
24    and for Standard.  Not really for Standard, some, because
25    I consulted with him about it but mostly his -- his work
```

```
                                           Page 51
 1   was with Giuliani Safety and Security and Giuliani

 2   Partners.

 3          Q.    Okay.

 4          A.    He would do research.

 5          Q.    Did you pay Monsignor Placa for any of

 6   those roles?

 7          A.    Yes, for quite -- for several years.  I

 8   can't remember exactly how long but...

 9          Q.    Do you recall which entities he drew a

10   salary from?

11          A.    Well, I'm sure he drew the salaries from

12   the same entity that everyone did which would be Giuliani

13   Partners.  But you'd be paid from Giuliani Partners

14   whether you did work for any one of the subsidiaries.

15          Q.    Okay.

16          A.    Ryan would know exactly how it was

17   consolidated.

18          Q.    Okay.  But Giuliani Partners would have

19   been the entity that paid --

20          A.    I think it was, yes.

21          Q.    -- Monsignor Placa and -- all right.

22                I see that Monsignor Placa lives in Palm

23   Beach; is that accurate?

24          A.    He lives in West Palm Beach, yes.

25          Q.    In West Palm.  Again, is that --
```

```
                                            Page 52
 1          A.    Palm Beach Gardens.
 2          Q.    Palm Beach Gardens.
 3          A.    Yeah.
 4          Q.    I apologize for the crosstalk.
 5          A.    That's okay.
 6          Q.    Palm Beach gardens, Monsignor Placa lives
 7    here in Palm Beach --
 8          A.    He does.
 9          Q.    -- in Palm Beach County.  That makes him
10    the only witness on this list, I believe, who lives here
11    in Florida?
12          A.    You'd have to look, yeah, I guess.  That's
13    what it looks like.
14          Q.    Okay.  So if anyone would know about your
15    relocation to Florida, he would; is that right?
16          A.    No.  Other people would know about it.
17          Q.    Well, I'm not -- I'm not saying other
18    people wouldn't know but he would -- he would know,
19    wouldn't he, about your relocation to Florida?
20          A.    Well, I talked to him about it.  You'd have
21    to ask him if he -- if he know -- I assume he knows about
22    it.
23          Q.    But he has personal experience --
24          A.    I've talked to him about it.
25          Q.    He talks about it --
```

```
                                                      Page 53
 1           A.     For years.  I've talked to him about it for
 2     years.
 3                  THE REPORTER:  Okay.  I'm sorry.
 4                  THE WITNESS:  I'm sorry.
 5                  THE REPORTER:  I can only take one at a
 6           time, so please.
 7                  THE WITNESS:  I talked to him about it for
 8           years.  So I know I've talked to him about it.  He
 9           would have to tell you what he recollects of that.
10     BY MR. NATHAN:
11           Q.    Okay.  Since you -- since you've been
12     living in Florida, have you seen him in person?
13           A.     Yes.
14           Q.    Okay.  Do you see him regularly?
15           A.     I would say so, yeah, regularly.
16           Q.    Okay.  And is that how he would know that
17     you physically have relocated to Florida?
18           A.     I talked to him about -- discussions about
19     doing it.  As long as I've talked to Dr. Ryan about it, I
20     mean, five years ago, six years ago, seven years ago, I
21     told him that was my eventual goal, when it was my
22     eventual goal.  I told him as I was getting closer to it
23     and I told him when I decided.  As I did with personal
24     friends.
25           Q.    Okay.  The next witness on this list -- oh,
```

Page 54

1    excuse me.  Monsignor Placa, you know him very well?

2            A.    I do.

3            Q.    And you find him to be a credible person?

4            A.    Yes, sir.

5            Q.    If he were to testify in this matter, he'd

6    testify truthfully?

7            A.    He would.

8            Q.    Okay.  And he would take his oath

9    seriously?

10           A.    Yes.

11           Q.    The next witness is Michael Ragusa.  Who is

12   Michael Ragusa?

13           A.    Michael Ragusa is a New York City

14   corrections officer.  His status -- he has a status as an

15   investigator for them, like a detective, and he works

16   for -- he works for -- he worked for Giuliani

17   Communications and then, for now, Standard on a part-time

18   basis.

19           Q.    Okay.  How long has Mr. Ragusa worked for

20   Standard?

21           A.    Well, Standard, since it's been in

22   existence, and for us, about a year and a half.

23           Q.    Okay.

24           A.    And I'm -- I can't remember exactly when.

25   It could have been -- it could be two years, it could be

Page 55

```
 1    a year and a half.
 2             Q.    Prior to Standard being in existence, he
 3    worked for Giuliani Communications?
 4             A.    He did, he worked for Giuliani
 5    Communications as well.
 6             Q.    Okay.  And how is Mr. Ragusa paid?
 7             A.    Same way as Ryan and -- Dr. Ryan and Ryan
 8    Medrano and Ted Goodman.  They are all paid the same way.
 9             Q.    And how is that?
10             A.    Through Standard by Ryan.  Ryan Medrano
11    sends out the -- the checks or wire transfers, whatever
12    they elected.
13             Q.    Okay.  Here it says that "Mr. Ragusa would
14    testify about discussions of Rudolph W. Giuliani's
15    relocation from his New York City cooperative apartment
16    to his Palm Beach County, Florida, condominium as his
17    homesteaded property prior to December 31, 2023."
18                   How would Mr. Ragusa have gained personal
19    knowledge of that subject?
20             A.    Because either I would tell him or Dr. Ryan
21    would tell him that -- that we were -- that we moved
22    there or basically through discussions with me or other
23    members of the company.
24             Q.    And those discussions, would they occur
25    over email?
```

Page 56

```
 1          A.    No.  I don't think -- maybe, but I don't
 2    think so.  They would be in person.
 3          Q.    Okay.  The next witness -- oh, and if
 4    Mr. Ragusa were to testify in this matter, would he
 5    testify truthfully?
 6          A.    Yes, sir.
 7          Q.    He would take his oath seriously?
 8          A.    Yes, sir.
 9          Q.    The next witness is Theodore Goodman.  Who
10    is Theodore Goodman?
11          A.    Ted is -- I would consider Ted for a number
12    of roles.  He's the producer of my daily shows.  He's --
13    and he's someone who carries out a lot of the
14    technological organization that we need.  He helps
15    Dr. Ryan in negotiating our contracts.  He plays a
16    multifaceted role.
17                The main one every day is he produces --
18    now he produces my show, two of my shows, which, one is
19    at 7:00 to 8:00 with FrankSpeech Network, and the second
20    is 8:00 to 9:00 on X, as well as YouTube, Gettr, Rumble,
21    Facebook, QUX, and Newsmax.
22          Q.    How long have you known Ted Goodman?
23          A.    I've known Ted for a very long time, like
24    -- well, very long.  I've known Ted since at least 2020.
25    Yes, since at least 2020.
```

```
                                              Page 57

 1           Q.     Okay.  How often do you speak to Ted?

 2           A.     Every day.

 3           Q.     How do you speak --

 4           A.     Almost every day.

 5           Q.     Okay.  And what methods do you use to

 6     communicate with him?

 7           A.     Almost all of it is oral.  He's with me --

 8     he's probably with me, you know, most of the time.

 9           Q.     Okay.  You mentioned before that sometimes

10     you would receive an email and you'd ask Ted to take care

11     of it.  Does Ted have access to your email accounts?

12           A.     For that purpose, yeah.  I mean, I'll show

13     it to him or sometimes I'll hand it to him.

14           Q.     Is he able to access your email accounts

15     without you showing him an email?

16                  MR. CAMMARATA:  Objection.

17     BY MR. NATHAN:

18           Q.     Is he otherwise able to access your email

19     accounts?

20           A.     I think so.  He -- he -- sometimes he'll

21     bring an email to my attention.  I don't always look at

22     it.  So he must be able to access it.

23           Q.     When he brings an email to your attention,

24     that's an email that's been sent to your email account;

25     is that accurate?
```

```
                                                      Page 58
 1              A.    Well, no, sometimes it will be sent to him
 2      for me to respond to something or sometimes -- you'd have
 3      to ask him whether he actually accesses my -- technically
 4      accesses my email account.  I'm not sure.  Same thing as
 5      Dr. Ryan.
 6              Q.    Okay.  Just so I understand, so people
 7      might try to get in touch with you by sending an email to
 8      Ted?
 9                   MR. CAMMARATA:  Objection.
10      BY MR. NATHAN:
11              Q.    Is that right?
12              A.    You'd have to ask him that.  Oh --
13              Q.    I think you just mentioned --
14                   (Simultaneously speaking.)
15                   THE WITNESS:  I don't know if some people
16              would.  All I can tell you is he will come to me
17              and say, Oh, Alan wants you to call him back, or
18              he might say -- or he might say, You got a call
19              from -- from Senator Graham, or it could be
20              personal or it could be business or politics.
21      BY MR. NATHAN:
22              Q.    Okay.  I think -- yes, you testified a
23      moment ago, "sometimes it will be sent to him for me to
24      respond to or sometimes -- you'd" -- excuse me.
25                   You testified that sometimes an email would
```

```
                                                        Page 59
 1   be, quote, "sent to him for me to respond to."
 2               Is that an accurate statement about how
 3   people would communicate with you through Ted?
 4         A.   I'm not sure.  I -- I'm not.  I'm sorry.
 5         Q.   I can simplify.  Do people ever send Ted
 6   emails requesting a response from you personally?
 7               MR. CAMMARATA:  Objection.
 8               You can answer.
 9               THE WITNESS:  Yes, that's happened.
10   BY MR. NATHAN:
11         Q.   Okay.  Does Mr. Goodman know anything about
12   your plans to relocate to Florida?
13         A.   Yes.
14         Q.   What does he know?
15         A.   He knows -- he knows my original plan to do
16   it which I explained to him when he first came to work me
17   for me, that I was going to eventually do it.  He knows
18   the process through which I went.  You'll have to ask him
19   exactly what he knows.  But I think he knows, if not all
20   of it, most of it.
21         Q.   And how has he learned that information?
22         A.   Just by being around, by my talking to him,
23   my -- when he first came to work with me, I told him that
24   we were going to be in both -- we were going to work in
25   three places, basically, and travel a lot; was he able to
```

Page 60

```
 1    handle that.  And I told him which ones, Florida, New
 2    York and New Hampshire, and that we would travel a lot.
 3    He said he loves doing that.
 4                And I said -- at that time, I think I said
 5    we'll spend a lot of time in Washington, but we didn't.
 6    He would accompany me on most of those trips and he knew
 7    that my ultimate plan was to locate here.  He knows when
 8    I made the decision to sell the apartment which was
 9    sometime before it was listed because it took a while to
10    get a listing.  He knows about the dislocations that took
11    place when the apartment was viewed by prospective buyers
12    because we had to sometimes relocate our shooting.  We
13    had to clean it up.
14          Q.     Does Mr. Goodman have --
15          A.     He knows about our plans to -- he knows
16    about how we created a studio here, he helped me create
17    it.
18          Q.     When did he help you create a studio here?
19          A.     Year and a half ago, two -- I didn't do
20    live -- I didn't do live streaming until Ted was with me.
21    Before that, I did -- I did just a radio show and
22    podcasting which is sort of a prerecorded.  So Ted would
23    have to have been here when we initiated the ability to
24    do it here, which is little different than just
25    podcasting.  Podcasting is a recording that you send in.
```

```
                                                     Page 61
 1    Live streaming is something you do live and then you can
 2    convert it into a podcast.
 3            Q.    Sure.  So Mr. Goodman helped you set up a
 4    studio in Florida -- excuse me, where is your studio in
 5    Florida?
 6            A.    It's in my house.
 7            Q.    It's in the Palm Beach condo?
 8            A.    At 315, yeah.
 9            Q.    And Ted helped you set that up about a year
10    and a half ago?
11            A.    Whenever we started live streaming,
12    sometime shortly after that.  We came to Florida and set
13    one up here.
14            Q.    Okay.  It sounds like you are saying that
15    happened sometime in the middle of 2023?
16            A.    I think earlier than that.
17            Q.    Earlier than 2023?
18            A.    Yeah, in fact, I can tell you -- when did
19    the Yankees play the Guardians?  Not recently.  I think
20    the Yankees played in the World Series in '22.  They
21    missed the playoffs in -- had to be in '22.
22            Q.    Okay.
23            A.    I began live casting by simulcasting the
24    Yankee playoff games.  And doing a -- doing a play by
25    play sort of, because I've always had a desire to do one,
```

```
                                                    Page 62

 1    and whenever they put me on a Yankee broadcast, they

 2    would only let me do color.  And I used to get angry at

 3    John Sterling, who is a good friend of mine, for not

 4    letting me do color -- not letting me do play by play.

 5              So I was watching the Guardians and the

 6    Yankees in the playoffs and I said, "Ted, let's go live."

 7    That's how we started.  And we got a gigantic audience,

 8    so then we continued it as a political show.  That was in

 9    2022.  And now we've done 570.

10         Q.    Okay.  I relate to this way of marking

11    time.  I appreciate that.

12         A.    That's what I remember.

13         Q.    So it would have been --

14         A.    And almost from the first time that we

15    decided to make it regular, probably the next time we

16    went to Florida, which would have been 2022, we set up a

17    live studio here.

18         Q.    So you set up -- you set up a studio --

19         A.    Because we knew when we --

20         Q.    -- in the Palm Beach condo around the time

21    of the 2022 --

22         A.    Right after --

23         Q.    -- baseball playoffs?

24         A.    After it was over.  Yeah.

25         Q.    Just after --
```

Page 63

```
 1            A.     Yeah.
 2            Q.     -- the --
 3            A.     Around that time.
 4            Q.     The Yankees playoff run in 2022.
 5                   Okay, thank you.
 6                   It says here on this witness list that
 7    Mr. Goodman would testify about photographs taken that
 8    show the defendant, which is you.
 9                   Are there any other topics that Mr. Goodman
10    might testify about in this matter?
11            A.     I'm sure, I just don't -- I mean --
12            Q.     Okay.
13            A.     -- just doesn't come to mind what they -- I
14    mean --
15            Q.     That's fine.
16            A.     -- there -- there are probably things he
17    knows but I don't know what he knows.  He's been -- he's
18    around all the time, so...
19            Q.     Okay.  And if Mr. Goodman were to testify
20    in this matter, he would testify truthfully?
21            A.     Yes, sir.
22            Q.     And he would take his oath seriously?
23            A.     Mm-hmm.  Yes, sir.
24            Q.     And he would take court orders seriously?
25            A.     Yes.
```

Page 64

```
 1          Q.    Okay.  Does Mr. Goodman have access to any
 2     of your personal bank accounts?
 3          A.    Not unless I ask him -- no, he doesn't have
 4     access on his own.
 5          Q.    Okay.  Does he have access to any of your
 6     businesses bank accounts?
 7          A.    The bank accounts, oh, sorry.  He may or
 8     may not.  I don't know if he has access to the Standard
 9     account.  He -- he has ownership interest in Standard, so
10     he may.
11          Q.    Okay.  Does he have access to any of your
12     credit cards?
13          A.    Only at -- at times when I would give it to
14     him ask him to do something for me.
15          Q.    Okay.  Is Mr. -- is Mr. Goodman --
16          A.    I don't have any right now.
17          Q.    Do you pay Mr. Goodman?
18          A.    Well, Standard does, yeah.
19          Q.    Okay.  Before Standard was in existence,
20     did you pay Mr. Goodman?
21          A.    It is possible and I'm only doing this out
22     of excess of caution, just in case.  Might have been a
23     time when we -- when we used him as a consultant before
24     he was a permanent employee.  But I -- I'm only saying
25     that as a possibility.
```

Page 65

```
 1              Q.     Okay.  Does Mr. Goodman hold any property
 2    for you?
 3              A.     No, sir.
 4              Q.     Does he hold any money for you?
 5              A.     No, sir.
 6                     MR. NATHAN:  Okay.  We're coming up at
 7              about an hour and a half and this is a natural
 8              stopping point, so --
 9                     THE WITNESS:  Sure.
10                     MR. NATHAN:  -- if everyone agrees, we can
11              take a break.
12                     THE WITNESS:  Yes, appreciate it.
13                     MR. CAMMARATA:  Do we have a breakout room?
14                     THE VIDEOGRAPHER:  Time is 10:23.  We're
15              going off the record.
16                     (A recess is taken.)
17                     THE VIDEOGRAPHER:  This is Media Number 2
18              in the deposition of Rudolph W. Giuliani.  The
19              time is 10:40 a.m.  We are back on the record.
20    BY MR. NATHAN:
21              Q.     Mr. Mayor, during the break, did you
22    discuss your testimony here today with anyone?
23              A.     I did not.  We talked about other things.
24              Q.     And when you say "we," who do you mean?
25              A.     Myself and my lawyer.
```

Page 66

1          Q.     All right.  But you didn't discuss the
2     substance of your testimony with him?
3          A.     No, sir.
4          Q.     Okay.  I'm going to continue speaking about
5     this exhibit in front of you marked as Exhibit 1.  And
6     I'd like to direct your attention to page 3 of that
7     document.
8          A.     Oh, yes.
9          Q.     Roman numeral II, where it says that you've
10    got a list here --
11         A.     Oh, this what we were looking at before.
12         Q.     Oh, excuse me.
13         A.     I'm sorry.
14         Q.     Page 3, this is the same document as
15    before.
16         A.     Yeah, go ahead.
17         Q.     So at page 3, there is the beginning of a
18    list of -- of exhibits that spans the next two pages, on
19    page 5.  It looks here as though you've listed one large
20    trial exhibit named Defendant's Trial Exhibit that has
21    175 pages.  Is that what you see here?
22         A.     Actually, the -- the lawyers put together
23    the exhibits for the trial.
24         Q.     Okay.  Did you review these exhibits before
25    they were listed here?

```
                                              Page 67

 1            A.    As best I could figure them out, sure.

 2    I -- I don't know them in detail.

 3            Q.    Okay.  And these are the exhibits you

 4    intend to rely on in trial in this matter?

 5            A.    Well, they are conducting the trial, so

 6    yeah, I'd have to say that these are the ones that are,

 7    at that time, they believe they are going to rely on at

 8    trial.

 9            Q.    When you say "they," who do you mean?

10            A.    Well, Mr. Cammarata.

11            Q.    Okay.  Mr. Cammarata is your attorney

12    acting on your behalf --

13            A.    Yes, he's --

14            Q.    -- in this matter, right?

15            A.    Yes, he -- he would be responsible for

16    this, yes.

17            Q.    And these are the exhibits that, through

18    your attorneys, you've disclosed that you intend to rely

19    on in this matter?

20            A.    Yes.

21            Q.    Okay.  All right.  I'd like to begin with

22    the first of those exhibits.  And the pagination may get

23    a little complicated here so stop me and ask for

24    clarification if I say things in a way that is confusing.

25                  The first of these on the list is at page 7
```

Page 68

1    of this big document but it's marked as -- Defendant's

2    Trial Exhibit 001 is the first page in the --

3        A.    Page 7?

4        Q.    Yeah, if you flip to the first of the

5    exhibits in the documents.

6        A.    Uh-huh, the warranty deed?

7        Q.    The warranty deed.

8        A.    I see it.  Yeah.  Uh-huh.

9        Q.    All right.  The warranty deed spans page

10   numbers Defendant's Trial Exhibit 001 through 003 and it

11   also has docket stamps on top.  It is a document that's

12   been filed at ECF Number 42-1 in the case 24 civil 6563

13   and DCF 179 in the case 24, miscellaneous 353, at

14   page 16.

15            What is the warran- -- this warranty deed?

16       A.    What is it?

17       Q.    Yes.  Do you recognize this?

18       A.    Really don't.  But I recognize that there

19   was one.  So this has to be -- do I remember this deed?

20   I mean, I remember doing it but I don't remember the

21   deed.

22       Q.    Okay.  And --

23       A.    Did I sign it somewhere?

24       Q.    What do you plan to say about this at

25   trial?

Page 69

```
 1            A.    Well, this is when I bought the apartment.
 2            Q.    I'm sorry, we have to take a brief break.
 3            A.    This would be the official --
 4            Q.    Excuse me, excuse me, sir.  I'm sorry, we
 5      have to take a quick break just to deal with technical
 6      issue with the Zoom.
 7            A.    I'm sorry.
 8                  THE VIDEOGRAPHER:  Time is 10:44.  We're
 9            going off the record.
10                  (A recess is taken.)
11                  THE VIDEOGRAPHER:  Time is 10:45 a.m.
12            We're back on the record.
13      BY MR. NATHAN:
14            Q.    Okay.  We're discussing Defendant's Trial
15      Exhibit pages 1 through 3, the warranty deed for the
16      South Lake condominium, the Palm Beach condo.
17                  Can you please tell me what you plan to say
18      about this document at trial?
19            A.    It represents when I purchased the
20      condominium at 315 South Lake.
21            Q.    Okay.  And when did you buy the
22      condominium?
23            A.    Pardon me?
24            Q.    When did you buy the condominium?
25            A.    This would be the best I could do about the
```

```
                                                    Page 70
 1    date.  That's why I put it in.
 2            Q.    Okay.  And so this document just shows the
 3    date that you purchased the condominium?
 4            A.    Correct.
 5            Q.    Okay.  Why did you buy the condominium --
 6    why did you buy the condominium?
 7                 MR. CAMMARATA:  Objection.
 8                 THE WITNESS:  I had been coming to Florida
 9            every winter since 2002, 2001 -- no, 2002 and
10            staying for periods of time.  I would bring my
11            children here.
12                 I would stay sporadic -- you know, a
13            weekend, a week at a time.  And I'd rent either at
14            The Breakers or Mar-a-Lago or sometimes some other
15            place if they were booked.
16    BY MR. NATHAN:
17            Q.    Okay.
18            A.    Sometime earlier I purchased a condo for my
19    in-laws at Palm Beach Towers, probably was about three
20    years earlier.  I used to stay there.  We owned it, but
21    they lived there.  "We," meaning my wife and I.  And we
22    had been looking for two or three years.  So we finally
23    found something we liked and purchased it.
24            Q.    Okay.  And you purchased -- excuse me, you
25    purchased it to use as a vacation home?
```

Page 71

```
 1          A.    I purchased to use for -- for the winter
 2    months or any other time we wanted to use it.  But
 3    primarily, at the beginning, for the winter months.  It
 4    was always the thought that this would be where I would
 5    retire but that was in the future.
 6          Q.    Okay.  But for the, at least for the first
 7    period that you owned the Palm Beach condo, you used it
 8    as a part-time vacation home?
 9              MR. CAMMARATA:  Objection.
10              THE WITNESS:  Yeah, not so much vaca- --
11          not just vacation, I come and live here for a
12          period of time.
13              Like my ex-wife would spend the entire
14          winter here.  So I'd commute here constantly.
15    BY MR. NATHAN:
16          Q.    Okay.
17          A.    It was more than -- it was more than just a
18    vacation home but I hadn't made the decision that this
19    would be my permanent --
20          Q.    Okay.  So at that --
21          A.    -- place to live, or the place I would
22    vote, I'd say.
23          Q.    The period -- during this period, you
24    maintained a principal residence in New York; is that
25    right?
```

1          A.     I think you could call it.  A place I

2    voted.

3          Q.     Okay.

4          A.     That's where I paid taxes and I voted.

5          Q.     Okay.  And would you say that your

6    principal residence was in New York?

7          A.     I would.

8          Q.     Okay.  How frequently -- yeah, you -- you

9    mentioned that you used Palm Beach condo during the

10   winter months.

11               Which are the winter months in your mind?

12         A.     Well, when I was married to Judith, our

13   regular sometimes varied based on family circumstances.

14   Our regular routine was, we would come here before

15   Christmas for weekends but then usually on Christmas

16   night or the day after, we would come down and she would

17   stay here until after Easter with occasional trips back

18   to New York.

19               And I would stay here -- I'd come here each

20   one of the weekends and very often, I'd work out of here

21   for a week or two or fly out of here.  At that time, I

22   would do 100 -- as many as 150 speeches a year.  So I was

23   probably traveling 200 of the -- of the days of the year.

24   So it was just as easy for me to travel out of here as it

25   was out of New York.

Page 73

```
 1              So during -- this was sort of my home base
 2    during the -- from December through April, May.
 3         Q.    Okay.  So -- so you said roughly from
 4    Christmas through Easter.  So that translates in most
 5    years from December through roughly April?
 6         A.    Yeah, before that it would be sporadic
 7    visits like in September, October, November.  But she
 8    would permanently move here, very often, December 26th,
 9    and then come back sometime in April.
10         Q.    Okay.  So during the period when you
11    maintained your New York apartment as your principal
12    residence, there were still periods of the year when you
13    considered Palm Beach your home base; is that accurate?
14         A.    Correct.
15         Q.    Okay.  And they were pretty substantial
16    periods.  They were several months from December through
17    April the following year?
18         A.    That was the regular process.
19         Q.    That was your habit year to year?
20         A.    Right.  But for example, in 2016, I spent
21    the entire summer traveling with President Trump when he
22    was running for president.
23         Q.    Oh.  So any given year might have been
24    slightly different from another, but in general from
25    about December to about April, you considered yourself to
```

1   be sort of based in Florida?

2            A.    Correct.

3            Q.    Okay.  Even during the period that you

4   maintained a principal residence in New York?

5            A.    That's correct, yeah.

6            Q.    Okay.

7            A.    I also spent the summers in south -- in

8   Water Mill.  We had a home there.

9            Q.    Where is Water Mill?

10           A.    Water Mill is in South Hampton.

11           Q.    On Long Island?

12           A.    So from May until September, again, my

13   ex-wife lived there, and I traveled there each weekend

14   and spent occasional weeks there.

15           Q.    Okay.  So during the time that you were

16   maintaining a principal residence at the New York

17   apartment, it's fair to say that you spent a substantial

18   amount of your time in other locations?

19           A.    Yeah, I probably spent a little more time

20   in the two others than I did in New York but probably

21   the -- probably the most time in New York.

22           Q.    Okay.

23           A.    Like a plurality at the time.

24           Q.    Okay.  You would --

25           A.    Although I travel so much, I probably spent

Page 75

```
 1    most of my time, 200 days, on the road.
 2           Q.    Okay.  And from May to September you would
 3    also have foothold in South Hampton, which is on Long
 4    Island; is that correct?
 5           A.    Correct.  South Hampton, Florida, and New
 6    York, Manhattan.  And the world.
 7           Q.    Okay.  And just so I'm clear, in your
 8    discovery responses, you used the term "vacation home" to
 9    refer to the way that you used the Palm Beach condo
10    before January 1, 2024.
11                 Is anything about that inaccurate?
12           A.    Yeah, it is inaccurate because, you know, I
13    think of a vacation home as you just go there
14    occasionally on vacation.  It was more like a winter
15    residence, certainly for my wife, and I was there
16    probably half the time.
17           Q.    Okay.  But would it be fair to call it a
18    second home?
19           A.    Yeah, it would be fair to call it a second
20    home.  And you could call the Hamptons a third home.
21           Q.    A third home, okay.  Thank you.  All right.
22                 I made a little error in the page counting
23    on the warranty deed we were just talking about.
24    Actually pages 1 through 4 of the defendant's trial
25    exhibit?
```

Page 76

```
 1          A.    Page 1 of 4, yeah.
 2          Q.    1 through 4, right.  These are the tiny
 3    little page numbers stamped on the bottom right-hand
 4    corner of these pages.  I'm now going to move to the next
 5    document.
 6                This is the quitclaim deed that you'll see
 7    here.  And this spans three pages, from pages 5 through 7
 8    of the defendant's trial exhibit.  It's also got docket
 9    stamps up top.  It's Document 42-2 in the 24-civil- --
10          A.    Quitclaim deed.
11          Q.    653 matter.
12          A.    Yeah, I see it.
13          Q.    What is this document?
14          A.    Well, I mean, again, I don't specifically
15    recall.  But looking at it, this looks like when Judith
16    signed the Florida residence over to me as the singular
17    owner.
18          Q.    Okay.  And why was she doing that?
19          A.    That was part of the divorce.  That was
20    part of the divorce settlement.
21          Q.    Okay.  And when did you -- when was your
22    divorce from Judith finalized?
23          A.    It must have been around that time, I don't
24    know the exact date.
25          Q.    And in connection with the divorce, Judith
```

Page 77

```
 1   executed this quitclaim deed --
 2          A.    She did.
 3          Q.    -- to transfer her interest in the property
 4   to you?
 5          A.    Correct.
 6          Q.    And since that date, you've been the sole
 7   owner of the property?
 8          A.    I have.
 9          Q.    And that occurred January 14, 2020,
10   according to this document?
11          A.    That's when we signed it.  It seems to me I
12   probably took possession of it quite a bit before that,
13   as she did the home in the Hamptons.
14          Q.    Okay.  And since that time, was there any
15   change in the way that you used the Palm Beach condo?
16          A.    Progressively I spent more and more time
17   there, until I decided it was going to be my permanent
18   residence and I was going to vote here rather than in New
19   York, and then I was going to leave New York as soon as I
20   sold my condo.
21          Q.    Okay.  Your plan was to -- I'm sorry, when
22   you say as soon as you "sold your condo," you mean the
23   New York apartment?
24          A.    Yes, when I -- when I put it up for sale, I
25   knew I would have only one other place to live and it
```

Page 78

1    would be here, and that's when I decided this would be my

2    permanent residence.

3            Q.    So you planned to move to the Palm Beach

4    condo as soon as you sold your New York apartment?

5            A.    Correct.  It's something I had talked about

6    and thought about for some years.  I knew eventually I

7    was going to do it.  And then the thing that made me come

8    to the conclusion that this was my permanent residence is

9    when I decided to put my home in New York up for sale.  I

10   didn't have the intention of buying like another home

11   there and then eventually I didn't have the resources to

12   do it.  But at first I didn't have the intention to do

13   it.

14           Q.    Okay.  Well, let's move to the next

15   document, because the next document jumps forward in time

16   to July 12th, 2023.  And this begins at page 8 of the

17   defendant's trial exhibit?

18           A.    Which one is it?

19           Q.    You see the --

20           A.    This one?

21           Q.    Lower page.  It's the Sotheby's.

22                 MR. CAMMARATA:  I'm just pointing him in

23           the numerical direction.

24   BY MR. NATHAN:

25           Q.    I just want to direct your attention now --

```
                                                      Page 79
 1              MR. CAMMARATA:  So it's page -- could we

 2         stick to page -- maybe it would make it easier for

 3         me just to --

 4              THE WITNESS:  The one that says Sotheby's

 5         on top?

 6    BY MR. NATHAN:

 7         Q.    Exactly.  The one that says Sotheby's on

 8    top.  Do you see in the bottom right-hand corner of that

 9    document that it's marked as Defendant's Trial

10    Exhibit 008?

11         A.    I do.  I do.

12         Q.    Okay.  And 008 is the page number that I've

13    been referring to.

14         A.    Defendant Trial Exhibit 008, I see it.

15         Q.    Okay.  So I'll use those page numbers just

16    to keep track of where we are in this big document.

17              So what is this document?

18         A.    This is the eventual agreement that we

19    entered with Sotheby's, the exclusive agreement, to

20    handle the sale of 45 East 66th Street.

21         Q.    Okay.  And that's the New York condo?

22    Excuse me, that's the New York apartment?

23         A.    Yeah, what we've been calling the New York

24    condo.  Actually, it's the New York co-op and the Florida

25    condo.
```

Page 80

1          Q.    Thank you for that.  This relates to the

2     New York co-op, the New York apartment?

3          A.    Correct.

4          Q.    Okay.  And you've mentioned a little bit

5     about the decision to put this on the market.  Why did

6     you decide to put it on the market at this time?

7          A.    I decided quite a bit before this.  It was

8     a long process in getting Sotheby's.  I can't tell you

9     exactly when I decided.  It even could have been in 2022.

10    I decided that I was going to make Florida my permanent

11    residence.  I was going to sell this apartment, meaning

12    the co-op.  I get them confused too.

13              My -- originally I was going to make

14    Florida my -- my permanent residence and I was going to

15    use -- use the money from this and buy something, either

16    buy a bigger home here or maybe buy one in New Hampshire

17    because I spent so much time there.  In fact, I even went

18    home shopping both here and -- in 2022, went home

19    shopping here and in New Hampshire.  But those were like

20    plans that I would execute in my head six months later, a

21    year later.

22         Q.    Okay --

23         A.    I got serious about selling this sort of at

24    the end of 2022, selling the co-op, and I started looking

25    at -- asked Maria to handle it for me, Dr. Maria, and she

Page 81

1    brought me a number of agents and my original intention

2    was to -- of course, when I bought it, I had a group of

3    agents -- to have a number of agents.

4              But then Sotheby's talked her and me, since

5    we're very friendly with some of the people there, into

6    handling it.  And we signed this because we -- when I

7    signed this, I seem to recall we thought we were going to

8    sell it right away.  We had a buyer.  So I guess what I'm

9    trying to explain to you is this was the end of -- this

10   was the end of a long process of deciding that Florida

11   would be my permanent residence, and at this point, my

12   only residence.  I couldn't afford anything else.

13        Q.    Okay.  I think you said when you were --

14   you were formulating this plan you went home shopping

15   here, meaning in Palm Beach and in New Hampshire, but

16   those were plans that you would execute, in your head,

17   you said, six months later.

18        A.    Yeah, unless I found something great.

19        Q.    Did any of those plans ever come to

20   fruition?

21        A.    No, they never did.  That was probably in

22   2022.

23        Q.    Okay.  Do you recall why you didn't find

24   anything you liked in New Hampshire?

25        A.    No.  Or here.  I don't remember why.

1          Q.    But you were looking for homes to consider

2     purchasing in New Hampshire at that time?

3          A.    I was -- I was thinking that I would be a

4     permanent resident here and New Hampshire would be part

5     time.

6          Q.    Okay.  And you said you also went home

7     shopping here.  Did you look at any other apartments to

8     consider purchasing here?

9          A.    I did.  I had homes.

10          Q.    Did you see anything that you considered

11     purchasing?

12          A.    Considered, yeah, uh-huh.

13          Q.    Okay.  Why didn't you purchase another

14     apartment down here?

15          A.    Ultimately, I didn't want to give up -- I

16     really love this place, I mean, I would have taken --

17          Q.    This place meaning --

18          A.    I'm sorry, I would have taken the Florida

19     condo over the new New York co-op if that were a trade in

20     the -- when we were trading places with my ex-wife, it

21     just worked out better, the allocation of resources,

22     because she got a lot more cash, that I get the -- that I

23     get two residences and she get one.

24               But when I was going to get two residences

25     and she was going to get one, I was going to take the one

Page 83

1    in South Hampton, and this.

2         Q.    "This" meaning the condo --

3         A.    "This" meaning Florida.  I just happen to

4    like it better.  The staff -- the staff is nicer and the

5    people are wonderful.  I mean, I've lived in many

6    different places and they're just wonderful people.  I

7    mean, I have a balcony and I used to smoke cigars -- used

8    to smoke cigars here, too, in the courtyard -- and they

9    never complained.  In New York, my gosh, if I even took a

10   cigar out, they would complain.

11              I just liked -- I liked living here a lot.

12   I mean, I decided to live here because I enjoyed it so

13   much.  I -- the reason I resisted was I had so many

14   things to do in New York.  Probably would have done it

15   five years ago, six years ago.

16        Q.    Since your divorce, did you ever consider

17   selling the Palm Beach condo?

18        A.     I thought about it -- or I thought about it

19   but I never put it on -- I don't think I ever put it on

20   the market.

21        Q.    Okay.  But you were shopping -- you were at

22   least --

23        A.    At one point we thought about selling it

24   all as a way of settling the divorce, and then decided

25   the better thing to do would be to trade it.

1          Q.     Okay.  You mentioned you were looking

2     around at other apartments and homes in the Palm Beach

3     area.  If you had purchased one of those homes, would you

4     have sold the Palm Beach condo?

5                    MR. CAMMARATA:  Objection.

6                    THE WITNESS:  Might not have.  I was trying

7               to see if I could keep it.  Emotionally, I didn't

8               want to give it up.

9     BY MR. NATHAN:

10         Q.     Okay.  This document, the Sotheby's

11    document, is dated 2023.  There are no documents in this

12    defendant's trial exhibit between the 2020 date on the

13    quitclaim deed and the 2023 date on the Sotheby's listing

14    agreement.

15                   And I'm just wondering, was there anything

16    during that period that you think is relevant to your

17    plans to live permanently at the Palm Beach condo?

18         A.     Documents, documents.

19         Q.     Any documents that would be relevant

20    between that period?

21                   MR. CAMMARATA:  Objection.

22                   You can answer.

23                   THE WITNESS:  That would be from the time

24               of my divorce until 20- -- there probably are, I

25               just can't remember.

```
                                                    Page 85

 1    BY MR. NATHAN:

 2          Q.    What type -- what type of documents would

 3    exist that would be relevant?

 4          A.    Since I can't remember, I don't know what

 5    they are.

 6          Q.    Fair enough.  All right.  Let's move to the

 7    next document --

 8          A.    I'd have to know what you are looking for.

 9          Q.    -- in the defendant's trial exhibit.  This

10    one begins on page 13 of the defendant's trial exhibit.

11    I direct your attention to that page.

12                The title says, Original Application for

13    Homestead and Related Tax Exemptions and it has a docket

14    stamp of 24-mc--

15          A.    Oh, one of the things that I --

16          Q.    Excuse me, just let me --

17          A.    Oh, I'm sorry.  I thought of something.

18    I'm sorry.

19          Q.    -mc-00353, document 79 in that case

20    caption.  That's the next document I want to talk about.

21    But first go ahead and --

22          A.    I was going to say one of the things, among

23    others, that comes to mind is I reorganized -- I -- at

24    some point between 2020 and 2023, I -- I reconfigured the

25    apartment in Florida so that it had Ethernet and was able
```

Page 86

```
 1   to broadcast internationally on radio because I knew I
 2   would be ending up here, so I could -- at that time I was
 3   working for WABC -- so that I could do my radio show out
 4   of here.  They're probably documents that indicate that.
 5   I had to sign a contract for that.
 6            Q.   Okay.  And do you recall --
 7            A.   That would have been like in 2021.
 8            Q.   Okay.  Thank you.  Yeah, actually I do just
 9   have a couple other questions about your plans to sell
10   the New York co-op going back to 2023.
11                 Are you aware that Judith -- excuse me.
12   Let me start from the beginning.
13                 In 2020, you were divorced from Judith
14   Giuliani; is that accurate?
15            A.   Yeah, I always thought it was 2019.  But
16   you are right.  That's what it says.
17            Q.   Oh, okay.  But the divorce that we're
18   talking about in that 2019-2020 period, we've been
19   discussing the divorce settlement, that's your divorce
20   from Judith Giuliani?
21            A.   Correct.
22            Q.   Okay.  And prior to the divorce, you owned
23   the Palm Beach condo jointly with Judith?
24            A.   I did.  I owned everything jointly with
25   Judith.
```

Page 87

1           Q.      Jointly.  Okay.  Including the New York

2     co-op?

3           A.      And South Hampton.

4           Q.      Okay.  Are you aware that following your

5     divorce, Judith's name remained on the co-op shares of

6     the New York apartment?

7           A.      On both.

8           Q.      Well, let me clarify.

9           A.      I just was very negligent in removing her.

10          Q.      Okay.  But you are aware of that actually

11    as of today, Judith's name is still listed on the co-op

12    shares for the New York --

13          A.      Yeah, and we have -- we have an application

14    pending with the board to change it for about six --

15    eight months.

16          Q.      For about eight months --

17          A.      Yeah.

18          Q.      -- you've had that in with the board?

19          A.      Maybe more.

20          Q.      Do you remember --

21          A.      But she doesn't -- I mean, she acknowledges

22    that she doesn't own it.

23          Q.      Okay.

24          A.      She had to do that for something or other

25    recently, recently being within the last year.

Page 88

```
 1              Q.    Okay.  Do you recall when you first took
 2      steps to try to remove her name from the co-op shares?
 3              A.    Over a year ago.
 4              Q.    Could you be more precise than that?
 5              A.    No.
 6              Q.    Okay.  Was it before you listed the
 7      apartment for sale in 2023?
 8              A.    Probably.
 9              Q.    Okay.  But you were aware that without
10      transferring the apartment into your name, you wouldn't
11      be able to sell the apartment without her approval; is
12      that correct?
13              A.    Well, I think I could have used the divorce
14      decree and gotten through it.  It would be easier to have
15      her approval.  But the divorce decree makes it clearer.
16              Q.    Okay.  So with the force of the divorce
17      degree, you would --
18                    (Simultaneously speaking.)
19                    THE WITNESS:  With the force of the divorce
20              decree, I didn't feel like a real compulsion --
21      BY MR. NATHAN:
22              Q.    The divorce decree gave you everything you
23      needed?
24              A.    The divorce decree gave me full title to
25      New York and Florida.  It gave her the Hamptons.
```

Page 89

```
 1          Q.     And I'm sorry, Mr. Mayor, because we're
 2     both doing this, I just -- we have to remind both of us
 3     to let the other finish speaking.
 4          A.     Okay.  I'm sorry.
 5          Q.     And I'm sorry too.
 6                 So it was your view that with the divorce
 7     decree you would easily be able to effectuate the
 8     transfer from Judith and your names jointly into your
 9     name solely?
10          A.     Correct.
11          Q.     Okay.  Okay.  Did you -- did you have any
12     conversations with any title insurance companies while
13     you were contemplating the sale of the New York
14     apartment?
15                 MR. CAMMARATA:  Objection.
16                 You can answer.
17                 THE WITNESS:  I really left the sale mostly
18            to Dr. Maria.  She handled that.
19     BY MR. NATHAN:
20          Q.     Did anybody ever bring up with you that
21     Judith's name remaining on the co-op would pose an
22     obstacle to a sale?
23          A.     No.
24          Q.     Okay.  And you are aware that there are
25     some IRS tax liens that run against your property in New
```

```
                                             Page 90
```

1   York?

2          A.    I'm aware they do now, yeah.

3          Q.    They do now.

4          A.    Yeah.

5          Q.    And when -- when did you become aware of

6   their existence?

7          A.    You'd have to look at the date.  Whatever

8   the date is.

9          Q.    Okay.  Did you ever have any plans to

10  satisfy those liens?

11         A.    I did.

12         Q.    When did you make those plans?

13         A.    When they happened and my accountant

14  negotiated with them and made an agreement that we would

15  pay them a certain amount per month, I think it was

16  10,000, and that -- and that when we sold the co-op, we

17  would pay them full balance.

18         Q.    When you say your accountant, who do you

19  mean?

20         A.    Robert Gilbert.

21         Q.    Okay.  And that agreement --

22         A.    And his associate.

23         Q.    Is that agreement that you mentioned still

24  in effect?

25         A.    No, the bankruptcy sort of interrupted

Page 91

1    that.

2              Q.    Okay.  And by "interrupted," you mean what?

3              A.    It means I didn't continue to pay the

4    10,000 but the agreement still remains that I have to use

5    part of the -- part of the proceeds to satisfy the tax

6    indebtedness.

7              Q.    Okay.  All right.  I'm ready to move to

8    this next document I mentioned, the one that's titled

9    Original Application for Homestead and Related Tax

10   Exemptions, beginning on page 13 of the defendant's trial

11   exhibit.  I direct your attention there.

12              Can you tell me what this document is?

13              A.    Well, all I can tell you is it is what it

14   says it is, an original application for homestead-related

15   tax exemptions that I filed with Florida and that they

16   granted at some point.

17              Q.    And you filed this document?

18              A.    I filed the document with the help of -- of

19   a lawyer, yes.

20              Q.    Okay.  And I direct your attention to

21   page 2 of the document.

22              A.    Two?

23              Q.    Page 2.

24              A.    Oh, page 2, yeah.

25              Q.    Do you see your signature on the document?

Page 92

```
 1          A.    I do.

 2          Q.    And it's dated May 18, 2024?

 3          A.    That's correct.

 4          Q.    And below that there is another date that's

 5   crossed out.  I don't know if you can make it out.  It

 6   looks to me like May 16, 2024.  Is that what you see?

 7          A.    I think it's crossed out because it was

 8   sent to me to be signed on the 16th and I actually signed

 9   it on the 18th and I am very, you know, peculiar about

10   that and I want to make sure it's the exact date.

11          Q.    Okay.

12          A.    I'm guessing at that.

13          Q.    And who helped you prepare this document?

14          A.    A -- a lawyer.

15          Q.    Okay.  What's the name of the lawyer who

16   helped you prepare it?

17          A.    Gosh.  I'll think of it.  Just give me a

18   minute.  Can I consult my lawyer?

19          Q.    No.  Is it Gary Rosen?

20          A.    Yes, I think it was Gary or one of his

21   associates.

22          Q.    Okay.  Gary Rosen is an attorney --

23          A.    Yes.

24          Q.    -- who assisted you?

25          A.    He has a law firm that -- may have been one
```

Page 93

1   of his associates who helped me.

2           Q.    Okay.

3           A.    Gary -- yes, it's comfortable to say that

4   Gary would be responsible, sure.

5           Q.    Okay, fair enough.

6                 And here it says that -- at the top of

7   page 1 of the document, that you are applying for

8   homestead exemption and the box is checked that says

9   "new"?

10          A.    Correct.

11          Q.    Okay.  So had you ever applied for this

12  type of homestead exemption before?

13          A.    I don't recall.

14          Q.    Okay.  When you filed this document, did

15  you review it to make sure your answers were accurate?

16          A.    Sure, sure, I did this.

17          Q.    Okay.

18          A.    I had -- I had a certain amount of time to

19  do this.  So I think I was very careful about the date, I

20  wanted to make sure we got it in within the period of

21  time that I had to do this.  There was a certain amount

22  of time you have from the beginning of the year to file

23  and there is a certain amount of time that you have to

24  get a license.  So I wanted to make sure we did that.

25          Q.    So it says at the top of the document that

```
                                              Page 94
```

 1   the application is due to the property appraiser by

 2   March 1st.

 3             Is that your understanding?

 4        A.    No, that isn't my understanding.

 5        Q.    What's that?

 6        A.    Oh, due to the property appraiser?

 7        Q.    Right.

 8        A.    Yeah, but I thought I had six months to do

 9   this for the State of Florida.  You'll have to check with

10   Gary.

11        Q.    Okay.  So you expect to offer this document

12   at trial.  What do you plan to say about it?

13        A.    Well, I mean, it -- it indicates that I am

14   affirming that my permanent Florida residency was on

15   January 1st.  I made the decision that it was my

16   permanent residency, I can't give you an exact date but

17   before January 1st.  And realized that it would apply as

18   of January 1st, did that in 2023, probably in December

19   when I decided that I would just -- also that I wanted

20   to -- I wanted to make sure that I could register to vote

21   in Florida in 20- -- in 2024.

22             So -- so sometime -- I mean, describe the

23   process?  At the time that I signed -- around the time

24   that I signed the application with Sotheby's, I made the

25   decision that Florida was going to be my permanent

Page 95

```
1    residence and maybe my only residence at that point.
2              And then I've -- by December, I was certain
3    of it.  And then when I went back -- when I went back to
4    Florida, I made a -- made an appointment to change my
5    license that got canceled for some reason.  Then I -- I
6    think I did it in February.  And then I -- and then I
7    executed this.
8         Q.   How did you prove to the Florida tax
9    authorities that you satisfied the requirements for this
10   homestead tax exemption?
11        A.   Well, one of them -- one of them was
12   getting the license in early 2024.  I had had a license
13   in Florida to drive.  I hadn't -- I hadn't had a license
14   in New York.  Also, the tax bills that I showed them for
15   Florida that I paid in 2023, some utilities.
16        Q.   Do you see down at the -- about halfway
17   down the page where it says "Proof of residence" and then
18   there is a list of documents?
19             MR. CAMMARATA:  I'm sorry, where are you
20        looking?
21             MR. NATHAN:  I'm still on Defendant's Trial
22        Exhibit page 13, about halfway down the page.
23   BY MR. NATHAN:
24        Q.   There is a list of documents that you can
25   use as proof of residence and then the next column over,
```

Page 96

```
 1   you filled out several of the entries.
 2              Are these the documents that you relied on
 3   or that you offered to the Florida tax authorities?
 4        A.    Yeah, I didn't know which ones we did.  But
 5   yeah, now that we look at it, those would -- those would
 6   be the ones, yes.
 7        Q.    Okay.  And these are the documents that
 8   would -- that would have established that you were --
 9   that you were entitled to the homestead tax exemption at
10   the Palm Beach condo as of January 1st, 2024?
11        A.    Yes, sir.
12        Q.    Okay.  You mentioned that you didn't have
13   New York driver's license.  Why didn't you have a New
14   York driver's license?
15        A.    I never renewed it.
16        Q.    Why --
17        A.    I wasn't driving for a long time.  So I
18   never renewed it.  When I was the mayor, I had a -- a
19   large security detail.
20              When I was in private practice, I owned a
21   security company and had had numerous death threats,
22   including two attempts to kill me in 2018, one in France
23   and one in -- and one in -- and one in our -- in Albania.
24              I have a -- I have -- I have fatwas issued
25   against me by the Ayatollah, personally.
```

Page 97

```
 1                   There are two groups in jail, convicted,
 2    one in Belgium, the other one in Albania for attempting
 3    to kill me.  Organized by the Iranian government.
 4            Q.    Do you recall when you last had an active
 5    New York driver's license?
 6            A.    So I had -- I had security but what -- I
 7    mean, what's the expiration date?  I always kept a
 8    license because I always -- I liked to drive.
 9            Q.    And you told me just a moment ago that --
10            A.    I don't remember when it expired.
11            Q.    Okay.
12            A.    It expired before.
13            Q.    Okay.
14            A.    It had been expired about a -- I seem to
15    recall about a year.
16            Q.    About a year before you obtained a --
17            A.    Yeah.
18            Q.    -- new driver's license?
19            A.    Maybe less, maybe a little less -- I always
20    meant to renew it and I really decided to renew it
21    probably some time in 2023 here and made a couple of
22    appointments and couldn't keep them.  Made another
23    appointment in 2024, early, like early January, couldn't
24    keep it.
25            Q.    Okay.  You testified a moment ago --
```

Page 98

```
 1            A.    And then eventually I did it, I did it that
 2     day.
 3            Q.    You testified a moment ago that when your
 4     New York driver's license --
 5            A.    Oh, I know, I know what it was.
 6            Q.    Go ahead.
 7            A.    I'm sorry.  I thought I needed to take a
 8     driver's test, a written driver's test.  So I went and
 9     got the manual and I did -- maybe I should submit that.
10     I did that in 2023 and I studied to take the test and
11     finally when I got there, they told me my license wasn't
12     expired long enough so I had to take a test.
13                  So I didn't have to take a test but I had
14     to study for it any way.
15            Q.    Okay.  This was in New York?
16            A.    Un-uh.  This was in Florida.
17            Q.    This was in Florida.  Okay.
18                  You mentioned that you allowed your New
19     York driver' license to expire and didn't renew it and
20     that it was -- so you didn't have an active driver's
21     license anywhere for maybe a year, little over a year?
22            A.    Yeah, that sounds about right.
23            Q.    Okay.  And you mentioned that was because
24     you -- you weren't driving for a long time.
25                  When was the last time you drove a car?
```

Page 99

1              A.    Well, now I have.  I mean, I've had the --
2       since I've had the license.
3              Q.    Since you've had the Florida driver's
4       license --
5              A.    Right.
6              Q.    -- how -- how often do you drive?
7              A.    I don't have a car now because you've taken
8       it from me.  I used to drive that car regularly when I
9       was here.
10             Q.    Okay.  And while you were living in New
11      York before you obtained a Florida driver's license, did
12      you drive a car?
13             A.    I never did when I didn't have a license.
14      I'm enormously compulsive, obsessive compulsive about
15      that.
16             Q.    During the period when you --
17             A.    When I had a license and I was driven, I
18      would occasionally drive because I liked to drive.  But I
19      never really had to drive.
20             Q.    Okay.  Up at the top of this document, do
21      you see the line that says, "Do you claim residency in
22      another county or state"?
23             A.    No, I don't.  Where is it?
24             Q.    This is up at the top of the page.  It's
25      the third line of the form.

```
 1          A.    This -- third line on page 1?

 2          Q.    Yep.

 3          A.    Correct.

 4          Q.    Okay.  You see it says, "Do you claim

 5    residency in other county or state," and then there is a

 6    box that says, "Yes, no, per applicant"?

 7          A.    Yeah, I don't know why it's filled out no

 8    in co-applicant.  There is no co-applicant.

 9          Q.    Right, but the applicant boxes are not

10    checked; is that right?

11          A.    Yeah, that seems like a mistake.

12          Q.    Do you know why the co-applicant boxes were

13    checked and --

14          A.    A mistake --

15          Q.    -- the applicant boxes were not --

16          A.    I'm sure it's a mistake.

17          Q.    Okay.

18          A.    There was no co-applicant.  So must have

19    looked at it and just missed co-applicant there and

20    filled out the last box.

21          Q.    Does this document list all of the --

22          A.    And I -- and that's -- that's the best

23    explanation I can give because unless -- unless -- until

24    I construed residency as homestead permanent residency

25    and my residency now was in Florida.  That's the only
```

Page 101

```
 1    explanation I can give for it.
 2                 But I don't -- residency is -- is kind of
 3    vague, right?  Does it mean one of many or does it mean
 4    the residency you are going to claim?  I'm not even sure
 5    I would know how to answer that now.
 6         Q.    Okay.  But you did answer it then.  You
 7    checked the -- or --
 8         A.    Well, the co-applicant answered it.
 9         Q.    The co-applicant --
10         A.    There was no co-applicant.
11         Q.    So -- so if you -- okay.  Should that box
12    have been checked "no"?
13         A.    I don't know what it should have been
14    checked.  Again, it depends on what "residency" means.
15         Q.    Okay.  Why would it have made sense --
16         A.    If residency means --
17         Q.    -- to check the box "no"?
18         A.    Well, as you know, you can have many
19    residencies and you have one domicile.  And the homestead
20    is the dom- -- domicile.  So is this saying, do you have
21    other residencies, in which case at that time I did, but
22    Florida was my domicile or is it saying, do you claim --
23    the claim residency makes the confusion.  I'm -- I'm
24    claiming permanent residency in only one place but I was,
25    at the time, a resident of two places.
```

```
                                                      Page 102
 1          Q.     Okay.  So --
 2          A.     Do you understand what I'm saying?
 3          Q.     I -- I think I do.
 4          A.     I think it's inherently confusing and I
 5   have no idea why the co-applicant box is checked because
 6   there was no co-applicant --
 7          Q.     Okay.
 8          A.     -- as far as I know.
 9          Q.     This document is about obtaining the
10   homestead tax exemption for the Florida condo for the
11   year 2024.
12               Is -- is that your understanding?
13          A.     Yes.
14          Q.     And the proofs of residence that are listed
15   here, are these all of the documents and proofs of your
16   residents that you think supported your entitlement to
17   that homestead tax exemption at the time this document
18   was filed?
19          A.     Where are they?
20          Q.     This is --
21          A.     Proof of residency?
22          Q.     About halfway down.
23          A.     Where it says proof of residence?
24          Q.     Right.  The documents listed there, are
25   those all of the documents that supported your claim to
```

Page 103

```
1    this homestead tax exemption at the time you filed this

2    document?

3            A.    No, there probably were others.  These are

4    the ones that seem the most relevant.  I mean, I could

5    have -- I could have put in what I described to you

6    before, the records of change in the apartment so that I

7    could broadcast from there.  There might have been other

8    things.  But these are the ones that came to mind.

9            Q.    Okay.  You mentioned that in 20- --

10           A.    Driver's license, expired.  Vehicle tag

11   number.  Florida voter registration.  Declaration of

12   domicile.  I guess that would be this.  I don't have any

13   children so there would have been no -- dependent

14   children.  So there would be no --

15           Q.    To the extent that you had other

16   documents --

17           A.    It seems to me that I had other documents

18   but these are the only ones they are asking for.

19           Q.    To the extent that you have other documents

20   that would have been relevant, why didn't you list them

21   here?

22               MR. CAMMARATA:  Objection.

23               THE WITNESS:  They weren't asked for.

24   BY MR. NATHAN:

25           Q.    Okay.  But in your mind, these documents
```

```
                                                    Page 104

 1   were sufficient to show that you were entitled to bring

 2   homestead --

 3            A.     No, not in my mind.  It's their mind, they

 4   have to decide on it.  This is what they asked for.  This

 5   is what I gave them.

 6            Q.     Okay.  If you thought that this wouldn't be

 7   enough to prove that you were entitled to --

 8            A.     I did.

 9            Q.     -- a homestead tax exemption, would you

10   have given them more?

11                 MR. CAMMARATA:  Objection.

12                 THE WITNESS:  I wouldn't have given them

13          more if they had asked for more.

14   BY MR. NATHAN:

15            Q.     But your goal was to get the homestead tax

16   exemption for the Palm Beach condo; is that right?

17                 MR. CAMMARATA:  Objection.

18                 THE WITNESS:  Okay.  Correct, and I

19          answered the questions that they asked.

20   BY MR. NATHAN:

21            Q.     Okay.  If you thought that there was

22   something missing here that would have strengthened your

23   claim for a homestead tax exemption, you would have

24   provided it --

25            A.     No.
```

Page 105

```
 1            Q.    -- to the tax authorities?
 2            A.    Wouldn't have given them anything beyond
 3    what they asked for.  I don't know why I would do that.
 4    I mean, this is what they asked for.  They know what they
 5    want.  I'm not going to give them --
 6            Q.    Do you see just above the line --
 7            A.    The bill -- the bill --
 8            THE REPORTER:  Okay.  I'm sorry.  One at a
 9            time, please.
10    BY MR. NATHAN:
11            Q.    Let's try again.  I just have a question
12    for you about this document.
13            If you look just above where the tax says
14    proof of residence, do you see it says "Please provide as
15    much information as possible"?
16            A.    I do.
17            Q.    Okay.  Did you try to follow that
18    instruction --
19            A.    I did.
20            Q.    -- when you filled out this document?
21            A.    I answered every question.  I don't even
22    know where I would put it.  It didn't occur to me I
23    should submit more than what they wanted.  I don't
24    know -- I mean, I'm looking at it, I'm trying to figure
25    out where I would put it.
```

1          Q.     You understood that the county property
2     appraiser would determine your entitlement to the
3     homestead tax exemption based on the information you
4     submitted?
5          A.     This is a lot of sort of interpreting, but
6     it seems to me they know what questions to ask.  And if
7     you answer them, they are going to do it based on the
8     answers to the questions they asked.
9          Q.     So it would be based on the answers to the
10    questions they asked --
11         A.     I'd be surprised --
12         Q.     -- that you submitted?
13         A.     Correct.
14         Q.     Okay.  So when you --
15         A.     They don't ask for anything else.  I've
16    never even thought to give them anything else because
17    they didn't ask for anything else.  If they asked for
18    anything else, I think I would have thought of other
19    things to give them, like I told you.  But it never even
20    occurred to me that I should give them more things.  And
21    again, I don't know where I'd put it.
22         Q.     In your view, the information you did give
23    them was enough to entitle you to the homestead tax
24    exemption?
25         A.     No, in their view.  They asked the

Page 107

```
 1   questions, I didn't.  If they wanted more information,
 2   they'd ask for more information.
 3            Q.    When you filed this application, did you
 4   think the homestead tax exemption would be granted?
 5            A.    I didn't see any reason why it wouldn't.  I
 6   answered all the questions that they have here correctly.
 7   And my understanding of domiciliary is you get to decide
 8   that.  And you can have five residences and you decide
 9   this one is my domiciliary.
10            Q.    Okay.  What does this application -- strike
11   that.
12                 How does this document support your claim
13   that you established a homestead at the Palm Beach condo
14   under the Florida constitution?
15                 MR. CAMMARATA:  Objection.
16                 THE WITNESS:  That's their determination.
17            I don't think I've read the Florida Constitution.
18   BY MR. NATHAN:
19            Q.    Okay.  You understand your claim in this
20   case is that the Palm Beach condo is protected by the
21   homestead exemption under the Florida Constitution?
22                 MR. CAMMARATA:  Objection.
23                 THE WITNESS:  It is.
24   BY MR. NATHAN:
25            Q.    Okay.
```

Page 108

1              A.    I thought they granted this in some way.

2              Q.    Well, I'm just asking about the relevance

3      of this document.

4              A.    All I can tell you is how I answered the

5      questions.  I have not read the Florida Constitution.  My

6      lawyers helped to fill this out and if they wanted more

7      documents, I would have given them more documents.  But

8      this is what they asked for.  This is what the appraiser

9      asked for.

10             Q.    Okay.  And so in your opinion, this

11     document only shows how you answered questions that the

12     county property appraiser asked you?

13                   MR. CAMMARATA:  Objection.

14                   THE WITNESS:  That's all it could do.  Here

15             are the questions, I answered all of them.  There

16             is nothing else I could do.

17     BY MR. NATHAN:

18             Q.    Okay.  And you -- okay.  Do you remember

19     when -- this document was signed on May 18, 2024.  Do you

20     remember when it was submitted?

21                   MR. CAMMARATA:  Objection.

22                   THE WITNESS:  I assume around then.

23     BY MR. NATHAN:

24             Q.    Okay.  How did you get the signed version

25     of this document back to Mr. Rosen?

```
 1          A.    I don't remember.  As I said, I do remember
 2     I got it -- probably got it on or before the 16th, but
 3     didn't get around to signing it until the 18th, which is
 4     why we made that last change.
 5          Q.    Okay.  And you -- it looks like you signed
 6     this by hand; is that right?
 7          A.    Oh, I did, yeah.  Yeah, I signed it by
 8     hand.
 9          Q.    So a copy of this was scanned and returned
10     to Mr. Rosen?
11          A.    I don't know if it was scanned and returned
12     or was personally returned.  I'm not sure.
13          Q.    Okay.  Did anybody help you get this
14     document back to Mr. Rosen?
15          A.    I don't remember.
16          Q.    Is that something you would have emailed
17     yourself?
18               MR. CAMMARATA:  Objection.
19               THE WITNESS:  Emailed, if it was -- I could
20          have -- I could have, but this -- it doesn't look
21          like a document that was photographed.
22     BY MR. NATHAN:
23          Q.    Would somebody have emailed it for you?
24               MR. CAMMARATA:  Objection.
25               THE WITNESS:  Could have or it could have
```

```
 1              been me.  It could have been Maria or it could
 2              have been Ted or I could have hand-delivered it.
 3              Or he could have come and picked it up.  Any
 4              number of possibilities.
 5   BY MR. NATHAN:
 6          Q.    Do you recall where you were when you
 7   signed this document?
 8          A.    Pardon me?
 9          Q.    Do you recall where you were --
10          A.    I don't, I don't.
11          Q.    You mentioned that in 2023 you were
12   studying to take the driver's test for the Florida
13   driver's license you obtained and then they told you you
14   didn't need to take the test?
15          A.    I found that out when I went to the -- I
16   went to the motor vehicle bureau.  You had to make
17   appointments unless you wanted to stand in a long line.
18   I missed a couple.  Then when I got there and I gave them
19   all the information, I said, "Where do I go to take the
20   test?"  "You don't have to take a test."  Your -- your
21   license isn't expired long enough where you have to take
22   a test.
23          Q.    When did that occur?
24          A.    The date that I -- the date that's on my
25   application.  It was all done in person.
```

1          Q.    The date you applied for your Florida

2     driver's license?

3          A.    Yeah.  One of the reasons I held up was I

4     wanted to study the book.  Then it turned out I didn't

5     have to.

6          Q.    Okay.  But you didn't learn that you didn't

7     have to until --

8          A.    Until I got there.

9          Q.    Until you got there.  And when you got

10    there, did you obtain the driver's license right then or

11    did you have to wait?

12               MR. CAMMARATA:  Objection.

13               THE WITNESS:  I got it right then.

14    BY MR. NATHAN:

15          Q.    Okay.

16          A.    Let me amend that answer so it's perfectly

17    accurate.  I actually went there with the intention of

18    getting an identification card and an appointment to do

19    the test.  And when I applied, when I went to the clerk,

20    the clerk said, "You don't have to take the test."  I

21    said, "What?"  And she said, I can just give you -- "we

22    can process the driver's license right now."  And I said,

23    "Okay."  And she did.

24          Q.    Okay.

25          A.    And the reason I had held up going was six

Page 112

1    months earlier, at least, I had gotten the booklet and I

2    read it several times.  And studied for it.  I guess

3    that's good.

4         Q.    Okay.  Just the last few questions about

5    this application for your homestead tax exemption.  Why

6    didn't you file this document earlier?

7              MR. CAMMARATA:  Objection.

8              THE WITNESS:  I'm not sure I knew it had to

9         be filed.  I thought you just -- you decided what

10        your -- I thought of it more in terms of the law

11        that I remembered of domiciliary.  You decide what

12        your domicile is.  And I decided -- by the end of

13        '23 I had gone through my laborious process of

14        deciding where I would permanently reside.

15             In '23 I decided I would reside here, when

16        I put the apartment up for sale, but I would not

17        buy anything else.  And then I got a license and

18        then I found out I had to file an application.

19    BY MR. NATHAN:

20        Q.    Okay.

21        A.    So I filed it as soon as I found out.

22        Q.    So when you -- when you changed your

23    domicile, you -- you can just decide that you are now

24    going to have a different domicile?

25        A.    That's the way I remember it.  It's up to

```
                                            Page 113
 1   you.  You decide your domicile.
 2            Q.    Okay.  And could you change it back just by
 3   deciding that now you are going to change it back?
 4                  MR. CAMMARATA:  Objection.
 5                  THE WITNESS:  Of course you can change it
 6            back.
 7   BY MR. NATHAN:
 8            Q.    Okay.  And how -- how many times back and
 9   forth?
10                  MR. CAMMARATA:  Objection.
11                  THE WITNESS:  I have no idea how many times
12            but the decision of what is your domicile is
13            yours.  You decide that.
14   BY MR. NATHAN:
15            Q.    And do you have to do anything else?
16                  MR. CAMMARATA:  Objection.
17                  THE WITNESS:  Well, you have to have some
18            connection to the place.  You have to have a
19            residence there or you have to be voting there or
20            you have -- in order to objectively show that it's
21            your domicile.  But you could make that decision.
22            That's your decision to make, particularly, if you
23            have dual residences and you can change it.
24                  I mean, that's my understanding of it.  I'd
25            be very surprised if that was something different.
```

Page 114

1   BY MR. NATHAN:

2           Q.    So if you have two residences, you can just

3   decide to make one your primary residence without doing

4   anything else?

5                   MR. CAMMARATA:  Objection.

6                   Counsel, you are asking him -- him to

7               interpret the law.

8                   MR. NATHAN:  I don't -- I don't want to

9               hear speaking objections.

10                  MR. CAMMARATA:  You are asking him to

11              interpret the law.

12                  MR. NATHAN:  But that's not a proper

13              objection.

14                  MR. CAMMARATA:  Okay.  Well, it will be at

15              trial.

16  BY MR. NATHAN:

17          Q.    Answer the question.

18          A.    It's my understanding that you --

19                  MR. CAMMARATA:  You are laughing but it

20              is -- you're asking him to interpret that law.

21                  Him MR. NATHAN:  Trial objections are not

22              proper objections in deposition.

23                  MR. CAMMARATA:  Okay.

24                  MR. NATHAN:  You can state your

25              objection --

Page 115

 1              MR. CAMMARATA:  It's fine.

 2              MR. NATHAN:  -- on the record.

 3              MR. CAMMARATA:  Note it that I'll preserve

 4          it for trial.  That's fine.

 5              THE WITNESS:  It's my understanding that

 6          you decide what your domicile is if you have

 7          several residences.  And then if you need to prove

 8          it, you have to have at least some connection to

 9          that place and owning a residence is usually

10          enough.  That would be my understanding.

11  BY MR. NATHAN:

12          Q.    Okay.  And in this situation, you owned a

13  residence both in New York and in Florida?

14          A.    Yeah, and I could have -- I could have made

15  either one at any time my domicile, and I kept it in New

16  York.  I had decided in '23 that I was going to change it

17  to -- to Florida.

18              That's my -- that was my permanent

19  residence and then I executed the documents in 20- -- the

20  necessary documents beyond owning property there with the

21  driver's license and then this application that I didn't

22  know about, that you had to file such an application.  As

23  soon as I found out about it, I filled it out.

24          Q.    Okay.  But you made the decision when?

25          A.    I made the decision -- safest way to say it

Page 116

```
1    is before the end of the year, some time in 2023 after --
2    when I put the apartment up for sale, and we had original
3    buyer and I thought we were going to sell it right away,
4    I made the decision that Florida should now be my
5    permanent residence because it could be -- I would have
6    to move there like that.
7            Q.    Why would you have to move there like that?
8            A.    Because I didn't have any place to live in
9    New York.
10           Q.    Why didn't you have any place to New York?
11           A.    Because I'd be selling the apartment.
12           Q.    Had you sold the apartment at that point?
13           A.    No, but I was -- I wasn't going to wait
14   until I sold it to decide where I was going to live.  I'm
15   not used to being homeless.  I kind of cured homelessness
16   when I was mayor.
17           Q.    Okay.  I'd like to turn to the next
18   exhibit, which begins at page 17 of the defendant's trial
19   exhibit in this document.
20                 If you'll just turn --
21           A.    Page 17?
22           Q.    Yeah, I think you may have gone one or two
23   pages too far but if you flip --
24           A.    Okay.
25           Q.    -- just after this application for the
```

Page 117

1    homestead tax exemption.

2           A.    This -- I see a thing that says

3    "Declaration of domicile."

4           Q.    Just before that.

5           A.    Before that.

6           Q.    Now you are getting there.

7           A.    This one?

8           Q.    The first page of that document, if you

9    just keep flipping back.

10          A.    This it?

11          Q.    There you go.

12                And there is a page number 17 in the bottom

13   right corner.  This is titled 2024 Notice of Proposed

14   Property Taxes and Proposed or Adopted Non-Ad Valorem

15   Assessments.

16                This is a notice of your property tax

17   liabilities in Palm Beach County and it shows you were

18   entitled to a homestead tax exemption for the tax year

19   2024.  Is that right?

20          A.    I'm -- I'm not aware of that.

21          Q.    Take a look at the document and just make

22   sure you understand what it is.

23          A.    (Complies.)

24          Q.    You can turn to the -- it's three pages

25   long, four pages long so you can flip through it.

```
                                              Page 118
 1              Oh, excuse me.  It's actually two

 2   documents.  The first two pages are a notice of the

 3   property taxes, and then the second two pages are your

 4   actual property tax bill.

 5         A.    I see "Exemption and discounts

 6   requirements."

 7         Q.    I think you flipped back one page too far.

 8   If you turn to --

 9         A.    I have exemption and discount requirements.

10   That's not right?

11         Q.    No.  Turn the page one more time --

12         A.    Okay, I see --

13         Q.    Okay.  So you have this colorful page with

14   the few columns.

15         A.    It says, "Do not pay"?

16         Q.    Correct, because this is not a bill.  This

17   is just a notice.  If you flip the page over, there is a

18   table that shows the exemption.

19         A.    On the back of that or the next page?

20         Q.    Exactly.  No, you are doing fine, on the

21   back of that.  You see the table that lists exemptions?

22         A.    No.

23         Q.    It says, last year, 0.  This year, 50,000

24   or 25,000 depending on the column -- the column.

25              And then if you look at the bottom table on
```

Page 119

```
 1    that document, it says that the exemptions applied
 2    include the homestead tax exemption --
 3            A.    I'm not sure I ever --
 4            Q.    -- and the additional homestead tax
 5    exemption?
 6                  Do you see that this --
 7            A.    I don't remember this.
 8            Q.    Okay.  Do you see that this was sent to you
 9    at --
10            A.    I think once it said, do not -- not a bill,
11    I may not have looked at it.
12            Q.    Fair enough.
13                  If you look at the bottom of the second
14    page with those blue tables, you see that it's -- it has
15    your 315 South Lake Drive address.  So this would have
16    been mailed to you at -- at your Palm Beach condo; is
17    that right?
18            A.    If it says that, sure.
19            Q.    Okay.  And then the next page, this is the
20    property tax bill beginning on page 19 --
21            A.    This is the bill?
22            Q.    Correct.  Correct.
23            A.    Okay.
24            Q.    Labeled 2024 Real Estate Property Tax Bill.
25    And you can see the exemptions listed in the third column
```

1    of that top table?

2          A.    I don't.

3          Q.    Well, why don't you look at the very top of

4    the document, you see --

5          A.    Property control number, the year, build

6    number.

7          Q.    Yep.

8          A.    Applied exemptions.

9          Q.    Applied exemptions, and you see there that

10   it says --

11         A.    Homestead, additional homestead.

12         Q.    And so this means that the homestead tax

13   exemption you applied for was granted; is that right?

14         A.    I gue- -- I mean, I honestly don't recall

15   that, but I guess.

16         Q.    Okay.  And it was granted based on the

17   information you provided in your application; is that

18   right?

19         A.    I assume that, sure.

20         Q.    Could it have been granted based on

21   anything other than --

22         A.    No.

23         Q.    -- the information you provided?

24         A.    I -- that's all the informa- -- as we

25   pointed out, I answered their questions and they -- no, I

Page 121

```
 1    don't recall giving any -- any other information.
 2         Q.    Okay.  And this exemption applied to the
 3    entire tax year of 2024; is that right?
 4         A.    I don't know, does it?  I mean, this is an
 5    extraordinarily confusing document, because you pay it at
 6    different times, I mean, you have all the way until -- I
 7    mean, we didn't -- can you refresh my recollection on
 8    when I paid it?
 9         Q.    I'm just asking about what the county tax
10    authorities decided about whether you were entitled to a
11    homestead tax exemption.
12         A.    Yes.
13         Q.    And this document shows that they decided
14    you were entitled to a homestead tax exemption for the
15    tax year --
16         A.    That's -- that's what --
17         Q.    -- of 2024?
18         A.    That's what it -- that's what it says up
19    here.
20         Q.    Okay.  And they made that decision based on
21    the application we just looked at --
22         A.    They would have to.  That's the only -- as
23    far as I know, that's the only information I have.
24    Unless they did a separate investigation of their own.
25         Q.    Okay.  You mentioned a moment ago that --
```

Page 122

1    we were talking about -- well, okay.  Let me -- you -- we

2    were talking about how you change your domicile when you

3    have two different residences and you -- you were

4    testifying that it's your decision and it's -- it's up to

5    you which is your domicile when you have two different

6    residences.

7                    What does "domicile" mean to you?

8                    MR. CAMMARATA:  Objection.

9                    THE WITNESS:  What you regard as your

10        permanent home.

11   BY MR. NATHAN:

12        Q.    Permanent home.  Would you say that it also

13   means your principal residence?

14        A.    Yeah.

15        Q.    Okay.  All right.  Now I'd like to turn to

16   defendant's -- page 21 of the defendant's trial exhibit

17   document.

18        A.    Is that beyond declaration of domicile?

19        Q.    That is declaration of domicile, thank you.

20        A.    Okay.

21        Q.    So you expect to offer this document at

22   trial.  What do you plan to say about it?

23                    MR. CAMMARATA:  Objection.

24                    THE WITNESS:  Just another indication

25        that -- that this is my permanent residence.

Page 123

BY MR. NATHAN:

2        Q.    Okay.  And --

3        A.    I mean, I don't really know if it's

4    necessary if you have the one before it but...

5        Q.    The ones before it meaning the two

6    documents --

7        A.    The fact that they approved it.

8        Q.    The fact that the homestead --

9        A.    That the state approved it.

10        Q.    The tax authorities --

11        A.    That the county approved it.

12        Q.    Thank you.  The tax authorities for Palm

13    Beach County approved your application for a homestead

14    tax --

15        A.    That would seem to be dispositive, right?

16        Q.    Okay.  Is there anything else you would

17    testify about at trial relating to the homestead tax

18    exemption documents we were just looking at?

19        A.    I don't know.  You'd have to ask me.

20        Q.    In your mind --

21        A.    I haven't prepared -- I haven't prepared my

22    testimony yet, so there might be other things I've

23    testified to.  I mean, some of it comes about by calling

24    my attention to things I don't remember.  I have to

25    explain I was doing a lot of other things and engaged in

1    equally compelling litigation, two or three of them.

2           Q.    Do you recognize this declaration of

3    domicile document as --

4           A.    Honestly, I don't recognize it.

5           Q.    Okay.  Well --

6           A.    I signed it.

7           Q.    Do you see that you signed it?  Okay.

8           A.    I'd have to go back and ask, I assume Gary,

9    what this -- what this represents.

10          Q.    Gary is Gary Rosen?

11          A.    Gary Rosen.

12          Q.    Did he assist you with this document?

13          A.    I'm assuming he did because it's a Florida

14   document and -- I don't have an independent recollection

15   of this.  I don't dispute that it's mine but I don't

16   have --

17          Q.    Okay.  And you signed it and you see that

18   it was also notarized?

19          A.    Yes, up in New Hampshire, right.

20          Q.    Okay.  Were you in New Hampshire when you

21   executed this document?

22          A.    I was.  That was during the summer where I

23   was kind of a vagabond.  I lived in about five places by

24   myself.

25          Q.    Okay.  And as you sit here today, what's

Page 125

```
1    the relevance of this document to the claims in this

2    case?

3              A.    I don't know.

4              Q.    You don't know the relevance of this

5    document?

6              A.    No.  As I said, I don't have an independent

7    recollection of it.

8              Q.    As far as --

9              A.    Now that you say I signed it in New

10   Hampshire, I do remember going to get a -- I do remember

11   going to get notary in New Hampshire but I also remember

12   going to get one in Illinois and -- and in Texas.  So I

13   guess this is the one I did in New Hampshire.  In fact,

14   my full recollection of this is I remember signing a

15   document and getting it notarized in New Hampshire.

16             Q.    Okay.

17             A.    And then in several other places.

18             Q.    And you see up in the upper right-hand

19   corner of the document it says it was recorded July 15,

20   2024, in Palm Beach County; do you see that?

21             A.    I do.

22             Q.    Did you record this document in Palm Beach

23   County personally?

24             A.    No.

25             Q.    Who did that?
```

Page 126

```
 1              MR. CAMMARATA:  Objection.

 2              THE WITNESS:  I think you'd have to ask

 3         Gary.  Gary Rosen.

 4    BY MR. NATHAN:

 5         Q.    Gary Rosen would know who recorded this

 6    document?

 7         A.    That's my best answer.  I'm not sure -- I'm

 8    honestly not sure who filed it.

 9         Q.    Was Gary Rosen handling this declaration

10    for you?

11         A.    I don't recall the declaration.  He was

12    handling this matter for me.

13         Q.    And what do you mean by "this matter"?

14         A.    The -- the proper documentation of my

15    decision that Florida was my homestead or domicile.

16         Q.    When did you first retain Mr. Rosen?

17         A.    I don't recall exactly when.

18         Q.    Can you give me a ballpark?

19         A.    And I don't recall a specific time.  I -- I

20    would say sometime in 2023 or early '24.

21         Q.    Okay.  Is there a reason you didn't file

22    this declaration of domicile earlier?

23              MR. CAMMARATA:  Objection.

24              THE WITNESS:  I don't recall -- I can't

25         answer the question.  I don't -- somebody would
```

Page 127

```
 1            have to explain this to me.  I don't understand
 2            this document completely, what the purpose of it
 3            is.
 4   BY MR. NATHAN:
 5            Q.   Okay.  Sitting here today, you don't recall
 6   why you filed this when you did?
 7            A.   I do not.  I don't know if there was a
 8   requirement for it or -- no.  I mean, all I'm doing is
 9   interpreting what I see here.  I don't have any
10   independent knowledge to give you on it other than it
11   appears to me to not be necessary.
12            Q.   And why isn't it necessary?
13            A.   Unless there is a distinction between
14   homestead and domicile.
15                 (Reporter asks for clarification.)
16            THE WITNESS:  Because unless there is a
17            distinction between homestead and domicile.  They
18            granted the homestead as evidenced by the tax
19            bill.  I assume that was before -- it seems like
20            this was before I filled out this declaration of
21            domicile.  There has to be a reason for it but I
22            have to ask my lawyer what it is.  I don't know.
23   BY MR. NATHAN:
24            Q.   Okay.  Could you have executed this just to
25   give the appearance that you were going to maintain a
```

Page 128

1    permanent home at the Palm Beach condo?

2              MR. CAMMARATA:  Objection.

3              THE WITNESS:  I didn't have to give an

4         appearance.  I had already been declared having a

5         homestead.

6    BY MR. NATHAN:

7         Q.    So why did you execute this document?

8              MR. CAMMARATA:  Objection.

9              THE WITNESS:  I don't remember executing

10        it.  I can't do any better than tell you I don't

11        have any independent recollection of executing it.

12        You'll have to ask my lawyer as to why I did it.

13        But since I submitted all the others, it is not

14        going to fool anybody.

15   BY MR. NATHAN:

16        Q.    Okay.  Let's just look at the language of

17   this document and you'll see just above your signature it

18   says that you, "Hereby declare that you resided and

19   maintained a place of abode at 315 South Lake Drive, Unit

20   5-D, Palm Beach, which place of abode I recognize and

21   intend to maintain as my permanent home."

22             And it goes on to say that if you

23   maintained another place of abode in some other state or

24   states, you hereby declare that this place, the Palm

25   Beach condo, quote, "constitutes my predominant and

Page 129

1    principal home and I intend to continue it permanently as

2    such."

3                Is that your understanding of what you were

4    attesting to when you signed this document?

5        A.    I don't remember signing the document.

6    That's true.  Everything you just said is true.

7        Q.    And it's true as of when?

8        A.    I mean, that would be true as of before the

9    end of 2020 -- 2023.

10        Q.    Okay.  But you didn't sign this document

11    until the 13th of July, 2024; isn't that right?

12                MR. CAMMARATA:  Objection.

13                THE WITNESS:  That's what it says.  But I'm

14            not sure -- I don't know what this document does

15            that the other documents don't do.  And it seemed

16            to me that the homestead was already granted.

17    BY MR. NATHAN:

18        Q.    Okay.  And your --

19        A.    So I'm not certain as to what the relevance

20    of this document is.

21        Q.    Your view is that when you say "the

22    homestead was already granted," you mean the homestead

23    tax exemption we were just discussing a few moments ago?

24        A.    Yes.

25        Q.    And your view is that by granting that

```
                                                Page 130
 1    exemption, it also meant that you had established a
 2    homestead at the Palm Beach condo that's disputed in this
 3    case?
 4                   MR. CAMMARATA:  Objection.
 5                   THE WITNESS:  Sure.  What else would it
 6         mean?
 7    BY MR. NATHAN:
 8         Q.    Okay.  And that -- that homestead tax
 9    exemption was granted based on the information that you
10    submitted to the Palm Beach County taxing authorities
11    with that application we had discussed?
12         A.    To the best of my recollection, I do not
13    recall submitting any other information.  Could we get --
14    could you give me the date of the tax document?
15         Q.    Well, you submitted the tax -- the
16    application of the tax exemption on May 18th.  I was
17    going to ask you on what date it was granted.
18                   Do you know that?
19         A.    No.  The -- I don't remember.
20         Q.    Do you have any reason to think that -- do
21    you have any way to know whether it was before or after
22    July 13th?
23                   MR. CAMMARATA:  Objection.
24    BY MR. NATHAN:
25         Q.    2024?
```

1          A.    Again, you would have to -- no, I don't

2     remember the date.

3          Q.    So sitting here today, you don't know one

4     way or the other which came first, the declaration of

5     domicile that was executed on July 13, 2024, or the

6     granting of the homestead tax exemption which occurred

7     after you applied on May 18, 2024?

8          A.    My best recollection is that I received

9     document -- that the tax document that says exemption --

10    the exemptions were granted before I did the declaration

11    of domicile.

12         Q.    And what's that based on?

13         A.    Just my recollection.  Maybe it is the way

14    you placed them.

15         Q.    When you say you "received" it, how did you

16    receive it?

17         A.    In the mail.  These come in the mail.

18         Q.    And it was mailed to your address at 315

19    South Lake Drive, Palm Beach condo here in Palm Beach,

20    Florida?

21         A.    That's what it says.

22         Q.    And do you recall when you received it at

23    that address?

24         A.    I don't recall exactly, no.  So I'm just

25    telling you my best recollection.

```
 1          Q.     Okay.  But you don't have any documents to
 2    back up your recollection that you received the homestead
 3    tax exemption before the declaration of domicile was
 4    executed on July 13th?
 5                  MR. CAMMARATA:  Objection.
 6                  THE WITNESS:  I'd have to look.  I never
 7             looked.
 8    BY MR. NATHAN:
 9          Q.     You never looked for any documents --
10          A.     I never looked to see -- to see which --
11    which came first.
12          Q.     Okay.
13          A.     And since I was traveling from about the
14    end of June until September almost constantly, I'd have
15    to -- I mean, I could search and see if there is
16    anything.
17          Q.     Where would you search?
18          A.     In my record -- in my files that I keep.
19          Q.     In your files.  And that's --
20          A.     It's rather sporadic.
21          Q.     But that's not a search you've made so far?
22                  MR. CAMMARATA:  Objection.
23                  THE WITNESS:  Well, it has but I -- but I
24             never -- I never -- as I said, this -- this
25             declaration of domicile, I don't remember.  The
```

Page 133

```
 1          other I do remember.  So I never searched it with
 2          that in mind.
 3    BY MR. NATHAN:
 4          Q.   Okay.  All right.  I just want to turn
 5    another page here.  We'll go past the declaration of
 6    domicile there for a moment.
 7               Do you see at page 22 of defendant's trial
 8    exhibit, it says that -- well, what this says and what
 9    this is is a letter addressed to Rudolph Giuliani at 216
10    Lakeville Road, Great Neck, New York.
11          A.   Yeah.
12          Q.   Yeah.  What is that address?
13          A.   I have no idea.
14          Q.   You don't know -- you don't recognize that
15    address?
16          A.   No, I never lived in Great Neck.
17          Q.   Okay.
18          A.   Ever, ever, ever.
19          Q.   And on the right-hand side of that upper --
20          A.   Sorry.
21          Q.   In the upper right-hand corner, it says
22    "Property description," 45 East 66th Street, 10W.
23               THE REPORTER:  What was the --
24               MR. NATHAN:  Excuse me.  45 East 66th
25          Street 10W.
```

Page 134

1  BY MR. NATHAN:

2        Q.    So that's the New York apartment address --

3        A.    May I ask a question?  Is this -- oh, I

4  guess I should ask you:  Is this -- here's the

5  declaration of domicile.

6        Q.    Right.

7        A.    This is a separate document --

8        Q.    This is a brand-new document --

9        A.    -- even though --

10              (Simultaneously speaking.)

11              THE REPORTER:  Okay, one at a time.

12  BY MR. NATHAN:

13        Q.    I'll -- I'll describe the document to you

14  just to make sure --

15        A.    Yeah.

16        Q.    -- you recognize it.  You see that this is

17  from the New York State Department of Taxation and

18  Finance?

19        A.    I see that.

20              MR. NATHAN:  Okay.  Joe, I see you nodding.

21        I just ask you not to coach the witness.

22              MR. CAMMARATA:  I'm not coaching him.

23              MR. NATHAN:  Okay.

24              MR. CAMMARATA:  I'm nodding at you

25        actually.

```
 1              MR. NATHAN:  Well, you were looking at him.
 2              MR. CAMMARATA:  No, I actually wasn't.
 3              THE WITNESS:  Well, I wasn't looking at
 4         him.
 5    BY MR. NATHAN:
 6         Q.    Rudolph Giuliani, 216 Lakeville Road,
 7    that's not an address you recognize but this is a
 8    document from the New York tax authorities and it says,
 9    "Confirmation of no STAR credit," and it says, "We,"
10    meaning the tax authorities of New York, "received your
11    request for confirmation that you are not receiving New
12    York State school tax relief STAR credit."  And as of
13    January 1st, 2024, you are not receiving the STAR credit
14    in New York State.
15              Do you recall anything about this document?
16         A.    I do not.
17         Q.    Okay.  Do you recognize this document?
18         A.    I don't.
19         Q.    Okay.  You disclosed it as an exhibit that
20    you plan to on rely on trial.
21              What do you plan to say about this document
22    at trial?
23         A.    That my lawyer submitted it.
24         Q.    How do you know your lawyer submitted it?
25         A.    Because he gave it to me.
```

Page 136

```
1          Q.    Which lawyer gave it to you?
2          A.    Would have probably been Joe or Gary, one
3    or the other.
4          Q.    Okay.  As far as you know, what relevance
5    does this have to your -- to the claim in this case?
6          A.    None.  I think.  I don't know what the
7    relevance is.
8          Q.    Okay.  But as far as you know, it doesn't
9    have any relevance because you don't know one way or the
10   other; is that right?
11              MR. CAMMARATA:  Objection.
12              THE WITNESS:  No, I would have to speculate
13         as to what the relevance is --
14   BY MR. NATHAN:
15         Q.    Okay.  Fair enough.
16         A.    They can tell you.
17         Q.    If you look at the next document, and this
18   may help solve the mystery of the address but this is a
19   letter from the New York State -- City Department of
20   Finance, Property Exemptions Administration.  It is
21   addressed to Gary Rosen, Esquire, at 216 Lakeville Road
22   in Great Neck, New York.
23              Does that refresh your recollection of what
24   the 216 Lakeville Road address might be?
25         A.    Well, that obviously -- I mean, that looks
```

```
                                                Page 137
 1    like it is his address.
 2          Q.    Okay.  So Gary --
 3          A.    Gary's address in New York.
 4          Q.    And Gary Rosen was representing you in
 5    connection with this matter?
 6          A.    He was.  Yes.
 7          Q.    Okay.  And this is a letter to Gary Rosen
 8    advising that the cooperative condominium abatement for
 9    Unit 10W at 45 East 66th Street, which is the New York
10    apartment, has been removed for the period beginning
11    July 1st, 2023.  Is that accurate?
12          A.    That's what it says.
13          Q.    Okay.  Do you have any recollection of this
14    document?
15          A.    I can't say I recall the document, no.
16          Q.    Okay.  You disclosed it as an exhibit that
17    you plan on rely at trial.
18                What do you plan to say about this
19    document?
20          A.    That it speaks for itself.
21          Q.    What does it say, when it speaks for
22    itself?
23          A.    What you just read.  Do I have to read it
24    again?
25          Q.    Okay.  Does it -- what relevance does it
```

Page 138

 1  have to the claims in this case?

 2              MR. CAMMARATA:  Objection.

 3              THE WITNESS:  You really want me to get the

 4         legal interpretation?

 5              MR. CAMMARATA:  Objection.

 6              THE WITNESS:  It seems like they are

 7         acknowledging that I wasn't a permanent resident

 8         in 2023.

 9  BY MR. NATHAN:

10         Q.    How do you know that?

11         A.    Well, I don't know that.  You asked me to

12  interpret it.

13         Q.    Well, I'm not asking you to guess, I'm just

14  asking you based on what you know.

15         A.    Well, then I can't guess, then I -- then I

16  can't give you the relevance of it.

17         Q.    Based on what you know, this document has

18  no relevance to the claim?

19         A.    No.

20              MR. CAMMARATA:  Objection.

21              THE WITNESS:  It seems to me that it has

22         the relevance that I just said.  That's my --

23  BY MR. NATHAN:

24         Q.    And what's that based on?

25         A.    My ability to reason.

Page 139

1          Q.    Okay.  Is it based on any personal
2    knowledge?
3                MR. CAMMARATA:  Objection.
4                THE WITNESS:  Personal -- personal
5          knowledge is that I decided in 2023 that I would
6          be a permanent resident of Florida.
7    BY MR. NATHAN:
8          Q.    Do you know what the cooperative
9    condominium abatement is?
10         A.    I know -- I know -- I know what it is and I
11   assume it wasn't granted because maybe -- I'm saying
12   again, maybe it just applies if you are a permanent
13   resident.
14         Q.    You say "maybe" but you don't know --
15         A.    I don't know for sure.
16         Q.    -- one way or the other?
17         A.    Right.
18         Q.    Okay.
19                MR. NATHAN:  All right.  It's now noon.  I
20         think this is a natural place to break for lunch.
21         If -- if that's okay with everyone, we'll go off
22         the record.
23                MR. CAMMARATA:  Yes.
24                THE WITNESS:  Wonderful.
25                MR. NATHAN:  Okay.

```
                                             Page 140

 1              THE VIDEOGRAPHER:  This is the end of Media

 2         2.  The time is 12:02 p.m.  We're going off the

 3         record for a media change.

 4              (A lunch recess is taken.)

 5              THE VIDEOGRAPHER:  This is Media Number 3

 6         in the deposition of Rudolph Giuliani.  And the

 7         time is 12:39 p.m. and we're back on the record.

 8    BY MR. NATHAN:

 9         Q.    Mr. Mayor, during the break, did you

10    discuss your testimony, your deposition testimony with

11    anyone?

12         A.    Not any of the details, no.

13         Q.    Did you discuss it at all?

14         A.    Just the fact that it was going on with my

15    lawyer.

16         Q.    What did you discuss?

17         A.    I think that's privileged.

18         Q.    The fact that it was going on?

19         A.    I think what I discussed with him is

20    privileged.

21         Q.    It was privileged -- okay.

22              Did you discuss any of the substantive

23    comments we've been addressing here today?

24         A.    I would assert the client privilege.  You

25    don't have a right to what I discuss with my attorney --
```

Page 141

1              MR. NATHAN:  Joe, are you instructing --

2              THE WITNESS:  -- whether I did or didn't.

3              MR. NATHAN:  Joe, are you instructing your

4         client --

5              MR. CAMMARATA:  I believe my client

6         answered --

7              MR. NATHAN:  -- not to answer the question?

8              MR. CAMMARATA:  -- that.  If we can scroll

9         back, I think he answered that he didn't -- we

10        didn't discuss substance.

11             MR. NATHAN:  Okay.  Are you instructing

12        him --

13             MR. CAMMARATA:  No.

14             MR. NATHAN:  -- not to answer the question?

15             MR. CAMMARATA:  He can answer the question.

16        You can repeat it and he can answer it.

17             THE WITNESS:  I'm not going to answer the

18        question anymore than I did because I -- I don't

19        even think I should have answered it last time.  I

20        think it's improper of you to ask it.  You're

21        inquiring about my discussions with my lawyer.

22   BY MR. NATHAN:

23        Q.   I asked --

24        A.   Anyone would know that's a violation of the

25   attorney-client privilege.

Page 142

1          Q.    I asked whether you discussed your --

2          A.    And my answer is --

3          Q.    -- deposition with anyone --

4                THE REPORTER:  Okay.

5                THE WITNESS:  My answer is --

6     BY MR. NATHAN:

7          Q.    Just -- just let me finish.  I'm going to

8     read back your testimony to you.  I asked if you were

9     going to discuss your deposition testimony with -- if you

10    had discussed your deposition testimony with anyone and

11    you said, "Not in any great details, no."

12                MR. CAMMARATA:  That's his answer.

13                MR. NATHAN:  Okay.

14    BY MR. NATHAN:

15         Q.    To what extent did you discuss your

16    deposition testimony during the break?

17         A.    Any discussions I had during the break with

18    my attorney and beyond what I said, which I probably

19    shouldn't have said at all, is privileged.

20         Q.    Is it your position that everything you say

21    to your attorney is privileged?

22         A.    Whenever I'm seeking his advice it is,

23    unless the law has changed substantially or there is a

24    different law for people that are involved with Donald

25    Trump.

Page 143

1          Q.    Okay.  During the break when you were
2   speaking to your attorney, were you seeking his legal
3   advice?
4                MR. CAMMARATA:  I'm going to object to
5           that.
6                THE WITNESS:  I think the questions are
7           pretty outrageous.  But the answer is I will not
8           answer questions about what I talk to my attorney
9           about.  I think I'm entitled to that privilege as
10          an American citizen.
11  BY MR. NATHAN:
12          Q.    Okay.  Does that hold regardless of what
13  the substance of the conversation you had with your
14  attorney was about?
15               MR. CAMMARATA:  I'm going object to that.
16               THE WITNESS:  Certainly I can't -- I can't
17          tell you whether it does or it doesn't.  I can
18          only tell you what you asked, and what you asked,
19          I think privilege applies to it.
20  BY MR. NATHAN:
21          Q.    I asked whether you were seeking legal
22  advice from your attorney when you had a conversation
23  with him during the break and --
24          A.    And I gave you an answer to it and I've
25  given you --

Page 144

```
1          Q.    Are you --
2          A.    -- no further.
3          Q.    -- refusing to answer the question?
4               MR. CAMMARATA:  Hold on a second.  You have
5          to clarify the difference between seeking legal
6          advice and discussing prior testimony.  There is a
7          difference.
8               MR. NATHAN:  I asked whether he was seeking
9          legal advice.
10              THE WITNESS:  I will do it now for the
11         third time.  I'm asserting the attorney-client
12         privilege and I am not going to answer the
13         question, even if you ask it a hundred times.
14   BY MR. NATHAN:
15         Q.    You won't even tell me whether you were
16   seeking legal advice from your attorney?
17         A.    Again, same answer.
18         Q.    Okay.  Okay.  Are you representing yourself
19   in connection with this matter?
20              MR. CAMMARATA:  Excuse me?  I didn't hear
21         the question.
22   BY MR. NATHAN:
23         Q.    Are you representing yourself in connection
24   with this matter?
25              MR. CAMMARATA:  Objection.
```

```
 1              THE WITNESS:  I think the record is pretty
 2         clear who my attorneys are.
 3    BY MR. NATHAN:
 4         Q.    Are you representing yourself in connection
 5    with this matter?
 6         A.    No, I'm not pro se.
 7         Q.    Okay.  Your own lawyer has not instructed
 8    you not to answer the question I asked --
 9              MR. CAMMARATA:  I'm instructing him to
10         answer the question as to whether or not anything
11         substantive of his prior testimony was --
12              (Simultaneously speaking.)
13              THE WITNESS:  It's not my lawyer's
14         privilege.  It is my privilege.  It's my personal
15         privilege.  My lawyer doesn't have the right to
16         instruct me one way or the other of the
17         attorney-client privilege.  In case you forgot
18         constitutional law, it is a personal privilege
19         that I have.  I have to -- I have to -- I have to
20         give my lawyer permission --
21    BY MR. NATHAN:
22         Q.    Okay.  The question on the --
23         A.    -- to discuss it.
24         Q.    The question on the table was whether you
25    were seeking legal advice from your attorney when you
```

1    spoke to him --

2            A.     Wow.

3            Q.     -- during the break, and you've refused to

4    answer the question, although your own lawyer has not

5    instructed you not to answer that question.

6                  Is that accurate?

7                  MR. CAMMARATA:  My client --

8                  THE WITNESS:  I'm not going to answer that

9            because it's a complete waste of time.  You've

10           asked that four times.

11   BY MR. NATHAN:

12           Q.     I'm asking you to clarify your own

13   testimony.

14           A.     Is this for the purpose of just delaying?

15   The answer is clear on the record.

16           Q.     And what is the answer that's clear on the

17   record under your understanding?

18                  THE WITNESS:  Could you please read it

19           back, how I answered it?

20   BY MR. NATHAN:

21           Q.     Why don't you tell me if it's clear what

22   your answer was to my question?

23                  THE WITNESS:  Could you read it back,

24           please?

25                  (The last answer is read back.)

1    BY MR. NATHAN:

2          Q.    That was your answer to my question of

3    whether you were seeking legal advice from your attorney

4    during the break?

5          A.    Whatever the record says my answer was.

6          Q.    It was just read back to you, is that --

7          A.    That was my answer.

8          Q.    -- your answer to my question?

9          A.    The record speaks for itself.

10          Q.    I'm entitled to know if you discussed the

11    substance of your testimony with your lawyer at the

12    break.

13          A.    I've already answered the question.  I

14    don't know how many times I can answer the question

15    except to note that this seems to me to be obstructive,

16    conduct which is kind of way this case has been conducted

17    by your law firm throughout.

18          Q.    How am I obstructing you from answering the

19    question?

20          A.    Because you've asked the question three

21    times and I've given you the answer.

22          Q.    Okay.  The question was whether you

23    discussed the substance of your deposition testimony, and

24    you said "not the details."  So I asked to what extent

25    did you discuss your deposition testimony with your

Page 148

```
 1    lawyer at the break, and you refused to answer that
 2    question.  Is that accurate?
 3            A.    I'm not going to take your characterization
 4    of it.  The record speaks for itself.
 5            Q.    You can say -- you can say --
 6                  MR. CAMMARATA:  You asked him -- you asked
 7            two questions.
 8                  MR. NATHAN:  Joe, I don't want you to coach
 9            your witness.
10                  MR. CAMMARATA:  I'm not.  I'm talking to
11            you.
12                  MR. NATHAN:  Yeah, you can't talk to me.
13                  MR. CAMMARATA:  I can ask him to leave if
14            you won't, because there's not a pending question.
15                  MR. NATHAN:  You can't talk to me.  You can
16            note objections to the record --
17                  MR. CAMMARATA:  You asked two questions.
18                  MR. NATHAN: -- or you can object.  I'm not
19            going to --
20                  MR. CAMMARATA:  I'm going to object but you
21            asked two questions --
22                  (Simultaneously speaking.)
23                  MR. CAMMARATA:  -- whether or not he
24            received legal evidence and whether or not his
25            testimony was discussed.
```

Page 149

1          MR. NATHAN:  That's true.

2          MR. CAMMARATA:  That's two separate

3     questions.

4          MR. NATHAN:  And my -- I'd like the answer

5     to both.  So let's take them in order.

6          MR. CAMMARATA:  He answered the first

7     question already.

8   BY MR. NATHAN:

9          Q.    What's the answer to the question whether

10  you were seeking legal advice from your attorney during

11  the break?

12         A.    Beyond what I've said, I will assert the

13  attorney-client privilege.

14         Q.    Okay.  Well, I've already held the

15  deposition open for one reason so I'll hold it open for

16  this reason as well.  And now let's move on.  All right.

17              So you still have this big document in

18  front of you, defendant's trial exhibit.  This is just

19  sort of a general question.  But if you wanted an

20  important document to get to you, where would you have it

21  sent?

22         A.    I have no idea.

23         Q.    You don't know where?

24         A.    Such a hypothetical general question.

25         Q.    All right.  So let's say that there was an

```
                                              Page 150
 1    important document you wanted to make sure you received
 2    it, where would you ask somebody to send it?
 3                  MR. CAMMARATA:  Objection.
 4                  THE WITNESS:  Well, normally I would say,
 5             if you were to ask me right now, to send it to 315
 6             South Lake Drive, but if I knew I was going to be
 7             in, let's say, Milwaukee, Wisconsin, for four
 8             days, I would have it sent there.  Or if I knew I
 9             was going to be in Texas for four days or five, I
10             do that occasionally, I have it sent to a hotel.
11    BY MR. NATHAN:
12        Q.    Okay.  And if you wanted there to be no
13    doubt about it, that no matter what else happened,
14    eventually you'd receive the document, where would you
15    have it sent?
16                  I can rephrase the question.  You know --
17        A.    Really depends on the circumstances.
18        Q.    Okay.  You are somebody who travels a lot.
19    You are not always home.  But if there was something that
20    was very important and you wanted to make sure that you
21    received it, where would you ask somebody to mail it?
22                  MR. CAMMARATA:  Objection.
23                  THE WITNESS:  It would depend on the
24             circumstances.
25
```

Page 151

1    BY MR. NATHAN:

2         Q.    Okay.

3         A.    That's a highly hypothetical question.

4         Q.    As you sit here today, for example, to what

5    address do you have your bank statements sent?

6         A.    315 South Lake Drive.

7         Q.    And why is that?

8         A.    Because that's where I get my bank

9    statements.

10        Q.    And why do you get your bank statements

11   there?

12        A.    Because that's where I live.

13        Q.    That's where you live.

14        A.    That's the only place I live.

15        Q.    Is it important that you get your bank

16   statements sent to you at your home?

17              I can rephrase that.  When you had two

18   residences, where would you have important documents

19   sent?

20        A.    Again, it depends on the circumstances.

21        Q.    At the time that you -- strike that.

22              All right.  Why don't we look at exhibit --

23   well, at page 24 of the defendant's trial exhibit

24   document.  This is your driver's license, the photograph

25   of your driver's license?

Page 152

1          A.    Page 20 --

2          Q.    It's page 24, those little numbers at the

3    bottom right-hand corner?

4          A.    All right.  Sure, let me just get there.

5    Yes.

6          Q.    Okay.  This is one of the documents that

7    you disclosed as something you'd rely on at trial and

8    this is your driver's license; is that right?

9          A.    That is.

10         Q.    This is the Florida driver's license that

11   you received in February of 2024; is that right?

12         A.    February 2024, yes.

13         Q.    Okay.  And you've disclosed this as a

14   document you plan to rely on at trial.  What do you plan

15   to say about this document at trial?

16         A.    That it's one indication of the decision

17   that I made before the end of 2023 that Florida would be

18   my permanent residence because it would be the only place

19   in which I had a driver's license.

20         Q.    Okay.  How does it show that you made that

21   decision for the end of 2023?

22         A.    Well, it shows that shortly after the

23   beginning of 2024, I sought the driver's license.

24         Q.    Okay.  And --

25         A.    My testimony is that I made the decision

Page 153

1    before.  Now, this would be evidence that I executed on

2    that.

3                Q.    My question was just how does this -- how

4    does this driver's license support that contention, and I

5    think you answered it.

6                A.    Uh-huh.

7                Q.    The -- you also mentioned that your -- that

8    Florida would be your permanent residence because it

9    would be the only place in which you had a driver's

10   license.

11               Do you -- do you consider your permanent

12   residence to be defined by the place where you have your

13   driver's license?

14               A.    No, it's defined by you.  It's -- it's just

15   one of the things that you use to show tangible evidence

16   of your subjective decision.

17               Q.    When you say, "it's defined by you," you

18   mean it's defined by you?

19               A.    My understanding of the law is you decide

20   on your domicile.  And then there are external pieces of

21   evidence that can support that.  A driver's license is

22   traditionally one of them as evidenced by the questions

23   asked by the County of Palm Beach.

24               Q.    Okay.  If we can move to the next document

25   here.  This is your Florida vehicle registration.  It is

1    photocopy of vehicle registration for a Mercedes Benz

2    vehicle.

3           A.    I'm having a hard time reading it, I'm

4    sorry.

5           Q.    I am too.  Can you make out the words

6    "Florida vehicle registration"?

7           A.    I do see that, yeah.

8           Q.    Okay.  This is among the documents you

9    disclosed that you plan to rely on at trial.

10               What do you intend to say about this

11   document?

12               MR. CAMMARATA:  Objection.

13               THE WITNESS:  Well, to show my connection

14          to Florida.

15   BY MR. NATHAN:

16          Q.    And what relevance does this document have

17   to whether or not you established a permanent -- or a

18   homestead at the Palm Beach condo?

19          A.    It shows -- it shows that I had a -- that I

20   had a car registered here which is a connection to the

21   state of Florida.

22               A domicile is a conclusion you come to.

23   This is one other indication that I had a connection to

24   the state of Florida.

25          Q.    Just for clarity, you said, "domicile is a

Page 155

1    conclusion you come to."

2            You don't mean me, do you?

3        A.    What?

4        Q.    When you said, "domicile is a conclusion

5    you come to," by "you," you didn't mean me?

6        A.    No, I meant me.

7        Q.    Okay.  Thank you.

8        A.    I think an individual makes a decision on

9    domicile.  Then it is a question of -- of your being able

10   to -- depending on the state, get -- show them that

11   there's tangible indications of it.  This would be one

12   among a number of tangible indications.

13       Q.    So an individual makes a decision and then

14   there is -- then there is paperwork?

15       A.    Or the paperwork may exist and then you

16   make the decision, either way.

17       Q.    Okay.

18       A.    I -- I can't see the date on this, I'm

19   sorry.

20       Q.    Before --

21       A.    I know I registered the vehicle here way

22   before 2024.

23       Q.    When did you first register the vehicle in

24   Florida?

25       A.    I don't know, two -- two years earlier,

1    three years earlier.  That's why I wish this were

2    clearer.

3             Q.    Okay.  But you didn't -- you didn't obtain

4    a Florida driver's license until 2024?

5             A.    No, but I registered the vehicle here.

6             Q.    Okay.  Do you -- can you make out here that

7    the vehicle is registered to the name of Rudolph W.

8    Giuliani and Judith S. Giuliani?

9             A.    I cannot but that would -- that would be

10   the same as -- that would mean I certainly did it way

11   before 2024 originally.

12            Q.    Okay.  So your -- your -- this vehicle was

13   registered in Florida.  Your testimony in a -- is way

14   before 2024?

15            A.    Well, I was still married to Judith, which

16   means 2019 or earlier.

17            Q.    So as you sit here today, to the best of

18   your knowledge, you registered this vehicle in Florida no

19   later than 2019?

20            A.    Yeah.

21            Q.    Okay.  All right.  Let's turn to the next

22   page of this document, defendant trial exhibit page 26.

23                 What is this document?  Well, I'll tell you

24   what it is.

25            A.    It's a voter registration -- voter

Page 157

1    information, rather.

2           Q.    Okay.  And this shows that you registered

3    to vote in Florida on May 18th, 2024.

4           A.    That's correct.

5           Q.    Is that correct?

6           A.    That's correct.

7           Q.    Okay.  And it shows your residence address

8    as 315 South Lake Drive, Unit 5D, Palm Beach, Florida; is

9    that correct?

10          A.    I see that, yes.

11          Q.    Okay.  Before you registered to vote in

12   Florida, where were you registered to vote?

13          A.    I was registered -- I was registered at 45

14   East 66th Street.  Then I was registered indirectly for a

15   while in Water Mill, which meant I had to cast a

16   provisional ballot in 2020.  But from my point of view, I

17   was registered there from the time I moved in and voted

18   there.

19                And then surprisingly, someone switched my

20   registration on me, unbeknownst to me and then I switched

21   it back.  So from 2022 or 3 to 2024, this date, I was

22   registered in New York.

23          Q.    Okay.  When you say, "somebody switched

24   your registration on you," what do you mean by that?

25          A.    I have no idea.  I walked in on -- on -- in

1   2020, I walked in to my usual polling place at Hunter

2   College and I was told I wasn't registered there anymore.

3   I have no idea why I wasn't.  And my registration was

4   switched -- switched without any signature from me to

5   Water Mill.  I had -- and I had to get a provisional

6   ballot and fill out paperwork to get it switched back to

7   its rightful place.

8            Q.    Okay.

9            A.    And it just attributed to the unbelievably

10  incompetent way in which the State of New York handles

11  voting.

12           Q.    When you disclosed this voter registration

13  document as a document that you plan to rely on at trial,

14  what's the relevance of this document to your claims?

15           A.    Well, it seemed to me it's relevant because

16  the county asked the question.  So it's yet another piece

17  of, maybe you'd call it circumstantial evidence or

18  tangible indication of your subjective decision.

19           Q.    Okay.  And why did you decide to register

20  to vote in Florida?

21           A.    Because I wanted to vote in Florida.

22           Q.    Okay.

23           A.    And because I was a res- -- by this time, I

24  was a resident of Florida.

25           Q.    Okay.

Page 159

```
 1          A.    A permanent resident of Florida.

 2          Q.    And at the time the county -- when you

 3     said, "the county asked you the question," what did you

 4     mean by that?

 5          A.    When I filled out the -- when we filled out

 6     the homestead, I think it asked, where you are registered

 7     to vote?

 8          Q.    Okay.  And --

 9          A.    And I don't remember if I filled it out

10     before or after I registered to vote, but they're

11     certainly independent decisions.  I -- I registered to

12     vote in order to vote.  That was -- I wanted to make sure

13     I voted -- frankly, I wanted my vote to count.  And I

14     knew I'd be living here forever, so I wanted to be able

15     to vote here.

16          Q.    Okay.  Why didn't you register to vote in

17     Florida earlier?

18          A.    I just didn't think of it.

19          Q.    What made you think of it?

20          A.    The election was coming up.

21          Q.    Did it have anything to do with receiving

22     the homestead tax exemption?

23                MR. CAMMARATA:  Objection.

24                THE WITNESS:  As I said, I don't know if I

25          registered to vote here before or after I received
```

Page 160

```
 1           that.  Somehow I seem to recall I got that in the
 2           spring of 2024.
 3                  But this was primarily based on the fact
 4           that I wanted to vote here and I wanted to make
 5           sure I could vote in the primary too.  I think I
 6           could have registered later to vote in the general
 7           election.
 8   BY MR. NATHAN:
 9           Q.    Okay.  Is there a reason why you said -- or
10   strike that.
11                  You said you registered because you wanted
12   to vote -- your vote to count.  Could you explain that?
13           A.    Sure.
14                  A presidential vote in New York is
15   unfortunately, but it's just the way it is, isn't going
16   to have any effect on the presidential election because
17   New York hasn't voted other than for a Democrat in two
18   generations.  And the City of New York hasn't voted --
19   the City of New York didn't even vote for -- for Abraham
20   Lincoln.
21                  So unless you like 150 years of a one-party
22   state, it's a tough place to vote if you are not a
23   Democrat.
24           Q.    Okay.  And why was it important for you to
25   vote in Florida in 2024?
```

Page 161

1          A.    Well, it's important for me to vote.  I
2    vote -- I vote every year.  I think I -- I think there
3    was another particular reason.  I think I wanted to make
4    sure I voted in the primaries with some candidates I was
5    supporting in the primaries, I'm pretty sure.  But
6    certainly the general election.
7          Q.    And why was it important to vote in the
8    general election?
9          A.    Because I am a very, very strong supporter
10   of Donald Trump, which is the reason why you are doing
11   all of this to me, and -- and I was personally convinced
12   more than anyone else that the President of the United
13   States was a career criminal for 30 years for which I
14   have unbelievable amounts of proof and for which I've
15   been tortured because I revealed it.
16         Q.    Okay.  If we can turn to the next document
17   here.  This starts at page 30 of the defendant's trial
18   exhibit document.
19         A.    Which one?
20         Q.    Page 30.
21         A.    Got it.
22         Q.    You recognize this as your 2023 tax
23   returns?
24         A.    Only because my name is on it.  Everything
25   is crossed -- crossed out, yeah, I -- I do -- I -- I --

Page 162

1    yeah, I see.

2         Q.    Right, I see that --

3         A.    I recognize it as what it is.

4         Q.    I see that there is number of redactions on

5    this document.

6               Why are there so many redactions on this

7    document?

8         A.    I'd assume because you are not entitled to

9    the information.  Tax -- tax -- taxes are generally

10   considered private.

11        Q.    You disclosed this as a document you intend

12   to rely on at trial.

13              Could you explain to me the relevance of

14   this document?

15        A.    Is this a New York -- this is federal?

16        Q.    This is federal.

17        A.    Because of the -- because of the address.

18        Q.    And the address being 315 South Lake Drive?

19        A.    Yeah, I mean, I'm -- I can't remember this

20   exact document, so I'm -- I'm basically giving that

21   answer based on what I see here.

22        Q.    Okay.  Well, this relates to something I

23   was asking you before, you know, would you consider this

24   to be an important document?

25        A.    No more important than the others, but

Page 163

1    yeah, I mean...

2              Q.    In your communications with the IRS, you

3    would want the IRS to be able to get in touch with you if

4    it had to?

5              A.    That's funny.  Do you want the IRS to get

6    in touch with you?  Well, I mean, it isn't emotionally.

7    Emotionally, probably no.

8              Q.    Emotionally, maybe not.

9              A.    But you do have to get the information.

10             Q.    Right.  So when you have get the

11   information --

12             A.    I don't know that that was filled like that

13   for that reason.  Basically, I was asked to produce

14   everything that shows that I live at 315 South Lake

15   Drive.

16             Q.    Okay.  And this is one --

17             A.    In order to have a homestead, basically,

18   first you have to have a residence.  So this proves that,

19   that I have a residence.

20             Q.    And -- and so this document, in your mind,

21   this is important because it shows that you lived at 315

22   South Lake Drive at the time that you contend in this

23   case you established a homestead there?  That --

24             A.    Yes.

25             Q.    Yes, okay.  I do want to come back to this

Page 164

1   question of addresses.  You mentioned even with the IRS,

2   if they have something to tell you, you want to get the

3   information.

4             So when you are in that situation where you

5   want to be sure you get the information, you would give

6   them the address of your -- your principal residence,

7   wouldn't you?

8        A.    Mostly, unless you are away for three

9   months and change it.  I've had to do that at times.  But

10  generally you would, sure.

11       Q.    Okay.  And if you were going away and you

12  weren't exactly sure where you'd be, you'd tell the IRS

13  to send you something at home?

14       A.    Yeah, I think you'd keep your address the

15  same until you noticed it again.  And then you -- like

16  when I move, sometimes for six months things are going to

17  my prior address.  So yeah, when you catch up with it,

18  you change your address.  The IRS would be one of those.

19       Q.    But if you were in a situation where you

20  weren't catching up with a change but starting a new

21  relationship, for example, if you retained a new attorney

22  or if you executed a new legal document and you needed to

23  be sure that you had received legal notice as an address,

24  you would use your current principal address, correct?

25       A.    That's too hypothetical for me to answer.

Page 165

1    I don't know that I would or I wouldn't.

2         Q.    Is there a reason you would use a different

3    address?

4         A.    No, there might be a reason you don't

5    change an address for a while.  You just don't get around

6    to it.  I mean it's very, very typical.  It's happened to

7    me every time I've moved, even when I've moved offices.

8    I was getting addressed to my prior law office a year

9    after I left it.

10        Q.    Okay.  But if you were entering a new

11   relationship with a client after you had moved, would you

12   give them your old office address?

13        A.    No.  Unless I did it as a mistake.

14        Q.    Okay.  But it -- okay.  If you wanted to be

15   sure that a new client could contact you, you would give

16   them your --

17        A.    Well, once I was established at a new

18   place, I would give the new address, although it is not

19   uncommon to sometimes use the old address because you

20   forget.  Like people who write down -- like people who

21   write down -- who will be writing down 2025 for the

22   entire month of January coming up.  They even -- I think

23   banks even make accommodations for that.

24        Q.    Okay.

25        A.    I've done that.

Page 166

```
 1          Q.    Okay.  But when you are established at the
 2    new place --
 3          A.    You generally -- you generally give the new
 4    address unless -- unless habit -- habit gets in the way.
 5          Q.    Unless you make a mistake, in other words?
 6          A.    Yeah, yeah.
 7          Q.    All right.  Well, having flipped through
 8    your tax return, one thing that jumps out is that it's
 9    quite long.  So you've been -- you've had a lot of
10    business experience.  You've been in public life a long
11    time.  You -- and you seem to have a pretty complicated
12    tax situation.
13              You must be a pretty meticulous tax filer.
14    Would you agree with that?
15              MR. CAMMARATA:  Objection.
16              THE WITNESS:  I think I have a good
17          accountant.
18    BY MR. NATHAN:
19          Q.    Okay.
20          A.    I don't think I'm a particularly good
21    meticulous.  I'm more of a generalist than I am a
22    particularist.  And I think my accountant -- and Joe is
23    responsible for that.
24          Q.    With your accountant's help, you try to get
25    it right?
```

```
                                                      Page 167

 1             A.    Of course I do.

 2             Q.    Okay.  And you report your income

 3      accurately?

 4             A.    Sure.  I give him -- I give them

 5      everything -- that's why I take my income through the

 6      corporation so that I don't lose track of it.

 7             Q.    Okay.  And you would report any deductions

 8      accurately?

 9                   MR. CAMMARATA:  Objection.

10                   THE WITNESS:  Sure, yeah.

11      BY MR. NATHAN:

12             Q.    And you'd report gifts accurately?

13             A.    Pardon me?

14             Q.    You would report gifts accurately?

15                   MR. CAMMARATA:  Objection.

16                   THE WITNESS:  Gifts.  The person that gives

17             you the gift has to report it.

18      BY MR. NATHAN:

19             Q.    Right.  That's the type -- if you gave any

20      gifts, you'd report that accurately?

21             A.    Sure.  I've been filing a gift tax return

22      for some time because of my daughter.

23             Q.    Okay.  And you are careful to make sure

24      that your gift tax return is accurate?

25                   MR. CAMMARATA:  Objection.
```

```
                                              Page 168
 1              THE WITNESS:  I am.  I go over -- I give my
 2         accountant the records and then he determines
 3         what's a gift -- there are limits and he
 4         determines what I have to report each year.
 5   BY MR. NATHAN:
 6         Q.    Okay.  Okay.  I'd like to now move to the
 7   next exhibit which doesn't start for a few pages.  But it
 8   starts on -- well, actually, let me ask you one more
 9   question about the tax return.
10              You mentioned you file a gift tax return
11   because of your daughter.  Can you explain that?
12         A.    Yes, for a period of time I was helping to
13   supplement her income, so it exceeded the limit.  I
14   forgot what the limit is.  And therefore, for maybe -- I
15   can't remember the number of years, I would file a gift
16   tax return.
17         Q.    But you would keep track of the gifts and
18   pass that information to your accountant?
19         A.    Basically I'd give them my -- I do
20   everything through a checking account, so I give them my
21   checking account.
22         Q.    Okay.  All right.  I'd like to move now to
23   the exhibit that begins on page 53 of the defendant's
24   trial exhibit.  This is the calendar exhibit.
25         A.    Uh-huh.
```

Page 169

```
 1           Q.     All right.  And this is a calendar that
 2      shows the months February through August 2024.
 3      Specifically it gives information about your physical
 4      location for the period of February 7th through the --
 5      through August 8th of 2024.  Is that your understanding?
 6           A.     Yes.
 7           Q.     Okay.  And who prepared this document?
 8           A.     Dr. Maria Ryan prepared this and probably
 9      with help from Ted to try to recreate -- as I said, I
10      don't keep -- I don't keep a consistent calendar.  So
11      you'd have to go get this from different places.  So this
12      was constructed from other records, might even be plane
13      tickets or -- they -- she mainly constructed this.  You'd
14      have to ask her -- and she got help, including from me,
15      she'd ask me.  Because I remember like I had a very good
16      recollection of the summer, where I was, but not a very
17      good recollection of February.  I'd have to rely on this
18      for that.  Some of it I can tell you of my own
19      recollection.  Some I can't.
20           Q.     Okay.  Well, looking at this calendar, it
21      looks like you spent quite a lot of time in New
22      Hampshire -- strike that.
23                  So this calendar by itself represents
24      information that Dr. Ryan and Ted Goodman reconstructed
25      from other records that indicated where you were; is that
```

Page 170

1    accurate?

2         A.    Yes.

3         Q.    Okay.  So to really be sure that this

4    calendar was accurate, we would need to compare to the

5    underlying records; isn't that right?

6         A.    Uh-huh, yeah.

7         Q.    Okay.

8         A.    But I mean looking at it, it -- there is

9    nothing about it that seems terribly wrong.

10        Q.    Okay.  And looking at it, I see that you

11   did spend quite a lot of time in New Hampshire over the

12   summer, beginning on June 18th, and then aside from some

13   trips to other locations through August 8th at least,

14   that's when the calendar cuts off.

15             What were you doing in New Hampshire over

16   the summer?

17             MR. CAMMARATA:  Objection.

18             THE WITNESS:  I was enjoying the cooler

19        weather and doing my show from there.  Of course I

20        have -- and I was also traveling quite a bit.  It

21        seems to me like I'm traveling, starting in

22        June 7th.  I went to Michigan.

23   BY MR. NATHAN:

24        Q.    Well, it looks like you took a few trips

25   leaving from New Hampshire and then returning to New

Page 171

1    Hampshire over the course of the summer?

2         A.    Right, I rented a two -- a small little

3    cottage for two months.

4         Q.    You rented a small cottage --

5         A.    But I didn't use it -- I didn't use it for

6    the entire two months.  I used it for part of it.

7         Q.    Okay.  You rented a small cottage in New

8    Hampshire -- excuse me, you rented a small cottage in New

9    Hampshire; is that right?

10        A.    Correct.  I don't seem to -- the only thing

11   that seems a little strange to me is the August date in

12   New Hampshire because I don't think I had it in August.

13        Q.    Okay.

14        A.    But then I traveled out of that.

15        Q.    Let's talk about where you stayed.  When

16   you were in New Hampshire, where did you stay?

17                MR. CAMMARATA:  Objection.

18                THE WITNESS:  I stayed at the cottage I

19        rented.

20   BY MR. NATHAN:

21        Q.    At the cottage.  What was the address at

22   that cottage?

23        A.    I don't remember.

24        Q.    Who did you rent it from?

25        A.    I rented it from Maria's daughter, Vanessa

Page 172

```
 1   Ryan.  It was her -- it was her condo that she was
 2   selling and I think I had to be out by August 1st.  So I
 3   rented it for the last two months that she had because it
 4   was convenient for setting up a temporary -- a temporary
 5   studio.
 6            Q.    A recording studio?
 7            A.    Yeah, amateur -- broadcasting studio.
 8            Q.    Okay, fair enough.
 9            A.    Then when you see those other dates, I
10   would just move it with me, move the studio with me.
11   It's a portable studio.
12            Q.    Okay.  It's a studio that would allow you
13   to broadcast from wherever you happen to be?
14            A.    Correct, like some of those days in New
15   Hampshire, we were covering the eclipse, and we were
16   really in northern New Hampshire.  So I wasn't
17   consistently -- I wasn't consistently in that one
18   residence in New Hampshire.
19                  I had forgotten when the eclipse was but in
20   the -- in the middle of these dates in New Hampshire that
21   seem to start on the 18th; is that right, about the 18th?
22                  In the middle of this, I was away from that
23   address covering the eclipse.  Then you see the
24   Republican convention on the 14th through the 20th, that
25   entire week.  And then I was in London and Paris for
```

Page 173

1    almost another week.

2              And August, I was in -- at the Democratic

3    convention and then Florida.

4         Q.    While you were in living in New Hampshire

5    at that rented cottage, did you consider yourself a New

6    Hampshire resident?

7         A.    No.  It was very temporary.  I knew I had

8    it or only two months, and I -- I used it for, looks like

9    about half of the two months.

10        Q.    Okay.  Do you recall when you began renting

11   the cottage in New Hampshire?

12        A.    I mean, probably -- I'd have to go by

13   the -- by the -- probably on the 18th.  And I had it

14   until -- I had it until the 1st of August.  When I came

15   back on the 2nd and 3rd there, I might have stayed in a

16   hotel.

17        Q.    Okay.  Did you -- did you execute a lease

18   in connection with renting that cottage?

19        A.    Yeah, a short form lease.

20        Q.    Okay.  Do you have a copy of that lease?

21             MR. CAMMARATA:  Objection.

22             THE WITNESS:  Probably.

23   BY MR. NATHAN:

24        Q.    But you didn't produce that to us?

25        A.    Pardon me?

Page 174

1          Q.     But you didn't produce that in response to

2     discovery requests in this litigation?

3          A.     I wasn't -- I didn't -- I guess I didn't.

4     If it's here, I did.  If it isn't, I didn't.

5          Q.     Okay.  Do you know one way or the other

6     whether you produced it?

7          A.     I can't recall what I -- everything I

8     produced.  Only thing I can recall is by looking in here.

9          Q.     What did you do -- oh.  Well, actually,

10    that's -- that's an interesting point.  So the documents

11    in this -- in this defendant's trial exhibit, are these

12    all the documents that you produced in this litigation?

13               MR. CAMMARATA:  Objection.

14               THE WITNESS:  Unless some were rejected.

15    BY MR. NATHAN:

16         Q.     You -- you just said that the way you would

17    know whether you produced something --

18         A.     Yeah, I -- I really should amend that to,

19    could be that somewhere rejected is not relevant or

20    duplicative or --

21         Q.     Okay.

22         A.     -- too unclear, I don't --

23         Q.     Rejected by whom?

24         A.     As far -- as far -- my -- my lawyer.

25         Q.     Okay.  So you would send documents to your

1    lawyer and then your lawyer would decide what to produce?

2         A.    Yeah, I think they included all of it but I

3    can't -- I can't be -- I can't be absolutely certain of

4    that.  I know I sent them -- they asked me for documents

5    and I sent them or gave them the documents.  And then

6    this is what emerged, but I can't tell you for sure that

7    every -- that every document I gave them, they included.

8              They made the decision on relevancy, right,

9    they are going to conduct the trial.  And they may have

10   gotten some of the documents independent of me, like go

11   to Ted and -- like these pictures.

12         Q.    Well, we'll get to the pictures in a

13   second.

14         A.    I didn't take them.

15         Q.    I'm still interested in the -- in the

16   question --

17         A.    And this -- and this document, they

18   prepared -- Dr. Maria prepared this for them.  And I -- I

19   was -- I gave her help on recollection but she prepared

20   this.

21         Q.    Okay.  While you were living in New

22   Hampshire, at that point, did you consider the Palm Beach

23   condo to be your principal residence?

24         A.    A hundred percent, yeah.

25              MR. CAMMARATA:  Objection.

Page 176

1    BY MR. NATHAN:

2           Q.    It was sort of like your home base?

3           A.    Sure, because it was -- it was definitely

4    not New Hampshire.

5           Q.    So your plan was to go back to the Palm

6    Beach condo at the end of your time in New Hampshire?

7                MR. CAMMARATA:  Objection.

8                THE WITNESS:  Yes, because I live there

9           permanently.

10   BY MR. NATHAN:

11          Q.    Okay.  Not to the New York apartment?

12          A.    Well, I knew I had to go back to clean it

13   up.  But, I mean, my place I was going to go back as a

14   permanent residence was -- was Palm Beach as you can see.

15   I spent much more time in Palm Beach than in New York.

16          Q.    So in that situation, so to be more

17   concrete and less hypothetical, in that situation, if

18   somebody had an important document that they needed to

19   send you and you wanted to be sure it would get to you,

20   would you have asked them to send it to the New York

21   apartment or the Palm Beach condo?

22               MR. CAMMARATA:  Objection.

23               THE WITNESS:  I'd probably -- I probably

24          would have said, during this period of time, to

25          send it to Palm Beach but if I had it sent to New

Page 177

```
 1            York, I'd be pretty sure I'd get it too.
 2   BY MR. NATHAN:
 3            Q.    Okay.  But your preference for Palm Beach,
 4   what's that's based on?
 5            A.    That's sort of hypothetical but I think
 6   that's right.  It's hard to know at any given point in
 7   time.  But I would think I would say, send it there.
 8            Q.    "There," meaning Palm Beach?
 9            A.    If it related to the New York -- like,
10   paying the utilities or whatever, maybe I'd -- I would
11   have those sent to New York.
12            Q.    But if it was --
13            A.    In any event, somebody would pick it up and
14   send it to me wherever I was.  So it was not uncommon,
15   both after I became a permanent residence of Florida and
16   even before, for somebody to pick up my mail in New York
17   and send it to Florida or at times, pick up my mail in
18   Florida and send it to New York.  A friend would do that
19   or the doorman.  I'd leave an envelope for them to do it
20   in.
21            Q.    Okay.  So you --
22            A.    That -- that was going on for years.
23            Q.    You still knew that you would, you would be
24   back in New York and you would be able to get things
25   there?
```

Page 178

```
 1              MR. CAMMARATA:  Objection.
 2              THE WITNESS:  Did I know I would be back in
 3         New York?
 4  BY MR. NATHAN:
 5         Q.    You still -- you still understood that you
 6  would be returning to the New York apartment?
 7              MR. CAMMARATA:  Objection.
 8              THE WITNESS:  I expected I'd be returning
 9         there occasionally but -- as a very temporary
10         resident as opposed to a permanent resident.  I
11         still had things there.
12  BY MR. NATHAN:
13         Q.    Okay.  So the next document I'd like to
14  talk about with you are these photographs.  And they
15  begin on defendant's trial exhibit page 60.  They go
16  through -- there is a lot of them.  They go through 92.
17         A.    These are all 2024?
18         Q.    These are a series of photographs that you
19  disclosed that you plan to rely on at trial.
20              What do you plan to say on it -- excuse me,
21  what do you plan to say about these photographs?
22              MR. CAMMARATA:  Objection.
23              THE WITNESS:  In case anybody has disputed
24         that I was in Florida, it shows that I was in
25         Florida.  And I think if you did an analysis of
```

Page 179

```
 1            the entire -- like if we brought the calendar up
 2            to date, you would find that I was in Florida way
 3            more than anyplace else.
 4    BY MR. NATHAN:
 5            Q.    Did -- how -- how can you --
 6            A.    For 2024.
 7            Q.    How can you tell from these photographs
 8    that you were in Florida?
 9            A.    Oh, how can I tell?
10            Q.    Yeah.
11            A.    Let's see.  I'd have to -- each one of
12    them, we'd have to do differently.
13            Q.    Is it -- is it -- in general, is it based
14    on the backgrounds of the photographs?
15            A.    Yeah, also, I didn't -- this was done by
16    Ted mostly, I'd say, with a little of Maria's help but
17    he -- he -- he would be able to testify, I think, that
18    America's Mayor Live, the 316th edition of it, emanated
19    from Florida.  And that's a picture of it.
20            Q.    That's the picture of --
21            A.    And -- and I -- and I can tell you it is
22    because you see the white background there?
23            Q.    Uh-huh.
24            A.    That's my -- that's 315 South Lake.
25            Q.    That -- that -- that white wall with the --
```

Page 180

1           A.     Yeah, and that's -- and that's the --

2           Q.     The moldings?

3           A.     And that's the paint -- the painting that

4    is always behind me if I do it inside.  When I'm in

5    Florida, I sometimes do the show inside and I sometimes

6    do it on the balcony.

7           Q.     Okay.

8           A.     This is a restaurant, I'm familiar with the

9    second one here.  61 is a restaurant that I'm familiar

10   with.  But I think Ted would have to be the one to

11   testify to this.  He's the one who took these pictures.

12          Q.     I was going to ask.  Who took these

13   pictures?

14          A.     I would say -- I would say the -- the vast

15   majority were taken by Ted, could be that one or two were

16   taken by Dr. Maria.  It could be that some were taken by

17   Steven Schumacher.  Steven Schumacher occasionally works

18   with us -- well, more than occasionally and he's a --

19   he's an excellent photographer.  He probably took some of

20   these, too.

21          Q.     Okay.

22          A.     But Ted would have been the one who

23   assembled these and could give the testimony, based on

24   the records of the broadcast, where I was.

25          Q.     Okay.  But aside from where you were, you

                                        Page 181

1    are not aware of any relevance that these photographs may

2    have to this case?

3                 MR. CAMMARATA:  Objection.

4                 THE WITNESS:  Just that I was in Florida

5           for -- I was in Florida for all of these days,

6           showing that I live here.

7    BY MR. NATHAN:

8           Q.    Okay.  In the second photograph -- in the

9    second photograph, it's dated January 9th, 2024 -- all

10   right, let's move -- let's actually move to, there is a

11   photograph dated March 25th, 2024, I'd like you to look

12   at.  That's page 78.

13          A.    March 25th?

14          Q.    Yeah, page 78 of the photographs.

15          A.    That was outside of a pizza place.  That

16   was at the cigar bar.  Yeah.

17          Q.    March 25th.  And you see it's -- it's --

18   it's a picture of you sitting at a desk with your -- with

19   your hands folded.  You see -- I -- I -- in that

20   photograph, you are wearing two rings.  Could you tell me

21   what those rings are?

22          A.    Sure.  Those -- one is my -- one is my --

23   one is a college ring and the other is a high school

24   ring.  Neither one of them are the Yankee rings.

25          Q.    Can you tell which is which?

1          A.    No, I would have to look.  One is green and

2     the other is purple.

3          Q.    Is one of them one of the rings that you

4     are wearing today?

5          A.    Yeah.

6          Q.    Which is that?

7          A.    This is college.

8          Q.    That's the college ring.  So the other ring

9     that's on your right pinky finger in the photograph is a

10    high school ring?

11         A.    Oh, I'm sorry.  Big mistake.  I can't find

12    my high school ring.  That's my college ring.  I used to

13    wear my high school ring.  I don't know where it is.  The

14    other ring is the ring I turned over to you.  It's a gold

15    pinky ring.  Well, actually it isn't a pinky ring.  It's

16    a ring that should have gone on here but it didn't fit.

17    So I put it on here.  And you have that.

18         Q.    All right.  Just to -- let's move to the

19    next exhibit in this big document.

20         A.    Done with the pictures?

21         Q.    Beyond the pictures, starts at 93.  These

22    are going to be some of your Citibank account statements?

23         A.    Uh-huh.

24         Q.    This document -- these are Citibank

25    statements for the months of March through July of 2024.

Page 183

```
 1          A.    Okay.  Yeah.
 2          Q.    You produced these documents -- you
 3   disclosed them as documents that you intend to rely on at
 4   trial.  What do you intend to say about these documents
 5   at trial?
 6          A.    Well, what I would say about them is it
 7   took us a while to make the change with Citibank because
 8   it had been that address for 20 years.  And it also
 9   seemed like I could pick up documents in New York, so
10   why -- also my -- a lot of this time my Citibank account
11   was frozen.  There wasn't much I could do with it.  And I
12   didn't.
13          Q.    So is the reason you didn't change the
14   address on your Citibank --
15          A.    I didn't think about it.
16          Q.    And is the reason that you didn't change it
17   because it was frozen?
18          A.    No, no.  The reason was it was just -- I
19   had been going there forever and it took a while to
20   change a lot of the things that were going there forever.
21          Q.    Okay.  Why did it take a while?
22          A.    Because I didn't think about it.
23          Q.    Okay.
24          A.    I didn't sit down and change everything all
25   at once.  I don't have the time to do that.  So as
```

Page 184

1    somebody calls something to my attention, I would change

2    the address.  I changed my subscription to Epic Times and

3    somehow I never get one anymore.  I changed it to 315

4    South Lake Drive.  I used to get it every Wednesday.

5    Since I changed it, they can't seem to find 315 South

6    Lake.

7            Q.    Okay.  So this is another example of how

8    you would change addresses on documents when they were

9    brought to your attention in cases where you'd been using

10   New York address for a long time.  But when you started

11   new relationships, you'd use the new address?

12           A.    Or if it was called to my attention.  Oh,

13   you'd better change this.

14           Q.    Okay.  So --

15           A.    But since I had a very effective long-term

16   service -- service, practice in New York of sending me

17   things from New York, I never really worried.  Probably

18   if I had actually sold the apartment, I never would have

19   worried.  But I didn't worry that I wouldn't get it.  My

20   doorman there I know for 25 years.

21           Q.    Okay.

22           A.    And also Mike Ragusa would sometimes

23   personally pick up packages for me.  Sometimes my son.

24   That was a common practice that we had gotten used to.

25           Q.    So you saw a change in the address on these

Page 185

```
 1   types of documents just as --
 2              A.    When it came up.
 3              Q.    -- some paperwork that you could get to but
 4   that wasn't actually important to where your homestead
 5   was?
 6                   MR. CAMMARATA:  Objection.
 7                   THE WITNESS:  It was more convenience and
 8              it's being brought up.  Like if I was going to
 9              make a new application, I would certainly put down
10              315 by now.  Maybe the first couple months I might
11              occasionally make a mistake.
12   BY MR. NATHAN:
13              Q.    Okay.  And if you made a mistake, you'd be
14   putting down what address?
15              A.    I'd probably put down 45 East 66th.  I had
16   done it for 22 years.
17              Q.    Okay.  But if you weren't putting down 45
18   East 66th, it's because you were thinking about what
19   address to put down?
20              A.    I might just do it out of habit.
21              Q.    Do what out of habit?
22              A.    Just say 45 East 66th.
23              Q.    Okay.  So it's when the habit was broken --
24   when you were paying close attention, you would have --
25   strike that.
```

Page 186

```
 1              To the extent that you didn't use the 45
 2    East 66th Street address, that's because you were paying
 3    attention to where you wanted something to go?
 4              MR. CAMMARATA:  Objection.
 5              THE WITNESS:  I don't know.  I mean, again,
 6         that's hypothetical.
 7    BY MR. NATHAN:
 8         Q.    Okay.
 9         A.    When you're -- when your memory or your
10    recollection fails you, you don't know why.
11         Q.    Okay.  Other than the address on these
12    statements, do they have any other relevance to your
13    claims?
14         A.    No.
15         Q.    Okay.  And you only produced the statements
16    from March through July, why is that?
17         A.    I don't know.
18         Q.    Are these all of the bank statements, the
19    Citibank statements that you produced?
20         A.    Are they?  I don't know.
21         Q.    Okay.  Is there any reason you wouldn't
22    have been able to produce your Citibank statements going
23    back earlier than March 2024?
24              MR. CAMMARATA:  Objection.
25              THE WITNESS:  No, not as far as I know.  I
```

Page 187

```
 1            mean, if I asked for them, I could get them.  I
 2            don't know why we started the pictures when we did
 3            either.  It could go back years.
 4   BY MR. NATHAN:
 5            Q.   Okay.  I want to turn now to the next
 6   exhibit.  This is -- starts at page 143?
 7            A.   143.
 8            Q.   This appears to be an invoice from
 9   Corporate Transfer & Storage, Inc.?
10                 (Reporter asks for clarification.)
11                 MR. NATHAN:  Corporate Transfer & Storage,
12            Inc.
13                 THE WITNESS:  143.  Okay, I got it.
14   BY MR. NATHAN:
15            Q.   I have one more question about the bank
16   statements.  Do you recall if you changed the address on
17   your Citibank account to 315 South Lake Drive?
18                 MR. CAMMARATA:  Objection.
19                 THE WITNESS:  I don't know if I have or
20            haven't.  I haven't used it in so long, I can't
21            remember.
22   BY MR. NATHAN:
23            Q.   Did you personally do it?
24            A.   No, I wouldn't have personally.  Maria
25   probably would have done it.
```

Page 188

```
 1          Q.    And how -- okay.  And how would Maria have
 2   done it?
 3          A.    Tell them to change it.
 4          Q.    Okay.  And would she have done that
 5   because -- would she have done that without you asking?
 6          A.    Might have.
 7          Q.    Okay.  And why would she have done it when
 8   she did it?
 9          A.    Because she thought of it.
10          Q.    Okay.  And so for Maria, is the same thing,
11   that she would only update addresses when she thought of
12   it?
13          A.    You'd have to ask her that.  I would think
14   so, yes.
15          Q.    Okay.  Okay.  Let's look at the Corporate
16   Transfer & Storage invoice.  You disclosed this as a
17   document that you plan to rely on at trial.  What's the
18   relevance of this document?
19          A.    I don't know.  You'd have to ask my lawyer.
20          Q.    Did you have any involvement --
21          A.    No, I wasn't -- Dr. Ryan must have given
22   this to them.
23          Q.    Okay.  What do you know about this
24   document?
25          A.    Not much.
```

Page 189

```
 1            Q.    Okay.  Did you --
 2            A.    I mean, personally, I don't see how it is
 3    relevant.  This is more relevant to what we produced for
 4    another part of this case.
 5            Q.    What other part of this case?
 6            A.    What we produced, didn't produce or -- but
 7    it doesn't seem like it's relevant to this.  You have
 8    to -- I'm not the lawyer, remember.
 9            Q.    Do you know anything about --
10            A.    I'm not representing myself.
11            Q.    Do you know anything about this document?
12            MR. CAMMARATA:  Objection.
13            THE WITNESS:  I'm not sure if I've ever
14            seen the document.  I don't think I have.  When I
15            look at it, I kind of know what -- this is the
16            stuff that was moved out of my apartment.
17    BY MR. NATHAN:
18            Q.    When you say "the stuff," what do you mean
19    by the stuff?
20            A.    Well, whatever is indicated here.  Some of
21    the -- the first group is in packing numbers I wouldn't
22    know.  But it's self-explanatory, right.  Papers,
23    shredding machine, master bedroom, headboard, furniture,
24    master bedroom, sofa bed, television.
25            Q.    Okay.  I just asked you to look back at the
```

1    first page of the document.

2            A.    Oh, the first page of it told me -- other

3    than it took that many trucks to do it, it looks like.

4            Q.    Okay.  And do you -- does the date

5    October 2024 ring a bell for you?

6            A.    Not particularly, no.

7            Q.    Okay.  Do you recall any move out of your

8    New York City apartment in early October 2024?

9            A.    I recall being told it was happening.  I

10   wasn't there.

11           Q.    Okay.  Were you involved in planning that

12   move?

13           A.    Uh-uh, no.

14           Q.    Okay.  Why would items have been moved out

15   of your apartment without your knowledge?

16           A.    To put them in storage.

17           Q.    Well, why would items have been put in

18   storage, moved out of your apartment and put in storage

19   without your knowledge?

20           A.    Oh, it was with my knowledge and approval.

21   I didn't know exactly when it was going to be done.

22           Q.    Oh, okay.  Okay.  So what do you know about

23   the move out of your New York apartment?

24           A.    Again, I really didn't know -- all I knew

25   they were removing things and putting them in storage and

Page 191

1    keeping a record of it and -- but -- I mean, the last
2    time I saw the apartment it had everything in it.
3            Q.    Oh, okay.  And when was that?  When was
4    that?
5            A.    Gosh, I'd have to go back and look.  The
6    last time I saw it -- wow.  Sometime in September.
7            Q.    Sometime in September 2024?
8            A.    I haven't been in -- I haven't been in New
9    York in November.  Haven't been to New York in October.
10   Had to be September.  It had to be right after -- right
11   after that August -- it had to be right after -- if we
12   look at the calendar and then the dates -- the end with
13   New Hampshire, some point in that period of time I went
14   to -- I went to -- I went to Chicago for the democratic
15   convention.  I went somewhere else, Tennessee.  And then
16   I remember going to New York, maybe twice.
17           Q.    Okay.
18           A.    I have to remember the second time.  This
19   is -- I'll have to go back and check it for you and amend
20   it, but I would say it would have to have been in -- it
21   would have to have been in September.
22           Q.    Okay.
23           A.    I think.
24           Q.    So between August and October, which I
25   think it's fair to say is around September 2024 is the

```
 1   last time you were inside the New York City apartment?
 2           A.    Yeah, I'm sure I wasn't inside it last
 3   month, being the month of November.  Almost certain I
 4   wasn't inside it in October.  And I would think more the
 5   earlier part of September rather than the latter.
 6           Q.    Okay.  And when you were there in
 7   September 2024, you said the apartment still had
 8   everything in it?
 9           A.    Yeah, mostly --
10           Q.    In other words, you hadn't really taken --
11           A.    It didn't -- it didn't --
12           Q.    -- anything out?
13           A.    It didn't look much different than it
14   always was.
15           Q.    Okay.  And then here in early October,
16   there was a move and it looks like the movers spent five
17   days at the apartment moving items out?
18           A.    This happened -- well, this was definitely
19   after the last time I saw it.
20           Q.    Okay.  And can you tell me everything that
21   you recall about arranging this move?
22           A.    Arranged to move it out.
23           Q.    Okay.
24           A.    Yeah, this seems like the things that were
25   there the last time I saw them.
```

```
                                                      Page 193
 1          Q.    Okay.  You just -- you testified a moment
 2   ago that -- that to figure out the last time you were in
 3   the New York apartment, you would have to go back and
 4   look.  Look at what?
 5          A.    I guess I'd have to go look at travel
 6   records, you know, plane -- plane records that I have or
 7   Maria has.  She can probably reconstruct it or Ted.
 8                Ted was with me on that trip, for sure the
 9   last time I was there.  So he probably has his records as
10   well.
11          Q.    Okay.
12          A.    Maria was not there the last time I was
13   there.  I'm almost certain because I remember calling
14   her.
15          Q.    Is this October 4th through October 8th
16   move, is this when you moved the bulk of your property
17   out of the New York City apartment?
18                MR. CAMMARATA:  Objection.
19                THE WITNESS:  It seems that way.  I mean,
20          I'm looking at the items, that looks pretty
21          complete.
22   BY MR. NATHAN:
23          Q.    But that was your idea, that's what you --
24   that's what you approved, was that it was time to move
25   out of the New York City apartment?
```

Page 194

```
 1          A.    Yes.
 2          Q.    Is that right?
 3          A.    Yes.
 4          Q.    Okay.
 5                And now, if you just turn to the next page,
 6    145, there's another invoice.  This one is dated
 7    October 16th, also addressed to Dr. Ryan.
 8          A.    And this is a different date?
 9          Q.    Yeah, the first date is September 19th.
10    This appears to be a move from -- of some items from
11    Skyline Warehouse to the Corporate Transfer & Storage
12    Warehouse.
13                Does that sound familiar to you?
14          A.    No.
15          Q.    Okay.  Are you aware of ever having
16    property stored at a warehouse called the Skyline
17    Warehouse in Oceanside?
18          A.    No, I -- I -- that one doesn't ring a bell.
19    Ronkonkoma rings a bell because I know Joe who owns --
20    and he -- he was in charge of the move.  Maybe he didn't
21    have enough room and he put for a while at another
22    warehouse and then brought it to his place.  That's the
23    only thing I can think of.
24          Q.    Okay.  And then if you turn the page again,
25    there is another invoice.  This one is also dated
```

Page 195

```
 1    October 16th, 2024 --
 2              A.    Doesn't seem -- doesn't seem like a lot.
 3                    But okay, go ahead.
 4              Q.    Yes, if you turn the page again, you'll see
 5    an invoice for a move that occurred in July 2023.  This
 6    is just some items that appear to have been moved.
 7                    Do you -- do you recall anything about this
 8    move in July 2023?
 9              A.    What -- what number is it again?
10              Q.    So this is the invoice -- it's Invoice
11    Number 416643 in the top right-hand corner.
12              A.    Right.  That looks like October 16th.
13              Q.    Yeah, the invoice is dated October 16th.
14    And if you look at the description of the -- of the job,
15    the date given is July 6th, 2023, do you see that?
16              A.    I do.
17              Q.    Do you recall anything about that move?
18              A.    No.
19              Q.    Okay.  Why were these invoices sent to
20    Dr. Ryan?
21              A.    Because she took care of it.
22              Q.    Okay.  Did -- was it her responsibility to
23    pay these invoices?
24              A.    I don't think I had an account to pay them
25    from at that point.
```

1          Q.    Okay.  At the time, you engaged Corporate

2     Transfer & Storage Inc., was it your understanding that

3     Dr. Ryan would be --

4          A.    No, I think --

5          Q.    -- paying for these moves?

6          A.    -- she just took it upon herself to do it.

7     I don't -- I mean, I didn't -- I didn't recall who paid

8     for it.

9          Q.    All right.  I'd like to just move to the

10    next set of exhibits.  And these are the American Express

11    statements.  They begin on --

12         A.    I'm sorry, where are they?

13         Q.    Sure, they begin on the page labeled

14    Defendant's Trial Exhibit 156.

15         A.    Yeah, I got it.

16         Q.    Okay.  These are -- I'm sorry, just -- just

17    returning to the invoices for the Corporate Transfer &

18    Storage.

19         A.    I'm sorry, do you want me to go back?

20         Q.    Yeah, just one last question.

21               Other than what we've discussed, is there

22    any other relevance that these documents have --

23         A.    No.

24         Q.    -- to your contentions in this case?

25         A.    No.

Page 197

```
 1          Q.    Okay.  So turning to the American Express
 2    statements and these span 156 through 1- --
 3          A.    I do have to amend that by saying, I've got
 4    to leave relevance to my lawyers, what's relevant, it's
 5    sort of a --
 6          Q.    I'm just asking about --
 7          A.    Yeah, as far as I can tell --
 8          Q.    -- your understanding and your own
 9    knowledge.
10          A.    -- I can't give you another reason for it.
11    Maybe they can.
12          Q.    Okay.  So the American Express statements
13    that follow and those continue through pages -- through
14    defendant's trial exhibit page 170- --
15          A.    170?
16          Q.    Three, 173.
17                These --
18          A.    Hold on.
19          Q.    Sure.
20          A.    Okay.
21          Q.    Okay.  These statements are also partially
22    redacted.  But before I ask you about that, what --
23    you -- you disclosed these documents as documents you
24    plan to rely on at trial.
25                What do you plan to say about these
```

Page 198

1    documents?

2           A.    I honestly don't know.  I plan to --

3    that Ryan -- maybe -- that Ryan Medrano handles all of

4    this.  That these things didn't come to me.  They went to

5    Ryan.

6           Q.    Okay.

7           A.    I -- I don't -- I don't know why we -- oh,

8    I can -- I can see some -- I can see some travel there.

9    Again, you'll have to ask my lawyer why we -- why we

10   included these, what their relevance is.

11          Q.    Okay.  You submitted these or you -- you

12   served these documents with extensive redactions.  Why

13   did you redact this material?

14          A.    Well, I can see why we would do that, that

15   would be -- the amount doesn't matter.  I think it's the

16   dates that were important and that he was handling it.

17          Q.    What dates do you mean?

18          A.    Again, I don't know -- I really -- I -- I

19   don't know why we submitted it.  You'll have to ask them

20   again if they want to reserve the right to use them at

21   trial for some purpose.  I can't think of the purpose

22   right now.  But I don't think the amounts would have

23   anything to do with the purpose.

24          Q.    Okay.  But sitting here today, other than

25   the fact that this shows that Mr. Medrano was associated

Page 199

1  with your Giuliani Partners LLC Amex card and that you

2  did some travel from --

3          A.    Yeah, I mean, that's only one travel.

4          Q.    Okay.

5          A.    Seems to me if you are going to do the

6  travel, you'd submit all of the travel but okay, I

7  don't -- I don't want to argue against the relevance of

8  my own document.

9          Q.    Do you have -- do you have other documents

10 that would show travel that you engaged in over the

11 course of 2024?

12         A.    Sure, almost all of it is -- is documented,

13 right, almost all on my credit card.

14         Q.    Okay.  And if you were to testify about any

15 of the documents we've talked about today, would that be

16 based on your own knowledge or would it be based on what

17 your lawyers tell you is relevant?

18              MR. CAMMARATA:  Objection.

19              THE WITNESS:  Well, some -- as you -- as

20         you can tell, you've gone through them

21         individually.  Some are my own knowledge, some are

22         not.  And relevancy, I really think is up to them.

23 BY MR. NATHAN:

24         Q.    Okay.  So other than the travel that's

25 shown in these Amex statements and the fact that

Page 200

1    Mr. Medrano is affiliated with Giuliani Partners in

2    handling this Amex card, is there anything else about

3    them that you consider --

4            A.    No, I have to assume there is some

5    significance to the three travel records that are entered

6    but I -- I don't know --

7            Q.    And are you -- are you referring to the

8    three entries for --

9            A.    On 165.

10           Q.    And -- and those are the entries for Delta

11   Airlines?

12           A.    Seems to me those are the only one that

13   carry any substantive information, right?  I think.  So

14   I'm -- again, I'm counting on their having had a reason

15   for that.

16           Q.    Okay.

17           A.    I don't, I don't know what it is.

18           Q.    These show a flight from Boston Logan to

19   Palm Beach International on June 28th and tickets for

20   you, Maria Ryan and --

21           A.    Right.

22           Q.    -- Ted Goodman?

23           A.    Right.

24           Q.    Okay.  And does that date have any

25   significance to you?

Page 201

```
1            A.    As opposed to the other times, no, no, it
2      doesn't, not to me.  But there may be a significance --
3      there may be a significance that I'm not aware of.
4            Q.    Right, there's --
5            A.    There's an earlier one too.  There is one
6      here on February 4, very similar, on -- I can't read it,
7      159.  There is a Palm Beach to New York one.
8            Q.    I think you -- you may be referring to the
9      Delta flight from New York LaGuardia to PBI on --
10           A.    Yeah.
11           Q.    -- Sept- -- on February 4th?
12           A.    Ryan, Goodman and Giuliani.
13           Q.    Does that date have any significance to
14     you?
15           A.    Uh-uh, no -- no, sir.
16           Q.    Okay.  So nothing special about either of
17     those dates or either of those trips that you --
18           A.    There is nothing about those two dates that
19     is -- that -- that at least right now, I -- I can think
20     of as they are any different than ten other times.
21           Q.    Okay.  I'd like to now move just to the
22     final exhibits in this document.  They are on pages 174,
23     175 and actually that's it.
24           A.    Yeah.  This, I can tell you.
25           Q.    What is this?
```

1         A.    This is -- this is an examp- -- these are

2    just by example.  You asked about my calendar, right?

3         Q.    Right.

4         A.    I should have remembered these.  We could

5    have -- this may be all that we had left but this is the

6    way we do my schedule.

7              So -- but my -- like right now, there are

8    probably four sitting there.  So this would have been --

9    this would have been in March and that would have been

10   sitting next to my -- where I broadcast and -- and

11   that's -- that's the way I'd be notified of what I was

12   going to do.

13        Q.    Okay.  Sitting next to where you broadcast

14   where?

15        A.    Either -- well, we used to do this in New

16   York back years ago or a year ago.  And this is what we

17   do in Florida now or wherever I am.

18        Q.    Can you tell from the photographs where

19   these pictures were taken?

20        A.    Pardon me?

21        Q.    Can you tell from the photographs where

22   these pictures were taken?

23        A.    These are the ones that were hanging in --

24   I can tell from the moulding that these are the ones that

25   were hanging in Florida, in 315.

Page 203

1        Q.    Okay.

2        A.    But I mean, we could have -- but, see, but

3    they are probably gone.  The ones in -- we could go back

4    to 2022 and there would have been a bunch of them sitting

5    in New York and Florida.  But they've been ripped up.

6        Q.    Okay.  So these documents are examples of

7    how you would keep track of your upcoming appearances; is

8    that right?

9        A.    Yes, there have been a lot of questions

10   about my calendar and I think Dr. Ryan and Ted included

11   this to try to show how my calendar works and how we all

12   keep informed of it.

13       Q.    Okay.  And --

14       A.    This is a recent one, just -- just a couple

15   weeks ago on the last one.

16       Q.    The last one --

17       A.    December 7th.

18       Q.    Oh, that refers to 12/7?

19       A.    That I was going to Tulsa and returning on

20   Sunday, just one day.  That was to give a speech.

21       Q.    Okay.  So these are just examples of many

22   more documents like this one --

23       A.    Some of which are not in existence anymore.

24       Q.    Okay.  But some of which are?

25       A.    Some of which are.

Page 204

```
 1          Q.    Okay.  And who keeps track of those?
 2          A.    I keep track of them until they are not
 3    relevant anymore and then I throw them away.
 4          Q.    Okay.  You don't save them?
 5          A.    I do not.
 6          Q.    Okay.  And you have not saved them this
 7    year?
 8          A.    I never save them.
 9          Q.    Okay.
10                MR. NATHAN:  Okay.  It's now 2:00 p.m.
11          We've been back at it for about an hour and a
12          half.  Can I suggest we take a short break?
13                THE WITNESS:  Sure, whatever you want.
14                MR. CAMMARATA:  Yes.
15                THE VIDEOGRAPHER:  This is the end of Media
16          3.  The time is 1:58 p.m.  We're going off the
17          record.
18                (A recess is taken.)
19                THE VIDEOGRAPHER:  This is Media Unit
20          Number 4 in the deposition of Rudolph Giuliani.
21          The time is 2:16 p.m.  We're back on the record.
22    BY MR. NATHAN:
23          Q.    Mr. Mayor, during the break did you discuss
24    the substance of your testimony with anyone?
25          A.    I did not.
```

Page 205

```
 1              MR. NATHAN:  Okay.  All right.  I'd like to
 2         mark as Exhibit 2, tab number -- I think it's 117.
 3              MR. CAMMARATA:  It's in exhibit -- oh, it's
 4         a separate document?
 5              MR. NATHAN:  Yeah.
 6              (Giuliani Exhibit 2, Interrogatories, was
 7    marked for identification.)
 8              MR. CAMMARATA:  Thank you.
 9              THE WITNESS:  Okay.
10    BY MR. NATHAN:
11         Q.   Okay.  These are your interrogatory
12    responses in this case; is that right?
13         A.   I see them.  Exhibit 2, right.
14         Q.   And you answered these interrogatories
15    under oath?
16         A.   Yes, sir.
17         Q.   And you answered them truthfully?
18         A.   Pardon me?
19         Q.   And you answered them truthfully?
20         A.   Yes.
21         Q.   Okay.  The first interrogatory on the first
22    page here asks you to identify the date on which you
23    contend you established upon -- excuse me, the Palm Beach
24    condo as your homestead within the meaning of Article X,
25    Article 10, that is Section 4 of the Florida
```

Page 206

1    Constitution.

2                    And you answered January 1, 2024.  So can

3    you tell me everything that happened -- well, let me

4    start by asking you this.  Is that accurate?

5           A.    Yes.

6           Q.    Okay.  So your contention in this case is

7    that as of January 1st -- by January 1, 2024, you had

8    established the Palm Beach condo as your homestead; is

9    that correct?

10          A.    Yeah, actually that's even more accurate.

11   By January 1st, 2024.

12          Q.    Okay.

13          A.    Rather than "on."

14          Q.    Okay.  So if you had to say the date on

15   which you contend to establish the Palm Beach condo as

16   your homestead, how would you answer that question?

17          A.    All throughout the second half of 2024 and

18   had made up my mind in the last two weeks of December for

19   sure.

20          Q.    Okay.  I'm sorry, you said 2024.  Did you

21   mean --

22          A.    2023.  I meant 2023.

23          Q.    Okay.  So but here, you were asked the date

24   on which you established it as your homestead.  And your

25   response was January 1, 2024.  Is there any reason you

Page 207

1   wouldn't have been able to answer that interrogatory

2   accurately?

3           A.    Well, that -- I mean, that is when I said I

4   might as well get started on the first of the year.  I

5   mean, that's what I said in my mind.  I decided I was

6   going to do it probably 90 percent in the middle of the

7   year and 95 percent on December 20th and 98 percent, and

8   then I said, well, I'll make it January 1st.

9           Q.    Okay.  And January 1st is when you made it

10  a hundred percent?

11          A.    Yes, I mean that would be the accurate --

12  that would be the technically accurate answer and the

13  other would explain the process.

14          Q.    Okay.  Well, can you explain the process to

15  me?  I'd just like to understand, using that date as a

16  reference point, what's everything that happened to make

17  the Palm Beach condo your homestead as of January 1,

18  2024?

19                MR. CAMMARATA:  Objection.

20                THE WITNESS:  Well, I can summarize it by

21          saying that for a very, very long time, I had --

22          meaning for three or four years, my intent was to

23          eventually make Florida my permanent home.  And --

24          and then, and I decided that as of the two, I

25          would rather live in Florida rather than New York.

Page 208

```
 1          This is before -- way before I put it up for sale.
 2               And I thought about putting it up for sale
 3          earlier a couple of times, and I looked -- that
 4          would be sort of -- I could probably recreate that
 5          by looking back at when I looked at homes both in
 6          Florida and in New Hampshire, and at that point, I
 7          was going to try to sell the apartment in New York
 8          and use it to either buy a home in Florida or keep
 9          the condo in Florida as my permanent residence and
10          get a home in New Hampshire because I felt like I
11          needed more room than just a condo because I
12          had -- I had a home in south -- in South Hampton.
13               But I didn't want to give up the condo
14          because I loved living there.  I don't think I'm
15          ever going to find a better place to live.  So I
16          went through this for quite some time, discussing
17          it with people and thinking about it mostly.  When
18          it was in late '22 or early '23 that I finally
19          made the decision to put it up for sale.
20               It took about three months to find the
21          right broker, maybe less.  I knew -- I knew once I
22          sold it, that immediately Florida would be my
23          permanent residence because it would be my only
24          residence.  And that's when I decided I was going
25          to make it my permanent residence.
```

Page 209

1           It just took me a while to put it all

2      together.  Like you have to understand, this is

3      not an excuse, just a reality.  This is all during

4      a period of time in which I'm being pulled in 45

5      different directions.  So I might say to myself,

6      Florida is going to be my residence and I'm going

7      to go effectuate that and then I have a three-day

8      deposition or a four-day trial or -- so it's hard

9      to stick on one thing.

10          But what I -- what I -- once I put it up

11     for sale, I made a decision that Florida would be

12     my permanent residence.  I can't tell you exactly

13     when, other than saying to myself, well, I'll

14     effectuate that as of January 1st.

15 BY MR. NATHAN:

16     Q.    Okay.  And how did you effectuate it as of

17 January 1st?

18     A.    I said to myself, this is it.  And then I

19 asked -- I asked at some point, I don't know exactly

20 when, I asked Gary how would I -- what would I have to

21 do?  In addition to that, stating my intention, what else

22 do you have to do?  And that -- that's -- I kind of knew

23 I had to get a driver's license.

24          So I started, as I said, studying for it in

25 2023, made two appointments, thinking I have to go take a

Page 210

```
1    test.  I imagine -- I think I had to cancel both.  One of
2    them was when I had a trial going on in Washington in
3    this case.  So then it got -- it got put off for a couple
4    months.  But I probably made that appointment in
5    February.  Might have made that in December because they
6    schedule them out for about two months in advance.  By
7    the time I made the appointment, I mean, that -- I
8    actually thought that would be enough to make it clear
9    that this was my -- my decision.  When I thought about
10   voting, I really -- I really had decided, even
11   independent of that, that I wanted to vote in Florida.  I
12   found that out in '23.

13              I also found out, I think, I didn't have to
14   be a -- your domicile and your voting residence, if you
15   wanted it to be different.  But I didn't think that was
16   right.  So I waited until -- I waited until I got a
17   driver's license and did whatever I had to do to make
18   sure I was a domicile in order to register to vote.  So
19   that's the -- that's the process.
20         Q.    That's the process.
21         A.    I decided it in -- over the course of two
22   years, it came to fruition in my own mind.  I told my
23   coworkers we were going to -- over the course of '24, we
24   were going to eventually be totally in Florida and
25   probably even before we sold the apartment.  And then
```

Page 211

```
 1    went ahead and effectuated.
 2            Q.    Okay.  So you said -- you testified that
 3    you effectuated it as of January 1, 2024.  So is it fair
 4    to say that the steps you took after January 1st, getting
 5    a driver's license, registering to vote, those were about
 6    making clear something that had already happened, which
 7    is that you had established your homestead at the Palm
 8    Beach condo?
 9            A.    Yeah, I had made a permanent decision
10    before that.  I think one of the documents reflected
11    that, I'm not sure, that the decision had been made
12    earlier.
13            Q.    Okay.  So as of January 1, 2024, your
14    testimony is that you satisfied all of the requirements
15    for the condo to be protected as your homestead under
16    Florida law?
17                 MR. CAMMARATA:  Objection.
18                 THE WITNESS:  I think I met all the
19            criteria, yeah.
20    BY MR. NATHAN:
21            Q.    As of January 1, 2024?
22            A.    Well, I was -- I was told that you had a
23    certain period of time to do it, to do the concrete
24    things that had to be done.
25            Q.    Okay.  But the -- the change that happened
```

Page 212

```
1    on January 1, 2024, that was effective on January 1,

2    2024?

3           A.     Correct.  And then you have a certain

4    amount of time in which to register and -- for the

5    homestead.

6           Q.     But there is nothing else that you had to

7    do to establish the homestead protection after January 1,

8    2024.  All of that had been done?

9               MR. CAMMARATA:  Objection.

10              THE WITNESS:  No, no.  All of that -- some

11           of that had to be done after and it all kind of

12           placed that.  At least that's what I recall.

13   BY MR. NATHAN:

14          Q.     But you told me that the decision was made

15   to effectuate the change as of January 1, 2024, you

16   decided in your mind that's when would you effectuate

17   this change you've been planning for a long time?

18          A.     Yes, and I told my -- I told my -- my

19   coworkers.

20          Q.     Okay.  And the change you are referring to

21   is, is that you made a decision in your own mind that the

22   Florida -- the Palm Beach condo would be your permanent

23   residence?

24          A.     Correct.

25          Q.     Okay.  And is -- is -- is the intention in
```

1   your own mind enough to establish the Palm Beach condo as

2   your homestead?

3              MR. CAMMARATA:  Objection.

4              THE WITNESS:  As long as I'm going to take

5         the steps that have to be taken.

6   BY MR. NATHAN:

7         Q.    Okay.  So when you answered this --

8         A.    And I decided I would take the steps that

9   would be taken.

10        Q.    You -- you decided you'd take them --

11        A.    Before January 1st but definitely on

12  January 1st.

13        Q.    Okay.

14        A.    Which is why, when I filled it out, I made

15  it January 1st.

16        Q.    Because that's the date when --

17        A.    When I decided.

18        Q.    -- that you had established the Palm Beach

19  condo was your homestead?

20        A.    Correct.

21        Q.    Okay.

22        A.    I think there is a difference between

23  deciding and then proving it.  That's always true in

24  domicil- -- in domiciliary law.

25        Q.    But the important moment, legally speaking,

Page 214

1    is when you decided?

2                MR. CAMMARATA:  Objection.

3                THE WITNESS:  That's the way it seems to

4          me, given the fact you have a certain amount of

5          time to effectuate it.

6    BY MR. NATHAN:

7        Q.    I think we're using the word effectuate a

8    bunch of different ways.  Because you started by saying

9    that January 1st was the date that you effectuated --

10       A.    Yes.

11       Q.    -- the change --

12       A.    A number of times.

13       Q.    Okay.  I just want to be clear, that's the

14   date on which you are saying you effectuated the change

15   from the New York apartment being your homestead to the

16   Palm Beach condo?

17                MR. CAMMARATA:  Objection.

18                THE WITNESS:  That's the date at which I

19          established it.  I think "effectuate" is a word

20          you're adding.  That's the -- that's the date I

21          established the condo as my homestead.  And then I

22          went ahead and took the steps that would make my

23          decision, my individual decision, consistent with

24          the rules in Florida.  Which I did and they

25          granted it.  I don't know, I don't know what else

Page 215

```
 1            I can do.
 2     BY MR. NATHAN:
 3            Q.    Okay.  So I'll just -- I'm going to read
 4     back some testimony just so that the record is clear.
 5                  You -- you said, You know, this was all
 6     during a period of time in which you were being pulled in
 7     45 different directions, "so I might say to myself,
 8     Florida is going to be my residence, I'm going to go
 9     effectuate that and then you have a three-day deposition
10     or a four-day trial.  So it is hard to stick on one
11     thing.
12                  But once I put it up for sale -- and I
13     assume you are referring there to the New York
14     apartment -- I made a decision that Florida would be my
15     permanent residence.  I can't tell you exactly when other
16     than saying to myself, 'Well, I'll effectuate that as of
17     January 1st.'"
18                  So that's when you used the word
19     effectuate.  So that's why I asked, "Well, how did you
20     effectuate it as of January 1st," and you said, "I said
21     to myself, this is it."
22            A.    Correct.
23            Q.    And then afterwards you proceeded to engage
24     in the steps that we've been discussing, your driver's
25     license, your voter registration and so forth.
```

1          A.     All of which contemplate establishing an
2     earlier date as the date on which you became a
3     domiciliary and established a homestead.
4          Q.     Okay.  But the decision --
5          A.     And they -- and then they get to make the
6     decision -- you get to make the decision subjectively and
7     they get to make the decision as a matter of law which
8     they did.  So I don't even understand what we're arguing
9     about.
10          Q.     Oh, I -- I was --
11          A.     The county -- the county --
12          Q.     I don't think we're arguing.
13          A.     -- of Palm Beach, the County of Palm
14     Beach --
15          Q.     Excuse me, Mr. Mayor, I'm sorry.
16          A.     I'm sorry, I'm going to answer the --
17                 (Simultaneously speaking.)
18     BY MR. NATHAN:
19          Q.     I --
20          A.     You can't ask me a --
21          Q.     This is my --
22          A.     -- question --
23          Q.     This is my --
24                 THE REPORTER:  Okay, one at a time.
25     BY MR. NATHAN:

Page 217

1          Q.    This is my deposition.

2          A.    Yeah, and it's my answer so...

3          Q.    Well, there was no question pending.

4          A.    Yes, there was.

5                MR. CAMMARATA:  Hold on.  Let him finish

6          his answer --

7                (Simultaneously speaking.)

8                THE WITNESS:  -- an answer to my question.

9                MR. CAMMARATA:  There was a pending

10         question.

11               THE WITNESS:  And you very rudely

12         interrupted me.  I -- I went ahead and followed,

13         to a T, the rules in Florida.  They had all the

14         facts, including the fact that I was making the

15         application on the date I was making it based on a

16         January 1st decision.  And they granted it.  I

17         didn't do it.  They did.

18    BY MR. NATHAN:

19         Q.    Okay.

20         A.    So I don't know what you are fighting with.

21         Q.    Well, as I -- I was about to explain, I

22    don't think we're -- we're arguing.  I just want to make

23    sure the record --

24         A.    Well, I consider this to be entirely

25    frivolous and a complete waste of time since it was

Page 218

```
 1    decided.  You don't get to decide it.  I don't get to
 2    decide.  Even Judge Liman doesn't get to decide it.
 3              The county of -- the County of Palm Beach
 4    gets to decide it.  My goodness, if anything, it's a
 5    matter of protection under the Ninth and Tenth Amendment,
 6    it's deciding on, what's your homestead.
 7         Q.   So --
 8         A.   And the rules under which you establish it.
 9              So can we move on to another subject?  I
10    mean, we've kind of exhausted this.  Pretty clear it's my
11    homestead.
12         Q.   Okay.  You've been very emphatic that you
13    made the decision to change your homestead as of
14    January 1st, 2024.
15              So in your mind, is it your intention of
16    where you are going to maintain a homestead, that's the
17    key question, as to where your homestead is?
18              MR. CAMMARATA:  Objection.
19    BY MR. NATHAN:
20         Q.   You can answer.
21         A.   Of course.  I mean, it can't be a homestead
22    unless you decide it is.
23         Q.   Okay.  So it's really, it's up to you where
24    your homestead is?
25              MR. CAMMARATA:  Objection.
```

Page 219

```
 1            THE WITNESS:  Of course.  And then you have
 2       to do whatever that particular state says you
 3       should do.
 4  BY MR. NATHAN:
 5       Q.    Okay.
 6       A.    Which I did.
 7       Q.    So -- so --
 8       A.    And the state granted it.
 9       Q.    -- if --
10       A.    So what do you want me to do?
11       Q.    If there was something -- if there was
12  something that was required to establish the Palm Beach
13  condo as your homestead under Florida law, under the
14  Florida Constitution, you did that as of January 1st,
15  2024?
16       A.    No, the law doesn't say I have to do that.
17       Q.    Well, I'm -- I'm just reading what you said
18  in your interrogatory here.
19       A.    That isn't what I said.
20       Q.    You said -- I was -- I was reading from
21  your interrogatory and you were asked to identify the
22  date on which you contend you established the Palm Beach
23  condo --
24       A.    Well --
25       Q.    -- as your homestead within the meaning of
```

Page 220

```
 1    the Florida Constitution.

 2            A.    Correct.

 3            Q.    Do you -- do you disagree with that

 4    characterization of --

 5            A.    Well, that would contemplate the law --

 6    contemplate when it says you have a certain amount of

 7    time in which to complete it, that you made decision on a

 8    prior date.

 9            Q.    What's your understanding of what needs to

10    be done in order to complete it?

11                 MR. CAMMARATA:  Objection.

12                 THE WITNESS:  I've forgotten exactly the

13            steps you have to take but I took them.  I'd

14            have -- have to go back to the documents but it

15            says that you can -- you have a certain amount of

16            time to do several things in order to establish a

17            homestead as of a prior date.

18    BY MR. NATHAN:

19            Q.    Okay.  And when you say "it says," what do

20    you mean?

21            A.    The law -- the law.

22            Q.    The law?  What law?

23            A.    The law of Florida.

24            Q.    What Florida law in particular are you

25    thinking of?
```

Page 221

```
 1              MR. CAMMARATA:  Objection.
 2              THE WITNESS:  The -- the ones that --
 3              MR. NATHAN:  Will you let me finish my
 4          question before you say "objection"?
 5              THE WITNESS:  The ones that are
 6          contained --
 7              (Simultaneously speaking.)
 8              MR. CAMMARATA:  You finished it.
 9              THE WITNESS:  The criteria that's contained
10          in the questionnaire that's submitted by the
11          taxing authority who decides this.
12     BY MR. NATHAN:
13          Q.   So is it your understanding that the
14     homestead tax application that you submitted to the
15     Florida county tax authorities establishes or that that
16     taxing authority establishes the homestead status of your
17     condo under the Florida Constitution?
18              MR. CAMMARATA:  Objection.
19              THE WITNESS:  It seems -- it seemed --
20          certainly by then, yes.
21     BY MR. NATHAN:
22          Q.   The question was:  Is it your understanding
23     that the Florida taxing authority that you submitted that
24     homestead tax application -- exemption application to,
25     that authority decides whether or not your Palm Beach
```

Page 222

1    condo is protected as a homestead under the Florida

2    Constitution?

3                    MR. CAMMARATA:  Objection.

4                    THE WITNESS:  All I can do is read what it

5            says.  It says --

6    BY MR. NATHAN:

7            Q.    I just asked, what's your understanding?

8            A.    That's my understanding.  If they gave me

9    the homestead exemption, that they must have -- they had

10   to have decided it.

11           Q.    Is it your understanding that the homestead

12   tax exemption is the same thing as the constitutional

13   homestead tax exemption in Florida?

14                   MR. CAMMARATA:  Objection.

15   BY MR. NATHAN:

16           Q.    It's a yes-or-no question.

17           A.    I would think it is, yes.  That would have

18   to be, or very, very strong evidence of it.

19           Q.    What's that based on?

20                   MR. CAMMARATA:  Objection.

21                   THE WITNESS:  It's based on whatever I read

22           back then and just logical deduction.

23   BY MR. NATHAN:

24           Q.    Okay.  And so --

25           A.    I don't think they are going to give you

Page 223

1    money unless you have a homestead.

2         Q.    Okay.  So your understanding then is that

3    based on filling out that application and providing the

4    information you provided to the Florida taxing

5    authorities or the Palm Beach County tax authority, that

6    was also sufficient to prove that you were entitled to

7    the constitutional homestead protection at the Palm Beach

8    condo?

9              MR. CAMMARATA:  Objection.

10             THE WITNESS:  I believe so.  There may have

11        been another step that had to be taken that was

12        also granted but you'd have to ask my lawyer that.

13        Because we submitted several documents and they

14        granted all of them.

15   BY MR. NATHAN:

16        Q.    Okay.  What other documents were granted

17   other than the tax exemption application?

18        A.    Didn't I do an affidavit?

19        Q.    What about that document was granted?

20        A.    Well, maybe that's -- maybe that's the only

21   grant.  I'm not sure.

22        Q.    You just testified that there is --

23        A.    I know that they -- that the county -- the

24   county taxing authority granted a homestead exemption.

25        Q.    You've said that a number of times.

Page 224

```
 1            A.    To me -- Yeah, I know I've said it a number
 2     of times.
 3            Q.    I'm asking -- you also just testified --
 4            A.    That ends the case.
 5            Q.    No, I have a question.
 6                  MR. CAMMARATA:  Objection.
 7                  (Simultaneously speaking.)
 8                  THE WITNESS:  Then you are wasting time.
 9                  THE REPORTER:  Okay.
10     BY MR. NATHAN:
11            Q.    And I'm trying to ask it and you're not
12     letting me finish.
13                  THE REPORTER:  Okay.
14                  THE WITNESS:  And you are not letting me
15            answer.
16     BY MR. NATHAN:
17            Q.    Okay.  Okay.  You just testified, "We
18     submitted several documents and they granted all of
19     them."
20                  I asked, "What other documents were granted
21     other than the tax exemption application?"
22                  You asked -- you mentioned an affidavit.
23                  I asked, "Was that granted?"
24                  You said, "Maybe that's the only grant.
25     I'm not sure."
```

1              Were there any other documents you

2    submitted that were granted?

3         A.    The only other document is the one that you

4    showed me.  The only other document I can recall is the

5    one that you showed me.

6         Q.    Okay.  So is it your testimony then that --

7         A.    Could I please find it?  Here is one

8    application.  That's -- do we have this -- it's all

9    Exhibit 1.  So it is on page 013.  That's one

10   application.

11        Q.    And that's the homestead tax exemption

12   application?

13        A.    That's the one that I recall, yep.  Then

14   there is -- then there's the -- then there's the -- then

15   there's the assessment.  There is the application for

16   homestead-related tax exemptions.

17        Q.    That's the document you were just

18   mentioning.

19        A.    Yep, that's 013.  And then there is the

20   statement that homestead -- additional homestead is

21   granted on -- it doesn't seem to have a number.

22        Q.    It's in the lower right-hand corner.

23        A.    019.

24        Q.    Those are the documents showing that --

25        A.    And then --

Page 226

1           Q.     -- the tax authority --

2           A.     The only one that confuses me a bit,

3      because I don't remember this exactly, is the declaration

4      of domicile which is also signed by me and notarized, and

5      that's on July 13th.

6           Q.     Right.  I remember --

7           A.     Those are the documents I'm talking about.

8           Q.     Okay.  Thank you.  I really appreciate that

9      clarification.

10               So those are the steps you are referring to

11     when you say that after January 1, 2024, you had to take

12     additional steps under the law; is that right?

13               MR. CAMMARATA:  Objection.

14               THE WITNESS:  Yes.

15     BY MR. NATHAN:

16          Q.     Did you take any other steps?

17          A.     I don't recall.  Whatever steps I had to

18     take, I took.  The only one I actually recall -- the

19     declaration of domicile, I don't have an independent

20     recollection of, I'm relying on the document.  The only

21     thing I recall is answering the questions and getting the

22     response.  But it's possible I took others.  Obviously I

23     did.  I did a declaration of domicile.  I could have done

24     other things too, I don't know.

25          Q.     But sitting here today, you don't have any

```
                                              Page 227
```

```
 1   recollection of taking any other steps relating to
 2   establishing the Palm Beach condo as your homestead after
 3   January 1, 2024?
 4                   MR. CAMMARATA:  Objection.
 5                   THE WITNESS:  Well, I guess to be all
 6           inclusive I'd have to include registering to vote
 7           and -- and getting my license in Florida.
 8   BY MR. NATHAN:
 9           Q.    Okay.  Fair enough.  And I understand
10   that those were among the items that you submitted to the
11   tax authorities when you applied for the homestead tax
12   exemption.
13           A.    I could have taken other steps beyond that
14   but I don't recall.
15           Q.    Sitting here today --
16           A.    No, I can't recall any others.
17           Q.    You don't recall any others, okay.
18                 I'm just trying to understand from your
19   response to this interrogatory how it is that you contend
20   you established the Palm Beach condo as of January -- as
21   your homestead as of January 1, 2024, if you think that
22   there was still steps that had to be taken to make that
23   true --
24                   MR. CAMMARATA:  Objection.
25
```

Page 228

1    BY MR. NATHAN:

2          Q.    -- after that date?

3          A.    Because when it was explained to me, it was

4    explained to me that you can establish it as your

5    homestead and then you have a certain amount of time

6    after you do to file the appropriate documents.

7          Q.    Okay.  So -- so if the second step is

8    filing documents, what's the step that took place as of

9    January 1, 2024?

10         A.    The decision that I was going to do that.

11         Q.    Okay.

12         A.    That I was going to -- that this was going

13   to be my -- both domiciliary and homestead.

14         Q.    Okay.  And to be clear, I'm just trying to

15   understand the whole story.

16               So as of January 1, 2024, the decision is

17   made in your mind, and then afterwards you have to file

18   appropriate documents, and that's what you did after

19   January 1, 2024?

20         A.    Yes.

21         Q.    Okay.  Okay.  Okay.  And the decision that

22   you made as of January 1st, could you just explain that

23   again to me one more time?

24         A.    Really?

25         Q.    What was the decision --

Page 229

1          MR. CAMMARATA:  I'm going to object.  I

2     mean, we have to get the judge on the phone.

3          MR. NATHAN:  That's a speaking objection.

4          MR. CAMMARATA:  We may have to get the

5     judge.

6          MR. NATHAN:  That's a speaking objection.

7     It's not a proper objection.

8          MR. CAMMARATA:  Well, we may have to get

9     the judge on the phone.

10          MR. NATHAN:  Go ahead.

11          MR. CAMMARATA:  Because this has gone for

12     40 minutes.

13          MR. NATHAN:  Joe, I don't want to hear any

14     more speaking objections.

15          MR. CAMMARATA:  You're asking the same

16     question.

17          (Simultaneously speaking.)

18          MR. NATHAN:  I don't want to hear any more

19     speaking objections from you.

20          MR. CAMMARATA:  Well, I'm going to continue

21     it to do if you condition to ask the same

22     question.

23          MR. NATHAN:  You're telling me you're going

24     to continue to make improper objections on the

25     record.

Page 230

```
 1              MR. CAMMARATA:  You've asked the same
 2         question 15 times.
 3              THE WITNESS:  You want me to get -- repeat
 4         the question.
 5    BY MR. NATHAN:
 6         Q.   Sure.  Okay.  I'll just -- I'll just --
 7    just make sure that we still understand each other.  I
 8    had asked --
 9         A.   Go ahead.
10         Q.   You made the decision to change your
11    homestead as of January 1, 2024.  So in your mind, is it
12    your intention of where you are going to maintain a
13    homestead, that's the key question as to where your
14    homestead is?
15              You said, Of course.  I mean, it can't be a
16    homestead unless you decide it is.
17              And I said, Okay.  So it's really up to you
18    where your homestead is?
19              You said, Of course.  Then you have to do
20    whatever that particular state says you should do.
21              So it is on January 1, 2024, that you
22    decided that the Palm Beach condo would be your homestead
23    under Florida law.  That's the decision we're talking
24    about, right?
25         A.   Correct.
```

```
                                                    Page 231

 1          Q.     Okay.  Thank you.  Okay.

 2                 Did anything about the way you used the

 3     Palm Beach condo change after January 1, 2024?

 4                 MR. CAMMARATA:  Objection.

 5                 THE WITNESS:  It changed over a period of

 6          time.  I had more things directed there.  I spent

 7          more time there.  Before I had -- I had gone and

 8          gotten the -- made appointments to get a driver's

 9          license in 2023, which were canceled.  I got the

10          study material for the driver's license.  I -- let

11          me see what else.  One of the trips down I got --

12          I got additional equipment specifically for -- for

13          there if I was going to broadcast from there on a

14          much more consistent basis, better equipment.

15          Probably latter part of '23.  Moved a lot more

16          clothes in.  Sure, I moved a lot of clothes in in

17          late -- in late '23, probably by late '23 I

18          remember making two trips with -- with year-round

19          clothing which you only need for one month in

20          Florida.

21     BY MR. NATHAN:

22          Q.     For which month would you need year-round

23     clothing in Florida?

24          A.     The only month it would ever get cold.

25     Every once in a while in December it will get cold, you
```

Page 232

1    know, it will get down to 40 or whatever.  And every once

2    in a while you get one very cold night.  I like to sit

3    outside and smoke a cigar.  And downstairs, with the

4    people downstairs.

5        Q.    Okay.  So if I asked you just -- and I'm

6    asking you, if you can just compare the way you used the

7    Florida Palm Beach condo in 2024 to the way you used it

8    in 2023, what changed?

9              MR. CAMMARATA:  Objection.

10             THE WITNESS:  The things that I told you as

11             well as my -- my -- my decision about what it was.

12             I mean, when I lived in three places, right, you

13             get to select which one is your permanent

14             residence.  So in over a period of time starting

15             in '22, culminating in '23, I decided that Florida

16             was now going to be my permanent residence, for

17             all kinds of reasons including the fact that I was

18             now selling my co-op and I had to decide at some

19             point when I -- when I -- when I do sell it, where

20             am I going to live.

21                  There might have been a point in time if I

22             sold the co-op I would have gotten another place

23             in New York.  I decided I was not going to get

24             another place in New York.  So that immediately

25             sort of knocks New York out.  And now I'm in the

Page 233

1          process of selling it and I say, okay.  My
2          permanent residence is going to be Florida.
3               It's a pretty -- it's a pretty sensible and
4          obvious decision.  If I'm selling the apartment
5          and there was no capacity, no desire -- I wasn't
6          -- you don't see me looking for property in New
7          York.  When I first put it on the market, we had
8          an offer that looked like it was going to go
9          through.  In fact, the agent, every once in a
10         while, says, You should have taken that.  Like
11         water under the bridge, right.  Had I taken it,
12         I'd had to have another place to live within
13         60 days.  I wasn't looking for a place to live in
14         New York.  Pretty hard to move me.
15              I was looking for a place to live in
16         Florida.  I was looking for an alternative because
17         I thought I'd have two residences in New Hampshire
18         but not New York.  So that's -- I mean, that's how
19         I made the decision.  It isn't like you make it
20         all in -- over a two-year period, three-year
21         period, I'd been making the decision that Florida
22         would be my permanent residence.
23    BY MR. NATHAN:
24         Q.    Okay.
25         A.    And then it finally culminated, I made the

Page 234

1    final decision of -- it was almost an obv- -- it almost

2    made itself.  It was an obvious decision.  I'm selling

3    the apartment in New York.  I'm not buying another

4    apartment in New York.  Means I'm going to have to live

5    somewhere right away.

6              And that's when I started make -- making

7    Florida a -- a mirror image of New York so that I could

8    do everything in Florida that I was doing in New York.

9         Q.    Okay.  Can you --

10        A.    And once -- and once it was a mirror image

11   and I could do the same thing, then that made the

12   decision for me.  Seemed like the most convenient date

13   to -- to -- the most convenient date to start all of that

14   would be January 1st.

15        Q.    Okay.  And --

16        A.    I could have -- could have picked

17   September, I guess.

18        Q.    You could pick September of what?

19        A.    Of '23.

20        Q.    Okay.  Could you -- meaning that you could

21   have made the decision earlier if you wanted to?

22              MR. CAMMARATA:  Objection.

23              THE WITNESS:  Yeah, I could have, might

24         have -- could have made it the day I put my

25         apartment up for sale, I guess, right.  But I

Page 235

```
1          wasn't fully -- as I told you, I was 90 percent
2          sure and then 95 and then 98.  But I can certainly
3          say, without any confusion, that by the end of the
4          year, Florida was my permanent residence which
5          translates into domicile and homestead.
6                   So now I went about figuring out, how --
7          well, how do you -- how do you comply with
8          whatever the rules are in Florida for that?
9     BY MR. NATHAN:
10         Q.    Okay.  I understand.
11                  Could you just identify for me all the ways
12    you can think of that, the way you used the Palm Beach
13    condo in 2024 changed from the way you used it
14    previously?
15                  MR. CAMMARATA:  Objection.
16                  THE WITNESS:  Well, I didn't -- I mean, it
17         changed in the ways that I have described to you,
18         the things that I -- the things that I could do
19         here that I couldn't do then.  But I could -- I
20         could have -- I could have made it -- at any time
21         in which I was living in two or three different
22         places, you could make any one of them your
23         domicile or homestead and then go about and take
24         steps to do it.  I was living -- what steps do you
25         take other than living there?
```

Page 236

```
 1   BY MR. NATHAN:
 2        Q.    I'm just asking about the way you actually
 3   used the condo.
 4             Did you -- did you spend more time at the
 5   Palm Beach condo in 2024 than in --
 6        A.    Sure.
 7        Q.    -- previous years?
 8        A.    I think if you compare 2024 to previous
 9   years, I probably spent more time there, yes.
10        Q.    Okay.  And are there any other ways in
11   which you changed the way you actually use the Palm Beach
12   condo in 2024?
13             MR. CAMMARATA:  Objection.
14             THE WITNESS:  No, I used it as a residence,
15        except it became the permanent residence rather
16        than the second residence.
17   BY MR. NATHAN:
18        Q.    So was the -- the fact that it became the
19   permanent residence, was that reflected at all in the way
20   that you actually used the condo?
21             MR. CAMMARATA:  Objection.
22   BY MR. NATHAN:
23        Q.    Or was it reflected in your -- in --
24   intention that it become your permanent residence?
25             MR. CAMMARATA:  Objection.
```

Page 237

```
 1              THE WITNESS:  What -- what changed is I got
 2         a driver's license here.  I registered to vote
 3         here.  Those are the things that are changed -- I
 4         did the same thing here that I did before.  I came
 5         here, ate, slept, broadcast my show, except I did
 6         it more perm- -- more permanently.
 7  BY MR. NATHAN:
 8         Q.    Okay.  More -- more permanently because you
 9  had gotten a driver's license and registered to vote?
10         A.    No, no, no.  More permanently because I
11  moved in, instead of portable equipment, I moved in
12  permanent equipment.
13         Q.    Okay.  And so other than moving permanent
14  equipment in -- into your studio and changing your voter
15  registration and your driver's license, can you think of
16  any other ways that you changed the way you used the Palm
17  Beach condo in 2024?
18              MR. CAMMARATA:  Objection.
19              THE WITNESS:  I can't imagine what I --
20         what I would do.  Slept there two times a night?
21         I -- I don't know what else I could do.  The only
22         way you use a residence is you live there.
23  BY MR. NATHAN:
24         Q.    I'm just talking about changes --
25         A.    I mean, you're asking -- I guess one
```

1    practical change is, I think if I compared the prior

2    years, when we go back and look at 2024, I probably have

3    been there considerably more than any prior year, lived

4    there considerably more than any prior year.

5              In -- in the years in which I was traveling

6    a lot, it probably would have been -- probably on the

7    road the most.  New York second.  Florida third.

8    Hamptons fourth.  So now the road comes out, mostly,

9    right.  So now we look at this year, it's Florida first,

10   the road second and New York last.  That's --

11        Q.    Okay.  Where --

12        A.    That -- that would be how I changed it.

13        Q.    And where would New Hampshire have been

14   into that?

15        A.    The road.

16        Q.    Okay.

17        A.    Or if you want to say -- I don't have

18   residence in New Hampshire.  When I go there, except for

19   the one time that I rented for two -- for two or three

20   weeks because I wanted a permanent place to do my show

21   because I knew we were going to cover the eclipse, I

22   always rent there.  So I -- I really couldn't make -- I

23   could not make New Hampshire a -- a domicile.  The

24   critical thing is you have to have a residence for sure.

25        Q.    Okay.  When you are not renting in New

Page 239

1    Hampshire, where do you stay?

2            A.    Oh, I stay at a hotel.

3            Q.    Okay.

4            A.    Two different hotels.

5            Q.    If we wanted to confirm your statement that

6    you spent more time in Florida this year than in previous

7    years, how would we do that?

8            A.    I think you can look at the calendar of the

9    whole year.

10           Q.    We'd have to compare travel records from

11   previous years to records from this year?

12               MR. CAMMARATA:  Objection.

13               THE WITNESS:  Yeah, sure.

14   BY MR. NATHAN:

15           Q.    Okay.

16           A.    I could tell you it wouldn't be worth it

17   because it's -- I never spent this much time in Florida

18   before, not even close.

19           Q.    Okay.  Is there anything -- actually, if we

20   go back and look at the calendar that we were discussing

21   earlier, it is part of this big defendant's trial

22   exhibit.  Let me see if I can find it.

23           A.    Starting at the beginning of it or where?

24           Q.    Well, if you can look at the month of

25   February.

Page 240

1          A.    Let's go back to February.  I don't have

2    February.  Do I?  Hold on.  Yes, I do.  I'm sorry.

3          Q.    Calendar starts showing your location on

4    February 7th.  Why is that?

5          A.    I don't know.

6          Q.    Okay.  Sitting here today, you don't know

7    why that would be?

8          A.    I don't know -- as I said, I didn't prepare

9    this.  I mean, maybe -- maybe this is what we have

10   records for.  I don't know.

11         Q.    Okay.  And it ends on, if you flip to

12   August --

13         A.    Where did it end?

14         Q.    Well, let's see, it ends on August 8th,

15   doesn't it?

16         A.    Yeah, I don't know -- I don't know why it

17   ends on August 8th.

18         Q.    Okay.  So you don't know why it ends on

19   August 8th either?

20         A.    I can tell you that I've been here the

21   entire month of October and November with a little

22   exception, three or four days.

23         Q.    Okay.  And if we wanted to confirm that,

24   how would we be able to do that?

25         A.    I guess plane tickets, right?

Page 241

1          Q.    You have travel records that would show
2     where you've been?
3          A.    Most of it would be -- would be plane
4     tickets.  I've never -- I've never driven here.  So there
5     has to -- there have to be plane -- plane tickets.
6     That's how -- that's how they recreated this.
7          Q.     And is that -- is that a little bit like
8     the plane tickets that were shown in the Amex statements
9     we reviewed that that --
10               MR. CAMMARATA:  Objection.
11    BY MR. NATHAN:
12         Q.    -- you decided --
13         A.    Maybe they were just examples of -- the --
14    the other way to do is my broadcast.
15         Q.    Okay.
16         A.    I could look at the broadcast -- Ted --
17    either Maria or Ted could do it.  Maria could do it from
18    plane tickets and Ted could do it from -- from America's
19    Mayor Live --
20         Q.    Okay.
21         A.    -- where -- even if I don't announce --
22    sometimes I don't announce where I am for security
23    reasons because we just got a threat but I can tell where
24    I am.
25         Q.    Okay.  Somebody could help you based on

Page 242

1    records that are available to you to figure out where you

2    were?

3         A.    Yeah, we could 90 percent, we get

4    90 percent -- maybe a hundred.

5         Q.    Okay.

6         A.    Like, tonight, I'm going to broadcast from

7    here so you'll see or -- I saw a picture there, a big

8    dark background, a little rail.  That's -- that's --

9    that's Palm Beach.

10         Q.    Okay.  You said a minute ago that as you

11    were considering or getting closer to making a decision

12    to make Palm Beach County your residence, your permanent

13    residence, your homestead, you sort of turned it into a

14    mirror image of New York?

15         A.    Well, a mirror, I meant for the purpose

16    of -- not the decor of the apartment but the purpose of

17    broadcasting.

18         Q.    For the purpose of broadcasting?

19         A.    So I can do the same thing there as I did

20    in New York.

21         Q.    You wanted to have a studio -- broadcast

22    studio in Palm Beach?

23         A.    Yeah, which included having a much more

24    powerful internet service you have to get.  Had to move

25    in a more powerful computer.  I had a setup.  I had to

Page 243

1   set up special connections.  I had done that for radio

2   but I had done it for television.

3           Q.    Okay.  Did you make any other changes other

4   than broadcast radio?

5           A.    I probably did.  They would all be under

6   that category.

7           Q.    Okay.  So you didn't change the doctors you

8   see?

9           A.    Pardon me?

10          Q.    You didn't change the doctors you see?

11                MR. CAMMARATA:  Objection.

12                THE WITNESS:  Yeah, I did, yeah.

13  BY MR. NATHAN:

14          Q.    Excuse me?

15          A.    Yeah, I -- well, I didn't change my

16  doctors, I got new doctors.  My two -- I mean the two

17  doctors I use, I've been using forever.  One -- one --

18  they both took me through prostate cancer and he

19  recommended -- he recommended a doctor down here to take

20  care of me who -- his nephew, Dr. Ellis, and the other

21  is -- well, that's Dr. Kirschenbaum, Alexander

22  Kirschenbaum, and the other is Dr. Fuster, who's older

23  than I am.  And probably -- he's just a remarkable human

24  being.  But he also took me through prostate cancer and

25  also my heart condition, the stents that are put in.

Page 244

```
 1          Q.    And these folks --

 2          A.    So I will go see them even now.  But they

 3    have referred me to doctors down here.

 4          Q.    Okay.  Have you seen any doctors that they

 5    referred you to down here?

 6          A.    I have.

 7          Q.    Okay.  And when did that start?

 8          A.    Oh, that started sometime ago.  I mean, I

 9    -- even before this was a permanent residence, I

10    needed -- you know, I needed to have doctors here.  I

11    remember going to Good Samaritan Hospital five years ago,

12    six years ago, and established a relationship with a

13    doctor there.

14                And then -- then I was having a problem

15    with my chest and I called up either -- either

16    Dr. Fuster -- normally, I when want a doctor, I call

17    either Dr. Fuster or Dr. Kirschenbaum.

18                And Dr. Fuster's secretary recommends

19    doctors, Marta.  So she recommended a doctor here and I

20    went and had chest X-rays and he found a problem with my

21    chest.  And he prescribed the medicine for it.  And then

22    I wanted one overall doctor here and Dr. Kirschenbaum

23    recommended Dr. Ellis, who Maria and I both have used,

24    even Ted has used.

25                I also belong to clubs down here.  Well, I
```

Page 245

1    did when I could afford it.  There are only two that will

2    keep me.

3              Q.    Have you made any other changes just to the

4    way your life works -- strike that.

5              Have you moved any furniture down here?

6              A.    I did that -- I did that in '23 -- I did

7    that -- no, I don't think I moved furniture down here.

8    How would I?  I don't drive down here.  I haven't had a

9    moving service move anything.  I don't think I've moved

10   any furniture down here.

11             Q.    So the furniture in your Palm Beach condo

12   is the same as it's always been?

13             A.    Yeah, furniture I bought here.

14             Q.    Okay.

15             A.    I've moved television -- radio equipment

16   here.

17             Q.    Okay.  So it's fair to say you just kept

18   the furniture in your Palm Beach condo that was always

19   there, and then in October 2024, you moved items out of

20   your New York City apartment?

21             A.    Yeah, but they didn't come here.

22             Q.    But you didn't bring them here?

23             A.    No, I left them all in the -- because they

24   are all in dispute.

25             Q.    Okay.

Page 246

1              A.    I can't imagine I moved furniture -- I

2     moved certain things down here, you know, throughout the

3     ten years.  Might be something I'd rather have down here,

4     a book or -- can I get my books back?  I'm missing books

5     that I use all the time.

6              Q.    Do you have a will?

7                    MR. CAMMARATA:  Objection.

8                    THE WITNESS:  Yes, sir.

9     BY MR. NATHAN:

10             Q.    Okay.  When was the will executed?

11             A.    After -- after the divorce but shortly

12     after.

13             Q.    Okay.  So shortly after you divorced --

14             A.    Yeah.

15             Q.    Shortly after your divorce --

16             A.    So that would be like 2018.

17             Q.    Okay.  Somewhere in the period surrounding

18     your divorce, you executed a new will; is that right?

19             A.    I executed one during my divorce because,

20     you know, in a divorce, until you are fully divorced,

21     your wife automatically gets, you know, a third of your

22     property.  But you want to make sure that's all she gets

23     because I wanted my children and then afterwards,

24     after -- after -- after we were divorced, I changed it.

25             Q.    Okay.  And you changed it around when?  Let

```
 1    me rephrase the question.
 2              A.    If I was divorced in January 2018, I
 3    probably changed it in January or maybe February.
 4              Q.    Okay.  Since the --
 5              A.    Because I think the old will -- no, I
 6    probably took a little while.  Because I remember the old
 7    will, she would have only gotten it under it if she was
 8    my wife.  But then I straightened it out about two or
 9    three months later.
10              Q.    Okay.  When was the last time you updated
11    your will?
12              A.    Probably then.
13              Q.    "Then" meaning during or after your
14    divorce?
15              A.    I'm really not sure.
16              Q.    But you haven't updated it this year, have
17    you?
18              A.    No.  This year I haven't, no, or last year.
19    I can be sure of that.
20              Q.    Okay.  Your will was executed under New
21    York law?
22              MR. CAMMARATA:  Objection.
23    BY MR. NATHAN:
24              Q.    Let me rephrase.  The last update --
25              A.    Had to be 2018 or 2019, had to be New York.
```

Page 248

1          Q.     You haven't changed that since January 1st?

2          A.     I have not.

3          Q.     Okay.  You recall that you were employed by

4   WABC Radio?

5          A.     Sure, yeah.

6          Q.     Can you tell me a little bit about that?

7          A.     Other than I was employed by them, I had

8   the leading show on Sunday.  The leading show during the

9   week, 30 percent higher than Hannity in New York, and

10  they let me go because I refused to not comment on the

11  2020 election.

12         Q.     Where did you record those shows?

13         A.     What?

14         Q.     Where did you record those shows?

15         A.     All over.  I would record -- it began

16  during the COVID period, so I began recording at home.

17  So we set up my home as a radio studio.  Probably -- the

18  first nine months that I -- the first year that I

19  recorded, I almost was never in the studio.  At first it

20  was COVID.  And then -- and then I -- then I was in

21  Washington representing President Trump.  But I still did

22  my show almost every day at 3 o'clock.  And I did it from

23  the hotel I was in.

24                I didn't go to the studio until after the

25  election.  And they pretty much followed my crazy

Page 249

1    schedule which is -- the default place was the studio.

2    Since I had gotten used to recording at home for three or

3    four months, if it was a bad weather or I was too busy,

4    I'd record at home.  And then I traveled.

5               So, I mean, right from the beginning I

6    recorded from Florida and the places where I traveled.

7    And I had what's known as a Comrex, which is a fabulous

8    device.  You can plug it in as long as you have an

9    Ethernet connection and you can -- you can broadcast

10   directly to any radio station probably all over the

11   world.

12        Q.    Okay.

13        A.    This big.  (Indicating.)

14        Q.    Did you ever broadcast from the studios at

15   83rd Avenue or 800 3rd Avenue?

16        A.    Well, that was my default position.  I

17   mean, that was the home base.

18        Q.    Okay.  And at what point did your

19   employment at WABC terminate?

20        A.    Sometime this year.  I think it was this

21   year.

22        Q.    But you don't recall exactly when?

23        A.    Uh-uh.  I'm pretty sure it was sometime

24   earlier this year.

25        Q.    Okay.

Page 250

```
1              A.     It's been at least six or eight months.
2              Q.     You mentioned that you last amended your
3      will sometime during or shortly after your divorce.
4      Where is that will now?
5              A.     Probably in my -- in a box that I have here
6      with important, you know, important papers.
7              Q.     Okay.  What other important papers are in
8      that box?
9              A.     The deed, the -- both of the -- after --
10     after we -- all the divorce records are here.  I don't
11     remember when I moved them all here, a couple of years
12     ago.  They are in a box with all the divorce records.
13             Q.     Okay.
14             A.     Excuse me, they are in a box with
15     sensitive -- there are a lot of divorce records.  So some
16     of them don't fit in the box but the sensitive divorce
17     records are there and the deed.  Whatever you call the
18     thing on the condo, right.  Proprietary lease or
19     something like that.
20             Q.     Do you mean the co-op?
21             A.     Yes.
22             Q.     So the proprietary lease for the co-op is
23     in that box?
24             A.     Yeah.
25             Q.     What about the co-op shares?
```

1          A.    I haven't looked in there in a while but

2    they are probably there too.

3          Q.    When you say "in a while," what do you

4    mean?

5          A.    Six months.

6          Q.    Okay.  And do you have a birth certificate?

7          A.    I do -- I do and I had it reproduced

8    because I had to use it for different -- for different

9    visas.  And I have some copies here.  I probably have

10   some in the records that are now in the -- in the -- I

11   mean, some are in New York and some are here.

12         Q.    Okay.  The ones that were in New York --

13         A.    I had to get a -- I had to get a -- while I

14   was still a New York resident, I had to get a new

15   passport and I got it in Miami.  So I -- when that

16   happened, I tried to keep the records duplicate at both

17   places.

18         Q.    Okay.

19         A.    Because I needed a birth certificate.

20   And I had to get it sent down from New York.  At that

21   point, I had some moved there and some there.

22         Q.    Do you recall where the original of your

23   birth certificate is?

24         A.    I don't.  I'm not even sure I have an

25   original.  I think I had to go get another one.

Page 252

```
 1          Q.    Oh, okay.
 2          A.    I don't think I have the "original
 3    original."
 4          Q.    When I say the original, I don't mean the
 5    one that was issued at the time of your birth.
 6          A.    You mean the one that's the official
 7    record.
 8          Q.    The current official record.
 9          A.    I don't.  I'm not sure if it is here or in
10    New York.
11          Q.    Okay.
12          A.    It might be here because of what I had to
13    do.  I mean, if it is here, it doesn't have really any
14    relevance other than the fact I lived here.  Because I
15    did that a long time ago.
16          Q.    Would it be in the box that you were
17    describing?
18          A.    Yeah, uh-huh.
19          Q.    Okay.  Do you have a passport?
20          A.    I do.
21          Q.    Okay.  And where is the passport located?
22          A.    The passport I got here but that's because
23    I was here when I had applied for it.
24          Q.    Okay.  And when was that?
25          A.    Four years ago, five years ago.
```

Page 253

```
 1          Q.    Okay.  Have you always kept the passport
 2    here?
 3          A.    No, I didn't keep it here.  At the time
 4    that I got the passport, my residence was New York.  I
 5    just happen to get it here because I was here and I
 6    traveled a lot out of Miami.
 7          Q.    Okay.
 8          A.    And I had to get it right away.
 9          Q.    And during the time that you had that
10    passport, where did you usually keep it?
11          A.    With me.  I have it with me now.
12          Q.    Okay.  Do you have a social security card?
13          A.    I can't find it.
14          Q.    Okay.  And you haven't -- you haven't
15    gotten it reproduced or --
16          A.    I did, I did get it reproduced and do I
17    have it down here, the reproduction of it.
18          Q.    Okay.
19          A.    Because I had -- I had to produce it to
20    get one of the new -- to get one of the new companies
21    open.
22          Q.    Okay.  And when was that?
23          A.    About six months ago.
24          Q.    Okay.  Was that the Standard USA company?
25          A.    Yeah.
```

Page 254

1          Q.    Okay.  But before that, you didn't have a
2     copy of your social security card?
3          A.    I did not.
4          Q.    Okay.  Do you have a revocable trust?
5          A.    I do, yes.  Well, yeah, on death.
6          Q.    And is that created under your will or --
7          A.    It is --
8          Q.    -- separate from your wife?
9          A.    -- under will.  It's under the will.
10         Q.    Okay.  So it doesn't exist at the moment --
11         A.    No.
12         Q.    -- created it --
13         A.    Sure, right.
14               THE REPORTER:  Okay.  Hold on.
15               MR. CAMMARATA:  Yeah, yeah, just --
16               MR. NATHAN:  Sorry.
17               THE WITNESS:  I'm sorry.
18               MR. NATHAN:  I'll ask --
19               THE WITNESS:  Last --
20               MR. NATHAN:  I'll ask to clarify.
21               THE WITNESS:  I have -- I believe I have
22         one under the will.
23    BY MR. NATHAN:
24         Q.    Okay.  But independently of your will?
25         A.    I do not.

Page 255

1              Q.    You do not?  Okay.

2                    Do you know whether the will recites --

3      well, strike that.

4                    Based on what you've told me, it sounds

5      like the will would recite New York as your domicile,

6      is --

7              A.    If it was -- yeah, sure.  If it was '18,

8      sure.

9              Q.    So you cite New York as your domicile.

10     Okay.

11                   MR. NATHAN:  All right.  This is a natural

12                   stopping point.  Well, actually, I have about -- I

13                   have about ten more minutes -- well, let's stop

14                   here, if that's all right.

15                   MR. CAMMARATA:  Yeah.

16                   MR. NATHAN:  We'll take a short break,

17                   we'll come back and shall we go off the record?

18                   THE VIDEOGRAPHER:  Sure.

19                   This is the end of Media 4.  The time is

20                   3:19 p.m.  We're going off the record for a media

21                   change.

22                   (A recess is taken.)

23                   THE VIDEOGRAPHER:  This is Media Number 5,

24                   the deposition of Rudolph Giuliani.  The time is

25                   3:35 p.m.  We are back on the record.

Page 256

```
 1    BY MR. NATHAN:
 2            Q.    Mr. Mayor, during the break, did you
 3    discuss your deposition --
 4            A.    I did not.
 5            Q.    -- with your attorney -- with anyone?  You
 6    did not?
 7            A.    I learned my lesson.
 8            Q.    Okay.  As of August -- or on August -- as
 9    of August -- let me start over.
10            As of August 3rd, 2024, would it have been
11    accurate to say that you lived in New Hampshire?
12            A.    No.
13            MR. CAMMARATA:  Objection.
14            THE WITNESS:  You mean lived in New
15            Hampshire as a permanent place or --
16    BY MR. NATHAN:
17            Q.    Just --
18            A.    -- was there temporarily?
19            Q.    Just lived in New Hampshire.
20            A.    Yeah.  No, I don't think it would be --
21            Q.    Okay.
22            A.    -- because I've always rented there.
23            Q.    Okay.  Would it have been accurate to say
24    you worked in New Hampshire?
25            A.    Yes, I did some work in New Hampshire,
```

Page 257

```
 1   sure.
 2         Q.    You did "some" work?  Would it have been
 3   accurate to say you worked in New Hampshire?
 4              MR. CAMMARATA:  Objection.
 5              THE WITNESS:  Yes, also in Illinois and
 6         about ten other places.
 7   BY MR. NATHAN:
 8         Q.    Okay.  So you worked in New Hampshire in
 9   the same sense that you worked in Illinois when you were
10   on a trip there?
11         A.    Right, I spent a week in Illinois.  I spent
12   a week in Milwaukee.  I spent five days in Los Angeles.
13   I spent -- I spent some time in the northern part of New
14   Hampshire and sometimes in Manchester.  So yeah, I
15   probably was in New Hampshire more often but only by --
16   by a little bit.
17         Q.    Okay.  And so, for example, when you were
18   in Illinois, was that when you were at the Democratic
19   National Convention in Chicago?
20         A.    That was the Democratic convention, right.
21         Q.    Okay.  And so when you say you worked in
22   Illinois, you were referring to broadcasting from --
23         A.    Yes, I broadcast in Illinois.
24         Q.    Okay.  And that was a temporary trip and
25   you broadcast there just because you can broadcast
```

Page 258

1    anywhere?

2            A.    Correct.

3            Q.    Okay.  So when you -- if -- if somebody

4    were to say that you worked in New Hampshire, all that

5    would mean is you can broadcast from anywhere, so you

6    could broadcast from there?

7            A.    Correct, and I broadcast from -- I

8    broadcast from two different hotels.  Every once in a

9    while I use somebody's home, a friend or so --

10           Q.    Okay.

11           A.    -- if it's special.

12           Q.    Okay.  And the way that -- to the extent

13   you worked in New Hampshire in August 2020 -- or, excuse

14   me.

15                 To the extent you worked in New Hampshire

16   at all in 2024, was it any different from the way --

17           A.    Yeah, it was.

18           Q.    I'm sorry.  Just let me just finish the

19   question.

20                 Was it any different from the ways that you

21   had worked in New Hampshire in prior years?

22           A.    Just one time and that was the -- that was

23   the summertime when I was able to temporarily rent a

24   little condo as a permanent place, you know, for that

25   period of time to do my show.  So I could set it up in

Page 259

```
1   one place.  Didn't have to move it around.
2          Q.    Okay.  And so it was a permanent place for
3   a period of time?
4          A.    Permanent place for --
5              MR. CAMMARATA:  Objection.
6              THE WITNESS:  Yes, permanent place for a
7         month and a half -- two months, in which I
8         probably traveled about 40 percent of the time
9         that I was there.
10  BY MR. NATHAN:
11         Q.    Okay.  So something can be permanent even
12  if it has a set end date?
13             MR. CAMMARATA:  Objection.
14             THE WITNESS:  I guess for two weeks, three
15        weeks.  If I'm going to be in one place, I'll be
16        permanently there for two or three weeks.
17  BY MR. NATHAN:
18         Q.    Okay.  Do you recognize the address, 418
19  Walnut Street, Manchester, New Hampshire?
20             THE REPORTER:  What was the address?
21             MR. NATHAN:  418 --
22             THE WITNESS:  Sure, that's doctor --
23             MR. NATHAN:  -- Walnut Street --
24             THE WITNESS:  That's Dr. Ryan's --
25             MR. NATHAN:  -- Manchester, New Hampshire.
```

Page 260

1                     THE WITNESS:  -- address.

2      BY MR. NATHAN:

3              Q.    That's Dr. Ryan's address?

4              A.    Yes.

5              Q.    Okay.

6              A.    And Vanessa.

7              Q.    Okay.  Is there any reason that you would

8      have told somebody to contact you at that address?

9              A.    Other than she can -- she can get me.  I'll

10     have -- I'll have things sent there sometimes if I'm in

11     New Hampshire.  Safer than having it sent to the hotel.

12     So if I'm going to get some equipment or something, I'll

13     have it sent to 418 Walnut Street either under her name

14     or her granddaughter.

15             Q.    Okay.

16             A.    But because I've -- I've lost things that

17     were sent to hotels.

18             Q.    Okay.  Did you ever execute a change of

19     address form at the U.S. Postal Service?

20             A.    I'm not sure.

21             Q.    Let me combine that.

22                   In 2024 or between -- in 2023 or in 2024,

23     did you ever submit a change of address form to the U.S.

24     Postal Service?

25             A.    I'm not sure.

1          Q.    Would you have any way of knowing whether

2     you did or not?

3          A.    I'd have to go ask Dr. Maria or Ted.

4          Q.    Okay.  So if that was done on your behalf,

5     it would have been Dr. Maria or Ted who would have done

6     it?

7          A.    Yes, sir.

8          Q.    Okay.  And if they had done that and they'd

9     been asked to supply an email address, what email address

10    would they have given the post office for a confirmation?

11               MR. CAMMARATA:  Objection.

12               THE WITNESS:  I don't know.  I imagine mine

13          but I -- I don't know.  You would have to ask

14          them.

15    BY MR. NATHAN:

16          Q.    But it's possible they would have given

17    your email address?

18          A.    Yeah.

19               MR. CAMMARATA:  Objection.

20               THE WITNESS:  I -- I guess.

21    BY MR. NATHAN:

22          Q.    Okay.  So you'd be able to confirm whether

23    or not they had given the post office your email address

24    just by looking at your own emails?

25               MR. CAMMARATA:  Objection.

Page 262

1              THE WITNESS:  Yeah, if I didn't erase it.

2          But I don't recall seeing an email but --

3      BY MR. NATHAN:

4          Q.     Okay.  Would -- would --

5          A.     I don't -- I don't check all my emails.

6          Q.     Okay.

7          A.     I get too many.

8          Q.     Would you have erased an email like that --

9          A.     Probably not.

10          Q.     -- in the last year?

11          A.     Probably not but -- I don't recall -- I

12      don't recall an email like that.  Somehow all my mail

13      comes to me now at 315.  For a while, some would come to

14      315, even after I changed and some would go there.  And

15      then they forward to me.  But for the last three months,

16      I haven't had any issue like that.

17          Q.     Okay.

18          A.     And that's how, that's how I lost my

19      subscription at Epoch Times because I changed it in the

20      last --

21          Q.     Okay.  So for the last three months, you've

22      received all your mail --

23          A.     For sure.

24          Q.     -- at -- at --

25          A.     At the very beginning of the change, the

Page 263

1    first month or two, there was an overlap and then in the

2    middle, probably I received --

3            Q.    Okay.

4            A.    -- it all here.

5            Q.    At the beginning of the change, just to

6    clarify?

7            A.    Meaning -- meaning in January or

8    February --

9            Q.    Okay.

10           A.    -- there was more of an overlap.

11           Q.    Okay.

12           A.    The last three months, it's always been

13   here.  And in the middle, it was mostly here.  With a

14   few, I would still have to have them forward certain

15   things.

16           Q.    But in the middle, in sort of the middle of

17   this year you were telling someone where to send you

18   something, you would have told them to send it here?

19           A.    Yeah, although I have had -- I did have

20   people, for example, send things to me at the Republican

21   Convention at that hotel.  But I had people send things

22   to me at the Democratic Convention at the hotel because I

23   was going to be there for a week.  So I have, at various

24   times, given them other places to send things.

25           Q.    Okay.

Page 264

1           A.      Including Amazon.

2           Q.      Okay.  Would you have given them your New

3    York apartment as a place to send you something?

4           A.      Not in a long time.

5           Q.      Not in a long time.  Around when would you

6    say is the last time you would have thought to do that?

7           A.      You'd have to look on the calendar, the

8    last time I was there for more than a couple of days.

9    And therefore I thought it'd be more likely I'd get it

10   there than someplace else.

11          Q.      And if it's sitting here today, if you had

12   to say, around when would have been the last time?

13          A.      Probably before I went to -- before I went

14   off on my -- it would have to be before June.

15          Q.      Okay.  When is the -- when is the last time

16   that you think you would have referred to the New York

17   apartment as your home?

18                  MR. CAMMARATA:  Objection.

19                  THE WITNESS:  I just have to go back by

20          process of elimination.  Sometimes I'll even say

21          now, Oh, I'm in New York -- oh, former New Yorker.

22          Just because I'm so used to it.

23   BY MR. NATHAN:

24          Q.      Sure.  And if somebody --

25          A.      Or somebody will come up to me and say, Oh,

Page 265

1  you're from New York.  And I might originally say yes,

2  but oh, no, not anymore.  I probably got the addresses

3  confused for about six months, I'd say, or where I lived

4  con- -- you know, confused.

5         Q.    Okay.  So I can understand that --

6         A.    Occasionally.

7         Q.    If somebody asked you where you are from

8  and you said I'm from New York, that's totally

9  understandable.  I think some people would agree that

10 even if you moved to Florida, you are still from New

11 York.

12         But if somebody asked you whether it be

13 accurate to describe the New York apartment as your home,

14 when do you think the last date you would have agreed

15 with that characterization would have been?

16               MR. CAMMARATA:  Objection.

17 BY MR. NATHAN:

18         Q.    Let me rephrase the question.  By about

19 let's say April 2024, would you have described the New

20 York apartment as your home?

21               MR. CAMMARATA:  Objection.

22               THE WITNESS:  I would think -- I'd be

23         comfortable with the last two months, three

24         months, basically not making the mistake.  But

25         before that, it was so -- it was so routine, that

Page 266

```
 1            I would -- I would give it.
 2    BY MR. NATHAN:
 3            Q.    Okay.  And is that --
 4            A.    Sometimes.
 5            Q.    That -- okay.
 6            A.    Sometimes I'd give it and not realize it.
 7    Sometimes I'd give it and then change it.
 8            Q.    Okay.  Do you recall that you filed a
 9    petition for bankruptcy in December 2023?
10            A.    I remember filing it.  I don't remember the
11    exact date.
12            Q.    Okay.  You remember filing for bankruptcy?
13            A.    Of course, yeah.
14            Q.    Okay.  And do you remember that you filed
15    for Chapter 11 protection?
16                  MR. CAMMARATA:  Objection.
17                  THE WITNESS:  I do.
18    BY MR. NATHAN:
19            Q.    Okay.  And what's your understanding of
20    what Chapter 11 bankruptcy means?
21                  MR. CAMMARATA:  Objection.
22                  THE WITNESS:  Chapter 11 allows you to do a
23           reorganization.
24    BY MR. NATHAN:
25            Q.    Okay.  Can you just say a little bit more
```

Page 267

 1   about what that means?

 2           A.    Well, to be qualified you have to have more

 3   liabilities than assets and you -- ultimately you have to

 4   work on a plan so that you can pay off -- pay off your

 5   debts.

 6           Q.    Okay.  And do you have an understanding of

 7   what a Chapter 7 bankruptcy is?

 8           A.    Not as well, no.

 9           Q.    Okay.  What understanding do you have of

10   what a Chapter 7 bankruptcy is?

11               MR. CAMMARATA:  Objection.

12               THE WITNESS:  If you want to guess, I think

13           it's liquidation, I think.

14   BY MR. NATHAN:

15           Q.    Okay.  Liquidation?

16           A.    You sell everything and your creditors

17   parcel it out.

18           Q.    Okay.  And when you say --

19           A.    Or almost everything.

20           Q.    And when you say "you sell everything" --

21   Right.  So you'd sell -- would you sell assets that are

22   exempt from --

23           A.    I don't know.

24           Q.    Okay.

25           A.    I don't know.  I imagine there are certain

Page 268

1    exemptions, sure.

2            Q.    Okay.  But your understanding of Chapter 7

3    is that it's a liquidation in which your property is sold

4    and your creditors parcel out the proceeds?

5            A.    Yeah, as opposed to an 11 where you would

6    do the same thing but you do it as part of a plan to

7    reorganize.

8            Q.    Okay.  And in either case, you -- well,

9    strike that.

10           A.    In both cases, you'd be selling a lot of

11   your assets.

12           Q.    Okay.  Did you ever seek a Chapter 7

13   liquidation in your bankruptcy proceedings?

14           A.    I don't think so.

15           Q.    While you were in bankruptcy, did you pay

16   attention to the filings that your -- that you were

17   making in the Bankruptcy Court?

18           A.    As best I could.  They were complicated, as

19   I said, and obviously busy.

20           Q.    Okay.  And do you recall that --

21           A.    I relied on the lawyers probably to do a

22   lot more of that than usual because I was very, very

23   busy.

24           Q.    Okay.  And did you personally sign any

25   documents that were filed in the Bankruptcy Court?

Page 269

1          A.    I certainly signed the original one.

2          Q.    Okay.  Well --

3          A.    Petition.

4          Q.    If you were personally signing a document

5     that would be filed in the Bankruptcy Court, would you

6     have reviewed that document first?

7          A.    Yes.

8          Q.    Okay.  So at the time you filed it, you

9     would have been -- had an understanding of what was being

10    filed over your signature; is that correct?

11         A.    As best I could.  Yeah, I mean, I think.

12         Q.    If you had any questions about what it

13    meant, you would have asked your lawyers those questions,

14    right?

15         A.    I would have, although as I said, it wasn't

16    optimum time to have extraordinary amount of time to ask

17    a lot of questions.  So you move very, very quickly.

18         Q.    You're not the type of person that would

19    sign something and file it in a court --

20         A.    I wouldn't do it deliberately, that's

21    right.

22         Q.    -- without understanding it?

23         A.    Yes, that's pretty much true.  But there is

24    a little more -- when you are under a lot of pressure and

25    a lot of other things are calling your attention, it's

```
                                                    Page 270
 1    hard to concentrate.

 2          Q.    You say "pretty much true."  What are the

 3    circumstances under which you might file something in a

 4    court without understanding what you were signing?

 5          A.    Wouldn't do it without understanding it.

 6    I'd say that there are times in which you can pay optimum

 7    attention and times that you can't.

 8          Q.    Okay.

 9          A.    Depending on how much pressure there was to

10    do other things.  And I think it would be impossible to

11    describe the amount of pressure that was on me.

12          Q.    Okay.  Filing a bankruptcy petition is a

13    pretty big decision, wouldn't you agree?

14          A.    Sure.

15          Q.    Okay.  And applying for a Chapter 7

16    liquidation is also a pretty big decision, wouldn't you

17    agree?

18                MR. CAMMARATA:  Objection.

19                THE WITNESS:  I don't think I do.  I don't

20          think I -- I don't remember applying for a 7.

21    BY MR. NATHAN:

22          Q.    Okay.  But if -- if you were to apply for a

23    7, that would be a pretty big decision, right?

24          A.    They both were big.

25          Q.    Okay.  Those are the things you would try
```

Page 271

1    to pay as much attention to as possible?

2          A.    As possible, right.

3          Q.    Okay.

4          A.    There are certain human limits, however.

5          Q.    Okay.  But as much attention as you'd pay

6    to anything else, you'd --

7          A.    As much as attention as I could pay to

8    anything else at that time, yes.

9          Q.    Okay.  Do you understand that if you were

10   to seek a Chapter 7 liquidation that that would result in

11   all of your nonexempt property being sold?

12         A.    No.  I would assume that there would be

13   some exemptions under it -- or under anything.

14         Q.    I totally agree.  I'm not suggesting that

15   any exempt property would be sold, but is it your

16   understanding --

17         A.    Oh, sure, right.  The process lays out

18   exemptions and nonexemptions.  And nonexemptions get

19   sold.

20         Q.    Okay.  So if you were to engage in a

21   Chapter 7 liquidation, you understand that anything

22   that didn't qualify for an exemption would be sold?

23         A.    That makes sense to me.  I never read the

24   law, so it just makes sense to me that that would be the

25   case but I don't know that I ever thought about it.

Page 272

```
 1          Q.    Okay.

 2          A.    I didn't -- did I file a Chapter 7?

 3          Q.    All right.

 4          A.    I don't recall.

 5          Q.    The real question I have is, if you were to

 6     take any steps in the bankruptcy that would have resulted

 7     in the Palm Beach condo being sold, that's something you

 8     would have tried to pay very close attention to; is that

 9     accurate?

10                MR. CAMMARATA:  Objection.

11                THE WITNESS:  I don't know that I can -- I

12          don't -- I don't know that I thought about that.

13     BY MR. NATHAN:

14          Q.    Okay.  Are you aware that the creditors

15     committing in the bankruptcy filed a motion to compel you

16     to sell the Palm Beach condo?

17                MR. CAMMARATA:  Objection.

18                THE WITNESS:  I don't remember that.  I

19          thought they did the New York -- they wanted to

20          take over the sale of the New York condo -- co-op.

21     BY MR. NATHAN:

22          Q.    Are you aware of any hearings that were

23     held on the motion to compel the sale of the Palm Beach

24     condo?

25          A.    No, sir.
```

Page 273

```
1          Q.    Okay.  Were you present at any of those

2    hearings?

3          A.    I don't think so.

4          Q.    Were you present by Zoom?

5          A.    I was present for some hearings.  I don't

6    remember they're trying to force me to sell the -- the

7    Florida condo.

8          Q.    But if you were present for a hearing, you

9    would have been aware of what was going on at the hearing

10   while you were present?

11               MR. CAMMARATA:  Objection.

12               THE WITNESS:  All I could do is tell you

13          what I remember.  I can't tell you what I don't

14          remember.  I don't remember there being a hearing

15          to sell the condo in Florida.

16   BY MR. NATHAN:

17         Q.    So what would be the best evidence, if you

18   don't remember, what would be the best evidence of

19   whether that happened or not?

20         A.     If it happened, it happened.  And I was

21   there and I don't remember it, I don't remember it.

22         Q.    And similarly, if you don't remember, what

23   would be the best evidence of whether you sought to

24   convert your bankruptcy to Chapter 7 liquidation or not?

25               MR. CAMMARATA:  Objection.
```

```
 1              THE WITNESS:  The big issue with the
 2         bankruptcy was not that.  It was not being able to
 3         appeal the decision in the -- the judgment against
 4         me.  And the court would not give us permission to
 5         appeal.  And we -- and -- and to me that was, it
 6         was critical that we get an appeal because I
 7         believe the case is horrendous miscarriage of
 8         justice --
 9    BY MR. NATHAN:
10         Q.   Okay.  I --
11         A.   -- that will be reversed.  I'm telling you
12    what the --
13         Q.   I remember that issue.
14         A.   -- what the decision was.
15         Q.   I'm just -- I'm just focusing on the
16    question --
17         A.   To me --
18         Q.   -- of the Chapter 7 application.
19         A.   To me, there was no issue about Chapter 11
20    or Chapter 7.
21         Q.   Okay.  So given that your -- your testimony
22    today is you don't recall whether or not you tried to
23    convert the bankruptcy to a Chapter 7 liquidation, how
24    would we know whether you had or you did not?
25         A.   Either it was done or it wasn't done and --
```

1    or my lawyers talked about it and didn't tell me about

2    it.

3            Q.    Okay.  So we could just look at the court's

4    records to find out whether that happened or not?

5            A.    I guess, yes.  I mean, yeah.  But I

6    never -- I do not recall ever filing a Chapter 7, nor do

7    I ever recall having it explained to me in detail so I

8    could make a decision whether to do it.

9            Q.    And --

10           A.    And I remember the predominant discussion

11   being, if we stay in bankruptcy, who knows when the hell

12   we're going to be able to appeal because the judge won't

13   give us permission to appeal.

14                And I said that seems crazy to me because

15   that's -- I'm only in bankruptcy because of that

16   judgment.  Otherwise, I would be liquid.  And should we

17   get that resolved, should the creditors want it resolved

18   to figure out how much, and they couldn't give me a good

19   answer to that.

20           Q.    Okay.  So if --

21           A.    I think they told me that you were blocking

22   that.  And I said, well, that's only for the benefit of

23   one creditor, not all the creditors.

24           Q.    Okay.  So if -- since you don't recall

25   whether or not you filed an application to convert the

Page 276

1   bankruptcy to Chapter 7, the only way to know would be to

2   go look at the court's records; is that right?

3                   MR. CAMMARATA:  Objection.

4                   THE WITNESS:  Sure.

5   BY MR. NATHAN:

6           Q.    Okay.  And since you testified that you

7   don't know really have a full understanding of what a

8   Chapter 7 liquidation would mean with respect to the Palm

9   Beach condo, the way to note that would just be to look

10  at the law and see what the law says?

11                  MR. CAMMARATA:  Objection.

12  BY MR. NATHAN:

13          Q.    Is that right?

14          A.    I guess.  To this day, I mean, right now, I

15  don't know the answer to that.

16                  MR. CAMMARATA:  Don't guess.

17                  THE WITNESS:  I don't -- I don't know

18          Chapter 7.

19  BY MR. NATHAN:

20          Q.    Okay.  I -- I can appreciate that you are

21  telling me now, sitting here today, you don't know what

22  that is and I'm just asking whether you agree that the

23  way to know, one way or the other --

24          A.    Of course.

25          Q.    -- what would happen would just be to look

Page 277

1    at the law and see what the law says?

2              MR. CAMMARATA:  Objection.

3              THE WITNESS:  Of course.

4    BY MR. NATHAN:

5         Q.   Okay.  And ultimately it would be up to a

6    court to make that determination about what the law says?

7              MR. CAMMARATA:  Objection.

8              THE WITNESS:  Ultimately, sure.

9    BY MR. NATHAN:

10        Q.   Okay.

11             Now, just one final thing.  So you don't --

12   you don't recall being present at any hearings relating

13   to an application to convert your bankruptcy to

14   Chapter 7?

15        A.   No.

16        Q.   Okay.  So we've talked plenty about the

17   Palm Beach condo and your homestead claim.

18             Is there anything that we haven't discussed

19   that you think is important to the question whether you

20   established a homestead at the Palm Beach condo?

21        A.   I don't --

22             MR. CAMMARATA:  Objection.

23             THE WITNESS:  I really don't know the

24        answer to that.

25   BY MR. NATHAN:

1          Q.    You don't know whether there is anything --

2          A.    Well, sure there are other things to

3     discuss.  I mean, it was a long, long decision.  There

4     were many parts to it.  I've answered the questions

5     you've asked me.  I -- you are supposed to ask the

6     questions.

7          Q.    Sure.  Sitting -- so I'm asking the

8     question now.

9                So sitting here today, can you recall

10    anything else that is important to the question of

11    whether you established the -- the Palm Beach condo as a

12    homestead?

13         A.    Sure, I -- of course I can.  I mean, I can

14    think of all the people that I talked to about it.  I've

15    only given you a small sample of those.

16         Q.    I'm not asking about other people who might

17    also know.  I'm asking, in your mind, what are the other

18    facts that are important to that question that we haven't

19    discussed?

20               MR. CAMMARATA:  Objection.

21               THE WITNESS:  I can't think of -- I can't

22         think of a -- a -- I probably haven't described

23         adequately all the things that I bought or brought

24         down here so that it would be a permanent -- when

25         you say "permanent residence," I didn't really

1          have to buy anything to make it a permanent
2          residence.  I had to add things to make it a
3          permanent studio which I did.  I have explained
4          that that -- that took a long time.
5               Right now I can't think of anything other
6          than people that I've discussed it with who --
7          for -- for example, one of my close friends
8          thought I already was a Florida domiciliary.
9    BY MR. NATHAN:
10         Q.    And who is that?
11         A.    In mid -- in mid-'23.
12         Q.    Who was that?
13         A.    Bernard Kerik.
14         Q.    Okay.  And why did he think that?
15         A.    Because obviously -- because of the way I
16   acted, the way I -- they way he would come and see me
17   here.  He just assumed it.
18         Q.    Based on the way you were acting in 2023,
19   he thought that you were already a permanent resident
20   at --
21         A.    Correct, I had --
22         Q.    -- the Palm Beach condo?
23         A.    I had to correct him, that I wasn't.
24         Q.    Okay.  Is there anything else that we
25   haven't discussed, any other facts that you think are

Page 280

1    relevant to the question --

2            A.    Other than discussing it with people,

3    that's the one that comes to mind.

4            Q.    Okay.

5            A.    I'm sure when I leave here, there will be

6    five other things I'll remember about things that I did.

7            Q.    Okay.  So what types of those -- what types

8    of things would that be?

9            A.    I can't remember them.  Didn't you ever

10   give an argument and then remember three things you

11   should have argued?

12           Q.    I'm just asking right now, sitting here

13   today --

14           A.    Right now, sitting here --

15           Q.    -- do you remember any other facts --

16           A.    Right now --

17           Q.    -- that are relevant?

18           A.    -- I've told you -- I've answered your

19   questions.  If I -- if I say, are there other things that

20   should have been asked and you didn't ask?  I don't think

21   I can really help you with that.

22           Q.    Okay.

23           A.    There's nothing that I can think of --

24           Q.    I'm asking you --

25           A.    -- nor do I think it's a particularly --

Page 281

1          Q.    I'm not asking you --

2          A.    -- useful question.

3          Q.    Okay.  Just let me finish my question.

4          A.    You should know what to ask, not me.

5          Q.    I am not asking whether you answered my

6     questions.  I'm asking:  Other than the things we've

7     already spoken about, is there any other information that

8     you think is relevant to whether you established a

9     homestead at the Palm Beach condo?

10               MR. CAMMARATA:  Objection.

11               THE WITNESS:  I'm sure there is but I can't

12          think of it right now.

13     BY MR. NATHAN:

14          Q.    Sitting here right now, you cannot think of

15     anything else?

16               MR. CAMMARATA:  Objection.

17               THE WITNESS:  Right now I can't think of

18          anything else but I'm certain there is.

19     BY MR. NATHAN:

20          Q.    You are certain there is?

21          A.    Uh-huh.

22          Q.    Why are you certain?

23          A.    Because you always remember things

24     afterwards.

25          Q.    Always?

1          A.    Always, almost -- I've never -- I've

2     never -- I've argued a hundred cases.  There probably

3     isn't one where I didn't finish a summation, two days

4     later think, oh, I should have added that.  I should have

5     added that.

6          Q.    I'm just asking -- well, have you -- have

7     you given complete and honest testimony here today?

8          A.    Yes.

9          Q.    Okay.  So are you leaving out anything

10    that's important to these claims?

11         A.    No.

12         Q.    Okay.

13         A.    Well, wait a second.  I answered your --

14         Q.    I asked a question and you answered it.

15         A.    Well, I'm going to amend the answer so that

16    it's --

17         Q.    I'm not asking you to amend your answer.

18         A.    I've answered your questions.  Of course I

19    left things out that you didn't ask me.

20         Q.    Okay.  What did you leave out?

21         A.    Thousands of things you didn't ask me.

22         Q.    What did you leave out?  I'm asking you --

23               MR. CAMMARATA:  Objection.

24               THE WITNESS:  This is an absolutely

25          ridiculous question.

Page 283

1    BY MR. NATHAN:

2            Q.    What did you leave out?

3            A.    I'm not going to -- it's an absolutely

4    ridiculous question.

5            Q.    You won't tell me the things that you left

6    out?

7                  MR. CAMMARATA:  Objection.

8                  THE WITNESS:  They are totally irrelevant.

9            I mean, there are a lot of things you didn't ask

10           me.

11   BY MR. NATHAN:

12           Q.    Okay.  What are the things that are

13   relevant --

14           A.    I don't know.

15           Q.    -- that you haven't said?

16           A.    I don't know.  I don't know the answer to

17   that.  I'm sure I'll think of it later.

18                 MR. CAMMARATA:  That's his answer.

19                 MR. NATHAN:  Joe, I didn't ask you any

20           questions.

21                 THE WITNESS:  Argumentative, stupid

22           questions.

23   BY MR. NATHAN:

24           Q.    Well, I'm just asking a simple question

25   about whether there are other facts that are relevant to

Page 284

1    your claim.

2         A.    As I told you, I cannot recall any other

3    facts, but I'm certain there are.

4         Q.    Why are you certain that there are?

5         A.    Because of the way the operation of the

6    human mind takes place.  And after you finish, you

7    almost -- let me say, the odds are very strong that there

8    are things that you didn't remember.

9         Q.    Okay.  Are you aware of the phrase "the

10   whole truth"?

11        A.    That is the whole truth.  It's the whole

12   truth as of right now.

13        Q.    Have you told the whole truth today?

14        A.    Yeah.  It's rather insulting that you ask

15   me.  Yes, I've told the whole truth.

16        Q.    Well, that's all I'm asking, is whether you

17   told the whole truth today.

18        A.    I told the whole truth today.  Absolutely.

19        Q.    Okay.  I'm asking now whether there are any

20   other facts, other than what you've told me today, that

21   are relevant to your claim in this case?

22        A.    And I'm telling you, I don't recall any

23   right now but I'm certain there are.  That's the whole

24   truth.

25        Q.    So you're sure that there are other facts

1   that you haven't told me today?

2           A.    I am certain that between now and two weeks

3   from now I'll think of two or three more things that you

4   didn't ask about and I didn't think of.

5           Q.    Okay.

6           A.    That's after 50 years of experience of

7   being in court.

8           Q.    Okay.  But if I asked about something, you

9   gave me the most --

10          A.    I gave you the answer I could give you

11  today, honestly.

12          Q.    Okay.  So if I asked about something, you

13  gave me a complete answer?

14          A.    I gave you the honest answer that I could

15  give today based on my memory today.

16          Q.    Okay.  Is there any reason -- I think I

17  asked you earlier today as to whether there was any

18  reason that you would not be able to give complete

19  answers, whether there was any reason you wouldn't be

20  able to remember everything relevant to your testimony.

21                Is there any reason your memory today would

22  be any less sharp than usual?

23          A.    My memory is not any different than it is

24  normally is.

25          Q.    Okay.

Page 286

1         A.    But I am a human being, which means my
2    memory is not perfect.
3         Q.    Okay.  Are you aware that you have a
4    continuing obligation to supplement your discovery
5    responses?
6              MR. CAMMARATA:  Objection.
7              THE WITNESS:  Correct, I'm sure.
8    BY MR. NATHAN:
9         Q.    Okay.  And so if you recall any additional
10   relevant information, you'll supplement your discovery
11   responses accordingly?
12        A.    If I recall -- if I have the experience
13   that I think I will have, I will tell my lawyers and they
14   can figure what the right way to handle this.
15        Q.    Okay.  So I'll hold the deposition open in
16   case any additional material is disclosed.  We'll come
17   back and ask you about it.
18        A.    Are we finished?
19        Q.    No.  I would now like to ask you about the
20   World Series rings.  So at what point did you own four
21   Yankees World Series rings?
22        A.    They were given to me in the spring of
23   2002.  Well, actually, one was given to me in the fall of
24   1996 or after the fall of 1996 whenever they were ready.
25   And I sent it back to George Steinbrenner and said I

Page 287

```
 1   didn't think it was appropriate that a mayor get a ring.
 2                I didn't even think at that time that I
 3   could have paid for it.  I should have, because then I
 4   could have had it.  But I sent it back to him.  The
 5   Yankees then went on and won three more world
 6   championships while I was mayor.  And I was a very ardent
 7   Yankee fan.  When I was the mayor, I was described as New
 8   York's number one Yankee fan.  I would sit right next to
 9   Joe Torre, who is close personal friend.  We went through
10   prostate cancer together.  That made us even closer.  I
11   was a close friend of Bernie Williams.  I introduced him
12   at his first concert.  And I could go on and on with the
13   Yankees.
14           Q.    Okay.
15           A.    Unbeknownst to me -- well, let me tell you
16   how it happened.  After I left being mayor and during
17   spring training of 2002, George Steinbrenner invited me
18   to a lunch in Tampa, Florida, and at the lunch, he gave
19   me a plaque, I don't recall exactly, beautiful plaque, I
20   don't recall exactly, then he gave me three World Series
21   rings with my name on it.
22                And I said, what are those?  He said, well,
23   after the first one, I knew you didn't want any more.
24   And I had these three made up for you when they won.  And
25   I was very touched and moved by that.  And then -- but he
```

Page 288

```
 1    said -- he said, "after you didn't want any more."  So I
 2    said -- so I said, I hate to ask this, George, but where
 3    is the first one?  He said, You have that.  I said, No, I
 4    don't have it.  I sent it back.  He said, We don't have
 5    it.  And I said, George, I'm not going to take these
 6    unless I pay for them.  He said, Well, you can't pay for
 7    them.  I said, Well, I damn well can pay for them.  I can
 8    go call the guy who made them and find out.  Every player
 9    loses a ring, I knew that because several players had
10    told me they lost rings.  The Yankees make them buy the
11    new one.  So I'll figure out the value and pay -- pay the
12    Yankees for the value.
13                He said, If that's really going to make you
14    feel better, fine, but this is ridiculous.
15                I used to also pay for my seats all the
16    time and I have a letter somewhere from him, you probably
17    have it now in all those papers, where I was the only
18    politician who ever paid for his tickets.  I said I'm
19    going to pay for them but we've got to locate this --
20    we've got to locate this missing ring because this will
21    be a problem.  Because I know what the press is like.
22                So it took a while but -- I've forgotten
23    what his role was then -- but now the president of the
24    Yankees, Randy Levine, located it in his safe.  He --
25    Randy Levine had been my deputy mayor twice and now he
```

Page 289

```
 1   was George Steinbrenner's -- either the vice president or
 2   the president of the Yankees.
 3                And he had effectuated the return of the
 4   ring but he kept it in his safe.  Luckily, I had letters
 5   from my special assistant, Beth Hatton, documenting that
 6   I sent the ring back.  So that completed the whole thing.
 7   When I got the rings, I told George -- who loved Andrew,
 8   helped to bring him up.  He used to sit in his big glove
 9   chair.  I said, you know, These are for Andrew.  He said,
10   Well, I knew that.
11                And when I got them all together, I put
12   them out, this would be in 2002, maybe '3, I put them out
13   and I said, These are going to be yours.  He said, Well,
14   I shouldn't take them now.  I said, Well, why don't you
15   take one.  Pick the one you want and you can have that.
16   You can just take that one with you and I'll keep the
17   rest for safekeeping.  And so I did for a while.
18                I'd occasionally -- I'd wear them
19   usually -- I'd wear one on like a special Yankee
20   occasion, like I'd wear one when they were in the World
21   Series again.  I wore -- we both did.  We wore them
22   through the World Series in 2009.  We wore them through
23   the World Series in 2003.  It didn't do any good.  We
24   wore it when the Red Sox came back and won four games in
25   a row.  Didn't work then either.
```

Page 290

```
 1            I stopped wearing them after the Yankees
 2  stopped winning because it was no longer working.  And
 3  then I wasn't using them anymore.  And on my -- I don't
 4  remember if it was my birthday or his birthday, but it
 5  was about 2018, 2019, and we kept exchanging that one
 6  ring.  So I don't know which three rings it was.  But I
 7  brought the three boxes and I made a little ceremony.
 8  I'd given it to him.  I said, They are now yours.  These
 9  are your rings.  I don't know what I'm keeping them for.
10  They belong to you.
11            And then he -- he wore them from then on,
12  on and off.  And he moved -- when he moved, I took them
13  and put them in safekeeping.  And so they were in my
14  house for a while after I gave it to him, and then back
15  in his house when he moved.  And I think the last time --
16  and every once in a while I'd borrow one, either when he
17  had them or I had them.  The last time I probably did
18  maybe two years ago, but there hasn't been any real
19  occasion to wear them.
20            I might have -- I might have -- I think I
21  remember him bringing it over when I told you I was
22  doing -- when I was doing the Yankee simulcast or
23  whatever.  I think I asked him to bring a ring.
24            Also, I remember in 2007 or 2008, if you
25  need further evidence of this, I was being attacked by
```

Page 291

1    the press with complete lies -- that's not unusual --

2    that I had been given those rings -- I think Wayne

3    Barrett wrote this article -- as a bribe in order to

4    provide a new Yankee stadium.

5                    I thought it was a ridiculous article

6    because I don't think somebody would have taken $20,000

7    worth of rings for a $2 billion stadium but -- nor would

8    I have taken one since I was a prosecutor for more years

9    than I was anything else, and an honest person.

10                   And luckily I had kept all my records.  And

11   I had my secretary -- my special assistant, Beth Hatton,

12   who was an extraordinarily remarkably human being -- she

13   had every detail of how much I paid for them, when I paid

14   for them, the two valuations of them.  And I held a press

15   conference, this is when I was running for president.  I

16   held a press conference and I proved that I paid for

17   every ring.

18                   The press then said, Well, you are lying

19   because the rings are worth more than you say, because

20   they are your rings, and we went to specialists and they

21   had them valued, because they are yours, at more than

22   their actual value.  I said, Well in that case, when I

23   bought this suit which was about 6-, $700, I should have

24   paid 1,200.  Because if I resold the suit as my suit, it

25   would be worth $1,200.

Page 292

1           Oh, and this pen that cost me $100, I
2   should have gone to -- or probably had a Montblanc pen,
3   $500, probably should have said to Montblanc, if it is my
4   pen, how much is it worth?  And they would have said
5   1,500.  Well, I'll pay you another $1,000 or -- I said
6   this is ridiculous because I paid for them the same value
7   what everybody else paid for them.
8           If I would sell them -- if I spent 20,000
9   and I sold them sometime for 500 or 50,000, I'd have to
10  pay 40,000 in capital gains tax.  That's how it worked.
11  But I don't intend to sell them.  These are my son's
12  rings.  So I always intended to give it to him.  They
13  were his -- even considered them before I gave them his
14  rings.
15          And then I finally officially gave it to
16  him.  I remember reading something about a father who
17  turned all his property over to his kids before he died
18  so they could have it when they can enjoy it.  That was
19  probably on my mind when I did it.
20       Q.    Okay.
21       A.    That's all I remember about it.
22       Q.    Thank you, that was very helpful.  So I
23  just want to make sure I'm clear on the timeline.  So
24  initially there were -- there are four total rings; is
25  that right?

Page 293

```
1              A.    There were four total rings.  I explained
2      to you the hitch in one of them being missing for about
3      six months.
4              Q.    Sure.  Sure.  And then at one point, you
5      owned all four of them?
6              A.    (Nodding head yes.)
7              Q.    Okay.  And I think you testified -- I'm
8      sorry, could you just answer that verbally?  At one point
9      you owned all four of them?
10             A.    Sure, when they were given to me, yes.
11             Q.    Okay.  And then later you testified that
12     you -- you decided to give one of them to Andrew?
13             A.    No, immediately.
14             Q.    Well, I'm just talking about -- you
15     testified that sometime in 2002, you gave one of those
16     rings to Andrew?
17             A.    I did -- yes, when I first showed it to
18     him, I told him, pick out one.
19             Q.    Okay.
20             A.    And he did.  And then I said, I am
21     eventually going to give them all.
22             Q.    Okay.  So -- and then you told him you
23     would eventually give them all.
24                   And then you testified that you -- then you
25     did give them all to him in 2018?
```

Page 294

1          A.    I don't remember if it was 2018 or 2019.  I
2     can't remember if it was 2018.
3          Q.    That's when you -- that's when you
4     physically gave him all?
5          A.    Right.
6          Q.    The other three rings?
7          A.    Right.  I said, I might as well give them
8     to you.
9          Q.    And then --
10          A.    They are yours, do -- do -- I can't, I just
11     can't recall whether it was 2018 or 2019.  I don't
12     remember if it was my birthday or his birthday.
13          Q.    Okay.  And your testimony is that, that's
14     when you physically gave him the remaining three rings;
15     is that right?
16          A.    Uh-huh.
17          Q.    And after --
18          A.    Yes.
19          Q.    -- that point you didn't physically
20     possess --
21          A.    No.
22          Q.    -- any of the rings?
23          A.    Some -- I didn't -- I didn't physically
24     possess them in the sense that I used them on my own free
25     will.  I physically possessed them for a long period of

Page 295

```
1    time when he was moving in order to secure them.
2            Q.    Do you remember when that was?
3            A.    2020, 2021.
4            Q.    Okay.
5            A.    And then I haven't had them in my house
6    for -- I can't rem- -- seems to me, over a year or two.
7            Q.    Okay.
8            A.    So that would be like a one or two-year
9    period in between.  And all during that time, I would
10   occasionally borrow one and I'd make a little joke out of
11   it and I'd ask his permission.
12           Q.    So whenever you would -- okay.  So
13   starting -- let -- let me back up.
14                 I think you testified that during the time
15   you didn't physically possess them, you still were able
16   to use them of your own free will; is that right?
17           A.    No, no.  No.  Well, I probably could have.
18   He wouldn't have minded.  But I would -- I would always
19   tell him, asked him or tell him.
20           Q.    So if -- if you were going to use the
21   rings, you would always ask Andrew's permission?
22           A.    I would tell him I was, yeah, or ask him.
23   Either -- either way.
24           Q.    Would you tell him or ask him?
25           A.    Both.
```

Page 296

```
 1            Q.    Okay.  And if he had said no, what would
 2     you have done?
 3            A.    Not -- not use it.
 4            Q.    Okay.  Did he ever say no?
 5            A.    No.
 6            Q.    Okay.  In your mind, that moment in 2018
 7     when you physically gave him the -- strike that.
 8                  In your mind, the moment when you
 9     physically gave Andrew the remaining three rings, was
10     that the moment when you officially made the gift of
11     those three rings to him?
12            A.    Yes, I -- right.
13            Q.    So it would have been the moment when you
14     physically transferred possession to him?
15            A.    Right, whenever that was, whatever --
16            Q.    Okay.
17            A.    -- date that was.  And I -- I recall a
18     picture of handing it over to him that I've seen since
19     then.
20            Q.    Okay.
21            A.    Because it was -- it was at an event.
22     He -- it was at a certain event.  I just can't recall the
23     event and somebody took a picture of it.
24            Q.    Okay.  So you --
25            A.    And I said, "These for my son Andrew."
```

1          Q.    Okay.  And then there was an event.  There
2     was a picture and then what happened --
3          A.     And his wife.  There was a picture of me,
4     Andrew and his wife, Živile.
5          Q.    Okay.
6          A.     That picture would be the best evidence of
7     the date, if it -- yeah, if it marks the date.  I don't
8     remember.  Usually pictures do.
9          Q.    Okay.  And in -- and in your recollection,
10    that's the moment when you physically gave Andrew the --
11         A.    Yeah.
12         Q.    -- remaining three rings?
13         A.    Sort of the thing reversed, right.  So I --
14    they were technically mine and he would occasionally
15    borrow them.  Then they became his and I would
16    occasionally borrow them.
17         Q.    Okay.  And -- and that transition happened
18    when you made the physical transfer of the remaining
19    three rings to him?
20         A.    Yeah, and the best evidence of it would --
21    of the date would be -- would be the picture.  That would
22    help me figure out the date.
23         Q.    Okay.  Is it possible that it didn't happen
24    exactly then but it happened another time?
25         A.    At -- at the time of the picture?

1          Q.    Yeah, is it possible that -- that the

2     physical transfer of the remaining three rings that you

3     are describing didn't happen when that picture was taken?

4          A.    I guess anything is possible but that's

5     what I recall.

6          Q.    Okay.  Have you ever had the rings

7     appraised?

8          A.    I don't think so because they never were an

9     issue in my -- in my -- Judith never sought custody of

10    them.  So I -- I don't think I ever did.

11         Q.    Okay.  But Judith never possessed any of

12    the rings?

13         A.    Oh, no, she -- that was one of the things

14    that she -- she was not going to -- she wasn't going to

15    ask for the ring or my grandfather's watch or a couple

16    things and a couple of things of hers that I would never

17    have asked for.

18         Q.    Okay.  And -- okay.  Do you recall what you

19    did pay for the rings?

20                   MR. CAMMARATA:  Objection.

21                   THE WITNESS:  Between 20 and 30,000.

22    BY MR. NATHAN:

23         Q.    Each or total?

24         A.    Oh, no, total.

25         Q.    Total?

Page 299

1          A.    They each -- they became significantly more

2    expensive, ridiculously more expensive each year and

3    ridiculously bigger.

4                So the first one -- this is complete -- for

5    purposes of illustration, the first one, it started at

6    about two or $3,000 and it ended about 12.

7          Q.    Okay.

8          A.    So the first one was like 3,000, which

9    would be the Yanks and the Braves.  And the last one,

10   which was also the Yankees and the Braves was -- was like

11   12,000.  And one was about 8,000.  And the other one was

12   about four.  They kept going up.  And the -- the stone

13   kept getting bigger and bigger and bigger.

14               And the last one was ridic- -- you couldn't

15   wear it any way.  You'd look like it -- you look crazy

16   wearing it.  And now, now they are twice the size of --

17         Q.    Okay.

18         A.    -- what they were then.

19         Q.    Why did you list three Yankees World Series

20   rings as -- among your property when you filed for

21   bankruptcy?

22               MR. CAMMARATA:  Objection.

23               THE WITNESS:  Because they probably

24         were in -- they probably were somewhere in the

25         divorce papers and they got picked up.

Page 300

1    BY MR. NATHAN:

2            Q.    Okay.  And --

3            A.    Because I -- a lot of the discrepancies in

4    the bankruptcy papers come about because the best thing I

5    had to give was of the valuations that were done in the

6    divorce.

7            Q.    Okay.  But if you had a chance to fix that,

8    you would have fixed it?

9            A.    I would have, yeah.

10           Q.    Okay.  But the reason it would have said

11   three and not four, that's because Andrew had already

12   taken possession of one of them?

13           A.    Yeah.

14                 MR. CAMMARATA:  Objection.

15                 THE WITNESS:  Yes, but what I said, I

16          had -- I had given that one -- gave it to him

17          right away, right -- right when I got them.

18   BY MR. NATHAN:

19           Q.    Okay.  Have you ever had any insurance

20   coverage for the rings?

21           A.    Itemized insurance coverage or -- the items

22   in my -- I don't -- no, I don't think I had itemized

23   insurance coverage, other than general coverage of

24   everything in your apartment.

25           Q.    Okay.  Sort of a part of your homeowner's

Page 301

 1    policy?

 2            A.      Right.

 3            Q.      Okay.  Have you ever made any changes to

 4    the amount of that coverage?

 5            A.      I probably have, not anything -- not

 6    anything to do with the rings.

 7            Q.      Okay.  Do you recall which of the rings was

 8    the one that you gave Andrew initially?

 9            A.      I remember -- I remember having a Met ring

10    for a fairly long time because I use -- that's the one I

11    would wear in order to irritate people who were Met fans.

12    Probably wore that more often than any other.  I don't

13    remember which one he took.

14            Q.      Okay.

15            A.      All -- all I can remember is it was not the

16    Met ring.

17            Q.      Okay.

18            A.      Which is the one I thought he would take.

19            Q.      Okay.

20            A.      If --

21            Q.      Do you recall speaking to Andrew around

22    January 26th, 2024, about the rings?  Do you recall

23    speaking to Andrew around January 26th, 2024 --

24            A.      Do I recall what about Andrew?

25            Q.      Speaking to him about the rings?

Page 302

1           A.     Well, he -- I don't remember that date but

2    I remember talking about the rings and him telling me --

3    and reminding me that I gave them to him.

4           Q.     Okay.  Do you remember what exactly was

5    said in that conversation?

6           A.     He reminded me -- he reminded me, I said I

7    remembered and -- and then -- I don't remember if it was

8    on that occasion or other occasion, he -- he -- he

9    brought me the picture and he showed me the picture.

10          Q.     Okay.

11          A.     And I recall the -- the event.

12          Q.     Why did you need to be reminded that you

13   had given him the rings?

14                 MR. CAMMARATA:  Objection.

15                 THE WITNESS:  Because there are a million

16          things on my mind, and it would not have been

17          something that I would necessarily have

18          remembered.

19   BY MR. NATHAN:

20          Q.     Okay, so --

21          A.     I mean, I think it's impossible to recreate

22   how many things I've been through, so I don't know that I

23   would have independently been able to recall -- recall

24   that.  I think I would have but I'm not sure.

25          Q.     Okay.  You -- so you are not sure whether

Page 303

1    you would have been able to independently remember

2    whether or not you've given him the rings?

3            A.    The minute he said it, I remembered it.

4    And I remembered it was a birthday occasion.  But if out

5    of the blue you asked me to recite, yeah, if I -- if I

6    was going to tell the story I just told, I would remember

7    it.  But it was not a fact that I carried around in my

8    head all the time.

9            Q.    Okay.  Do you remember any specific details

10   of the conversation you had with Andrew at that time, in

11   January 2024?  Do you remember any specific words that

12   were said?

13           A.    No, I remember the subject.  I remember the

14   picture.  I remember recalling -- at that time, I recall

15   the event, meaning whether it was his birthday or mine.

16   Right now I'm a little unclear about which event it was.

17   And when he showed me the picture, I recalled it even

18   more vividly.

19           Q.    Okay.  Do you remember -- at that event, do

20   you remember exactly what words you used when you told

21   Andrew you were giving him the rings?

22           A.    No, I remember the substance of it which

23   these are -- something like as you know, I've always --

24   these are yours when I die, so you might as well have

25   them now.  Something like that, like a joke, or you might

Page 304

1   as well enjoy them now.

2           Q.    Okay.  Something --

3           A.    And then he said something about of course

4   you can always use them when you went and -- and we

5   hugged and kissed and I gave him the rings.

6           Q.    Okay.  Do you remember whether you said you

7   might as well have them now, or you might as well enjoy

8   them now?

9           A.    I could have said that, yeah.  That's what

10  I meant.  I meant he should enjoy them now, why wait

11  until I die.

12          Q.    I think I may not have been clear.  You

13  testified that you said something like these are yours

14  when I die, so you might as well have them now, or you

15  might as well enjoy them now.

16              Do you remember which of those two it was?

17          A.    If I had to use my own words, I would say

18  these are yours now.

19          Q.    That's that you would say --

20          A.    That's what I think I said.  Something like

21  that.

22          Q.    Okay.  Do you have anything that can

23  confirm one way the other which of those two things you

24  said?

25          A.    Uh-uh, all I can do is give you my best

Page 305

1    recollection.

2         Q.    Sitting here today, as far as you can

3    recall, it could have been either one?

4         A.    Could have been either one.

5         Q.    Okay.

6         A.    The intent was to give them to him and they

7    would be his.

8         Q.    Okay.  And that happened when you

9    physically gave the three rings to him?

10        A.    It happened on the date of that picture,

11   right.

12        Q.    Okay.  Well, I think you testified -- so

13   the act of physically giving him the other three rings,

14   that was the moment when you gave him -- when you

15   transferred ownership of the rings to him?

16        A.    Yes, when I -- yes.

17        Q.    Okay.  Do you know what the Giuliani

18   Freedom Fund is?

19             MR. CAMMARATA:  Objection.

20             THE WITNESS:  That is a fund that is run to

21        raise money to help pay my legal fees.  There are

22        two of them.  There are two such funds.  And

23        that's one of them.

24   BY MR. NATHAN:

25        Q.    Okay.  What's the other one?

Page 306

```
 1            A.    GoFundMe or something like that.

 2            Q.    Do you know what -- excuse me.

 3            A.    It's like a GoFundMe fund.  One is run by

 4     Andrew.  He's the trustee of it.  And the other is run by

 5     Jake Menges.

 6            Q.    Okay.  Do you know what Giuliani Defense

 7     is?

 8            A.    Pardon me?

 9            Q.    Giuliani Defense, do you know what that is?

10            A.    That's one of the -- that's one of the

11     funds.

12            Q.    Okay.

13            A.    I'm not sure which one -- I'm not sure of

14     the name of the one that Andrew is the trustee of and the

15     one that Jake Menges is the trustee of.

16            Q.    Okay.

17            A.    Jake's precedes Andrew's.

18            Q.    Okay.  I'll -- does it sound right to you

19     that Jake Menges is the trustee of Giuliani Freedom Fund

20     and Andrew is in charge of Giuliani Defense?

21            A.    Yes -- I mean, yes, but I could have

22     reversed them too.

23            Q.    Okay.  I'll represent to you that that's

24     the --

25            A.    I have no reason to disagree with that.
```

Page 307

1          Q.    No reason to disagree, okay.  To what
2    extent are you aware of the activities of Giuliani
3    Freedom Fund?
4          A.    Just what they tell me.
5          Q.    Is Jake Menges somebody you trust?
6          A.    A hundred percent.
7          Q.    Okay.  If Giuliani Freedom Fund were to
8    communicate something to the public that purported to be
9    on your behalf, would he let you know first?
10          A.    I don't -- there isn't any kind of rule
11    like that, no.
12          Q.    But if he were going to say something -- if
13    he were going to put words in your mouth, would he talk
14    to you about it first?
15          A.    I don't know.  I mean I don't know.  There
16    is no -- he's worked with me for so long and made
17    comments to the press for me for so long.  He worked with
18    me for eight years when I was mayor.  And he's helped run
19    my presidential campaign.  I think he -- he'd feel a
20    certain freedom to speak for me, yeah.
21          Q.    Okay.  And in particular, if Giuliani
22    Freedom Fund were to distribute a fundraising appeal that
23    included a personal message or something purporting to be
24    a personal message from you --
25          A.    Uh-huh.

Page 308

```
 1          Q.     -- would you review that message before it
 2     was circulated to the public?
 3          A.     Not always.  I mean, he would do it on his
 4     own.
 5          Q.     Okay.  So Giuliani Freedom Fund might send
 6     out a fundraising appeal with a message that purports to
 7     be from you personally, but that actually came from Jake
 8     Menges?
 9          A.     I don't remember them doing that but it
10     wouldn't surprise me if they would do that.  Because I
11     try -- I mean, I try very hard to stay as far away from
12     the fund as I can.
13          Q.     Okay.  Is the same true for Giuliani
14     Defense?
15          A.     Same thing.
16          Q.     So Giuliani Defense might put out a
17     fundraising appeal with a message that purports to be
18     from you personally, but actually --
19          A.     Yeah, I don't know that that's to be the
20     case.  It wouldn't shock me if that happened.
21          Q.     Okay.  Other than the issues we just
22     discussed with respect -- well, strike that.
23                 Do you have any documents to support the
24     story that you just told me about the four World Series
25     rings?
```

Page 309

```
 1          A.    Not about -- I have documents about the
 2    purchasing of them.
 3          Q.    Well, let's limit it to a narrower time
 4    period.  Do you have any documents --
 5          A.    That's way back.
 6          Q.    -- to support the story you told me about
 7    giving Andrew the three rings at all?
 8          A.    No, we never did a -- like a bill of sale.
 9          Q.    There are no documents to support --
10          A.    I don't remember doing any writing about
11    it, no.
12          Q.    There are no documents that would support
13    that?
14          A.    Except for the picture, I don't think so.
15          Q.    Okay.  Are there any communications that
16    would support that?
17          A.    Like an email or a...
18          Q.    Any communications of any kind that
19    would --
20          A.    I just recall it being oral.
21          Q.    Okay.  So --
22          A.    I handed it to him and that was it.
23          Q.    So there are no communications that would
24    support the contention that you gave Andrew the other
25    three World Series rings?
```

```
                                                        Page 310
 1                  MR. CAMMARATA:  Objection.
 2       BY MR. NATHAN:
 3            Q.    Other than the one that he --
 4            A.    There is nothing that would support that I
 5       gave him the first one.  I just gave it to him.
 6            Q.    Okay.  Is there anything that's relevant to
 7       you giving Andrew any of the World Series rings that you
 8       haven't shared?
 9            A.    Not that I can think of.
10            Q.    Okay.  Okay.  I'd like to ask you a little
11       bit about Standard USA, LLC.  Do you know what Standard
12       USA, LLC is?
13            A.    Sure.
14            Q.    What is it?
15            A.    It's the company that -- its main -- its
16       main business is producing and marketing the America's
17       Mayor Live.  And also all of my media and -- my media and
18       communication business.
19            Q.    Okay.  Who owns Standard USA, LLC?
20            A.    Myself, Dr. Ryan, and Theodore Goodman.
21            Q.    Okay.  Are you the majority owner of
22       Standard USA, LLC?
23            A.    Yes, I am.
24            Q.    Okay.  Who has managerial control over
25       Standard USA?
```

1          A.     De facto, Marie Ryan.  She runs it.

2          Q.     Okay.  What do you mean by de facto?

3          A.     I don't know that we wrote that down

4    anywhere.  We don't have those kinds of detailed

5    documents.  That's how -- that's how we -- she runs it

6    day to day and tells us what to do.  I'm the talent.

7          Q.     Is there an operating agreement for

8    Standard USA, LLC?

9          A.     No.

10         Q.     Is there any sort of membership agreement?

11         A.     Just the corporate papers and -- I don't

12    think so.

13         Q.     Okay.  Are there any documents that would

14    assign legal authority for any individual to act on its

15    behalf?

16         A.     Yes.

17         Q.     What are those?

18         A.     Well, the bank account.

19         Q.     Let me clarify.  Are there any corporate

20    documents that would assign legal authority --

21         A.     I would have to look.  I think there might

22    be one that was produced -- one that was done in order to

23    set up different accounts that makes her the person in

24    control of that.

25         Q.     In control of the bank account?

1          A.    Yes.  She -- she is -- she and Ryan are the

2     signatories of the bank account.

3          Q.    Meaning, Maria Ryan and Ryan Medrano?

4          A.    Yes, the two Ryans.

5          Q.    So the document you are referring to that

6     would give Dr. Ryan authority is a document in connection

7     with the bank account that gives her signatory authority

8     on the bank account?

9               MR. CAMMARATA:  Objection.

10              THE WITNESS:  Yes.

11    BY MR. NATHAN:

12         Q.    Okay.  But internal to Standard USA, LLC,

13    there is no -- is there any document that I would assign

14    authority to act to any particular member of the LLC?

15         A.    I don't remember.

16         Q.    Okay.  Do you take distributions and

17    profits from Standard USA?

18         A.    We haven't done that yet.  It's only been

19    in existence for what, six, seven months.  So we haven't

20    had -- we haven't distributed any profits.

21         Q.    Okay.  How -- are you paid by Standard USA,

22    LLC?

23         A.    I don't think I've received any money from

24    there.  I would be paid out of the profits.

25         Q.    If you were paid by Standard, it would

Page 313

```
 1    be --
 2              A.    Right.
 3              Q.    -- out of the profits?
 4              A.    Yes.
 5              Q.    Okay.  You don't take a salary as though
 6    you were an employee though?
 7              A.    I don't.
 8              Q.    Okay.  But -- but you have not been paid at
 9    all --
10              A.    I've got to check.
11              Q.    -- from Standard?
12              A.    Please let me check that.  I'm not sure.
13              Q.    Okay.  If -- if you were paid, it would be
14    out of the profits of the LLC, though, that's your
15    testimony?
16              A.    I believe that's right.  I would have to
17    check that --
18              Q.    You believe based on what?
19              A.    Just my recollection of having read it a
20    while back and talking about it.
21              Q.    Have you entered any employment agreement
22    with Standard USA?
23              A.    I -- I think by signing the corporate
24    documents, I did because the corporate documents say --
25    layout, you know, that I'm going to conduct a show and --
```

Page 314

1    and speak and -- I'd have to go back and look at the

2    corporate documents.  I do know there is something in

3    there about my -- the value of certain things going to

4    them.

5              For example, I, with Giuliani Partners, ABC

6    employed me as part of -- of Giuliani Communications.

7    And ABC paid Giuliani Communications and they paid me.

8         Q.    Okay.  Well, right now --

9         A.    And --

10        Q.    Right now I'm just asking you about

11   Standard USA though.

12             So your relationship --

13        A.    I think -- I think -- I think we carried

14   over the same arrangement to Standard USA.

15        Q.    And your relationship with Standard USA is

16   as an owner or a part owner, I should say, of the LLC; is

17   that right?

18        A.    Correct.

19        Q.    Okay.  So you are entitled to a share of

20   the profits?

21        A.    Right.

22        Q.    Okay.  Have you produced any documents --

23   any corporate documents relating to Standard USA LLC?

24   Strike that.

25             Do you have access to the corporate

Page 315

1    documents of Standard USA LLC?

2            A.    Sure, I'm sure if I ask for them, I get

3    them.

4            Q.    Okay.  Why did you create Standard USA LLC?

5            A.    Because the -- the Giuliani Communications

6    account was frozen and therefore, I couldn't pay any of

7    the -- I couldn't pay any of the obligations out of it,

8    so I had to -- and I was going to -- I was going to move

9    it to Florida any way, so we decided to open up a new --

10   a new corporation in Florida so that it would be free of

11   that and therefore -- I mean, it was mostly opened up as

12   an emergency to make sure we can pay our bills so we can

13   keep going.

14           Q.    Okay.  And I think you said if you were

15   paid out of Standard USA, it would have been a

16   distribution of the profits.

17                 Who decides when profits are contributed

18   for Standard?

19           A.    We haven't had a meeting yet but we would

20   decide.  I mean, Ryan would really tell, Ryan would

21   really tell us.

22           Q.    Ryan would tell you based on what?

23           A.    Based on his keeping the books.

24           Q.    Okay.  And if you had a disagreement among

25   the three members of Standard USA, how would you resolve

Page 316

1   that disagreement about what to do?

2              MR. CAMMARATA:  Objection.

3              THE WITNESS:  We'd sit down and talk about

4        it.

5   BY MR. NATHAN:

6        Q.    Okay.

7        A.    And probably all end up agreeing.

8        Q.    Would your views have any more weight

9   because of the size of your stake in the company?

10       A.    I would, sure.  I would but on the other

11  hand, we very -- very much respect Maria's business

12  judgment.  So I don't know that she would have as -- as

13  much -- she'd have a very important voice.  And I don't

14  tend to do business -- I mean, I would prefer to do

15  business without any agreement.  And if we have a

16  disagreement, we just split it in half.

17              I made a fortune with the Washington

18  Speakers Bureau without a single contract.  We had two

19  disagreements and we split it in half.  He thought I

20  should pay for something.  I thought he should pay for

21  something.  So I paid for half of it and he paid for it

22  and we did that twice and we probably made $50 million

23  together.

24       Q.    That was during your time at Washington

25  Speakers Bureau?

Page 317

```
 1          A.    Uh-huh.

 2          Q.    Not with Standard USA?

 3          A.    Pardon me?

 4          Q.    That didn't describe anything that occurred

 5   at Standard USA?

 6          A.    No, but I'm telling you how I prefer to do

 7   business.  I don't -- I don't -- I think if you have

 8   spends a lot of time disagreeing with your partners, you

 9   better not be partners.

10          Q.    Okay.  So you prefer to do business without

11   formal --

12          A.    Yeah, I don't -- I don't anticipate that

13   we'd have something we wouldn't agree on.

14          Q.    Okay.

15          A.    Or compromise, I should say.

16          Q.    Okay.  Let me just, just so the record is

17   clear, you prefer to do business without formal legal

18   agreements?

19          A.    I do.

20          Q.    Okay.

21          A.    Because if you need formal legal

22   agreements, you probably don't trust each other.

23          Q.    Okay.  I'd like to ask you now about

24   Giuliani Communications LLC.

25                Do you know what that is?
```

Page 318

```
1           A.    That was my -- that is -- I mean, I guess
2      it's still in -- I guess it's still in existence but that
3      was my former company.
4           Q.    Okay.  Who owns Giuliani Communications
5      LLC?
6           A.    I believe I own that.
7           Q.    Okay.  You own all of that one?
8           A.    I think now I do -- no, I think I --
9      Giuliani Partners had a lot of different partners at
10     different times.  And technically, I'm not sure if
11     Giuliani Partners doesn't own Giuliani Communications.
12     I'm not sure if I own it or Giuliani Partners owned it
13     but I'm the only partner left at Giuliani Partners.  So
14     either way, I own it.
15          Q.    Okay.  So one way or another --
16          A.    Right.
17          Q.    -- you are the sole owner of Giuliani
18     Communications?
19          A.    One way or another, right.
20          Q.    One way or another, you are entitled to all
21     the profits of Giuliani Communications?
22          A.    That is correct.
23          Q.    Okay.  Have you ever taken a distribution
24     or profits from Giuliani Communications?
25          A.    Sure, yes.
```

Page 319

```
 1          Q.    Okay.  When have you done that?
 2          A.    You have to -- I mean, I wouldn't want
 3    to -- it's in the tax returns, and it's in the record.  I
 4    mean, I don't remember exactly when.
 5          Q.    Okay.  Was there any regularity to the
 6    profit distributions you would take?
 7              MR. CAMMARATA:  Objection.
 8              THE WITNESS:  No.  It was always when Ryan
 9        felt there was enough money to distribute.
10    BY MR. NATHAN:
11          Q.    Okay, and -- okay.  So would it be fair to
12    say it was ad hoc?
13          A.    Yeah, yeah.
14          Q.    Okay.  What would have been a reason for
15    taking a distribution from Giuliani Communications?
16          A.    To pay bills.
17          Q.    Okay.  So whenever you had a financial
18    need, you -- you could call on the profits from Giuliani
19    Communications?
20          A.    Usually I -- no, I can't say -- no,
21    sometimes I couldn't get it.  There was no profit.
22          Q.    Okay.
23          A.    But if there was a profit -- well,
24    sometimes -- sometimes there was, and sometimes he would
25    say, "This is a good time to distribute $10,000."
```

Page 320

```
 1          Q.    Okay.  But if you had a financial need --
 2          A.    If I had a financial need, I -- I would --
 3    I could call him.  And if he had the money, he would give
 4    it to me.  If not, he would say, well, you have to wait a
 5    little while.
 6          Q.    Okay.
 7          A.    The more often it was, he would distribute
 8    it to me when he had it and therefore, I didn't have to
 9    do that.
10          Q.    Okay.  Did you need anybody's approval to
11    take a profit distribution from Giuliani Communications?
12               MR. CAMMARATA:  Objection.
13               THE WITNESS:  I didn't technically need
14          anyone's approval but I never did it without Ryan.
15          A few times I asked and he couldn't do it, I
16          didn't -- I didn't just go take it.
17    BY MR. NATHAN:
18          Q.    Okay.  But if you --
19          A.    Like, he said it's more prudent -- it
20    wasn't that he couldn't give it to me.  He would say to
21    me, it's more prudent if we wait a little because we have
22    these bills coming up.  I could give it to you now if you
23    really need it, but let's wait.  And I'd say, let's wait.
24          Q.    Okay.  So you would -- you would
25    voluntarily follow his advice?
```

Page 321

```
 1              A.    Yeah, I would voluntarily follow his advice
 2       but it was more than voluntary because of our working
 3       relationship.
 4              Q.    Okay.
 5              A.    I mean, I valued his judgment.
 6              Q.    And if -- and if --
 7              A.    It would be better than mine on something
 8       like that.
 9              Q.    If you gave him an instruction?
10              A.    If I told him you have to give it to me,
11       the corporate regulations would allow me to do that.
12              Q.    And he would have had to follow that
13       instruction?
14              A.    I think, yeah.
15              Q.    Okay.  Did you ever use funds in Giuliani
16       Communications, LLC to pay personal expenses?
17                    Let me clarify.  Did you ever use -- did
18       you ever transfer money directly from Giuliani
19       Communications, LLC to pay a personal expense?
20              A.    No.  Well, a --
21                    MR. CAMMARATA:  Objection.
22                    THE WITNESS:  I'm not sure I know exactly
23              what you mean.  If I -- if I -- usually the
24              opposite.  I would -- I'd pay for things
25              personally for the company because I get confused
```

Page 322

```
 1              with the credit cards or I didn't want the company
 2              to incur the money -- the expense so I would --
 3              I'd buy it and give it to the company.
 4    BY MR. NATHAN:
 5         Q.    But you were careful not to --
 6         A.    I was careful not to do it the other way
 7    around.
 8         Q.    Careful not -- and just to be clear, you
 9    were careful not to directly pay personal expenses out of
10    Giuliani Communications, LLC?
11              MR. CAMMARATA:  Objection.
12              THE WITNESS:  I don't recall ever doing it.
13    BY MR. NATHAN:
14         Q.    Okay.  Why wouldn't you have done that?
15              MR. CAMMARATA:  Objection.
16              THE WITNESS:  I didn't have to.  And if I
17              did, I mean, sometimes I -- I don't know if I ever
18              did it with Giuliani Communications, LLC.
19                   Sometimes over the years with Giuliani
20              Partners I might do that and then I'd make out --
21              I might used it -- most often I didn't even have
22              the corporate credit card, so Ryan kept the
23              corporate credit card.  So I hardly ever used it.
24                   But when I was in law practice or -- I
25              would then keep a record of it and reimburse it.
```

Page 323

```
 1   BY MR. NATHAN:
 2          Q.    I'm just trying to get clear on the
 3   testimony you gave because I think you said you
 4   occasionally would pay for Giuliani Communications
 5   expenses out of your personal funds, but that you were
 6   careful not to do it the other way around; is that
 7   accurate?
 8          A.    Yes.
 9          Q.    Okay.  And why were you careful not to do
10   it the other way around?
11          A.    Because it would be a tax issue.  Then I'd
12   have to remember it and list it as income and I might
13   miss it.  I like the idea of the money going to the
14   corporation and then the corporation paying me and we not
15   mix that up, so that even though I was getting income
16   from five different sources, it was all being registered
17   in one place.
18                And I always used one checking account so
19   that we didn't have to go looking around for what I paid,
20   so that my accountant could double-check what I did.
21          Q.    Okay.  So was it your feeling that there
22   would be anything improper about Giuliani Communications
23   directly paying your personal financial expenses?
24                MR. CAMMARATA:  Objection.
25                THE WITNESS:  No.  You'd just have to
```

Page 324

1          discuss it with your -- if -- if I would have used

2          Giuliani Communications to pay for personal

3          expense or Standard to pay for personal expense,

4          then I'd have to do one of either two things.  I'd

5          have to -- by the end of the year, or the end of

6          the tax year, I'd have to reimburse them or I'd

7          have to take as income.

8               And I didn't like doing that because that's

9          when you sort of miss things.  You know, if you

10         keep it clean, you don't miss it.  But I think

11         occasionally that probably happened over the years

12         where Joe has had to impute income to me or I had

13         to make a check.  He used to always say this is

14         really stupid because you pay for a lot of

15         corporate expenses all by yourself.

16    BY MR. NATHAN:

17         Q.    Okay.  And how would Joe know to impute

18    income to you?

19         A.    Huh?

20         Q.    How would Joe know in those -- and by Joe,

21    I'm sorry, we're talking about Joe Ricci?

22         A.    Yeah, he would do it when he was auditing.

23         Q.    Okay.  And he would be auditing records

24    that you provided for him?

25         A.    Yeah, I believe it happened maybe twice

Page 325

1    over 25 years, 24 years.

2             Q.    Would there be any documentation -- okay.

3    Strike that.

4             If Giuliani Communications had paid for any

5    personal expenses of yours this year, would you have

6    documentation of that?

7                  MR. CAMMARATA:  Objection.

8                  THE WITNESS:  There would be records at

9         Giuliani Communications.  I don't think it did,

10        but...

11   BY MR. NATHAN:

12            Q.    Okay.  Other than Standard USA, LLC, have

13   you formed any other companies in the last year?

14            A.    Did I form any other companies?  No, sir,

15   no.

16            Q.    Are you aware -- strike that.

17            Does Giuliani Communications, LLC owe

18   anyone money?

19                  MR. CAMMARATA:  Objection.

20                  THE WITNESS:  I'd have to -- I don't know.

21        You'd have to ask Ryan that.

22   BY MR. NATHAN:

23            Q.    Okay.  As far as you are aware, it doesn't

24   have -- you are not aware of any liabilities?

25            A.    I'm not aware that it does or that it

Page 326

1   doesn't.

2          Q.    Okay.  So for most issues relating to

3   the -- to any of your companies, the person to ask about

4   them would be Ryan Medrano?

5          A.    Yes, Ryan would know by far the most, yes.

6          Q.    Okay.  And Maria Ryan would know something?

7          A.    More the current -- things in the past,

8   Ryan would know.

9          Q.    And Maria Ryan would know --

10         A.    If you were asking about Giuliani

11  Communications, Ryan would know that.  Maria would know

12  very, very little.  If you are asking about Standard,

13  they probably have pretty much overlapping knowledge.

14         Q.    Okay.  Okay.

15                MR. NATHAN:  I'd like to take one more

16         break if that's all right with everyone.

17                MR. CAMMARATA:  We're getting close,

18         though.

19                THE WITNESS:  Why do you want to take a

20         break?

21                MR. NATHAN:  Take one more break and then

22         hopefully we can come back and wrap up.

23                THE WITNESS:  Okay.  I thought we were

24         finishing at 5:00.

25                MR. CAMMARATA:  I mean, how much are you

```
                                                       Page 327
 1            anticipating?
 2                    THE REPORTER:  Can we go off the record?
 3                    THE VIDEOGRAPHER:  This is the end of Media
 4            5.  The time is 4:55 p.m.  We're going off the
 5            record for media change.
 6                    (A recess is taken.)
 7                    THE VIDEOGRAPHER:  This is Media Number 6
 8            in the deposition of Rudolph W. Giuliani.  The
 9            time is 5:07 p.m.  We're back on the record.
10   BY MR. NATHAN:
11            Q.    Mr. Mayor, during the break, did you
12   discuss your testimony with anyone?
13            A.    No.
14            Q.    Okay.  As you sit here now, is there
15   anything about the testimony you've given today that you
16   feel the need to change?
17            A.    No, sir.
18            Q.    I think we discussed earlier that sometimes
19   you'll give an answer and then subsequently you will
20   think of something else.
21            A.    No.
22            Q.    Have you thought of anything else?
23            A.    Nothing has come to mind.
24            Q.    Okay.  So at least as far as you -- as far
25   as you know sitting here today, you've told me about
```

```
                                                   Page 328
 1    everything that you think is relevant to your claim that
 2    you established a homestead in the Palm Beach condo?  At
 3    least as far as you know, sitting here today?
 4            A.    I do.  I do.  I think I have.  I'm not --
 5    there are just so many facts that went into the decision,
 6    I feel a little inadequate in describing it, but I think
 7    I have.
 8            Q.    And same question regarding the World
 9    Series rings.  Sitting here today, you don't recall
10    anything else that you know that would be relevant to the
11    World Series rings?
12            A.    No.  No, sir.
13            Q.    Do you have any financial assets located
14    outside of the United States?
15            A.    Do I have any what?
16            Q.    Financial assets located outside of the
17    United States?
18            A.    No, sir.
19            Q.    Anyone outside of the United States who is
20    holding money for you?
21            A.    No.
22            Q.    Anyone outside of the United States who
23    owes you money?
24            A.    Not that I know of -- not that I know of.
25            Q.    That would be good news if it were true,
```

```
                                                   Page 329

 1   right?

 2          A.    Yeah, let me know.

 3          Q.    Yeah.

 4          A.    No, I don't have anything outside the

 5   United States.

 6          Q.    Do you own any -- do you own any

 7   cryptocurrency?

 8          A.    Pardon me?

 9          Q.    Do you own any cryptocurrency?

10          A.    No.

11          Q.    Does anyone hold any cryptocurrency for

12   you?

13          A.    No, sir.

14          Q.    Where is the signed Joe DiMaggio jersey

15   that you own?

16              MR. CAMMARATA:  Objection.

17              THE WITNESS:  I don't know.  The last time

18          I saw it, it was on the wall where it's always

19          been.

20   BY MR. NATHAN:

21          Q.    Where is that?

22          A.    At 45 East 66th Street.

23          Q.    And it's always been there as far as you

24   know?

25          A.    Well, always been there meaning from about
```

Page 330

```
 1   the time that I got it, yeah.
 2           Q.    Okay.  Did you ever move it to Florida?
 3           A.    I did not.
 4           Q.    Okay.  It's never been located in Florida?
 5           A.    Never has.
 6           Q.    Okay.  Did you take any steps to move it
 7   out of your New York City apartment?
 8           A.    I did not.
 9           Q.    Did anyone move it outside of the New York
10   City apartment on your behalf?
11           A.    No, I would have thought it would be with
12   the items that are -- that you showed me.
13           Q.    For the last three months, how have you
14   paid your day-to-day expenses?
15           A.    I -- well, I don't have a checking account.
16   I have some cash left over.  So I probably have used
17   that.  You'd have to ask Dr. Ryan.  I think she paid one
18   bill of mine.
19           Q.    Did she pay that out of her own money or
20   out of your money?
21           A.    No, no, out of her own money.
22           Q.    You said you had some cash left over.  What
23   cash do you mean?
24           A.    Just cash I had around the house.  I just
25   used it all up.
```

Page 331

```
1          Q.     Like paper money?

2          A.     Yeah, paper money.

3          Q.     Okay.  And how much -- about how much did

4    you have left over, how much paper money?

5          A.     500, $600.

6          Q.     Other than Maria Ryan paying one bill on

7    your behalf and spending that leftover paper money, what

8    other ways do you pay for your day-to-day expenses?

9          A.     The -- sometimes Ted buys lunch.  Sometimes

10   a friend.  I don't have -- I don't have any other

11   expenses.  My -- it would be a problem next month because

12   I have to pay the -- I have to pay the maintenance -- I

13   pay maintenance on the Florida condo every three months.

14              So there hasn't been a payment.  I made

15   that payment back in -- I guess since September or

16   October.  That paid the last three months.  But that will

17   come up now in -- that will come up in January.  That

18   covers most of the utilities.

19         Q.     When you made the last payment of your --

20         A.     The condo.

21         Q.     -- maintenance fees for the condo, how did

22   you make that payment?

23         A.     By check.

24         Q.     Out of what funds did you make that

25   payment?
```

Page 332

```
 1              A.    My usual checking account.
 2              Q.    By your usual checking account --
 3              A.    Chase -- maybe out of the one that I had
 4      for a short period that's been frozen -- the New
 5      Hampshire account.
 6              Q.    But sitting here today, you can't say for
 7      certain which checking account you used?
 8              A.    I'm pretty certain it was that one.
 9              Q.    Okay.  So you made that payment out of
10      funds that were available to you that had been deposited
11      into one of your personal checking accounts?
12              A.    Yes.
13              Q.    Okay.  Do you recall the source of the
14      income that was deposited into your checking accounts?
15              A.    I don't.
16              Q.    Okay.  When Ted pays for lunch -- I'm
17      sorry, strike that.
18                    Do you know how much you pay Ted Goodman?
19              A.    I believe we pay Ted $5,000 a month.
20              Q.    Okay.  Is -- is Ted's employment with you
21      his only employment?
22              A.    No, Ted does consulting work as well but
23      not much, but he does some.
24              Q.    Okay.  Are you aware of his income from
25      that other consulting work?
```

Page 333

```
 1          A.    I am not.
 2          Q.    Okay.  As far as you know -- strike that.
 3                You are not aware one way or another
 4    whether he earns income from his consulting work?
 5          A.    He does but I don't think he earns a great
 6    deal.
 7          Q.    Okay.  Would you estimate that he earns
 8    more or less than $5,000 a month from his consulting
 9    work?
10          A.    He probably earns -- I don't know.  You'd
11    have to -- you'd really have to ask him.  I don't want to
12    guess.
13          Q.    Okay.  Other than Ted buying lunch
14    occasionally, who pays for your meals?
15          A.    Dr. -- Dr. Ryan probably pays for them.
16          Q.    Okay.  And she pays out of her funds or out
17    of your funds?
18          A.    I don't have any funds.
19          Q.    Does that mean that she pays out of her
20    funds?
21                MR. CAMMARATA:  Objection.
22                THE WITNESS:  Again, you'd have to ask her.
23    BY MR. NATHAN:
24          Q.    Okay.  Who pays for your air travel?
25          A.    Pardon me?
```

Page 334

1          Q.     Who pays for your air travel?

2          A.     The business.

3          Q.     Which business?

4          A.     Standard or it might be reimbursed by

5     whoever is inviting me.  Most often, it's reimbursed.

6          Q.     Okay.  And who pays for your cigars?

7          A.     I don't -- I haven't bought cigars in, I

8     don't know, how long.

9          Q.     Okay.  Who -- when you take Ubers, who pays

10    for your Ubers?

11               MR. CAMMARATA:  Objection.

12               THE WITNESS:  Usually reimbursed or the

13          business.

14    BY MR. NATHAN:

15         Q.     So if the business is not paying and if --

16    if -- strike that.

17               If you need to pay an expense and the

18    business is not paying and it's not reimbursed, would it

19    be fair to say that Maria Ryan funds the payment of those

20    expenses?

21         A.     More often than anybody else, right.

22         Q.     How often do other people pay your

23    expenses?

24         A.     Every -- every so often.  I don't have that

25    many expenses.

Page 335

```
 1          Q.    Okay.  How does Maria Ryan make a living?
 2                MR. CAMMARATA:  Objection.
 3                THE WITNESS:  She -- she gets paid from
 4          Giuliani Partners -- from Standard and she gets
 5          about, I think, 10,000 a month.
 6    BY MR. NATHAN:
 7          Q.    Is that a salary?
 8          A.    That's a salary, yes.
 9          Q.    Okay.  Has that salary changed at any point
10    in the last year?
11          A.    I don't think so.  Maybe it was 8,000.  It
12    went to 10,000.  I'm not sure.
13          Q.    When would that change have occurred?
14          A.    A year ago.
15          Q.    Does she also own a share of Giuliani --
16    excuse me --
17          A.    She does.
18          Q.    -- Standard USA?
19          A.    Yes.
20          Q.    Okay.  Do you know her share?
21          A.    15 percent, I think.
22          Q.    Okay.  And did she --
23          A.    Oh, maybe ten.
24          Q.    Did she own a share of Giuliani
25    Communications, LLC?
```

Page 336

```
 1           A.      No.
 2           Q.      Okay.  Did Ted Goodman own a share of
 3    Giuliani Communications?
 4           A.      Pardon me?
 5           Q.      Excuse me.
 6                   Did Ted Goodman earn a share of Giuliani
 7    Communications, LLC?
 8           A.      No.
 9           Q.      Does Ted Goodman own a share of Standard
10    USA LLC?
11           A.      He does.
12           Q.      And what's the size of his share?
13           A.      Five or ten.
14           Q.      Okay.  Have any distributions or profits
15    been made to Maria Ryan out of Standard USA LLC?
16           A.      Not that I know of.
17           Q.      Have many --
18           A.      Again, you'd have to ask Ryan that.
19           Q.      Excuse me, I'd have to ask who that?
20           A.      Ryan -- Ryan --
21           Q.      Ryan Medrano?
22           A.      I haven't asked him.  Dr. -- no, no, Ryan
23    Medrano or Dr. Ryan I guess, either Ryan in that case.
24           Q.      Either Ryan Medrano or Dr. Maria Ryan?
25           A.      Correct, I don't think there's been any
```

Page 337

```
 1   distribution of profit but --
 2           Q.    Okay.
 3           A.    -- again, I can't be absolutely sure of
 4   that.
 5           Q.    Same question about Ted, has any
 6   distribution profits been made --
 7           A.    Same answer.
 8           Q.    Thank you.
 9                 Okay.  Are you aware of any other sources
10   of compensation that Maria Ryan earns?
11           A.    She's on boards.  You'd have to ask --
12   you'd have to ask her.  I think so but I'd only be
13   guessing at it.
14           Q.    Okay.  Okay.  Is it your testimony that
15   you've -- that you have never received a distribution of
16   funds from Standard USA?
17                 MR. CAMMARATA:  Objection.
18                 THE WITNESS:  I think before -- I think
19           I -- I think I received $10,000 at some point but
20           not recently.  I think.
21   BY MR. NATHAN:
22           Q.    What does "recently" mean?
23           A.    Meaning in the last month, while I was
24   having difficulty paying bills.
25           Q.    Okay.  You said earlier that you -- that
```

Page 338

```
 1   you were -- that you were not aware of any distributions
 2   or profits that had been made out of Standard USA LLC; is
 3   that correct?
 4           A.    Yes, I don't think -- I think -- I think
 5   they paid me like as if it was a salary.  You'd have to
 6   ask Ryan how he booked it.
 7           Q.    But you are not aware one way or the
 8   other -- well, are you certain that you did receive --
 9           A.    No, I'm not certain but I think I did.
10           Q.    Just -- just so the record is clear.  You
11   are not certain whether or not you received a payment
12   from Standard USA LLC?
13           A.    I'm not.
14           Q.    And if you did receive a payment, you are
15   not aware of whether it was a profit distribution or some
16   other form of payment?
17           A.    I would assume it was some other form of
18   payment because I think I would have had to have approved
19   the profit distribution I think but...
20           Q.    Okay.  But one way or the other, Ryan
21   Medrano or Dr. Maria Ryan would know the answer to these
22   questions?
23           A.    Yeah, more likely that one, Ryan Medrano
24   would know the answer to.
25           Q.    Okay.  So if -- if you and he had different
```

Page 339

1    recollections, his recollection would be the one --

2              A.    Uh-huh.  Yes.

3              Q.    -- you'd trust?

4              A.    Yep.  No question about it.

5              Q.    Okay.  How much work have you performed for

6    Standard USA LLC?

7              A.    I do a -- well, let me separate it now.  I

8    do a show between 7:00 and 8:00, five days a week for

9    Frank Network.  They pay me and I turn -- they're

10   supposed to pay Standard.  Occasionally, they make the

11   check out to me and then I turn it over to Standard but

12   the contract is with Standard.  So that's one source

13   of -- I don't get it directly.  I know occasionally they

14   put it in my name, but then I deposit it right into the

15   Standard account.

16             Q.    Why don't they pay you directly?

17             A.    I think -- I think they get confused.  They

18   used to pay to Giuliani --

19             Q.    Let me clarify.  I wasn't asking about

20   their intentions in terms of who they pay.

21                   Why do you arrange things so that the

22   contract is with your LLC rather than with you

23   personally?

24                   MR. CAMMARATA:  Objection.

25                   THE WITNESS:  I've always done that.  I've

```
 1            done that -- I've done that for -- the only thing
 2            I ever did that with and then I changed it with
 3            Speeches, I did that personally.  But I always had
 4            them contract with my company, rather than with
 5            me, largely because I could keep better track of
 6            it.  And also because I wanted to support my
 7            company.  I wanted it to grow.
 8                  So my contract with ABC --
 9     BY MR. NATHAN:
10            Q.    Was with Giuliani Communications?
11            A.    Right.
12            Q.    Okay.  And you did that because --
13            A.    And now -- and now originally my contract
14     with -- with Frank -- this is what caused the confusion.
15                  Originally my contract with FrankSpeech was
16     with Giuliani Communications.  And they made out the
17     check to Giuliani Communications.  And then when we
18     switched to Standard, they originally just made out the
19     checks to me until they changed it in their system.
20                  So I would then negotiate the check and
21     deposit it into the Standard account, I never took it for
22     myself.
23            Q.    Why was it easier to keep track of if your
24     LLC was the one making the contracts and receiving the
25     payments?
```

1              MR. CAMMARATA:  Objection.

2              THE WITNESS:  Because it all went to one

3         place and -- and they -- then Ryan could decide

4         how it could best be used.

5    BY MR. NATHAN:

6         Q.    Best be used for what?

7         A.    To help the company and help me.

8         Q.    Okay.  Are there any other -- I think you

9    described yourself as the talent with respect to these

10   companies?

11        A.    So I do that.  That's one -- that's one

12   thing.  Then I also do -- I do mayor -- America's Mayor

13   Live and the revenue from that is basically advertising

14   revenue and that goes into Standard every month.

15        Q.    Is there anyone, other than yourself, who

16   earns money for these communications, Giuliani

17   Communications or Standard USA?

18        A.    Not directly.  I mean, they have -- so the

19   money I earn, I couldn't earn without the help of

20   Dr. Ryan, Ted Goodman and then Mike.  So they help me

21   with it.

22        Q.    Okay.

23        A.    They -- and they -- they receive salaries

24   for that.

25        Q.    Okay.  Because they are employees of the

Page 342

1   company?

2           A.    They are both employees and owners.

3           Q.    Okay.  Ted and Maria are owners of

4   Standard?

5           A.    Right.

6           Q.    Are there any other --

7           A.    No, Mike is just --

8           Q.    -- employees of Standard?

9           A.    -- an employee and Steven Schumacher is

10  a -- and -- and Ryan gets paid a salary.  And Steve --

11  Steven Schumacher is -- which I guess you have to --

12  employed him as a consultant one or two times.

13          Q.    Okay.  But there is nobody else who you

14  describe as the talent with respect to either of these

15  companies?

16                MR. CAMMARATA:  Objection.

17                THE WITNESS:  No.

18  BY MR. NATHAN:

19          Q.    Okay.  Okay.  Is there anything else -- I

20  know I asked this earlier but now that we're coming to

21  the end, is there anything else about your testimony that

22  you'd like to amend in any way?

23          A.    No, sir.

24          Q.    Okay.  So of all the topics we've

25  discussed, you've answered my questions to the best of

```
                                                    Page 343

 1   your knowledge at this time?

 2          A.    I have.

 3          Q.    Okay.  And nothing has occurred to you

 4   while we've sit -- while we've been sitting here that

 5   would cause you to amend any of your answers?

 6          A.    No, nothing comes to mind.

 7               MR. NATHAN:  Okay.  I'm going to hold the

 8          deposition open for the reasons already stated on

 9          the record.

10               And other than that, I have no further

11          questions.

12               THE WITNESS:  Thank you.

13               MR. CAMMARATA:  Thank you.

14               THE VIDEOGRAPHER:  The time is 5:28 p.m.

15          This concludes today's proceedings and the

16          deposition of Rudolph W. Giuliani.

17               (The proceeding is adjourned at 5:28 p.m.)

18

19

20

21

22

23

24

25
```

Page 344

1                    CERTIFICATE OF OATH OF WITNESS

2

3    STATE OF FLORIDA            )

4    COUNTY OF ST. LUCIE         )

5

6                    I, the undersigned Notary Public, in and

7    for the State of Florida, hereby certify that RUDOLPH W.

8    GIULIANI personally appeared before me, produced ID and

9    was duly sworn.

10

11                   WITNESS MY HAND and official seal in the

12   City of Fort Pierce, County of St. Lucie, State of

13   Florida this December 30, 2024.

14

15

16

17

18   _____

     Jennifer L. Bush, RPR, FPR, FPR-C

19   Notary Public

     State of Florida at Large.

20   My Commission: #HH 529563

     My commission expires:  9/20/28

21

22

23

24

25

Page 345

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA          )

4    COUNTY OF ST. LUCIE       )

5                    I, Jennifer L. Bush, Registered

6    Professional Reporter, Florida Professional Reporter, do

7    hereby certify that I was authorized to and did

8    stenographically report the deposition of RUDOLPH W.

9    GIULIANI; and that a review of the transcript was

10   requested; and that pages 1 through 348, inclusive, are a

11   true record of my stenographic notes.

12                   I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties, nor

14   am I a relative or employee of any of the parties,

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18                   Dated this December 30, 2024.

19

20   _____

                   Jennifer Bush, RPR, FPR, FPR-C

21

22

23

24                   The foregoing certification of the

     transcript does not apply to any reproduction of the same

     by and means unless under the direct control and/or

25   direction of the certifying reporter.

```
                                                     Page 346

 1

 2    December 30, 2024

 3    RUDOLPH W. GIULIANI
      C/O Joseph M. Cammarata, Esquire

 4    Cammarata & DeMeyer PC
      456 Arlene Street

 5    Staten Island, NY 10314

 6    RE:  FREEMAN VS. GIULIANI
      Deposition of RUDOLPH W. GIULIANI

 7

      Dear Mr. Giuliani:

 8

                  The above-referenced transcript is

 9    available for review.

10                The witness should read the testimony to
      verify its accuracy.  If there are any changes, the

11    witness should note those with the reason on the attached
      Errata Sheet.

12

                  The witness should, please, date and sign

13    the Errata Sheet and e-mail to the deposing attorney as
      well as to Veritext at cs-ny@veritext.com and

14    copies will be e-mailed to all ordering parties.

15                It is suggested that the completed errata
      be returned 30 days from receipt of testimony, as

16    considered reasonable under Federal rules*.  However,
      there is no Florida statute to this regard.

17

                  If the witness fails to do so, the

18    transcript may be used as if signed.

19

                  Yours,

20

21

                  Veritext Legal Solutions

22

      *Federal Civil Procedure Rule 30(e)/Florida Civil

23    Procedure Rule 1.310(e).

24

25
```

```
                                                        Page 347

 1                    CERTIFICATE OF NOTARY PUBLIC

 2

 3      STATE OF FLORIDA

 4      COUNTY OF _____

 5

 6                 I, RUDOLPH W. GIULIANI, certify that I have

 7      read the foregoing transcript of my deposition and that

 8      the statements contained therein, together with any

 9      additions or corrections made on the attached Errata

10      Sheet are true and correct.

11

12                 Dated this _____ day of _____, 20__.

13

14                        _____

                          RUDOLPH W. GIULIANI

15

16                 The foregoing certificate was subscribed to

17      before me this _____ day of _____, 20__, by

18      the witness who has produced a _____ as

19      identification and who did not take an additional oath.

20

21                        _____

                                NOTARY PUBLIC

22

23

24

25
```

Page 348

```
1                      ERRATA SHEET

2    IN RE:  FREEMAN VS. GIULIANI

3    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE:

4    Page No.        Line No.     Change        Reason

5    _____/_____/_____/_____

6    _____/_____/_____/_____

7    _____/_____/_____/_____

8    _____/_____/_____/_____

9    _____/_____/_____/_____

10   _____/_____/_____/_____

11   _____/_____/_____/_____

12   _____/_____/_____/_____

13   _____/_____/_____/_____

14   _____/_____/_____/_____

15   _____/_____/_____/_____

16   _____/_____/_____/_____

17   _____/_____/_____/_____

18   _____/_____/_____/_____

19   _____/_____/_____/_____

20   _____/_____/_____/_____

21   _____/_____/_____/_____

22   _____/_____/_____/_____

23   I have read my deposition in this matter and entered any

     changes in form or substance as reflected above.

24

           _____   _____

25         DATE          RUDOLPH W. GIULIANI
```

| & |
| --- |
| **&** 2:5,11 4:21 4:24 5:1,3 187:9,11 188:16 194:11 196:2,17 346:4 |

| 0 |
| --- |
| **0** 118:23 |
| **001** 68:2,10 |
| **003** 68:10 |
| **00353** 85:19 |
| **008** 79:10,12,14 |
| **013** 225:9,19 |
| **019** 225:23 |
| **07068** 2:16 |

| 1 |
| --- |
| **1** 3:12 4:10 17:5,9 18:1,4,5 66:5 69:15 75:10,24 76:1 76:2 93:7 100:1 197:2 206:2,7,25 207:17 211:3 211:13,21 212:1,1,7,15 225:9 226:11 227:3,21 228:9 228:16,19 230:11,21 231:3 345:10 |

**1,000** 292:5
**1,200** 291:24,25
**1,500** 292:5
**1.310** 346:23
**10** 16:19 205:25
**10,000** 90:16 91:4 319:25 335:5,12 337:19
**100** 72:22 292:1
**1001** 1:10
**10314** 2:12 346:5
**10:23** 65:14
**10:40** 65:19
**10:44** 69:8
**10:45** 69:11
**10w** 133:22,25 137:9
**11** 266:15,20,22 268:5 274:19
**117** 205:2
**12** 299:6
**12,000** 299:11
**12/7** 203:18
**12:02** 140:2
**12:39** 140:7
**12th** 78:16
**13** 8:22 85:10 91:10 95:22 131:5

**13th** 129:11 130:22 132:4 226:5
**14** 8:21 77:9
**143** 187:6,7,13
**145** 194:6
**14th** 172:24
**15** 125:19 230:2 335:21
**150** 36:10 72:22 160:21
**156** 196:14 197:2
**159** 201:7
**16** 68:14 92:6
**165** 200:9
**16th** 92:8 109:2 194:7 195:1,12 195:13
**17** 3:12 116:18 116:21 117:12
**170** 197:14,15
**173** 197:16
**174** 201:22
**175** 66:21 201:23
**179** 68:13
**18** 39:25 92:2 108:19 131:7 255:7
**1875** 2:5
**18th** 92:9 109:3 130:16 157:3 170:12 172:21

172:21 173:13
**19** 10:11,12 119:20
**1974** 9:22,24
**1977** 9:22,24
**1980** 9:23 10:12
**1981** 10:13,18
**1983** 9:23
**1996** 286:24,24
**19th** 194:9
**1:58** 204:16
**1st** 94:2,15,17 94:18 96:10 135:13 137:11 172:2 173:14 206:7,11 207:8 207:9 209:14 209:17 211:4 213:11,12,15 214:9 215:17 215:20 217:16 218:14 219:14 228:22 234:14 248:1

| 2 |
| --- |
| **2** 3:13 65:17 91:21,23,24 140:2 205:2,6 205:13 291:7 |
| **20** 32:6,7,19 36:18 84:24 94:21 103:9 |

**[20 - 26th]**                                                                    Page 2

| | | | |
|---|---|---|---|
| 115:19 152:1 | 157:16 158:1 | 117:13,19 | 344:13 345:18 |
| 183:8 298:21 | 248:11 258:13 | 119:24 121:3 | 346:2 |
| 347:12,17 | 295:3 | 121:17 125:20 | **2025**  165:21 |
| **20,000**  291:6 | **2021**  86:7 | 129:11 130:25 | **205**  3:13 |
| 292:8 | 295:3 | 131:5,7 135:13 | **20th**  172:24 |
| **200**  72:23 75:1 | **2022**  32:17 | 152:11,12,23 | 207:7 |
| **20006**  2:6 | 62:9,16,21 | 155:22 156:4 | **21**  122:16 |
| **2001**  70:9 | 63:4 80:9,18 | 156:11,14 | **216**  133:9 |
| **2002**  70:9,9 | 80:24 81:22 | 157:3,21 160:2 | 135:6 136:21 |
| 286:23 287:17 | 157:21 203:4 | 160:25 169:2,5 | 136:24 |
| 289:12 293:15 | **2023**  32:14 | 178:17 179:6 | **22**  61:20,21 |
| **2003**  289:23 | 33:8,11,16,17 | 181:9,11 | 133:7 185:16 |
| **2007**  290:24 | 49:20 55:17 | 182:25 186:23 | 208:18 232:15 |
| **2008**  290:24 | 61:15,17 78:16 | 190:5,8 191:7 | **23**  112:13,15 |
| **2009**  289:22 | 84:11,13 85:24 | 191:25 192:7 | 115:16 208:18 |
| **2016**  73:20 | 86:10 88:7 | 195:1 199:11 | 210:12 231:15 |
| **2017**  20:7 | 94:18 95:15 | 206:2,7,11,17 | 231:17,17 |
| **2018**  39:25 | 97:21 98:10 | 206:20,25 | 232:15 234:19 |
| 96:22 246:16 | 110:11 116:1 | 207:18 211:3 | 245:6 279:11 |
| 247:2,25 290:5 | 126:20 129:9 | 211:13,21 | **24**  1:2 12:21 |
| 293:25 294:1,2 | 137:11 138:8 | 212:1,2,8,15 | 14:5 17:21,22 |
| 294:11 296:6 | 139:5 152:17 | 218:14 219:15 | 23:12 32:7 |
| **2019**  39:25 | 152:21 161:22 | 226:11 227:3 | 68:12,13 76:9 |
| 86:15 156:16 | 195:5,8,15 | 227:21 228:9 | 85:14 126:20 |
| 156:19 247:25 | 206:22,22 | 228:16,19 | 151:23 152:2 |
| 290:5 294:1,11 | 209:25 231:9 | 230:11,21 | 210:23 325:1 |
| **2019-2020** | 232:8 260:22 | 231:3 232:7 | **25**  31:12 |
| 86:18 | 266:9 279:18 | 235:13 236:5,8 | 184:20 325:1 |
| **202-303-1016** | **2024**  1:12 4:2 | 236:12 237:17 | **25,000**  118:24 |
| 2:6 | 30:9 33:12 | 238:2 245:19 | **25th**  181:11,13 |
| **2020**  21:14 | 75:10 92:2,6 | 256:10 258:16 | 181:17 |
| 56:24,25 77:9 | 94:21 95:12 | 260:22,22 | **26**  156:22 |
| 84:12 85:24 | 96:10 97:23 | 265:19 301:22 | **26th**  73:8 |
| 86:13 129:9 | 102:11 108:19 | 301:23 303:11 | 301:22,23 |

**27** 1:12
**27th** 4:2
**28th** 200:19
**2:00** 204:10
**2:16** 204:21
**2nd** 173:15

**3**

**3** 18:5 66:6,14
66:17 69:15
140:5 157:21
204:16 248:22
289:12
**3,000** 299:6,8
**30** 161:13,17,20
248:9 344:13
345:18 346:2
346:15,22
**30,000** 298:21
**3003** 344:17
345:19
**31** 49:20 55:17
**315** 16:11 61:8
69:20 119:15
128:19 131:18
150:5 151:6
157:8 162:18
163:14,21
179:24 184:3,5
185:10 187:17
202:25 262:13
262:14
**316th** 179:18

**33401** 1:11
**344** 3:6
**345** 3:7
**346** 3:7
**347** 3:5
**348** 3:6 345:10
**353** 12:21
17:24 68:13
**3:19** 255:20
**3:35** 255:25
**3rd** 173:15
249:15 256:10

**4**

**4** 75:24 76:1,2
201:6 204:20
205:25 255:19
**40** 229:12
232:1 259:8
**40,000** 292:10
**416643** 195:11
**418** 259:18,21
260:13
**42-1** 68:12
**42-2** 76:9
**45** 16:19 79:20
133:22,24
137:9 157:13
185:15,17,22
186:1 209:4
215:7 329:22
**456** 2:11 346:4
**4:55** 327:4

**4th** 193:15
201:11

**5**

**5** 3:4 16:12
66:19 76:7
128:20 255:23
327:4
**5,000** 332:19
333:8
**50** 285:6
316:22
**50,000** 118:23
292:9
**500** 292:3,9
331:5
**529563** 344:20
**53** 168:23
**570** 62:9
**5:00** 326:24
**5:07** 327:9
**5:28** 1:13
343:14,17
**5d** 157:8

**6**

**6** 291:23 327:7
**60** 178:15
233:13
**600** 331:5
**61** 180:9
**653** 76:11
**6563** 1:2 17:21
68:12

**66th** 16:19
79:20 133:22
133:24 137:9
157:14 185:15
185:18,22
186:2 329:22
**6th** 195:15

**7**

**7** 67:25 68:3
76:7 267:7,10
268:2,12
270:15,20,23
271:10,21
272:2 273:24
274:18,20,23
275:6 276:1,8
276:18 277:14
**700** 291:23
**718-447-0020**
2:12
**78** 181:12,14
**79** 85:19
**7:00** 56:19
339:8
**7th** 169:4
170:22 203:17
240:4

**8**

**8** 78:16
**8,000** 299:11
335:11
**800** 249:15

**[83 - act]** Page 4

**83** 10:17
**83rd** 249:15
**8:00** 56:19,20
   339:8
**8th** 169:5
   170:13 193:15
   240:14,17,19

**9**

**9/20/28** 344:20
**90** 207:6 235:1
   242:3,4
**92** 178:16
**93** 182:21
**95** 207:7 235:2
**973-597-6136**
   2:17
**98** 207:7 235:2
**99** 25:15
**9:00** 56:20
**9:12** 1:13 4:2
**9th** 181:9

**a**

**a.m.** 1:13 4:2
   65:19 69:11
**aaron** 2:3 4:21
**abatement**
   137:8 139:9
**abc** 314:5,7
   340:8
**ability** 13:16
   15:2,5,10
   60:23 138:25

**able** 6:9,12
   57:14,18,22
   59:25 85:25
   88:11 89:7
   155:9 159:14
   163:3 177:24
   179:17 186:22
   207:1 240:24
   258:23 261:22
   274:2 275:12
   285:18,20
   295:15 302:23
   303:1
**abode** 128:19
   128:20,23
**above** 1:24
   105:6,13
   128:17 346:8
   348:23
**abraham**
   160:19
**absolutely**
   175:3 282:24
   283:3 284:18
   337:3
**access** 21:22
   22:14,22,23,24
   23:8,9,24,25
   28:14,16 29:9
   29:12,13,14,20
   30:5,10 35:4
   35:14 46:23
   47:4,8 57:11
   57:14,18,22

   64:1,4,5,8,11
   314:25
**accesses** 58:3,4
**accommodati...**
   165:23
**accompany**
   36:16 60:6
**account** 26:7
   26:24 27:14
   29:17 30:11
   47:8 57:24
   58:4 64:9
   168:20,21
   182:22 183:10
   187:17 195:24
   311:18,25
   312:2,7,8
   315:6 323:18
   330:15 332:1,2
   332:5,7 339:15
   340:21
**accountant**
   31:21,22,24
   32:4,5,7,11,20
   33:7 41:24
   90:13,18
   166:17,22
   168:2,18
   323:20
**accountant's**
   166:24
**accountants**
   31:22

**accounts** 23:24
   23:25 29:10,12
   29:14,15,20
   30:6 35:4
   46:24 47:5
   57:11,14,19
   64:2,6,7
   311:23 332:11
   332:14
**accuracy**
   346:10
**accurate** 6:10
   6:13 51:23
   57:25 59:2
   73:13 86:14
   93:15 111:17
   137:11 146:6
   148:2 167:24
   170:1,4 206:4
   206:10 207:11
   207:12 256:11
   256:23 257:3
   265:13 272:9
   323:7
**accurately**
   167:3,8,12,14
   167:20 207:2
**acknowledges**
   87:21
**acknowledging**
   138:7
**acquired** 50:13
**act** 305:13
   311:14 312:14

acted   279:16
acting   67:12
  279:18
action   345:15
  345:16
active   14:1 97:4
  98:20
activities   307:2
actual   118:4
  291:22
actually   9:15
  10:13 11:22
  31:23 32:21
  47:19 58:3
  66:22 75:24
  79:24 86:8
  87:10 92:8
  111:17 118:1
  134:25 135:2
  168:8 174:9
  181:10 182:15
  184:18 185:4
  201:23 206:10
  210:8 226:18
  236:2,11,20
  239:19 255:12
  286:23 308:7
  308:18
ad   117:14
  319:12
add   279:2
added   282:4,5
adding   214:20

addition   7:14
  209:21
additional
  119:4 120:11
  225:20 226:12
  231:12 286:9
  286:16 347:19
additions   347:9
address   26:6,6
  26:23 27:4,5
  27:13 119:15
  131:18,23
  133:12,15
  134:2 135:7
  136:18,24
  137:1,3 151:5
  157:7 162:17
  162:18 164:6
  164:14,17,18
  164:23,24
  165:3,5,12,18
  165:19 166:4
  171:21 172:23
  183:8,14 184:2
  184:10,11,25
  185:14,19
  186:2,11
  187:16 259:18
  259:20 260:1,3
  260:8,19,23
  261:9,9,17,23
addressed
  133:9 136:21
  165:8 194:7

addresses
  164:1 184:8
  188:11 265:2
addressing
  140:23
adequately
  278:23
adjourned
  343:17
administration
  10:19 136:20
adopted   117:14
advance   210:6
advertising
  341:13
advice   30:23
  142:22 143:3
  143:22 144:6,9
  144:16 145:25
  147:3 149:10
  320:25 321:1
advising   137:8
advisor   31:5
affairs   30:18
  30:22 35:3
  41:5,11
affidavit
  223:18 224:22
affiliated   200:1
affirming
  94:14
afford   81:12
  245:1

agent   38:25
  39:6 233:9
agents   39:7
  81:1,3,3
ago   9:13 23:23
  49:14 53:20,20
  53:20 58:23
  60:19 61:10
  83:15,15 88:3
  97:9,25 98:3
  121:25 129:23
  193:2 202:16
  202:16 203:15
  242:10 244:8
  244:11,12
  250:12 252:15
  252:25,25
  253:23 290:18
  335:14
agree   4:8
  166:14 265:9
  270:13,17
  271:14 276:22
  317:13
agreed   265:14
agreeing   316:7
agreement
  79:18,19 84:14
  90:14,21,23
  91:4 311:7,10
  313:21 316:15
agreements
  317:18,22

**[agrees - anybody]** Page 6

agrees   65:10
ahead   66:16
  85:21 98:6
  195:3 211:1
  214:22 217:12
  229:10 230:9
air   333:24
  334:1
airlines   200:11
alan   49:4 58:17
albania   96:23
  97:2
alexander
  243:21
allocation
  82:21
allow   172:12
  321:11
allowed   98:18
allows   266:22
alternative
  233:16
amateur   172:7
amazon   264:1
amend   111:16
  174:18 191:19
  197:3 282:15
  282:17 342:22
  343:5
amended   16:1
  250:2
amendment
  218:5

america's
  179:18 241:18
  310:16 341:12
american
  143:10 196:10
  197:1,12
amex   199:1,25
  200:2 241:8
amount   36:8
  39:14 74:18
  90:15 93:18,21
  93:23 198:15
  212:4 214:4
  220:6,15 228:5
  269:16 270:11
  301:4
amounts
  161:14 198:22
analysis   178:25
anathan   2:7
andrew   2:14
  5:5 289:7,9
  293:12,16
  296:9,25 297:4
  297:10 300:11
  301:8,21,23,24
  303:10,21
  306:4,14,20
  309:7,24 310:7
andrew's
  295:21 306:17
angeles   257:12
angry   62:2

announce   4:18
  241:21,22
answer   13:10
  14:7 15:13
  24:10,14,16,17
  25:7,14 27:9
  27:10,11,18,22
  28:3,6 33:25
  34:1 35:8,17
  37:20 38:22
  40:6,15,18
  43:11 47:2
  49:24 59:8
  84:22 89:16
  101:5,6 106:7
  111:16 114:17
  126:7,25 141:7
  141:14,15,16
  141:17 142:2,5
  142:12 143:7,8
  143:24 144:3
  144:12,17
  145:8,10 146:4
  146:5,8,15,16
  146:22,25
  147:2,5,7,8,14
  147:21 148:1
  149:4,9 162:21
  164:25 206:16
  207:1,12
  216:16 217:2,6
  217:8 218:20
  224:15 275:19
  276:15 277:24

282:15,17
  283:16,18
  285:10,13,14
  293:8 327:19
  337:7 338:21
  338:24
answered
  14:10,18 101:8
  104:19 105:21
  107:6 108:4,11
  108:15 120:25
  141:6,9,19
  146:19 147:13
  149:6 153:5
  205:14,17,19
  206:2 213:7
  278:4 280:18
  281:5 282:13
  282:14,18
  342:25
answering
  147:18 226:21
answers   14:15
  93:15 106:8,9
  285:19 343:5
anti   11:3
anticipate
  317:12
anticipating
  327:1
anybody   8:11
  89:20 109:13
  128:14 178:23
  334:21

**[anybody's - argument]**

**anybody's**
320:10
**anymore**  24:24
141:18 158:2
184:3 203:23
204:3 265:2
290:3
**anyone's**
320:14
**anyplace**  179:3
**anyway**  25:23
**apart**  50:4
**apartment**
16:11,15,18,19
16:19,22 38:18
39:1,13 47:16
49:18 55:15
60:8,11 69:1
73:11 74:17
77:23 78:4
79:22 80:2,11
82:14 85:25
87:6 88:7,10
88:11 89:14
103:6 112:16
116:2,11,12
134:2 137:10
176:11,21
178:6 184:18
189:16 190:8
190:15,18,23
191:2 192:1,7
192:17 193:3
193:17,25

208:7 210:25
214:15 215:14
233:4 234:3,4
234:25 242:16
245:20 264:3
264:17 265:13
265:20 300:24
330:7,10
**apartments**
16:7 82:7 84:2
**apologize**  5:17
52:4
**appeal**  274:3,5
274:6 275:12
275:13 307:22
308:6,17
**appear**  195:6
**appearance**
127:25 128:4
**appearances**
4:19 203:7
**appeared**  344:8
**appearing**  2:2
2:9,14
**appears**  127:11
187:8 194:10
**applicant**  100:6
100:8,8,9,12,15
100:18,19
101:8,9,10
102:5,6
**application**
85:12 87:13
91:9,14 94:1

94:24 107:3,10
110:25 112:5
112:18 115:21
115:22 116:25
120:17 121:21
123:13 130:11
130:16 185:9
217:15 221:14
221:24,24
223:3,17
224:21 225:8
225:10,12,15
274:18 275:25
277:13
**applied**  93:11
111:1,19 119:1
120:8,9,13
121:2 131:7
227:11 252:23
**applies**  139:12
143:19
**apply**  94:17
270:22 345:24
**applying**  93:7
270:15,20
**appointment**
8:12 10:15
95:4 97:23
111:18 210:4,7
**appointments**
29:2 97:22
110:17 209:25
231:8

**appraised**
298:7
**appraiser**  94:1
94:6 106:2
108:8,12
**appreciate**
62:11 65:12
226:8 276:20
**appropriate**
228:6,18 287:1
**approval**  35:5
88:11,15
190:20 320:10
320:14
**approved**
123:7,9,11,13
193:24 338:18
**approximately**
32:19
**approximating**
37:2
**april**  73:2,5,9
73:17,25
265:19
**ardent**  287:6
**area**  84:3
**argue**  199:7
**argued**  280:11
282:2
**arguing**  216:8
216:12 217:22
**argument**
280:10

**[argumentative - attorney]**                                    Page 8

| | | | |
|---|---|---|---|
| **argumentative** | 209:19,19,20 | **aspects**  10:23 | **assume**  48:10 |
| 283:21 | 215:19 219:21 | **assembled** | 52:21 108:22 |
| **arlene**  2:11 | 222:7 224:20 | 180:23 | 120:19 124:8 |
| 346:4 | 224:22,23 | **assert**  140:24 | 127:19 139:11 |
| **arrange**  339:21 | 230:1,8 232:5 | 149:12 | 162:8 200:4 |
| **arranged** | 261:9 265:7,12 | **asserting** | 215:13 271:12 |
| 192:22 | 269:13 278:5 | 144:11 | 338:17 |
| **arrangement** | 280:20 282:14 | **assessment** | **assumed** |
| 314:14 | 285:8,12,17 | 225:15 | 279:17 |
| **arranging** | 290:23 295:19 | **assessments** | **assuming** |
| 192:21 | 298:17 303:5 | 117:15 | 124:13 |
| **article**  205:24 | 320:15 336:22 | **assets**  267:3,21 | **ate**  237:5 |
| 205:25 291:3,5 | 342:20 | 268:11 328:13 | **attached** |
| **aside**  21:5 | **asking**  103:18 | 328:16 | 346:11 347:9 |
| 170:12 180:25 | 108:2 114:6,10 | **assign**  311:14 | **attacked** |
| **asked**  8:2,13 | 114:20 121:9 | 311:20 312:13 | 290:25 |
| 38:25 80:25 | 138:13,14 | **assist**  30:17 | **attempting** |
| 103:23 104:4 | 146:12 162:23 | 32:13,16 33:21 | 97:2 |
| 104:13,19 | 188:5 197:6 | 124:12 | **attempts**  96:22 |
| 105:3,4 106:8 | 206:4 224:3 | **assistance** | **attention**  15:21 |
| 106:10,17,25 | 229:15 232:6 | 30:21 | 15:25 57:21,23 |
| 108:8,9,12 | 236:2 237:25 | **assistant**  10:7 | 66:6 78:25 |
| 138:11 141:23 | 276:22 278:7 | 31:17 32:24 | 85:11 91:11,20 |
| 142:1,8 143:18 | 278:16,17 | 289:5 291:11 | 123:24 184:1,9 |
| 143:18,21 | 280:12,24 | **assisted**  21:12 | 184:12 185:24 |
| 144:8 145:8 | 281:1,5,6 | 32:18 92:24 | 186:3 268:16 |
| 146:10 147:20 | 282:6,17,22 | **assists**  31:8,9 | 269:25 270:7 |
| 147:24 148:6,6 | 283:24 284:16 | **associate**  10:1,5 | 271:1,5,7 |
| 148:17,21 | 284:19 314:10 | 10:10,20,24 | 272:8 |
| 153:23 158:16 | 326:10,12 | 90:22 | **attesting**  129:4 |
| 159:3,6 163:13 | 339:19 | **associated** | **attorney**  5:3 |
| 175:4 176:20 | **asks**  14:14 22:5 | 198:25 | 9:6 10:1,3,4,5,8 |
| 187:1 189:25 | 127:15 187:10 | **associates** | 10:10,20,25 |
| 202:2 206:23 | 205:22 | 92:21 93:1 | 11:7,8,12 12:1 |

**[attorney - bankruptcy]**                    Page 9

67:11 92:22
140:25 141:25
142:18,21
143:2,8,14,22
144:11,16
145:17,25
147:3 149:10
149:13 164:21
256:5 345:13
346:13
**attorney's** 25:6
**attorneys** 7:19
7:24 8:3 11:19
67:18 145:2
345:15
**attributed**
158:9
**audience** 62:7
**audio** 4:7
**auditing**
324:22,23
**august** 169:2,5
170:13 171:11
171:12 172:2
173:2,14
191:11,24
240:12,14,17
240:19 256:8,8
256:9,10
258:13
**authorities**
95:9 96:3
105:1 121:10
123:10,12

130:10 135:8
135:10 221:15
223:5 227:11
**authority**
221:11,16,23
221:25 223:5
223:24 226:1
311:14,20
312:6,7,14
**authorized**
345:7
**automatically**
246:21
**available** 242:1
332:10 346:9
**avenue** 249:15
249:15
**aware** 13:1
86:11 87:4,10
88:9 89:24
90:2,5 117:20
181:1 194:15
201:3 272:14
272:22 273:9
284:9 286:3
307:2 325:16
325:23,24,25
332:24 333:3
337:9 338:1,7
338:15
**ayatollah** 96:25

**b**

**b** 2:15
**back** 31:15
33:6 42:17,22
58:17 65:19
69:12 72:17
73:9 86:10
95:3,3 108:25
109:14 113:2,3
113:6,8 117:9
118:7,19,21
124:8 132:2
140:7 141:9
142:8 146:19
146:23,25
147:6 157:21
158:6 163:25
173:15 176:5
176:12,13
177:24 178:2
186:23 187:3
189:25 191:5
191:19 193:3
196:19 202:16
203:3 204:11
204:21 208:5
215:4 220:14
222:22 238:2
239:20 240:1
246:4 255:17
255:25 264:19
286:17,25
287:4 288:4

289:6,24
290:14 295:13
309:5 313:20
314:1 326:22
327:9 331:15
**background**
179:22 242:8
**backgrounds**
179:14
**bad** 249:3
**balance** 90:17
**balcony** 83:7
180:6
**ballot** 157:16
158:6
**ballpark**
126:18
**bank** 29:10,12
64:2,6,7 151:5
151:8,10,15
186:18 187:15
311:18,25
312:2,7,8
**bankruptcy**
90:25 266:9,12
266:20 267:7
267:10 268:13
268:15,17,25
269:5 270:12
272:6,15
273:24 274:2
274:23 275:11
275:15 276:1
277:13 299:21

300:4
**banks** 165:23
**bar** 181:16
**barrett** 291:3
**base** 73:1,13
176:2 249:17
**baseball** 62:23
**based** 12:2
72:13 74:1
106:3,7,9
120:16,20
121:20 130:9
131:12 138:14
138:17,24
139:1 160:3
162:21 177:4
179:13 180:23
199:16,16
217:15 222:19
222:21 223:3
241:25 255:4
279:18 285:15
313:18 315:22
315:23
**basic** 43:17,17
43:18
**basically** 55:22
59:25 162:20
163:13,17
168:19 265:24
341:13
**basis** 25:13
26:19 27:17,21
27:23 54:18

231:14
**beach** 1:10,11
16:9,11 38:18
47:16 49:18
51:23,24 52:1
52:2,6,7,9
55:16 61:7
62:20 69:16
70:19 71:7
72:9 73:13
75:9 77:15
78:3 81:15
83:17 84:2,4
84:17 86:23
96:10 104:16
107:13,20
117:17 119:16
123:13 125:20
125:22 128:1
128:20,25
130:2,10
131:19,19
153:23 154:18
157:8 175:22
176:6,14,15,21
176:25 177:3,8
200:19 201:7
205:23 206:8
206:15 207:17
211:8 212:22
213:1,18
214:16 216:13
216:14 218:3
219:12,22

221:25 223:5,7
227:2,20
230:22 231:3
232:7 235:12
236:5,11
237:17 242:9
242:12,22
245:11,18
272:7,16,23
276:9 277:17
277:20 278:11
279:22 281:9
328:2
**beautiful**
287:19
**bed** 189:24
**bedroom**
189:23,24
**began** 10:19
61:23 173:10
248:15,16
**beginning**
29:22 30:7
31:15 32:6
66:17 71:3
86:12 91:10
93:22 119:20
137:10 152:23
170:12 239:23
249:5 262:25
263:5
**begins** 78:16
85:10 116:18
168:23

**behalf** 1:21 2:2
2:9,14 5:8 35:6
46:13 67:12
261:4 307:9
311:15 330:10
331:7
**belgium** 97:2
**believe** 9:6
10:11 11:21
13:19 19:21
24:8,11 25:24
28:19,20 37:10
37:10 38:1
40:4 45:14
52:10 67:7
141:5 223:10
254:21 274:7
313:16,18
318:6 324:25
332:19
**bell** 190:5
194:18,19
**belong** 244:25
290:10
**benefit** 275:22
**benz** 154:1
**bernard** 279:13
**bernie** 287:11
**best** 6:19 13:16
14:7 15:2,5,9
15:12 19:22
38:9 67:1
69:25 100:22
126:7 130:12

**[best - brooklyn]**                                                    Page 11

131:8,25
156:17 268:18
269:11 273:17
273:18,23
297:6,20 300:4
304:25 341:4,6
342:25
**beth** 289:5
291:11
**better** 82:21
83:4,25 128:10
184:13 208:15
231:14 288:14
317:9 321:7
340:5
**beyond** 20:19
105:2 115:20
122:18 142:18
149:12 182:21
227:13
**big** 43:19 68:1
79:16 149:17
182:11,19
239:21 242:7
249:13 270:13
270:16,23,24
274:1 289:8
**bigger** 80:16
299:3,13,13,13
**bill** 105:7,7
118:4,16
119:10,20,21
119:24 127:19
309:8 330:18

331:6
**billion** 291:7
**bills** 95:14
315:12 319:16
320:22 337:24
**birth** 251:6,19
251:23 252:5
**birthday** 290:4
290:4 294:12
294:12 303:4
303:15
**bit** 12:3 38:13
39:16 77:12
80:4,7 170:20
226:2 241:7
248:6 257:16
266:25 310:11
**blocking**
275:21
**blue** 119:14
303:5
**blvd** 1:10
**board** 87:14,18
**boards** 337:11
**bob** 32:23
**book** 111:4
246:4
**booked** 70:15
338:6
**booklet** 112:1
**books** 246:4,4
315:23
**boring** 5:18

**born** 8:17,18
**borrow** 290:16
295:10 297:15
297:16
**boston** 200:18
**bottom** 14:16
76:3 79:8
117:12 118:25
119:13 152:3
**bought** 69:1
81:2 245:13
278:23 291:23
334:7
**box** 93:8 100:6
100:20 101:11
101:17 102:5
250:5,8,12,14
250:16,23
252:16
**boxes** 100:9,12
100:15 290:7
**brand** 134:8
**braves** 299:9
299:10
**break** 6:25
25:10 33:3
65:11,21 69:2
69:5 139:20
140:9 142:16
142:17 143:1
143:23 146:3
147:4,12 148:1
149:11 204:12
204:23 255:16

256:2 326:16
326:20,21
327:11
**breakers** 70:14
**breakout** 65:13
**bribe** 291:3
**bridge** 233:11
**brief** 69:2
**briefly** 37:16
**bring** 57:21
70:10 89:20
104:1 245:22
289:8 290:23
**bringing**
290:21
**brings** 57:23
**broadcast**
23:20 62:1
86:1 103:7
172:13 180:24
202:10,13
231:13 237:5
241:14,16
242:6,21 243:4
249:9,14
257:23,25,25
258:5,6,7,8
**broadcasting**
172:7 242:17
242:18 257:22
**broken** 185:23
**broker** 208:21
**brooklyn** 8:18

**brought** 81:1
179:1 184:9
185:8 194:22
278:23 290:7
302:9
**budget** 11:11
**build** 120:5
**bulk** 193:16
**bunch** 203:4
214:8
**bureau** 11:6
110:16 316:18
316:25
**bush** 1:22 4:17
344:18 345:5
345:20
**business** 19:23
20:1,4,22 21:6
23:12,13 25:21
29:14,20 30:10
32:8 36:22,25
41:14,23 42:5
44:7,9,16,19
45:13 50:6,10
58:20 166:10
310:16,18
316:11,14,15
317:7,10,17
334:2,3,13,15
334:18
**businesses**
29:18 32:6
37:4,9 50:13
50:20 64:6

**busy** 41:17
249:3 268:19
268:23
**buy** 69:21,24
70:5,6 80:15
80:16,16
112:17 208:8
279:1 288:10
322:3
**buyer** 81:8
116:3
**buyers** 60:11
**buying** 78:10
234:3 333:13
**buys** 331:9

**c**

**c** 2:1 344:18
345:20 346:3
**calendar** 28:22
28:24 33:17
168:24 169:1
169:10,20,23
170:4,14 179:1
191:12 202:2
203:10,11
239:8,20 240:3
264:7
**call** 18:12 23:6
23:14 43:14
45:8 58:17,18
72:1 75:17,19
75:20 158:17
244:16 250:17

288:8 319:18
320:3
**called** 5:8 8:12
15:21,25 44:14
45:23 184:12
194:16 244:15
**calling** 23:3
45:11 79:23
123:23 193:13
269:25
**calls** 23:10,19
28:15 184:1
**camera** 23:17
**cammarata**
2:10,11 5:2,2,2
7:22 13:9 15:8
17:12 22:16
24:6,8,11,17,20
25:10 26:1,4
26:10,13,17,21
26:25 27:3,10
27:25 28:8
33:2,23 34:15
35:7,16 36:3
37:6 38:21
40:5,14 41:20
45:21 46:15,25
47:6 49:23
57:16 58:9
59:7 65:13
67:10,11 70:7
71:9 78:22
79:1 84:5,21
89:15 95:19

103:22 104:11
104:17 107:15
107:22 108:13
108:21 109:18
109:24 111:12
112:7 113:4,10
113:16 114:5
114:10,14,19
114:23 115:1,3
122:8,23 126:1
126:23 128:2,8
129:12 130:4
130:23 132:5
132:22 134:22
134:24 135:2
136:11 138:2,5
138:20 139:3
139:23 141:5,8
141:13,15
142:12 143:4
143:15 144:4
144:20,25
145:9 146:7
148:6,10,13,17
148:20,23
149:2,6 150:3
150:22 154:12
159:23 166:15
167:9,15,25
170:17 171:17
173:21 174:13
175:25 176:7
176:22 178:1,7
178:22 181:3

[cammarata - ceremony]                                              Page 13

| | | | |
|---|---|---|---|
| 185:6 186:4,24 | 278:20 281:10 | **card** 35:14 | 205:12 206:6 |
| 187:18 189:12 | 281:16 282:23 | 111:18 199:1 | 210:3 224:4 |
| 193:18 199:18 | 283:7,18 286:6 | 199:13 200:2 | 268:8 271:25 |
| 204:14 205:3,8 | 298:20 299:22 | 253:12 254:2 | 274:7 284:21 |
| 207:19 211:17 | 300:14 302:14 | 322:22,23 | 286:16 291:22 |
| 212:9 213:3 | 305:19 310:1 | **cards** 35:15 | 308:20 336:23 |
| 214:2,17 217:5 | 312:9 316:2 | 64:12 322:1 | **cases** 12:18 |
| 217:9 218:18 | 319:7 320:12 | **care** 57:10 | 13:24 15:18,18 |
| 218:25 220:11 | 321:21 322:11 | 195:21 243:20 | 184:9 268:10 |
| 221:1,8,18 | 322:15 323:24 | **career** 161:13 | 282:2 |
| 222:3,14,20 | 325:7,19 | **careful** 93:19 | **cash** 82:22 |
| 223:9 224:6 | 326:17,25 | 167:23 322:5,6 | 330:16,22,23 |
| 226:13 227:4 | 329:16 333:21 | 322:8,9 323:6 | 330:24 |
| 227:24 229:1,4 | 334:11 335:2 | 323:9 | **cast** 157:15 |
| 229:8,11,15,20 | 337:17 339:24 | **carried** 303:7 | **casting** 61:23 |
| 230:1 231:4 | 341:1 342:16 | 314:13 | **catch** 164:17 |
| 232:9 234:22 | 343:13 346:3,4 | **carries** 6:7 | **catching** |
| 235:15 236:13 | **campaign** | 56:13 | 164:20 |
| 236:21,25 | 307:19 | **carry** 200:13 | **categorical** |
| 237:18 239:12 | **cancel** 210:1 | **case** 1:2 7:11 | 35:25 |
| 241:10 243:11 | **canceled** 95:5 | 7:12,13,14 | **category** 243:6 |
| 246:7 247:22 | 231:9 | 12:11,14,14,20 | **catholic** 50:19 |
| 254:15 255:15 | **cancer** 243:18 | 13:14,22 14:11 | **cause** 1:24 |
| 256:13 257:4 | 243:24 287:10 | 14:19 17:18 | 343:5 |
| 259:5,13 | **candidates** | 19:9 20:19 | **caused** 340:14 |
| 261:11,19,25 | 161:4 | 21:1,3 25:16 | **caution** 64:22 |
| 264:18 265:16 | **capacity** 233:5 | 64:22 68:12,13 | **cdlawpc.com** |
| 265:21 266:16 | **capital** 292:10 | 85:19 101:21 | 2:13 |
| 266:21 267:11 | **caption** 17:18 | 107:20 125:2 | **cell** 22:18,20,23 |
| 270:18 272:10 | 85:20 | 130:3 136:5 | 23:1,15,21 |
| 272:17 273:11 | **captioned** | 138:1 145:17 | 28:10,15 |
| 273:25 276:3 | 12:15 | 147:16 163:23 | **ceo** 19:21 |
| 276:11,16 | **car** 98:25 99:7 | 178:23 181:2 | **ceremony** |
| 277:2,7,22 | 99:8,12 154:20 | 189:4,5 196:24 | 290:7 |

certain   36:8
90:15 93:18,21
93:23 95:2
129:19 175:3
192:3 193:13
211:23 212:3
214:4 220:6,15
228:5 246:2
263:14 267:25
271:4 281:18
281:20,22
284:3,4,23
285:2 296:22
307:20 314:3
332:7,8 338:8
338:9,11
certainly   33:8
48:25 75:15
143:16 156:10
159:11 161:6
185:9 221:20
235:2 269:1
certificate   3:5,6
3:7 251:6,19
251:23 344:1
345:1 347:1,16
certification
345:23
certify   344:7
345:7,12 347:6
certifying
345:25
chair   289:9

championships
287:6
chance   300:7
change   25:15
77:15 87:14
95:4 103:6
109:4 113:2,3
113:5,23
115:16 122:2
140:3 164:9,18
164:20 165:5
183:7,13,16,20
183:24 184:1,8
184:13,25
188:3 211:25
212:15,17,20
214:11,14
218:13 230:10
231:3 238:1
243:7,10,15
255:21 260:18
260:23 262:25
263:5 266:7
327:5,16
335:13 348:4
changed   31:22
112:22 142:23
184:2,3,5
187:16 231:5
232:8 235:13
235:17 236:11
237:1,3,16
238:12 246:24
246:25 247:3

248:1 262:14
262:19 335:9
340:2,19
changes   237:24
243:3 245:3
301:3 346:10
348:3,23
changing
237:14
chapter   266:15
266:20,22
267:7,10 268:2
268:12 270:15
271:10,21
272:2 273:24
274:18,19,20
274:23 275:6
276:1,8,18
277:14
character
40:21
characterizati...
148:3 220:4
265:15
charge   19:23
19:23 20:2
194:20 306:20
charitable
36:12
chase   332:3
check   94:9
101:17 191:19
262:5 313:10
313:12,17

323:20 324:13
331:23 339:11
340:17,20
checked   33:3
93:8 100:10,13
101:7,12,14
102:5
checking
168:20,21
323:18 330:15
332:1,2,7,11,14
checks   37:20
38:4 55:11
340:19
chest   244:15,20
244:21
chicago   191:14
257:19
chiefs   10:2,9
children   23:14
70:11 103:13
103:14 246:23
christmas   8:12
72:15,15 73:4
cigar   83:10
181:16 232:3
cigars   83:7,8
334:6,7
circulated
308:2
circumstances
72:13 150:17
150:24 151:20
270:3

**[circumstantial - commission]**    Page 15

| | | | |
|---|---|---|---|
| **circumstantial** 158:17 | **claims** 125:1 138:1 158:14 186:13 282:10 | **close** 20:10 29:6 46:3 49:10 185:24 | **combine** 260:21 |
| **cite** 255:9 | **clarification** | 239:18 272:8 | **come** 7:7 33:6 |
| **citibank** 182:22 | 22:5 67:24 | 279:7 287:9,11 | 42:1 48:20 |
| 182:24 183:7 | 127:15 187:10 | 326:17 | 58:16 63:13 |
| 183:10,14 | 226:9 | **closer** 53:22 | 71:11 72:14,16 |
| 186:19,22 | **clarify** 17:2 | 242:11 287:10 | 72:19 73:9 |
| 187:17 | 87:8 144:5 | **closest** 49:10 | 78:7 81:19 |
| **citizen** 143:10 | 146:12 254:20 | 50:11 | 110:3 131:17 |
| **city** 8:19,20,22 | 263:6 311:19 | **clothes** 231:16 | 154:22 155:1,5 |
| 8:23 9:3,9 | 321:17 339:19 | 231:16 | 163:25 198:4 |
| 38:18 47:16 | **clarity** 154:25 | **clothing** 231:19 | 245:21 255:17 |
| 49:17 50:1 | **clean** 60:13 | 231:23 | 262:13 264:25 |
| 54:13 55:15 | 176:12 324:10 | **clubs** 244:25 | 279:16 286:16 |
| 136:19 160:18 | **clear** 9:15 43:5 | **coach** 134:21 | 300:4 326:22 |
| 160:19 190:8 | 75:7 145:2 | 148:8 | 327:23 331:17 |
| 192:1 193:17 | 146:15,16,21 | **coaching** | 331:17 |
| 193:25 245:20 | 210:8 211:6 | 134:22 | **comes** 85:23 |
| 330:7,10 | 214:13 215:4 | **cohosted** 21:17 | 123:23 238:8 |
| 344:12 | 218:10 228:14 | 21:19 | 262:13 280:3 |
| **civil** 11:3,4,10 | 292:23 304:12 | **cold** 231:24,25 | 343:6 |
| 11:22 12:8 | 317:17 322:8 | 232:2 | **comfortable** |
| 17:21 68:12 | 323:2 338:10 | **college** 8:23 | 93:3 265:23 |
| 76:9 346:22,22 | **clearer** 88:15 | 158:2 181:23 | **coming** 65:6 |
| **claim** 99:21 | 156:2 | 182:7,8,12 | 70:8 159:20 |
| 100:4 101:4,22 | **clearly** 16:8 | **color** 62:2,4 | 165:22 320:22 |
| 101:23 102:25 | **clerk** 111:19,20 | **colorful** 118:13 | 342:20 |
| 104:23 107:12 | **client** 140:24 | **column** 95:25 | **comment** |
| 107:19 136:5 | 141:4,5,25 | 118:24,24 | 248:10 |
| 138:18 277:17 | 144:11 145:17 | 119:25 | **comments** |
| 284:1,21 328:1 | 146:7 149:13 | **columns** | 140:23 307:17 |
| **claiming** | 165:11,15 | 118:14 | **commission** |
| 101:24 | | | 344:20,20 |

**committing**
272:15
**common**
184:24
**communicate**
20:12,17 34:13
34:19 42:10,13
42:17 44:11,15
45:24 46:2
57:6 59:3
307:8
**communicated**
27:6 42:16
44:5,16 45:24
**communication**
22:3 310:18
**communicati...**
7:15 21:9 30:4
30:6,10 37:12
37:13 38:2
43:18 50:23
54:17 55:3,5
163:2 309:15
309:18,23
314:6,7 315:5
317:24 318:4
318:11,18,21
318:24 319:15
319:19 320:11
321:16,19
322:10,18
323:4,22 324:2
325:4,9,17
326:11 335:25

336:3,7 340:10
340:16,17
341:16,17
**commute** 71:14
**commuted** 8:22
**companies**
21:21 38:12
89:12 253:20
325:13,14
326:3 341:10
342:15
**company** 19:21
21:9 29:22,25
32:24 38:3
43:19 46:23
55:23 96:21
253:24 310:15
316:9 318:3
321:25 322:1,3
340:4,7 341:7
342:1
**compare** 170:4
232:6 236:8
239:10
**compared**
238:1
**compel** 272:15
272:23
**compelling**
124:1
**compensation**
337:10
**complain** 83:10

**complained**
83:9
**complete** 35:13
146:9 193:21
217:25 220:7
220:10 282:7
285:13,18
291:1 299:4
**completed**
289:6 346:15
**completely**
14:7 127:2
**complicated**
67:23 166:11
268:18
**complies**
117:23
**comply** 235:7
**compromise**
317:15
**compulsion**
88:20
**compulsive**
99:14,14
**computer**
242:25
**comrex** 249:7
**con** 265:4
**concentrate**
270:1
**concert** 287:12
**concludes**
343:15

**conclusion** 78:8
154:22 155:1,4
**concrete**
176:17 211:23
**condition**
229:21 243:25
**conditions** 6:19
**condo** 16:9,10
16:11 61:7
62:20 69:16
70:18 71:7
72:9 75:9
77:15,20,22
78:4 79:21,24
79:25 82:19
83:2,17 84:4
84:17 86:23
96:10 102:10
104:16 107:13
107:20 119:16
128:1,25 130:2
131:19 154:18
172:1 175:23
176:6,21
205:24 206:8
206:15 207:17
208:9,11,13
211:8,15
212:22 213:1
213:19 214:16
214:21 219:13
219:23 221:17
222:1 223:8
227:2,20

230:22 231:3
232:7 235:13
236:3,5,12,20
237:17 245:11
245:18 250:18
258:24 272:7
272:16,20,24
273:7,15 276:9
277:17,20
278:11 279:22
281:9 328:2
331:13,20,21
**condominium**
16:15 38:19
47:17 49:19
55:16 69:16,20
69:22,24 70:3
70:5,6 137:8
139:9
**conduct**  147:16
175:9 313:25
**conducted**
147:16
**conducting**
67:5
**conference**
291:15,16
**confirm**  239:5
240:23 261:22
304:23
**confirmation**
135:9,11
261:10

**confused**  13:21
22:2 80:12
265:3,4 321:25
339:17
**confuses**  226:2
**confusing**
67:24 102:4
121:5
**confusion**
101:23 235:3
340:14
**congress**  11:11
**connected**
345:15
**connection**
21:20 76:25
113:18 115:8
137:5 144:19
144:23 145:4
154:13,20,23
173:18 249:9
312:6
**connections**
243:1
**consider**  19:19
23:16 40:9
56:11 82:1,8
83:16 153:11
162:23 173:5
175:22 200:3
217:24
**considerably**
238:3,4

**considered**
73:13,25 82:10
82:12 162:10
292:13 346:16
**considering**
242:11
**consistent**
169:10 214:23
231:14
**consistently**
172:17,17
**consolidated**
51:17
**constantly**
71:14 132:14
**constitutes**
25:18 128:25
**constitution**
107:14,17,21
108:5 206:1
219:14 220:1
221:17 222:2
**constitutional**
145:18 222:12
223:7
**constructed**
169:12,13
**construed**
100:24
**consult**  92:18
**consultant**
64:23 342:12
**consulted**
50:25

**consulting**
21:11 332:22
332:25 333:4,8
**contact**  165:15
260:8
**contained**
221:6,9 347:8
**contains**  25:16
**contemplate**
216:1 220:5,6
**contemplating**
89:13
**contend**  163:22
205:23 206:15
219:22 227:19
**contention**
153:4 206:6
309:24
**contentions**
196:24
**continue**  4:7
19:25 66:4
91:3 129:1
197:13 229:20
229:24
**continued**  62:8
**continues**  18:5
**continuing**
286:4
**contract**  86:5
316:18 339:12
339:22 340:4,8
340:13,15

**[contracts - court]**                                    Page 18

| | | | |
|---|---|---|---|
| **contracts** 50:18 | **cooler** 170:18 | 89:10 92:3 | 47:16 49:18 |
| 56:15 340:24 | **cooperative** | 93:10 100:3 | 52:9 55:16 |
| **contributed** | 38:18 47:16 | 104:18 106:13 | 99:22 100:5 |
| 315:17 | 49:18 55:15 | 118:16 119:22 | 106:1 108:12 |
| **control** 120:5 | 137:8 139:8 | 119:22 157:4,5 | 117:17 121:9 |
| 310:24 311:24 | **copies** 251:9 | 157:6,9 164:24 | 123:11,13 |
| 311:25 345:24 | 346:14 | 171:10 172:14 | 125:20,23 |
| **controller** | **copy** 109:9 | 206:9 212:3,24 | 130:10 153:23 |
| 38:10,11 41:3 | 173:20 254:2 | 213:20 215:22 | 158:16 159:2,3 |
| 41:9 | **corner** 76:4 | 220:2 230:25 | 216:11,11,13 |
| **convenience** | 79:8 117:13 | 258:2,7 269:10 | 218:3,3 221:15 |
| 185:7 | 125:19 133:21 | 279:21,23 | 223:5,23,24 |
| **convenient** | 152:3 195:11 | 286:7 314:18 | 242:12 344:4 |
| 172:4 234:12 | 225:22 | 318:22 336:25 | 344:12 345:4 |
| 234:13 | **corporate** | 338:3 347:10 | 347:4 |
| **convention** | 187:9,11 | **corrections** | **couple** 86:9 |
| 172:24 173:3 | 188:15 194:11 | 54:14 347:9 | 97:21 110:18 |
| 191:15 257:19 | 196:1,17 | **correctly** 107:6 | 185:10 203:14 |
| 257:20 263:21 | 311:11,19 | **cost** 292:1 | 208:3 210:3 |
| 263:22 | 313:23,24 | **cottage** 171:3,4 | 250:11 264:8 |
| **conversation** | 314:2,23,25 | 171:7,8,18,21 | 298:15,16 |
| 39:19,22 | 321:11 322:22 | 171:22 173:5 | **course** 15:22 |
| 143:13,22 | 322:23 324:15 | 173:11,18 | 40:7 81:2 |
| 302:5 303:10 | **corporation** | **counsel** 4:12,18 | 113:5 167:1 |
| **conversations** | 50:15 167:6 | 4:22,24 5:1 | 170:19 171:1 |
| 4:5 48:4,9,16 | 315:10 323:14 | 17:7 24:15 | 199:11 210:21 |
| 50:3 89:12 | 323:14 | 114:6 345:13 | 210:23 218:21 |
| **convert** 61:2 | **correct** 9:10 | 345:15 | 219:1 230:15 |
| 273:24 274:23 | 10:20 16:4 | **count** 159:13 | 230:19 266:13 |
| 275:25 277:13 | 33:13 48:17 | 160:12 | 276:24 277:3 |
| **convicted** 97:1 | 70:4 73:14 | **counting** 75:22 | 278:13 282:18 |
| **convinced** | 74:2,5 75:4,5 | 200:14 | 304:3 |
| 161:11 | 77:5 78:5 80:3 | **county** 8:21,24 | **court** 1:1 4:16 |
| | 86:21 88:12 | 8:25 38:19 | 4:19 6:7 14:24 |

**[court - debts]**                                                   Page 19

15:1,6,23
40:13 63:24
268:17,25
269:5,19 270:4
274:4 277:6
285:7
**court's**  275:3
276:2
**courtyard**  83:8
**cover**  238:21
**coverage**
300:20,21,23
300:23 301:4
**covering**
172:15,23
**covers**  331:18
**covid**  248:16
248:20
**coworkers**
210:23 212:19
**crazy**  248:25
275:14 299:15
**create**  60:16,18
315:4
**created**  60:16
254:6,12
**credible**  48:24
54:3
**credit**  35:14,15
64:12 135:9,12
135:13 199:13
322:1,22,23
**creditor**  275:23

**creditors**
267:16 268:4
272:14 275:17
275:23
**criminal**  11:1,2
11:3,8 161:13
**criteria**  211:19
221:9
**critical**  238:24
274:6
**crossed**  92:5,7
161:25,25
**crosstalk**  52:4
**cryptocurrency**
329:7,9,11
**cs**  346:13
**culminated**
233:25
**culminating**
232:15
**cured**  116:15
**current**  164:24
252:8 326:7
**currently**  26:7
**custody**  298:9
**cuts**  170:14
**cv**  1:2

**d**

**d**  5:22 16:12
128:20
**daily**  56:12
**damn**  288:7

**daniel**  2:19
4:15
**dark**  9:5 242:8
**date**  1:12 19:11
19:12 48:17
70:1,3 76:24
77:6 84:12,13
90:7,8 92:4,10
93:19 94:16
97:7 110:24,24
111:1 130:14
130:17 131:2
155:18 157:21
171:11 179:2
190:4 194:8,9
195:15 200:24
201:13 205:22
206:14,23
207:15 213:16
214:9,14,18,20
216:2,2 217:15
219:22 220:8
220:17 228:2
234:12,13
259:12 265:14
266:11 296:17
297:7,7,21,22
302:1 305:10
346:12 348:25
**dated**  84:11
92:2 181:9,11
194:6,25
195:13 345:18
347:12

**dates**  172:9,20
191:12 198:16
198:17 201:17
201:18
**daughter**
167:22 168:11
171:25
**day**  8:22 14:5
20:10,11 23:13
56:17 57:2,4
72:16 98:2
203:20 209:7,8
215:9,10
234:24 248:22
276:14 311:6,6
330:14,14
331:8,8 347:12
347:17
**days**  11:6 72:23
75:1 150:8,9
172:14 181:5
192:17 233:13
240:22 257:12
264:8 282:3
339:8 346:15
**dc**  2:6 10:6
**dcf**  68:13
**de**  311:1,2
**deal**  69:5 333:6
**dear**  346:7
**death**  96:21
254:5
**debts**  267:5

[december - demeyer]                                                Page 20

**december** 1:12
4:2 49:20
55:17 73:2,5,8
73:16,25 94:18
95:2 203:17
206:18 207:7
210:5 231:25
266:9 344:13
345:18 346:2
**decide** 80:6
104:4 107:7,8
112:11,23
113:1,13 114:3
115:6 116:14
153:19 158:19
175:1 218:1,2
218:2,4,22
230:16 232:18
315:20 341:3
**decided** 53:23
62:15 77:17
78:1,9 80:7,9
80:10 83:12,24
94:19 97:20
112:9,12,15
115:16 121:10
121:13 139:5
207:5,24
208:24 210:10
210:21 212:16
213:8,10,17
214:1 218:1
222:10 230:22
232:15,23

241:12 293:12
315:9
**decides** 221:11
221:25 315:17
**deciding** 81:10
112:14 113:3
213:23 218:6
**decision** 60:8
71:18 80:5
94:15,25
113:12,21,22
115:24,25
116:4 121:20
122:4 126:15
152:16,21,25
153:16 155:8
155:13,16
158:18 175:8
208:19 209:11
210:9 211:9,11
212:14,21
214:23,23
215:14 216:4,6
216:6,7 217:16
218:13 220:7
228:10,16,21
228:25 230:10
230:23 232:11
233:4,19,21
234:1,2,12,21
242:11 270:13
270:16,23
274:3,14 275:8
278:3 328:5

**decisions**
159:11
**declaration**
103:11 117:3
122:18,19
124:2 126:9,11
126:22 127:20
131:4,10 132:3
132:25 133:5
134:5 226:3,19
226:23
**declare** 128:18
128:24
**declared** 128:4
**declining** 25:13
**decor** 242:16
**decree** 88:14,15
88:20,22,24
89:7
**dedicated** 23:8
23:16
**deduction**
222:22
**deductions**
167:7
**deed** 68:6,7,9
68:15,19,21
69:15 75:23
76:6,10 77:1
84:13 250:9,17
**default** 249:1
249:16
**defendant** 1:7
2:9 3:12 5:5

17:9 63:8
79:14 156:22
**defendant's**
66:20 68:1,10
69:14 75:24
76:8 78:17
79:9 84:12
85:9,10 91:10
95:21 116:18
122:16,16
133:7 149:18
151:23 161:17
168:23 174:11
178:15 196:14
197:14 239:21
**defense** 306:6,9
306:20 308:14
308:16
**defined** 153:12
153:14,17,18
**definitely** 176:3
192:18 213:11
**degree** 34:1
88:17
**delaying**
146:14
**deliberately**
269:20
**delivered** 110:2
**delta** 200:10
201:9
**demeyer** 2:11
5:3 346:4

**[democrat - disagreements]** Page 21

democrat
  160:17,23
democratic
  173:2 191:14
  257:18,20
  263:22
department
  10:6,7,22,24
  11:2 134:17
  136:19
departments
  11:15
depend  36:13
  150:23
dependent
  103:13
depending
  118:24 155:10
  270:9
depends  101:14
  150:17 151:20
deposed  5:25
  8:9,13
deposing
  346:13
deposit  339:14
  340:21
deposited
  332:10,14
deposition  1:15
  1:24 3:3 4:11
  7:4,19,20 8:4,5
  8:7 15:4 17:5
  28:5 65:18

114:22 140:6
140:10 142:3,9
142:10,16
147:23,25
149:15 204:20
209:8 215:9
217:1 255:24
256:3 286:15
327:8 343:8,16
345:8 346:6
347:7 348:23
deputy  10:1,3,4
  10:5 11:12,21
  11:25 288:25
describe  19:22
  34:4 94:22
  134:13 265:13
  270:11 317:4
  342:14
described
  28:10,12 41:8
  103:5 235:17
  265:19 278:22
  287:7 341:9
describing
  38:24 252:17
  298:3 328:6
description
  3:11 38:9
  133:22 195:14
desire  61:25
  233:5
desk  29:6
  181:18

detail  67:2
  96:19 275:7
  291:13
detailed  311:4
details  140:12
  142:11 147:24
  303:9
detective  54:15
determination
  107:16 277:6
determine
  106:2
determines
  168:2,4
device  249:8
die  303:24
  304:11,14
died  292:17
difference
  144:5,7 213:22
different  7:11
  9:17,18 12:4
  12:16,18 13:24
  16:7 36:17
  60:24 73:24
  83:6 112:24
  113:25 121:6
  122:3,5 142:24
  165:2 169:11
  192:13 194:8
  201:20 209:5
  210:15 214:8
  215:7 235:21
  239:4 251:8,8

258:8,16,20
285:23 311:23
318:9,10
323:16 338:25
differently
  11:16 179:12
difficulty
  337:24
dimaggio
  329:14
direct  3:4 5:12
  66:6 78:25
  85:11 91:11,20
  345:24
directed  231:6
direction  78:23
  345:25
directions
  209:5 215:7
directly  43:9,13
  44:12 249:10
  321:18 322:9
  323:23 339:13
  339:16 341:18
disagree  220:3
  306:25 307:1
disagreeing
  317:8
disagreement
  315:24 316:1
  316:16
disagreements
  316:19

**[disclose - document]**                                    Page 22

| | | | |
|---|---|---|---|
| disclose   25:3,5 | 142:1,10 | distribution | doctor   243:19 |
| 26:8 27:15 | 147:10,23 | 315:16 318:23 | 244:13,16,19 |
| disclosed   67:18 | 148:25 196:21 | 319:15 320:11 | 244:22 259:22 |
| 135:19 137:16 | 277:18 278:19 | 337:1,6,15 | doctors   243:7 |
| 152:7,13 154:9 | 279:6,25 | 338:15,19 | 243:10,16,16 |
| 158:12 162:11 | 308:22 327:18 | distributions | 243:17 244:3,4 |
| 178:19 183:3 | 342:25 | 312:16 319:6 | 244:10,19 |
| 188:16 197:23 | discussing | 336:14 338:1 | document |
| 286:16 | 28:14 39:7 | district   1:1,1 | 14:13 17:14 |
| disclosure | 69:14 86:19 | 9:7 12:16 | 18:1,7 19:6 |
| 47:14 | 129:23 144:6 | divided   11:13 | 38:16 66:7,14 |
| disclosures | 208:16 215:24 | 11:15,16 | 68:1,11 69:18 |
| 3:13 17:6,10 | 239:20 280:2 | division   11:2,3 | 70:2 76:5,9,13 |
| discount   118:9 | discussion | 11:4,4 | 77:10 78:15,15 |
| discounts   118:5 | 275:10 | divisions   11:1,3 | 79:9,16,17 |
| discover   16:4 | discussions | divorce   76:19 | 84:10,11 85:7 |
| 23:19 | 49:16 53:18 | 76:20,22,25 | 85:19,20 91:8 |
| discovery   12:8 | 55:14,22,24 | 83:16,24 84:24 | 91:12,17,18,21 |
| 12:10 13:2,6 | 141:21 142:17 | 86:17,19,19,22 | 91:25 92:13 |
| 13:13,23 14:6 | dislocations | 87:5 88:13,15 | 93:7,14,25 |
| 25:19 75:8 | 60:10 | 88:16,19,22,24 | 94:11 99:20 |
| 174:2 286:4,10 | dispositive | 89:6 246:11,15 | 100:21 102:9 |
| discrepancies | 123:15 | 246:18,19,20 | 102:17 103:2 |
| 300:3 | dispute   124:15 | 247:14 250:3 | 105:12,20 |
| discuss   65:22 | 245:24 | 250:10,12,15 | 107:12 108:3 |
| 66:1 140:10,13 | disputed   130:2 | 250:16 299:25 | 108:11,19,25 |
| 140:16,22,25 | 178:23 | 300:6 | 109:14,21 |
| 141:10 142:9 | distinction | divorced   86:13 | 110:7 112:6 |
| 142:15 145:23 | 127:13,17 | 246:13,20,24 | 116:19 117:8 |
| 147:25 204:23 | distribute | 247:2 | 117:21 119:1 |
| 256:3 278:3 | 307:22 319:9 | docket   12:17 | 120:4 121:5,13 |
| 324:1 327:12 | 319:25 320:7 | 12:20,20 17:18 | 122:17,21 |
| discussed   39:4 | distributed | 17:20,21 68:11 | 124:3,12,14,21 |
| 130:11 140:19 | 312:20 | 76:8 85:13 | 125:1,5,15,19 |

125:22 126:6
127:2 128:7,17
129:4,5,10,14
129:20 130:14
131:9,9 134:7
134:8,13 135:8
135:15,17,21
136:17 137:14
137:15,19
138:17 149:17
149:20 150:1
150:14 151:24
152:14,15
153:24 154:11
154:16 156:22
156:23 158:13
158:13,14
161:16,18
162:5,7,11,14
162:20,24
163:20 164:22
169:7 175:7,17
176:18 178:13
182:19,24
188:17,18,24
189:11,14
190:1 199:8
201:22 205:4
223:19 225:3,4
225:17 226:20
269:4,6 312:5
312:6,13

**documentation**
126:14 325:2,6

**documented**
199:12

**documenting**
289:5

**documents**    7:6
7:8,10,11 15:6
41:11,12,23,25
42:1 68:5
84:11,18,18,19
85:2 86:4
95:18,24 96:2
96:7 102:15,24
102:25 103:16
103:17,19,25
108:7,7 115:19
115:20 118:2
123:6,18
129:15 132:1,9
151:18 152:6
154:8 174:10
174:12,25
175:4,5,10
183:2,3,4,9
184:8 185:1
196:22 197:23
197:23 198:1
198:12 199:9
199:15 203:6
203:22 211:10
220:14 223:13
223:16 224:18
224:20 225:1
225:24 226:7
228:6,8,18

268:25 308:23
309:1,4,9,12
311:5,13,20
313:24,24
314:2,22,23
315:1

**doing**    20:25
50:17 53:19
60:3 61:24,24
64:21 68:20
76:18 89:2
114:3 118:20
123:25 127:8
161:10 170:15
170:19 234:8
290:22,22
308:9 309:10
322:12 324:8

**dom**    101:20

**domicil**    213:24

**domicile**
101:19,20,22
103:12 112:12
112:23,24
113:1,12,21
115:6,15 117:3
122:2,5,7,18,19
124:3 126:15
126:22 127:14
127:17,21
131:5,11 132:3
132:25 133:6
134:5 153:20
154:22,25

155:4,9 210:14
210:18 226:4
226:19,23
235:5,23
238:23 255:5,9

**domiciliary**
107:7,9 112:11
213:24 216:3
228:13 279:8

**donald**    142:24
161:10

**doorman**
177:19 184:20

**dormant**    24:3

**double**    323:20

**doubt**    150:13

**downstairs**
232:3,4

**dozen**    13:24,25

**dr**    21:21 22:13
22:13 23:23
28:14,14 29:4
29:9,19 30:5
30:17 31:13
33:21 34:13
35:2 36:20
37:17,21,25
38:15,16,20
39:20 40:3
41:6 42:18
45:19,25 53:19
55:7,20 56:15
58:5 80:25
89:18 169:8,24

175:18 180:16
188:21 194:7
195:20 196:3
203:10 243:20
243:21,22
244:16,17,17
244:18,22,23
259:24 260:3
261:3,5 310:20
312:6 330:17
333:15,15
336:22,23,24
338:21 341:20
**draft** 50:18
**draw** 37:3,8
**drawn** 37:18
**drew** 51:9,11
**drive** 2:16
16:11 95:13
97:8 99:6,8,12
99:18,18,19
119:15 128:19
131:19 150:6
151:6 157:8
162:18 163:15
163:22 184:4
187:17 245:8
**driven** 99:17
241:4
**driver** 98:19
**driver's** 96:13
96:14 97:5,18
98:4,8,8,20
99:3,11 103:10

110:12,13
111:2,10,22
115:21 151:24
151:25 152:8
152:10,19,23
153:4,9,13,21
156:4 209:23
210:17 211:5
215:24 231:8
231:10 237:2,9
237:15
**driving** 96:17
98:24
**drove** 98:25
**dual** 113:23
**due** 94:1,6
**duly** 5:9 344:9
**duplicate**
251:16
**duplicative**
174:20

**e**

**e** 2:1,1 346:13
346:14,22,23
**earlier** 41:8
46:7 61:16,17
70:18,20 112:1
112:6 126:22
155:25 156:1
156:16 159:17
186:23 192:5
201:5 208:3
211:12 216:2

234:21 239:21
249:24 285:17
327:18 337:25
342:20
**early** 95:12
97:23,23
126:20 190:8
192:15 208:18
**earn** 336:6
341:19,19
**earns** 333:4,5,7
333:10 337:10
341:16
**easier** 79:2
88:14 340:23
**easily** 89:7
**east** 16:19
79:20 133:22
133:24 137:9
157:14 185:15
185:18,22
186:2 329:22
**easter** 72:17
73:4
**easy** 72:24
**ecf** 68:12
**eclipse** 172:15
172:19,23
238:21
**edition** 179:18
**effect** 90:24
160:16
**effective**
184:15 212:1

**effectuate** 89:7
209:7,14,16
212:15,16
214:5,7,19
215:9,16,19,20
**effectuated**
211:1,3 214:9
214:14 289:3
**eight** 87:15,16
250:1 307:18
**either** 18:18
42:24 55:20
70:13 80:15
115:15 155:16
187:3 201:16
201:17 202:15
208:8 240:19
241:17 244:15
244:15,17
260:13 268:8
274:25 289:1
289:25 290:16
295:23,23
305:3,4 318:14
324:4 336:23
336:24 342:14
**elected** 55:12
**election** 21:14
159:20 160:7
160:16 161:6,8
248:11,25
**electronic**
28:21

elimination
264:20
ellis  243:20
244:23
email  21:22
22:1 23:24,25
24:18,19,20,21
24:22 25:2,23
26:4,6,7,24
27:4,5,14
34:14,20 42:16
42:17,19 43:7
43:9,13 44:1,2
44:5,18 45:2
45:12,19 46:8
46:9,12,23
47:5,8,9 55:25
57:10,11,14,15
57:18,21,23,24
57:24 58:4,7
58:25 261:9,9
261:17,23
262:2,8,12
309:17
emailed  44:12
45:23 109:16
109:19,23
emails  20:14
24:23 34:22
43:3,3,6 59:6
261:24 262:5
emanated
179:18

emerged  175:6
emergency
315:12
emotionally
84:7 163:6,7,8
emphatic
218:12
employed
248:3,7 314:6
342:12
employee  64:24
313:6 342:9
345:13,14
employees
341:25 342:2,8
employment
249:19 313:21
332:20,21
ended  299:6
ends  224:4
240:11,14,17
240:18
enforcement
13:7
engage  215:23
271:20
engaged  123:25
196:1 199:10
enjoy  292:18
304:1,7,10,15
enjoyed  83:12
enjoying
170:18

enormously
99:14
ensure  28:5
enter  348:3
entered  79:19
200:5 313:21
348:23
entering
165:10
entire  71:13
73:21 121:3
165:22 171:6
172:25 179:1
240:21
entirely  217:24
entities  51:9
entitle  106:23
entitled  96:9
104:1,7 117:18
121:10,14
143:9 147:10
162:8 223:6
314:19 318:20
entitlement
102:16 106:2
entity  37:14
51:12,19
entries  96:1
200:8,10
entry  29:7
envelope
177:19
environmental
11:4

epic  184:2
epoch  262:19
equally  124:1
equipment
231:12,14
237:11,12,14
245:15 260:12
erase  262:1
erased  262:8
errata  3:6
346:11,13,15
347:9 348:1
error  75:22
escapes  32:25
esquire  2:3,4,4
2:10,15 136:21
346:3
establish
206:15 212:7
213:1 218:8
219:12 220:16
228:4
established
96:8 107:13
130:1 154:17
163:23 165:17
166:1 205:23
206:8,24 211:7
213:18 214:19
214:21 216:3
219:22 227:20
244:12 277:20
278:11 281:8
328:2

**[establishes - exhausted]**                                Page 26

establishes
 221:15,16
establishing
 216:1 227:2
estate  119:24
estimate  333:7
ethernet  85:25
 249:9
event  177:13
 296:21,22,23
 297:1 302:11
 303:15,16,19
eventual  53:21
 53:22 79:18
eventually
 59:17 78:6,11
 98:1 150:14
 207:23 210:24
 293:21,23
everybody  23:8
 45:25 48:13
 292:7
evidence
 148:24 153:1
 153:15,21
 158:17 222:18
 273:17,18,23
 290:25 297:6
 297:20
evidenced
 127:18 153:22
evolved  31:19
ex  71:13 74:13
 82:20

exact  76:24
 92:10 94:16
 162:20 266:11
exactly  44:13
 51:8,16 54:24
 59:19 79:7
 80:9 118:20
 126:17 131:24
 164:12 190:21
 209:12,19
 215:15 220:12
 226:3 249:22
 287:19,20
 297:24 302:4
 303:20 319:4
 321:22
examination
 3:4 5:12
examined  5:9
examp  202:1
example  73:20
 151:4 164:21
 184:7 202:2
 257:17 263:20
 279:7 314:5
examples  203:6
 203:21 241:13
exceeded
 168:13
excellent
 180:19
except  147:15
 236:15 237:5
 238:18 309:14

exception
 240:22
excess  64:22
exchange  20:14
exchanging
 290:5
exclusive  79:19
exclusively
 39:8
excuse  8:2
 18:16,21 19:24
 21:21 33:19
 34:10 37:14
 43:4 49:6 54:1
 58:24 61:4
 66:12 69:4,4
 70:24 79:22
 85:16 86:11
 118:1 133:24
 144:20 171:8
 178:20 205:23
 209:3 216:15
 243:14 250:14
 258:13 306:2
 335:16 336:5
 336:19
execute  80:20
 81:16 128:7
 173:17 260:18
executed  77:1
 95:7 115:19
 124:21 127:24
 131:5 132:4
 153:1 164:22

246:10,18,19
 247:20
executing  31:9
 128:9,11
exempt  267:22
 271:15
exemption  93:8
 93:12 95:10
 96:9 102:10,17
 103:1 104:9,16
 104:23 106:3
 106:24 107:4
 107:21 112:5
 117:1,18 118:5
 118:9,18 119:2
 119:5 120:13
 121:2,11,14
 123:18 129:23
 130:1,9,16
 131:6,9 132:3
 159:22 221:24
 222:9,12,13
 223:17,24
 224:21 225:11
 227:12 271:22
exemptions
 85:13 91:10,15
 118:21 119:1
 119:25 120:8,9
 131:10 136:20
 225:16 268:1
 271:13,18
exhausted
 218:10

**[exhibit - far]**                                                      Page 27

**exhibit** 3:12,13
  17:5,9 66:5,5
  66:20,20 68:2
  68:10 69:15
  75:25 76:8
  78:17 79:10,14
  84:12 85:9,10
  91:11 95:22
  116:18,19
  122:16 133:8
  135:19 137:16
  149:18 151:22
  151:23 156:22
  161:18 168:7
  168:23,24,24
  174:11 178:15
  182:19 187:6
  196:14 197:14
  205:2,3,6,13
  225:9 239:22
**exhibits** 3:10
  66:18,23,24
  67:3,17,22
  68:5 196:10
  201:22
**exist** 85:3
  155:15 254:10
**existed** 37:24
**existence** 37:15
  54:22 55:2
  64:19 90:6
  203:23 312:19
  318:2

**expect** 94:11
  122:21
**expected** 178:8
**expense** 321:19
  322:2 324:3,3
  334:17
**expenses** 41:14
  41:14 321:16
  322:9 323:5,23
  324:15 325:5
  330:14 331:8
  331:11 334:20
  334:23,25
**expensive**
  299:2,2
**experience** 12:3
  52:23 166:10
  285:6 286:12
**expiration** 97:7
**expire** 98:19
**expired** 97:10
  97:12,14 98:12
  103:10 110:21
**expires** 344:20
**explain** 81:9
  123:25 127:1
  160:12 162:13
  168:11 207:13
  207:14 217:21
  228:22
**explained**
  59:16 228:3,4
  275:7 279:3
  293:1

**explanation**
  100:23 101:1
**explanatory**
  189:22
**express** 196:10
  197:1,12
**extends** 33:12
**extensive**
  198:12
**extent** 103:15
  103:19 142:15
  147:24 186:1
  258:12,15
  307:2
**external** 153:20
**extraordinarily**
  121:5 291:12
**extraordinary**
  269:16

**f**

**fabulous** 249:7
**facebook** 56:21
**fact** 8:6 61:18
  80:17 123:7,8
  125:13 140:14
  140:18 160:3
  198:25 199:25
  214:4 217:14
  232:17 233:9
  236:18 252:14
  303:7
**facto** 311:1,2

**facts** 217:14
  278:18 279:25
  280:15 283:25
  284:3,20,25
  328:5
**fails** 186:10
  346:17
**fair** 8:15 9:11
  39:14 41:4
  42:4 74:17
  75:17,19 85:6
  93:5 119:12
  136:15 172:8
  191:25 211:3
  227:9 245:17
  319:11 334:19
**fairly** 301:10
**fall** 286:23,24
**familiar** 50:16
  180:8,9 194:13
**families** 20:25
**family** 72:13
**fan** 287:7,8
**fans** 301:11
**far** 43:21 102:8
  116:23 118:7
  121:23 125:8
  132:21 136:4,8
  174:24,24
  186:25 197:7
  305:2 308:11
  325:23 326:5
  327:24,24
  328:3 329:23

333:2
**farr** 2:5 4:21,24
5:1
**father** 292:16
**fatwas** 96:24
**february** 95:6
152:11,12
169:2,4,17
201:6,11 210:5
239:25 240:1,2
240:4 247:3
263:8
**federal** 162:15
162:16 346:16
346:22
**feel** 88:20
288:14 307:19
327:16 328:6
**feeling** 46:5
323:21
**feels** 46:1
**fees** 305:21
331:21
**felt** 208:10
319:9
**fewer** 36:10
**fighting** 217:20
**figure** 67:1
105:24 193:2
242:1 275:18
286:14 288:11
297:22
**figuring** 235:6

**file** 15:6 93:22
112:6,18
115:22 126:21
168:10,15
228:6,17
269:19 270:3
272:2
**filed** 15:23
68:12 91:15,17
91:18 93:14
102:18 103:1
107:3 112:9,21
126:8 127:6
266:8,14
268:25 269:5,8
269:10 272:15
275:25 299:20
**filer** 166:13
**files** 132:18,19
**filing** 16:1
32:13,16,18
33:12 167:21
228:8 266:10
266:12 270:12
275:6
**filings** 7:14
268:16
**fill** 108:6 158:6
**filled** 96:1
100:7,20
105:20 115:23
127:20 159:5,5
159:9 163:12
213:14

**filling** 223:3
**final** 201:22
234:1 277:11
**finalized** 76:22
**finally** 70:22
98:11 208:18
233:25 292:15
**finance** 134:18
136:20
**finances** 42:8
**financial** 30:18
30:21,25 31:5
31:9,10 35:3,4
35:5 41:5,10
319:17 320:1,2
323:23 328:13
328:16
**financially**
345:16
**find** 38:25 54:3
81:23 179:2
182:11 184:5
208:15,20
225:7 239:22
253:13 275:4
288:8
**finding** 39:6
**fine** 63:15
115:1,4 118:20
288:14
**finger** 182:9
**finish** 89:3
142:7 217:5
221:3 224:12

258:18 281:3
282:3 284:6
**finished** 221:8
286:18
**finishing**
326:24
**firm** 4:17 92:25
147:17
**first** 5:9 6:11
8:20 9:20
19:13 31:16
39:19,22,23
59:16,23 62:14
67:22,25 68:2
68:4 71:6
78:12 85:21
88:1 117:8
118:2 126:16
131:4 132:11
149:6 155:23
163:18 185:10
189:21 190:1,2
194:9 205:21
205:21 207:4
233:7 238:9
248:18,18,19
263:1 269:6
287:12,23
288:3 293:17
299:4,5,8
307:9,14 310:5
**fit** 182:16
250:16

**[five - formulating]** Page 29

**five** 13:23,25
  15:18 21:7
  29:19 50:13
  53:20 83:15
  107:8 124:23
  150:9 192:16
  244:11 252:25
  257:12 280:6
  323:16 336:13
  339:8
**fix** 15:20,24
  300:7
**fixed** 300:8
**fl** 1:11
**flight** 200:18
  201:9
**flip** 68:4 116:23
  117:25 118:17
  240:11
**flipped** 118:7
  166:7
**flipping** 117:9
**florida** 1:23
  16:15 38:19
  39:2,18,21
  47:17 48:12
  49:18 52:11,15
  52:19 53:12,17
  55:16 59:12
  60:1 61:4,5,12
  62:16 70:8
  74:1 75:5
  76:16 79:24
  80:10,14 81:10

82:18 83:3
85:25 88:25
91:15 94:9,14
94:21,25 95:4
95:8,13,15
96:3 98:16,17
99:3,11 100:25
101:22 102:10
103:11 107:14
107:17,21
108:5 110:12
111:1 115:13
115:17 116:4
124:13 126:15
131:20 139:6
152:10,17
153:8,25 154:6
154:14,21,24
155:24 156:4
156:13,18
157:3,8,12
158:20,21,24
159:1,17
160:25 173:3
177:15,17,18
178:24,25
179:2,8,19
180:5 181:4,5
202:17,25
203:5 205:25
207:23,25
208:6,8,9,22
209:6,11
210:11,24

211:16 212:22
214:24 215:8
215:14 217:13
219:13,14
220:1,23,24
221:15,17,23
222:1,13 223:4
227:7 230:23
231:20,23
232:7,15 233:2
233:16,21
234:7,8 235:4
235:8 238:7,9
239:6,17 249:6
265:10 273:7
273:15 279:8
287:18 315:9
315:10 330:2,4
331:13 344:3,7
344:13,19
345:3,6 346:16
346:22 347:3
**fly** 72:21
**focusing**
  274:15
**folded** 181:19
**folks** 244:1
**follow** 26:11,13
  40:12 105:17
  197:13 320:25
  321:1,12
**followed**
  217:12 248:25

**following** 18:2
  25:6 73:17
  87:4
**follows** 5:10
**fool** 128:14
**football** 20:24
**foothold** 75:3
**force** 88:16,19
  273:6
**foregoing**
  345:23 347:7
  347:16
**forever** 159:14
  183:19,20
  243:17
**forget** 165:20
**forgot** 145:17
  168:14
**forgotten**
  172:19 220:12
  288:22
**form** 7:22
  99:25 173:19
  260:19,23
  325:14 338:16
  338:17 348:23
**formal** 317:11
  317:17,21
**formed** 325:13
**former** 264:21
  318:3
**formerly** 22:6
**formulating**
  81:14

**[fort - generations]**                                    Page 30

**fort**  344:12
**forth**  113:9
  215:25
**fortune**  316:17
**forward**  16:6
  44:22 78:15
  262:15 263:14
**forwarding**
  45:2
**found**  70:23
  81:18 110:15
  112:18,21
  115:23 210:12
  210:13 244:20
**four**  13:22,25
  21:18 117:25
  146:10 150:7,9
  202:8 207:22
  209:8 215:10
  240:22 249:3
  252:25 286:20
  289:24 292:24
  293:1,5,9
  299:12 300:11
  308:24
**fourth**  238:8
**fpr**  344:18,18
  345:20,20
**france**  96:22
**frank**  339:9
  340:14
**frankly**  25:21
  159:13

**frankspeech**
  56:19 340:15
**free**  46:1
  294:24 295:16
  315:10
**freedom**  305:18
  306:19 307:3,7
  307:20,22
  308:5
**freeman**  1:3
  4:13 12:15
  346:6 348:2
**frequently**  72:8
**friday**  1:12
**friend**  46:3
  49:8,11 50:11
  62:3 177:18
  258:9 287:9,11
  331:10
**friendly**  81:5
**friends**  8:12
  49:9,10 53:24
  279:7
**frivolous**
  217:25
**front**  17:17
  66:5 149:18
**frozen**  183:11
  183:17 315:6
  332:4
**fruition**  81:20
  210:22
**full**  5:20 88:24
  90:17 125:14

  276:7
**fully**  14:8 235:1
  246:20
**function**  11:22
  41:19
**fund**  305:18,20
  306:3,19 307:3
  307:7,22 308:5
  308:12
**fundraising**
  307:22 308:6
  308:17
**funds**  305:22
  306:11 321:15
  323:5 331:24
  332:10 333:16
  333:17,18,20
  334:19 337:16
**funny**  163:5
**furniture**
  189:23 245:5,7
  245:10,11,13
  245:18 246:1
**further**  144:2
  290:25 343:10
  345:12
**fuster**  243:22
  244:16,17
**fuster's**  244:18
**future**  71:5

**g**

**g**  5:23

**gained**  55:18
**gains**  292:10
**gallagher**  2:5
  4:22,24 5:1
**game**  20:24
**games**  61:24
  289:24
**gardens**  52:1,2
  52:6
**gary**  92:19,20
  92:22 93:3,4
  94:10 124:8,10
  124:10,11
  126:3,3,5,9
  136:2,21 137:2
  137:4,7 209:20
**gary's**  137:3
**general**  10:2,3
  10:4,5,10,21,25
  11:9 12:1
  42:23 48:9
  73:24 149:19
  149:24 160:6
  161:6,8 179:13
  300:23
**general's**  11:12
**generalist**
  166:21
**generally**  14:24
  25:23 47:4
  162:9 164:10
  166:3,3
**generations**
  160:18

| | | | |
|---|---|---|---|
| **george** 286:25 | 133:9 135:6 | 34:11 36:5,6 | 195:15 214:4 |
| 287:17 288:2,5 | 140:6 156:8,8 | 44:20,21 48:17 | 261:10,16,23 |
| 289:1,7 | 199:1 200:1 | 64:13 82:15 | 263:24 264:2 |
| **getting** 53:22 | 201:12 204:20 | 84:8 92:17 | 274:21 278:15 |
| 80:8 95:12 | 205:6 255:24 | 94:16 100:23 | 282:7 286:22 |
| 111:18 117:6 | 305:17 306:6,9 | 101:1 105:5 | 286:23 290:8 |
| 125:15 165:8 | 306:19,20 | 106:16,19,20 | 291:2 293:10 |
| 211:4 226:21 | 307:2,7,21 | 106:22 111:21 | 300:16 302:13 |
| 227:7 242:11 | 308:5,13,16 | 126:18 127:10 | 303:2 327:15 |
| 299:13 323:15 | 314:5,6,7 | 127:25 128:3 | **gives** 30:23 |
| 326:17 | 315:5 317:24 | 130:14 138:16 | 167:16 169:3 |
| **gettr** 56:20 | 318:4,9,11,11 | 145:20 164:5 | 312:7 |
| **gift** 167:17,21 | 318:12,13,17 | 165:12,15,18 | **giving** 6:19 |
| 167:24 168:3 | 318:21,24 | 166:3 167:4,4 | 25:22 42:23 |
| 168:10,15 | 319:15,18 | 168:1,19,20 | 121:1 162:20 |
| 296:10 | 320:11 321:15 | 180:23 197:10 | 303:21 305:13 |
| **gifts** 167:12,14 | 321:18 322:10 | 203:20 208:13 | 309:7 310:7 |
| 167:16,20 | 322:18,19 | 222:25 266:1,6 | **glove** 289:8 |
| 168:17 | 323:4,22 324:2 | 266:7 274:4 | **go** 4:8 9:1 16:5 |
| **gigantic** 62:7 | 325:4,9,17 | 275:13,18 | 19:12 31:15 |
| **gilbert** 32:23 | 326:10 327:8 | 280:10 285:10 | 44:7,9 62:6 |
| 90:20 | 335:4,15,24 | 285:15,18 | 66:16 75:13 |
| **giuliani** 1:6,15 | 336:3,6 339:18 | 292:12 293:12 | 85:21 98:6 |
| 2:14 3:3,10 | 340:10,16,17 | 293:21,23,25 | 110:19 117:11 |
| 4:11,14 5:3,5,7 | 341:16 343:16 | 294:7 300:5 | 124:8 133:5 |
| 5:23 12:15 | 344:8 345:9 | 304:25 305:6 | 139:21 168:1 |
| 17:5,9 19:14 | 346:3,6,6,7 | 312:6 320:3,20 | 169:11 173:12 |
| 21:9,10 30:3,6 | 347:6,14 348:2 | 320:22 321:10 | 175:10 176:5 |
| 30:10 37:12,13 | 348:25 | 322:3 327:19 | 176:12,13 |
| 38:1,2 50:22 | **giuliani's** 38:17 | **given** 73:23 | 178:15,16 |
| 50:22,23 51:1 | 47:15 49:17 | 104:10,12 | 186:3 187:3 |
| 51:1,12,13,18 | 55:14 | 105:2 108:7 | 191:5,19 193:3 |
| 54:16 55:3,4 | **give** 6:10,13 | 143:25 147:21 | 193:5 195:3 |
| 65:18 86:14,20 | 25:23,24 34:9 | 177:6 188:21 | 196:19 203:3 |

**[go - granted]**                                                    Page 32

| | | | |
|---|---|---|---|
| 209:7,25 215:8 | 105:5 106:7 | 244:11 255:20 | **goodness** 218:4 |
| 220:14 229:10 | 111:25 112:24 | 259:15 260:12 | **gosh** 8:11 12:12 |
| 230:9 233:8 | 113:3 115:16 | 263:23 273:9 | 32:25 83:9 |
| 235:23 238:2 | 116:3,13,14 | 275:12 282:15 | 92:17 191:5 |
| 238:18 239:20 | 125:10,11,12 | 283:3 288:5,13 | **gotten** 88:14 |
| 240:1 244:2 | 127:25 128:14 | 288:19 289:13 | 112:1 175:10 |
| 248:10,24 | 130:17 140:2 | 293:21 295:20 | 184:24 231:8 |
| 251:25 255:17 | 140:14,18 | 298:14,14 | 232:22 237:9 |
| 261:3 262:14 | 141:17 142:7,9 | 299:12 303:6 | 247:7 249:2 |
| 264:19 276:2 | 143:4,15 | 307:12,13 | 253:15 |
| 287:12 288:8 | 144:12 146:8 | 313:25 314:3 | **government** |
| 314:1 320:16 | 148:3,19,20 | 315:8,8,13 | 97:3 |
| 323:19 327:2 | 150:6,9 160:15 | 323:13 327:4 | **governski** 2:4 |
| **goal** 53:21,22 | 164:11,16 | 343:7 | 4:25,25 |
| 104:15 | 175:9 176:13 | **gold** 182:14 | **graham** 58:19 |
| **goes** 128:22 | 177:22 180:12 | **good** 62:3 | **granddaughter** |
| 341:14 | 182:22 183:19 | 112:3 166:16 | 260:14 |
| **gofundme** | 183:20 185:8 | 166:20 169:15 | **grandfather's** |
| 306:1,3 | 186:22 190:21 | 169:17 244:11 | 298:15 |
| **going** 8:9,13 | 191:16 199:5 | 275:18 289:23 | **grant** 223:21 |
| 16:6 17:4 22:3 | 202:12 203:19 | 319:25 328:25 | 224:24 |
| 24:7,16 25:3,5 | 204:16 207:6 | **goodman** 22:12 | **granted** 91:16 |
| 27:9 28:3 36:4 | 208:7,15,24 | 23:9 29:4 | 107:4 108:1 |
| 36:5 41:11,13 | 209:6,6 210:2 | 36:16 41:7 | 120:13,16,20 |
| 44:5 47:14 | 210:23,24 | 55:8 56:9,10 | 127:18 129:16 |
| 59:17,24,24 | 213:4 215:3,8 | 56:22 59:11 | 129:22 130:9 |
| 65:15 66:4 | 215:8 216:16 | 60:14 61:3 | 130:17 131:10 |
| 67:7 69:9 76:4 | 218:16 222:25 | 63:7,9,19 64:1 | 139:11 214:25 |
| 77:17,18,19 | 228:10,12,12 | 64:15,17,20 | 217:16 219:8 |
| 78:7 80:10,11 | 229:1,20,23 | 65:1 169:24 | 223:12,14,16 |
| 80:13,14 81:7 | 230:12 231:13 | 200:22 201:12 | 223:19,24 |
| 82:24,25,25 | 232:16,20,23 | 310:20 332:18 | 224:18,20,23 |
| 85:22 86:10 | 233:2,8 234:4 | 336:2,6,9 | 225:2,21 |
| 94:25 101:4 | 238:21 242:6 | 341:20 | |

**granting**
129:25 131:6
**great** 81:18
133:10,16
136:22 142:11
333:5
**green** 182:1
**group** 7:10
36:6 81:2
189:21
**groups** 97:1
**grow** 8:19
340:7
**guardians**
61:19 62:5
**gue** 120:14
**guess** 20:7 33:2
44:5 52:12
81:8 103:12
112:2 120:15
125:13 134:4
138:13,15
174:3 193:5
227:5 234:17
234:25 237:25
240:25 259:14
261:20 267:12
275:5 276:14
276:16 298:4
318:1,2 331:15
333:12 336:23
342:11
**guessing** 37:16
92:12 337:13

**guy** 288:8

**h**

**h** 5:22
**habit** 73:19
166:4,4 185:20
185:21,23
**half** 9:13 32:12
54:22 55:1
60:19 61:10
65:7 75:16
173:9 204:12
206:17 259:7
316:16,19,21
**halfway** 95:16
95:22 102:22
**hampshire**
60:2 80:16,19
81:15,24 82:2
82:4 124:19,20
125:10,11,13
125:15 169:22
170:11,15,25
171:1,8,9,12,16
172:15,16,18
172:20 173:4,6
173:11 175:22
176:4,6 191:13
208:6,10
233:17 238:13
238:18,23
239:1 256:11
256:15,19,24
256:25 257:3,8

257:14,15
258:4,13,15,21
259:19,25
260:11 332:5
**hampton** 74:10
75:3,5 83:1
87:3 208:12
**hamptons**
75:20 77:13
88:25 238:8
**hand** 17:4
57:13 76:3
79:8 109:6,8
110:2 125:18
133:19,21
152:3 195:11
225:22 316:11
344:11
**handed** 309:22
**handing** 296:18
**handle** 30:15
42:7 44:23
60:1 79:20
80:25 286:14
**handled** 89:18
**handles** 41:5
41:10 158:10
198:3
**handling** 81:6
126:9,12
198:16 200:2
**hands** 181:19
**hanging** 202:23
202:25

**hannity** 248:9
**happen** 83:3
172:13 253:5
276:25 297:23
298:3
**happened** 59:9
61:15 90:13
150:13 165:6
192:18 206:3
207:16 211:6
211:25 251:16
273:19,20,20
275:4 287:16
297:2,17,24
305:8,10
308:20 324:11
324:25
**happening**
190:9
**happy** 40:17
**hard** 31:19
50:6 154:3
177:6 209:8
215:10 233:14
270:1 308:11
**harold** 10:9
**hate** 288:2
**hatton** 289:5
291:11
**he'll** 57:20
**head** 80:20
81:16 293:6
303:8

| | | | |
|---|---|---|---|
| **headboard** 189:23 | **helping** 8:15 168:12 | 248:16,17 249:2,4,17 258:9 264:17 265:13,20 | 163:17,23 185:4 205:24 206:8,16,24 207:17 211:7 |
| **health** 42:1 50:14 | **helps** 30:24 31:8 56:14 | **homeless** 116:15 | 211:15 212:5,7 213:2,19 |
| **hear** 6:11 114:9 144:20 229:13 229:18 | **hh** 344:20 **high** 49:9 181:23 182:10 182:12,13 | **homelessness** 116:15 **homeowner's** 300:25 | 214:15,21 216:3 218:6,11 218:13,16,17 218:21,24 |
| **hearing** 273:8,9 273:14 | **higher** 248:9 **highly** 151:3 | **homes** 82:1,9 84:2,3 208:5 | 219:13,25 220:17 221:14 |
| **hearings** 272:22 273:2,5 277:12 | **hitch** 293:2 **hmm** 63:23 **hoc** 319:12 | **homestead** 13:4 39:3 85:13 91:9,14 | 221:16,24 222:1,9,11,13 223:1,7,24 |
| **heart** 243:25 | **hold** 26:10 28:4 | 93:8,12 95:10 | 225:11,16,20 |
| **held** 111:3,25 149:14 272:23 291:14,16 | 65:1,4 143:12 144:4 149:15 197:18 217:5 | 96:9 100:24 101:19 102:10 102:17 103:1 | 225:20 227:2 227:11,21 228:5,13 |
| **hell** 275:11 | 240:2 254:14 | 104:2,9,15,23 | 230:11,13,14 |
| **help** 30:25 60:18 91:18 109:13 136:18 166:24 169:9 169:14 175:19 179:16 241:25 280:21 297:22 305:21 341:7,7 341:19,20 | 286:15 329:11 343:7 **holding** 328:20 **home** 8:23 70:25 71:8,18 73:1,13 74:8 75:8,13,18,20 75:20,21 77:13 78:9,10 80:16 80:18,18 81:14 82:6 122:10,12 | 106:3,23 107:4 107:13,21 112:5 117:1,18 119:2,4 120:11 120:11,12 121:11,14 123:8,13,17 126:15 127:14 127:17,18 128:5 129:16 | 230:16,18,22 235:5,23 242:13 277:17 277:20 278:12 281:9 328:2 **homesteaded** 38:19 47:17 49:19 55:17 **honest** 40:9 282:7 285:14 |
| **helped** 21:6 32:10 50:18 60:16 61:3,9 92:13,16 93:1 108:6 289:8 307:18 | 128:1,21 129:1 150:19 151:16 164:13 176:2 | 129:22,22 130:2,8 131:6 132:2 154:18 | 291:9 **honestly** 120:14 124:4 126:8 198:2 |
| **helpful** 292:22 | 207:23 208:8 208:10,12 | 159:6,22 | |

285:11
**hopefully**
326:22
**horrendous**
274:7
**hospital** 50:15
244:11
**hotel** 150:10
173:16 239:2
248:23 260:11
263:21,22
**hotels** 239:4
258:8 260:17
**hour** 65:7
204:11
**hours** 14:5
23:12
**house** 61:6
290:14,15
295:5 330:24
**housekeeping**
5:19
**hugged** 304:5
**huh** 42:20 68:6
68:8 82:12
153:6 168:25
170:6 179:23
182:23 252:18
281:21 294:16
307:25 317:1
324:19 339:2
**human** 243:23
271:4 284:6
286:1 291:12

**hundred**
144:13 175:24
207:10 242:4
282:2 307:6
**hunter** 158:1
**hypothetical**
149:24 151:3
164:25 176:17
177:5 186:6

**i**

**idea** 42:24
102:5 113:11
133:13 149:22
157:25 158:3
193:23 323:13
**identification**
17:11 111:18
205:7 347:19
**identify** 205:22
219:21 235:11
**ii** 66:9
**illinois** 125:12
257:5,9,11,18
257:22,23
**illustration**
299:5
**image** 234:7,10
242:14
**imagine** 210:1
237:19 246:1
261:12 267:25
**immediately**
208:22 232:24

293:13
**immigration**
11:6
**important**
149:20 150:1
150:20 151:15
151:18 160:24
161:1,7 162:24
162:25 163:21
176:18 185:4
198:16 213:25
250:6,6,7
277:19 278:10
278:18 282:10
316:13
**impossible**
270:10 302:21
**improper**
141:20 229:24
323:22
**impute** 324:12
324:17
**inaccurate**
15:24 75:11,12
**inadequate**
328:6
**include** 119:2
227:6
**included** 175:2
175:7 198:10
203:10 242:23
307:23
**including** 22:25
37:20 87:1

96:22 169:14
217:14 232:17
264:1
**inclusive** 227:6
345:10
**income** 167:2,5
168:13 323:12
323:15 324:7
324:12,18
332:14,24
333:4
**incompetent**
158:10
**incorrectly**
15:15,16,19
**incur** 322:2
**indebtedness**
91:6
**independent**
124:14 125:6
127:10 128:11
159:11 175:10
210:11 226:19
**independently**
254:24 302:23
303:1
**index** 3:1
**indicate** 86:4
**indicated**
169:25 189:20
**indicates** 94:13
**indicating**
249:13

**indication**
122:24 152:16
154:23 158:18
**indications**
155:11,12
**indirectly**
157:14
**individual**
155:8,13
214:23 311:14
**individually**
199:21
**informa** 120:24
**information**
24:12 25:22
34:5,8 42:5,7
45:18 46:14
59:21 105:15
106:3,22 107:1
107:2 110:19
120:17,23
121:1,23 130:9
130:13 157:1
162:9 163:9,11
164:3,5 168:18
169:3,24
200:13 223:4
281:7 286:10
**informed**
203:12
**inherently**
102:4
**initial** 5:22

**initially** 292:24
301:8
**initiated** 60:23
**inquiring**
141:21
**inside** 180:4,5
192:1,2,4
**instruct** 145:16
**instructed**
145:7 146:5
**instructing**
141:1,3,11
145:9
**instruction**
24:15 25:7
105:18 321:9
321:13
**insulting**
284:14
**insurance**
50:14,15 89:12
300:19,21,23
**intend** 18:18,22
18:25 67:4,18
128:21 129:1
154:10 162:11
183:3,4 292:11
**intended**
292:12
**intent** 207:22
305:6
**intention** 78:10
78:12 81:1
111:17 209:21

212:25 218:15
230:12 236:24
**intentions**
48:12 339:20
**interest** 64:9
77:3
**interested**
175:15 345:16
**interesting**
174:10
**internal** 312:12
**international**
200:19
**internationally**
86:1
**internet** 242:24
**interpret** 114:7
114:11,20
138:12
**interpretation**
138:4
**interpreting**
106:5 127:9
**interrogatories**
3:13 13:18
14:10,18 205:6
205:14
**interrogatory**
205:11,21
207:1 219:18
219:21 227:19
**interrupt** 23:20
**interrupted**
90:25 91:2

217:12
**intervener** 5:5
**introduced**
287:11
**introduction**
5:18
**inundated** 14:4
**investigation**
121:24
**investigator**
54:15
**invited** 36:7
287:17
**inviting** 334:5
**invoice** 187:8
188:16 194:6
194:25 195:5
195:10,10,13
**invoices** 195:19
195:23 196:17
**involved** 13:24
142:24 190:11
**involvement**
188:20
**ipad** 29:8
**iphone** 23:7,11
23:12 29:8
**iranian** 97:3
**irrelevant**
283:8
**irritate** 301:11
**irs** 89:25 163:2
163:3,5 164:1
164:12,18

**island** 2:12
74:11 75:4
346:5
**issue** 39:3 69:6
262:16 274:1
274:13,19
298:9 323:11
**issued** 96:24
252:5
**issues** 21:2
30:25 308:21
326:2
**it'd** 264:9
**itemized**
300:21,22
**items** 190:14,17
192:17 193:20
194:10 195:6
227:10 245:19
300:21 330:12

**j**

**jail** 97:1
**jake** 306:5,15
306:19 307:5
308:7
**jake's** 306:17
**january** 18:19
75:10 77:9
94:15,17,18
96:10 97:23
135:13 165:22
181:9 206:2,7
206:7,11,25

207:8,9,17
209:14,17
211:3,4,13,21
212:1,1,7,15
213:11,12,15
214:9 215:17
215:20 217:16
218:14 219:14
226:11 227:3
227:20,21
228:9,16,19,22
230:11,21
231:3 234:14
247:2,3 248:1
263:7 301:22
301:23 303:11
331:17
**jennifer** 1:22
4:17 344:18
345:5,20
**jersey** 2:16
329:14
**joanna** 2:4 4:23
**job** 195:14
**jobs** 12:4
**joe** 2:13 7:23
31:25 33:7
134:20 136:2
141:1,3 148:8
166:22 194:19
229:13 283:19
287:9 324:12
324:17,20,20
324:21 329:14

**john** 62:3
**jointly** 86:23
86:24 87:1
89:8
**joke** 295:10
303:25
**joseph** 2:10 5:2
32:2,3 346:3
**judge** 10:9
218:2 229:2,5
229:9 275:12
**judgment** 13:8
274:3 275:16
316:12 321:5
**judith** 72:12
76:15,22,25
86:11,13,20,23
86:25 89:8
156:8,15 298:9
298:11
**judith's** 87:5
87:11 89:21
**july** 78:16
125:19 129:11
130:22 131:5
132:4 137:11
182:25 186:16
195:5,8,15
226:5
**jumps** 78:15
166:8
**june** 132:14
170:12,22
200:19 264:14

**justice** 10:6,22
10:24 11:2,15
274:8

**k**

**k** 2:5
**keep** 29:1 79:16
84:7 97:22,24
117:9 132:18
164:14 168:17
169:10,10
203:7,12 204:2
208:8 245:2
251:16 253:3
253:10 289:16
315:13 322:25
324:10 340:5
340:23
**keeping** 191:1
290:9 315:23
**keeps** 41:11,12
204:1
**kept** 97:7
115:15 245:17
253:1 289:4
290:5 291:10
299:12,13
322:22
**kerik** 279:13
**key** 218:17
230:13
**kids** 292:17
**kill** 96:22 97:3

**[kind - known]**                                          Page 38

| | | | |
|---|---|---|---|
| **kind** 7:17 101:2 | 49:21 51:16 | 178:2 182:13 | 306:2,6,9 |
| 116:15 124:23 | 52:14,16,18,18 | 184:20 186:5 | 307:9,15,15 |
| 147:16 189:15 | 52:21 53:8,16 | 186:10,17,20 | 308:19 310:11 |
| 209:22 212:11 | 54:1 57:8 | 186:25 187:2 | 311:3 313:25 |
| 218:10 307:10 | 58:15 59:11,14 | 187:19 188:19 | 314:2 316:12 |
| 309:18 | 63:17 64:8 | 188:23 189:9 | 317:25 321:22 |
| **kinds** 232:17 | 67:2 70:12 | 189:11,15,22 | 322:17 324:9 |
| 311:4 | 75:12 76:24 | 190:21,22,24 | 324:17,20 |
| **kirschenbaum** | 85:4,8 92:5,9 | 193:6 194:19 | 325:20 326:5,6 |
| 243:21,22 | 96:4 98:5,5 | 198:2,7,18,19 | 326:8,9,11,11 |
| 244:17,22 | 100:7,12 101:5 | 200:6,17 | 327:25 328:3 |
| **kissed** 304:5 | 101:13,18 | 209:19 214:25 | 328:10,24,24 |
| **knew** 44:7 60:6 | 102:8 105:3,4 | 214:25 215:5 | 329:2,17,24 |
| 62:19 77:25 | 105:22,24 | 217:20 223:23 | 332:18 333:2 |
| 78:6 86:1 | 106:6,21 | 224:1 226:24 | 333:10 334:8 |
| 112:8 150:6,8 | 109:11 115:22 | 232:1 237:21 | 335:20 336:16 |
| 159:14 173:7 | 121:4,23 123:3 | 240:5,6,8,10,16 | 338:21,24 |
| 176:12 177:23 | 123:19 125:3,4 | 240:16,18 | 339:13 342:20 |
| 190:24 208:21 | 126:5 127:7,22 | 244:10 246:2 | **knowing** 261:1 |
| 208:21 209:22 | 129:14 130:18 | 246:20,21 | **knowledge** |
| 238:21 287:23 | 130:21 131:3 | 250:6 255:2 | 43:22 55:19 |
| 288:9 289:10 | 133:14 135:24 | 258:24 261:12 | 127:10 139:2,5 |
| **knocks** 232:25 | 136:4,6,8,9 | 261:13 265:4 | 156:18 190:15 |
| **know** 5:17 6:23 | 138:10,11,14 | 267:23,25 | 190:19,20 |
| 7:1 12:5,18,19 | 138:17 139:8 | 271:25 272:11 | 197:9 199:16 |
| 15:16 18:23,24 | 139:10,10,10 | 272:12 274:24 | 199:21 326:13 |
| 24:22 28:13 | 139:14,15 | 276:1,7,15,17 | 343:1 |
| 32:25 35:24 | 141:24 147:10 | 276:21,23 | **knowledgeable** |
| 36:9,25 37:19 | 147:14 149:23 | 277:23 278:1 | 41:6 |
| 38:20 39:12 | 150:16 155:21 | 278:17 281:4 | **known** 8:14 |
| 40:2,25 41:25 | 155:25 159:24 | 283:14,16,16 | 20:6 22:6 |
| 44:14 47:1,4,7 | 162:23 163:12 | 288:21 289:9 | 56:22,23,24 |
| 47:8,12,18,19 | 165:1 174:5,17 | 290:6,9 302:22 | 249:7 |
| 47:23 48:23 | 175:4 177:6 | 303:23 305:17 | |

**[knows - license]**                                                    Page 39

| | | | |
|---|---|---|---|
| **knows** 28:17 | **large** 1:23 | 141:21 145:7 | 245:23 282:19 |
| 39:16 46:1 | 35:24 41:16 | 145:15,20 | 283:5 287:16 |
| 47:9,19 52:21 | 66:19 96:19 | 146:4 147:11 | 318:13 330:16 |
| 59:15,15,17,19 | 344:19 | 148:1 174:24 | 330:22 331:4 |
| 59:19 60:7,10 | **largely** 340:5 | 175:1,1 188:19 | **leftover** 331:7 |
| 60:15,15 63:17 | **late** 208:18 | 189:8 198:9 | **legal** 50:12,17 |
| 63:17 275:11 | 231:17,17,17 | 223:12 | 138:4 143:2,21 |

**l**

| | | | |
|---|---|---|---|
| **l** 1:22 5:22,23 | **latest** 20:24 | 144:5,9,16 | |
| 344:18 345:5 | **laughing** | **lawyer's** | 145:25 147:3 |
| **labeled** 119:24 | 114:19 | 145:13 | 148:24 149:10 |
| 196:13 | **law** 9:1 92:25 | **lawyers** 7:5 | 164:22,23 |
| **laborious** | 112:10 114:7 | 19:3 66:22 | 305:21 311:14 |
| 112:13 | 114:11,20 | 108:6 197:4 | 311:20 317:17 |
| **lago** 70:14 | 142:23,24 | 199:17 268:21 | 317:21 346:21 |
| **laguardia** | 145:18 147:17 | 269:13 275:1 | **legally** 213:25 |
| 201:9 | 153:19 165:8 | 286:13 | **lesson** 256:7 |
| **lake** 16:11 | 211:16 213:24 | **layout** 313:25 | **letter** 3:7 133:9 |
| 69:16,20 | 216:7 219:13 | **lays** 271:17 | 136:19 137:7 |
| 119:15 128:19 | 219:16 220:5 | **leading** 248:8,8 | 288:16 |
| 131:19 150:6 | 220:21,21,22 | **leaking** 25:22 | **letters** 289:4 |
| 151:6 157:8 | 220:22,23,24 | **learn** 111:6 | **letting** 62:4,4 |
| 162:18 163:14 | 226:12 230:23 | **learned** 47:21 | 224:12,14 |
| 163:22 179:24 | 247:21 271:24 | 59:21 256:7 | **level** 46:1 |
| 184:4,6 187:17 | 276:10,10 | **lease** 173:17,19 | **levine** 288:24 |
| **lakeville** | 277:1,1,6 | 173:20 250:18 | 288:25 |
| 133:10 135:6 | 322:24 | 250:22 | **liabilities** |
| 136:21,24 | **laws** 70:19 | **leave** 77:19 | 117:17 267:3 |
| **lamberta** 2:4 | **lawyer** 12:3 | 148:13 177:19 | 325:24 |
| 4:23,23 | 16:3 50:17,18 | 197:4 280:5 | **license** 93:24 |
| **language** | 65:25 91:19 | 282:20,22 | 95:5,12,12,13 |
| 128:16 | 92:14,15,18 | 283:2 | 96:13,14 97:5 |
| | 127:22 128:12 | **leaving** 170:25 | 97:8,18 98:4 |
| | 135:23,24 | 282:9 | 98:11,19,21 |
| | 136:1 140:15 | **left** 38:11 89:17 | 99:2,4,11,13,17 |
| | | 165:9 202:5 | |

103:10 110:13
110:21 111:2
111:10,22
112:17 115:21
151:24,25
152:8,10,19,23
153:4,10,13,21
156:4 209:23
210:17 211:5
215:25 227:7
231:9,10 237:2
237:9,15
**liens** 89:25
90:10
**lies** 291:1
**life** 31:11 41:19
42:6 166:10
245:4
**lifelong** 9:12
**lifetime** 49:8
**liked** 70:23
81:24 83:11,11
97:8 99:18
**likely** 42:17
264:9 338:23
**liman** 218:2
**limit** 168:13,14
309:3
**limits** 168:3
271:4
**lincoln** 160:20
**line** 99:21,25
100:1 105:6
110:17 348:4

**liquid** 275:16
**liquidation**
267:13,15
268:3,13
270:16 271:10
271:21 273:24
274:23 276:8
**list** 47:14 49:15
52:10 53:25
63:6 66:10,18
67:25 95:18,24
100:21 103:20
299:19 323:12
**listed** 18:1
19:13 40:24
49:3 60:9
66:19,25 87:11
88:6 102:14,24
119:25
**listing** 60:10
84:13
**lists** 118:21
**litigation** 12:6
13:3,7 17:7,15
18:14 21:14
25:20 124:1
174:2,12
**litigations**
13:25
**little** 60:24
67:23 74:19
75:22 76:3
80:4 97:19
98:21 152:2

171:2,11
179:16 240:21
241:7 242:8
247:6 248:6
257:16 258:24
266:25 269:24
290:7 295:10
303:16 310:10
320:5,21
326:12 328:6
**live** 9:20 60:20
60:20 61:1,1
61:11,23 62:6
62:17 71:11,21
77:25 83:12
84:17 116:8,14
151:12,13,14
163:14 176:8
179:18 181:6
207:25 208:15
232:20 233:12
233:13,15
234:4 237:22
241:19 310:17
341:13
**lived** 9:16,22
9:23 50:1,4
70:21 74:13
83:5 124:23
133:16 163:21
232:12 238:3
252:14 256:11
256:14,19
265:3

**lives** 51:22,24
52:6,10
**living** 9:24
53:12 83:11
99:10 159:14
173:4 175:21
208:14 235:21
235:24,25
335:1
**ljl** 1:2
**llc** 21:6 29:24
30:4 199:1
310:11,12,19
310:22 311:8
312:12,14,22
313:14 314:16
314:23 315:1,4
317:24 318:5
321:16,19
322:10,18
325:12,17
335:25 336:7
336:10,15
338:2,12 339:6
339:22 340:24
**llp** 2:5,15
**locate** 60:7
288:19,20
**located** 252:21
288:24 328:13
328:16 330:4
**location** 169:4
240:3

**locations** 74:18
170:13
**logan** 200:18
**logical** 222:22
**london** 172:25
**long** 20:6 31:13
32:1,3,10,10
37:15 50:5
51:8 53:19
54:19 56:22,23
56:24 74:11
75:3 80:8
81:10 96:17
98:12,24
110:17,21
117:25,25
166:9,10
184:10,15
187:20 207:21
212:17 213:4
249:8 252:15
264:4,5 278:3
278:3 279:4
294:25 301:10
307:16,17
334:8
**longer** 290:2
**longest** 32:23
**look** 21:25
52:12 57:21
82:7 90:7 96:5
105:13 109:20
117:21 118:25
119:13 120:3

128:16 132:6
136:17 151:22
181:11 182:1
188:15 189:15
189:25 191:5
191:12 192:13
193:4,4,5
195:14 238:2,9
239:8,20,24
241:16 264:7
275:3 276:2,9
276:25 299:15
299:15 311:21
314:1
**looked** 7:10
100:19 119:11
121:21 132:7,9
132:10 208:3,5
233:8 251:1
**looking** 66:11
70:22 76:15
80:24 82:1
84:1 85:8
95:20 105:24
123:18 135:1,3
169:20 170:8
170:10 174:8
193:20 208:5
233:6,13,15,16
261:24 323:19
**looks** 52:13
66:19 76:15
92:6 109:5
136:25 169:21

170:24 173:8
190:3 192:16
193:20 195:12
**los** 257:12
**lose** 167:6
**loses** 288:9
**lost** 260:16
262:18 288:10
**lot** 16:6 25:17
25:17 36:10
39:14 56:13
59:25 60:2,5
82:22 83:11
106:5 123:25
150:18 166:9
169:21 170:11
178:16 183:10
183:20 195:2
203:9 231:15
231:16 238:6
250:15 253:6
268:10,22
269:17,24,25
283:9 300:3
317:8 318:9
324:14
**love** 82:16
**loved** 208:14
289:7
**loves** 60:3
**lowenstein** 2:15
2:16 5:4
**lower** 78:21
225:22

**lucie** 344:4,12
345:4
**luckily** 289:4
291:10
**lunch** 139:20
140:4 287:18
287:18 331:9
332:16 333:13
**lying** 291:18
**lynch** 31:5

**m**

**m** 2:10 346:3
**machine**
189:23
**made** 60:8
71:18 75:22
78:7 90:14
94:15,24 95:4
95:4 97:21,22
101:15 109:4
115:14,24,25
116:4 121:20
132:21 152:17
152:20,25
159:19 175:8
185:13 206:18
207:9 208:19
209:11,25
210:4,5,7
211:9,11
212:14,21
213:14 215:14
218:13 220:7

**[made - marriott]**                                          Page 42

| | | | |
|---|---|---|---|
| 228:17,22 | **maintaining** | 275:8 277:6 | **maria** 19:16,18 |
| 230:10 231:8 | 74:16 | 279:1,2 288:10 | 19:19 20:9 |
| 233:19,25 | **maintenance** | 288:13 292:23 | 42:18 80:25,25 |
| 234:2,11,21,24 | 42:2 331:12,13 | 295:10 315:12 | 89:18 110:1 |
| 235:20 245:3 | 331:21 | 322:20 324:13 | 169:8 175:18 |
| 287:10,24 | **majority** | 331:22,24 | 180:16 187:24 |
| 288:8 290:7 | 180:15 310:21 | 335:1 339:10 | 188:1,10 193:7 |
| 296:10 297:18 | **make** 9:15 | **makes** 37:20 | 193:12 200:20 |
| 301:3 307:16 | 11:25 16:1,7 | 52:9 88:15 | 241:17,17 |
| 316:17,22 | 23:6 35:5 | 101:23 155:8 | 244:23 261:3,5 |
| 331:14,19 | 39:13 44:14 | 155:13 271:23 | 312:3 326:6,9 |
| 332:9 336:15 | 62:15 79:2 | 271:24 311:23 | 326:11 331:6 |
| 337:6 338:2 | 80:10,13 90:12 | **making** 5:16 | 334:19 335:1 |
| 340:16,18 | 92:5,10 93:15 | 45:7 211:6 | 336:15,24 |
| 347:9 | 93:20,24 94:20 | 217:14,15 | 337:10 338:21 |
| **mail** 45:23 | 110:16 113:21 | 231:18 233:21 | 342:3 |
| 131:17,17 | 113:22 114:3 | 234:6 242:11 | **maria's** 171:25 |
| 150:21 177:16 | 117:21 134:14 | 265:24 268:17 | 179:16 316:11 |
| 177:17 262:12 | 150:1,20 154:5 | 340:24 | **marie** 311:1 |
| 262:22 346:13 | 155:16 156:6 | **manage** 30:25 | **mark** 17:4 |
| **mailed** 119:16 | 159:12 160:4 | **managerial** | 205:2 |
| 131:18 346:14 | 161:3 165:23 | 310:24 | **marked** 17:10 |
| **mailing** 34:12 | 166:5 167:23 | **manchester** | 66:5 68:1 79:9 |
| 34:13 | 183:7 185:9,11 | 257:14 259:19 | 205:7 |
| **main** 23:11 | 207:8,16,23 | 259:25 | **market** 80:5,6 |
| 56:17 310:15 | 208:25 210:8 | **manhattan** | 83:20 233:7 |
| 310:16 | 210:17 214:22 | 75:6 | **marketing** |
| **maintain** 28:21 | 216:5,6,7 | **manual** 98:9 | 310:16 |
| 28:24 127:25 | 217:22 227:22 | **mar** 70:14 | **marking** 62:10 |
| 128:21 218:16 | 229:24 230:7 | **march** 94:2 | **marks** 297:7 |
| 230:12 | 233:19 234:6 | 181:11,13,17 | **married** 72:12 |
| **maintained** | 235:22 238:22 | 182:25 186:16 | 156:15 |
| 71:24 73:11 | 238:23 242:12 | 186:23 202:9 | **marriott** 1:10 |
| 74:4 128:19,23 | 243:3 246:22 | | |

[marshals - medrano]                                                      Page 43

**marshals** 11:5
**marta** 244:19
**massive** 13:23
**master** 189:23
189:24
**material**
198:13 231:10
286:16
**matter** 4:12
17:21,24 18:3
18:12 19:10
40:4 44:6,7,12
48:22 54:5
56:4 63:10,20
67:4,14,19
76:11 126:12
126:13 137:5
144:19,24
145:5 150:13
198:15 216:7
218:5 348:23
**matters** 11:8,10
18:18 25:16
45:13 50:17
**mayor** 5:14 9:9
38:11 65:21
89:1 96:18
116:16 140:9
179:18 204:23
216:15 241:19
256:2 287:1,6
287:7,16
288:25 307:18
310:17 327:11

341:12,12
**mc** 17:24 85:14
85:19
**mcbride** 2:15
5:4,4
**meals** 333:14
**mean** 12:22
20:3 21:1 34:2
37:19 38:1
41:9 42:15
44:4 45:14,23
46:10,17 47:8
53:20 57:12
63:11,14 65:24
67:9 68:20
76:14 77:22
82:16 83:5,7
83:12 87:21
90:19 91:2
94:13,22 97:7
99:1 101:3,3
103:4 105:4,24
113:24 120:14
121:4,6,7
122:7 123:3,23
126:13 127:8
129:8,22 130:6
132:15 136:25
153:18 155:2,5
156:10 157:24
159:4 162:19
163:1,6 165:6
170:8 173:12
176:13 186:5

187:1 189:2,18
191:1 193:19
196:7 198:17
199:3 203:2
206:21 207:3,5
207:11 210:7
218:10,21
220:20 229:2
230:15 232:12
233:18 235:16
237:25 240:9
243:16 244:8
249:5,17
250:20 251:4
251:11 252:4,6
252:13 256:14
258:5 269:11
275:5 276:8,14
278:3,13 283:9
302:21 306:21
307:15 308:3
308:11 311:2
315:11,20
316:14 318:1
319:2,4 321:5
321:23 322:17
326:25 330:23
333:19 337:22
341:18
**meaning** 70:21
80:11 81:15
82:17 83:2,3
123:5 135:10
177:8 205:24

207:22 219:25
234:20 247:13
263:7,7 303:15
312:3 329:25
337:23
**means** 14:15
41:4,10 47:7
91:3 101:14,16
120:12 122:13
156:16 234:4
266:20 267:1
286:1 345:24
**meant** 97:20
130:1 155:6
157:15 206:22
242:15 269:13
304:10,10
**media** 4:10
22:1 65:17
140:1,3,5
204:15,19
255:19,20,23
310:17,17
327:3,5,7
**medicine**
244:21
**medrano** 37:19
38:7,8,8,9,13
40:24 41:1,3,8
41:18 42:11
43:5,6,8,25
44:11 45:12,18
46:14 47:12,14
47:18 48:6,21

55:8,10 198:3
198:25 200:1
312:3 326:4
336:21,23,24
338:21,23
**medrano's**
46:22
**meeting** 315:19
**member** 312:14
**members** 55:23
315:25
**membership**
311:10
**memoranda**
7:12
**memorandum**
7:12
**memory** 6:15
186:9 285:15
285:21,23
286:2
**menges** 306:5
306:15,19
307:5 308:8
**mental** 6:18
**mentioned**
29:23 57:9
58:13 72:9
80:4 84:1
90:23 91:8
96:12 98:18,23
103:9 110:11
121:25 153:7
164:1 168:10

224:22 250:2
**mentioning**
225:18
**mercedes** 154:1
**merrill** 31:5
**meryl** 2:4 4:25
**message** 22:1
44:3 307:23,24
308:1,6,17
**messages** 21:25
**met** 31:16
39:23 49:9
211:18 301:9
301:11,16
**methods** 57:5
**meticulous**
166:13,21
**miami** 251:15
253:6
**michael** 29:5
54:11,12,13
**michigan**
170:22
**microphones**
4:3
**mid** 279:11,11
**middle** 5:22
61:15 172:20
172:22 207:6
263:2,13,16,16
**mike** 37:11
184:22 341:20
342:7

**mill** 74:8,9,10
157:15 158:5
**million** 302:15
316:22
**milwaukee**
150:7 257:12
**mind** 48:20
63:13 72:11
85:23 103:8,25
104:3,3 123:20
133:2 163:20
206:18 207:5
210:22 212:16
212:21 213:1
218:15 228:17
230:11 278:17
280:3 284:6
292:19 296:6,8
302:16 327:23
343:6
**minded** 295:18
**mine** 37:20
62:3 124:15
261:12 297:14
303:15 321:7
330:18
**minute** 92:18
242:10 303:3
**minutes** 229:12
255:13
**mirror** 234:7
234:10 242:14
242:15

**miscarriage**
274:7
**miscellaneous**
12:20,21 68:13
**missed** 61:21
100:19 110:18
**missing** 104:22
246:4 288:20
293:2
**mistake** 15:20
15:24 100:11
100:14,16
165:13 166:5
182:11 185:11
185:13 265:24
**mix** 323:15
**mixed** 16:25
**mm** 63:23
**moldings** 180:2
**moment** 23:23
58:23 97:9,25
98:3 121:25
133:6 193:1
213:25 254:10
296:6,8,10,13
297:10 305:14
**moments**
129:23
**money** 65:4
80:15 223:1
305:21 312:23
319:9 320:3
321:18 322:2
323:13 325:18

328:20,23
330:19,20,21
331:1,2,4,7
341:16,19
**monsignor**
49:4,7,16,21
51:5,21,22
52:6 54:1
**montblanc**
292:2,3
**month** 90:15
165:22 192:3,3
231:19,22,24
239:24 240:21
259:7 263:1
331:11 332:19
333:8 335:5
337:23 341:14
**months** 37:16
71:2,3 72:10
72:11 73:16
80:20 81:17
87:15,16 94:8
112:1 164:9,16
169:2 171:3,6
172:3 173:8,9
182:25 185:10
208:20 210:4,6
247:9 248:18
249:3 250:1
251:5 253:23
259:7 262:15
262:21 263:12
265:3,23,24

293:3 312:19
330:13 331:13
331:16
**moss** 1:3 4:13
**motion** 272:15
272:23
**motions** 7:9
**motor** 110:16
**moulding**
202:24
**mouth** 307:13
**move** 28:6 73:8
76:4 78:3,14
85:6 91:7
116:6,7 149:16
153:24 164:16
168:6,22
172:10,10
181:10,10
182:18 190:7
190:12,23
192:16,21,22
193:16,24
194:10,20
195:5,8,17
196:9 201:21
218:9 233:14
242:24 245:9
259:1 269:17
315:8 330:2,6
330:9
**moved** 39:17
50:2 55:21
157:17 165:7,7

165:11 189:16
190:14,18
193:16 195:6
231:15,16
237:11,11
245:5,7,9,15,19
246:1,2 250:11
251:21 265:10
287:25 290:12
290:12,15
**movers** 192:16
**moves** 196:5
**moving** 192:17
237:13 245:9
295:1
**multifaceted**
56:16
**mute** 4:6
**mystery** 136:18

**n**

**n** 2:1 5:23
**name** 4:15 5:20
32:24 33:4
87:5,11 88:2
88:10 89:9,21
92:15 156:7
161:24 260:13
287:21 306:14
339:14
**named** 66:20
**names** 89:8
**narrower**
41:16 309:3

**nassau** 8:21,24
8:25
**nathan** 2:3 3:4
4:21,21 5:13
8:1 13:12
15:11 17:8,13
19:4 22:8,17
24:9,13 25:1
25:12 26:3,5
26:12,15,19,23
27:7,12,17,20
28:2,9 33:5,24
34:18 35:10,19
36:19 37:7
39:10 40:8,19
42:9 43:23
46:6,18 47:3
47:10 50:9
53:10 57:17
58:10,21 59:10
65:6,10,20
69:13 70:16
71:15 78:24
79:6 84:9 85:1
88:21 89:19
95:21,23
103:24 104:14
104:20 105:10
107:18,24
108:17,23
109:22 110:5
111:14 112:19
113:7,14 114:1
114:8,12,16,21

114:24 115:2
115:11 122:11
123:1 126:4
127:4,23 128:6
128:15 129:17
130:7,24 132:8
133:3,24 134:1
134:12,20,23
135:1,5 136:14
138:9,23 139:7
139:19,25
140:8 141:1,3
141:7,11,14,22
142:6,13,14
143:11,20
144:8,14,22
145:3,21
146:11,20
147:1 148:8,12
148:15,18
149:1,4,8
150:11 151:1
154:15 160:8
166:18 167:11
167:18 168:5
170:23 171:20
173:23 174:15
176:1,10 177:2
178:4,12 179:4
181:7 185:12
186:7 187:4,11
187:14,22
189:17 193:22
199:23 204:10

204:22 205:1,5
205:10 209:15
211:20 212:13
213:6 214:6
215:2 216:18
216:25 217:18
218:19 219:4
220:18 221:3
221:12,21
222:6,15,23
223:15 224:10
224:16 226:15
227:8 228:1
229:3,6,10,13
229:18,23
230:5 231:21
233:23 235:9
236:1,17,22
237:7,23
239:14 241:11
243:13 246:9
247:23 254:16
254:18,20,23
255:11,16
256:1,16 257:7
259:10,17,21
259:23,25
260:2 261:15
261:21 262:3
264:23 265:17
266:2,18,24
267:14 270:21
272:13,21
273:16 274:9

276:5,12,19
277:4,9,25
279:9 281:13
281:19 283:1
283:11,19,23
286:8 298:22
300:1,18
302:19 305:24
310:2 312:11
316:5 319:10
320:17 322:4
322:13 323:1
324:16 325:11
325:22 326:15
326:21 327:10
329:20 333:23
334:14 335:6
337:21 340:9
341:5 342:18
343:7
**national** 257:19
**nationalization**
  11:6
**natural** 65:7
  139:20 255:11
**necessarily**
  20:11 302:17
**necessary**
  115:20 123:4
  127:11,12
**neck** 133:10,16
  136:22
**need** 6:25 27:9
  35:4 41:12,13

56:14 110:14
115:7 170:4
231:19,22
290:25 302:12
317:21 319:18
320:1,2,10,13
320:23 327:16
334:17
**needed** 34:6
  39:17 43:12
  88:23 98:7
  164:22 176:18
  208:11 244:10
  244:10 251:19
**needs** 220:9
**negligent** 87:9
**negotiate**
  340:20
**negotiated**
  50:14 90:14
**negotiating**
  39:6,9 56:15
**neither** 181:24
**nephew** 243:20
**network** 56:19
  339:9
**never** 23:22
  24:3 81:21
  83:9,19 96:15
  96:18 99:13,19
  106:16,19
  132:6,9,10,24
  132:24 133:1
  133:16 184:3

**[never - november]**                                                  Page 47

184:17,18
204:8 239:17
241:4,4 248:19
271:23 275:6
282:1,2 298:8
298:9,11,16
309:8 320:14
330:4,5 337:15
340:21
**new** 1:1 2:16
8:18,20 9:3,9
9:12 12:16
16:17,20,20,23
38:18 39:1
47:15 49:17
54:13 55:15
60:1,2 71:24
72:6,18,25
73:11 74:4,16
74:20,21 75:5
77:18,19,23
78:4,9 79:21
79:22,23,24
80:2,2,16,19
81:15,24 82:2
82:4,19,19
83:9,14 86:10
87:1,6,12
88:25 89:13,25
93:9 95:14
96:13,13 97:5
97:18 98:4,15
98:18 99:10
115:13,15

116:9,10
124:19,20
125:9,11,13,15
133:10 134:2,8
134:17 135:8
135:10,11,14
136:19,22
137:3,9 157:22
158:10 160:14
160:17,18,19
162:15 164:20
164:21,22
165:10,15,17
165:18 166:2,3
169:21 170:11
170:15,25,25
171:7,8,12,16
172:14,16,18
172:20 173:4,5
173:11 175:21
176:4,6,11,15
176:20,25
177:9,11,16,18
177:24 178:3,6
183:9 184:10
184:11,11,16
184:17 185:9
190:8,23 191:8
191:9,13,16
192:1 193:3,17
193:25 201:7,9
202:15 203:5
207:25 208:6,7
208:10 214:15

215:13 232:23
232:24,25
233:6,14,17,18
234:3,4,7,8
238:7,10,13,18
238:23,25
242:14,20
243:16 245:20
246:18 247:20
247:25 248:9
251:11,12,14
251:14,20
252:10 253:4
253:20,20
255:5,9 256:11
256:14,19,24
256:25 257:3,8
257:13,15
258:4,13,15,21
259:19,25
260:11 264:2
264:16,21,21
265:1,8,10,13
265:19 272:19
272:20 287:7
288:11 291:4
315:9,10 330:7
330:9 332:4
**news** 328:25
**newsmax** 56:21
**nicer** 83:4
**night** 72:16
232:2 237:20

**nine** 248:18
**ninth** 218:5
**nodding** 134:20
134:24 293:6
**non** 117:14
**nonexempt**
271:11
**nonexemptions**
271:18,18
**noon** 139:19
**normally** 150:4
244:16 285:24
**northern**
172:16 257:13
**notarized**
124:18 125:15
226:4
**notary** 1:22 3:5
125:11 344:6
344:19 347:1
347:21
**note** 4:3 115:3
147:15 148:16
276:9 346:11
**notes** 345:11
**notice** 1:23
117:13,16
118:2,17
164:23
**noticed** 164:15
**notified** 202:11
**november** 73:7
191:9 192:3
240:21

[number - objections]                                                    Page 48

| number 3:11 | o | 112:7 113:4,10 | 235:15 236:13 |
|---|---|---|---|
| 8:7 12:20,21 | | 113:16 114:5 | 236:21,25 |
| 12:22 17:21 | o 5:22 346:3 | 114:13,25 | 237:18 239:12 |
| 23:7,18 34:2 | o'clock 248:22 | 122:8,23 126:1 | 241:10 243:11 |
| 50:12 56:11 | oath 3:6 6:4 | 126:23 128:2,8 | 246:7 247:22 |
| 65:17 68:12 | 14:11,14,21 | 129:12 130:4 | 256:13 257:4 |
| 79:12 81:1,3 | 49:1 54:8 56:7 | 130:23 132:5 | 259:5,13 |
| 103:11 110:4 | 63:22 205:15 | 132:22 136:11 | 261:11,19,25 |
| 117:12 120:5,6 | 344:1 347:19 | 138:2,5,20 | 264:18 265:16 |
| 140:5 155:12 | object 27:8 | 139:3 144:25 | 265:21 266:16 |
| 162:4 168:15 | 143:4,15 | 150:3,22 | 266:21 267:11 |
| 195:9,11 | 148:18,20 | 154:12 159:23 | 270:18 272:10 |
| 204:20 205:2 | 229:1 | 166:15 167:9 | 272:17 273:11 |
| 214:12 223:25 | objecting 26:12 | 167:15,25 | 273:25 276:3 |
| 224:1 225:21 | 26:15,17,25 | 170:17 171:17 | 276:11 277:2,7 |
| 255:23 287:8 | 27:3 | 173:21 174:13 | 277:22 278:20 |
| 327:7 | objection 7:22 | 175:25 176:7 | 281:10,16 |
| numbers 12:17 | 13:9 15:8 | 176:22 178:1,7 | 282:23 283:7 |
| 17:18,20 28:10 | 22:16 24:6 | 178:22 181:3 | 286:6 298:20 |
| 68:10 76:3 | 26:20 27:19,21 | 185:6 186:4,24 | 299:22 300:14 |
| 79:15 152:2 | 33:23 34:15 | 187:18 189:12 | 302:14 305:19 |
| 189:21 | 35:7,16 36:3 | 193:18 199:18 | 310:1 312:9 |
| numeral 17:25 | 37:6 38:21 | 207:19 211:17 | 316:2 319:7 |
| 66:9 | 40:5,14 41:20 | 212:9 213:3 | 320:12 321:21 |
| numerical | 45:21 46:15,25 | 214:2,17 | 322:11,15 |
| 78:23 | 47:6 49:23 | 218:18,25 | 323:24 325:7 |
| numerous | 57:16 58:9 | 220:11 221:1,4 | 325:19 329:16 |
| 96:21 | 59:7 70:7 71:9 | 221:18 222:3 | 333:21 334:11 |
| nw 2:5 | 84:5,21 89:15 | 222:14,20 | 335:2 337:17 |
| ny 2:12 346:5 | 103:22 104:11 | 223:9 224:6 | 339:24 341:1 |
| 346:13 | 104:17 107:15 | 226:13 227:4 | 342:16 |
| nyu 9:2 | 107:22 108:13 | 227:24 229:3,6 | objections |
| | 108:21 109:18 | 229:7 231:4 | 114:9,21,22 |
| | 109:24 111:12 | 232:9 234:22 | 148:16 229:14 |

229:19,24

**objectively**
  113:20

**obligation**
  286:4

**obligations**
  315:7

**obsessive**  99:14

**obstacle**  89:22

**obstructing**
  147:18

**obstructive**
  147:15

**obtain**  111:10
  156:3

**obtained**  97:16
  99:11 110:13

**obtaining**
  102:9

**obv**  234:1

**obvious**  233:4
  234:2

**obviously**
  136:25 226:22
  268:19 279:15

**occasion**  35:18
  50:7 289:20
  290:19 302:8,8
  303:4

**occasional**
  44:19 72:17
  74:14

**occasionally**
  29:7 43:10,11

43:25 75:14
99:18 150:10
178:9 180:17
180:18 185:11
265:6 289:18
295:10 297:14
297:16 323:4
324:11 333:14
339:10,13

**occasions**  44:10

**occur**  55:24
  105:22 110:23

**occurred**  77:9
  106:20 131:6
  195:5 317:4
  335:13 343:3

**oceanside**
  194:17

**october**  73:7
  190:5,8 191:9
  191:24 192:4
  192:15 193:15
  193:15 194:7
  195:1,12,13
  240:21 245:19
  331:16

**odds**  284:7

**offer**  18:3,13
  94:11 122:21
  233:8

**offered**  96:3

**office**  11:9,12
  11:18 27:6
  165:8,12

261:10,23

**officer**  54:14

**offices**  165:7

**official**  10:15
  69:3 252:6,8
  344:11

**officially**  39:5
  292:15 296:10

**oh**  8:11 12:12
  29:13 31:21
  32:5 36:4
  53:25 56:3
  58:12,17 64:7
  66:8,11,12
  73:23 85:15,17
  86:17 91:24
  94:6 98:5
  109:7 118:1
  134:3 174:9
  179:9 182:11
  184:12 190:2
  190:20,22
  191:3 198:7
  203:18 205:3
  216:10 239:2
  244:8 252:1
  264:21,21,25
  265:2 271:17
  282:4 292:1
  298:13,24
  335:23

**okay**  7:18 8:8
  8:10 9:14,19
  10:4,11,14,16

10:18 11:14,24
12:2,19,24
13:6,13 14:10
14:13,18,21
15:3,19,23
16:1,5,14,17,25
17:4,20,24
18:7,10,10
19:5,8,12,16
20:3,6,12,14,23
21:5,20 23:5
25:6,9 27:16
27:24 28:2,8
28:17,21 29:1
29:9,16 30:9
30:15,20 31:20
32:13 33:6,15
34:7,24 35:2
35:11,20,22
36:20 37:3,12
37:17 38:6,13
40:3,9,20,23,23
41:8,18 42:10
42:19 43:2,4
43:12,24 44:8
44:25 45:5,9
45:12 46:7,19
46:22 47:12,21
48:1,3,8,19
49:3,12 51:3
51:15,18 52:5
52:14 53:3,11
53:14,16,25
54:8,19,23

**[okay - okay]** Page 50

| | | | |
|---|---|---|---|
| 55:6,13 56:3 | 101:11,15 | 139:18,21,25 | 183:23 184:7 |
| 57:1,5,9 58:6 | 102:1,7 103:9 | 140:21 141:11 | 184:14,21 |
| 58:22 59:11 | 103:25 104:6 | 142:4,13 143:1 | 185:13,17,23 |
| 61:14,22 62:10 | 104:18,21 | 143:12 144:18 | 186:8,11,15,21 |
| 63:5,12,19 | 105:8,17 | 144:18 145:7 | 187:5,13 188:1 |
| 64:1,5,11,15,19 | 106:14 107:10 | 145:22 147:22 | 188:4,7,10,15 |
| 65:1,6 66:4,24 | 107:19,25 | 149:14 150:12 | 188:15,23 |
| 67:3,11,21 | 108:10,18,18 | 150:18 151:2 | 189:1,25 190:4 |
| 68:22 69:14,21 | 108:24 109:5 | 152:6,13,20,24 | 190:7,11,14,22 |
| 70:2,5,17,24 | 109:13 111:6 | 153:24 154:8 | 190:22 191:3 |
| 71:6,16,20 | 111:15,23,24 | 155:7,17 156:3 | 191:17,22 |
| 72:3,5,8 73:3 | 112:4,20 113:2 | 156:6,12,21 | 192:6,15,20,23 |
| 73:10,15 74:3 | 113:8 114:14 | 157:2,7,11,23 | 193:1,11 194:4 |
| 74:6,15,22,24 | 114:23 115:12 | 158:8,19,22,25 | 194:15,24 |
| 75:2,7,17,21 | 115:24 116:17 | 159:8,16 160:9 | 195:3,19,22 |
| 76:18,21 77:14 | 116:24 118:12 | 160:24 161:16 | 196:1,16 197:1 |
| 77:21 78:14 | 118:13 119:8 | 162:22 163:16 | 197:12,20,21 |
| 79:12,15,21 | 119:19,23 | 163:25 164:11 | 198:6,11,24 |
| 80:4,22 81:13 | 120:16 121:2 | 165:10,14,14 | 199:4,6,14,24 |
| 81:23 82:6,13 | 121:20,25 | 165:24 166:1 | 200:16,24 |
| 83:21 84:1,10 | 122:1,15,20 | 166:19 167:2,7 | 201:16,21 |
| 86:6,8,17,22 | 123:2,16 124:5 | 167:23 168:6,6 | 202:13 203:1,6 |
| 87:1,4,10,23 | 124:7,17,20,25 | 168:22 169:7 | 203:13,21,24 |
| 88:1,6,9,16 | 125:16 126:21 | 169:20 170:3,7 | 204:1,4,6,9,10 |
| 89:4,11,11,24 | 127:5,24 | 170:10 171:7 | 205:1,9,11,21 |
| 90:9,21 91:2,7 | 128:16 129:10 | 171:13 172:8 | 206:6,12,14,20 |
| 91:20 92:11,15 | 129:18 130:8 | 172:12 173:10 | 206:23 207:9 |
| 92:22 93:2,5 | 132:1,12 133:4 | 173:17,20 | 207:14 209:16 |
| 93:11,14,17 | 133:17 134:11 | 174:5,21,25 | 211:2,13,25 |
| 94:11 96:7,12 | 134:20,23 | 175:21 176:11 | 212:20,25 |
| 97:11,13,25 | 135:17,19 | 177:3,21 | 213:7,13,21 |
| 98:15,17,23 | 136:4,8,15 | 178:13 180:7 | 214:13 215:3 |
| 99:10,20 100:4 | 137:2,7,13,16 | 180:21,25 | 216:4,24 |
| 100:17 101:6 | 137:25 139:1 | 181:8 183:1,21 | 217:19 218:12 |

**[okay - ones]**                                          Page 51

| | | | |
|---|---|---|---|
| 218:23 219:5 | 255:10 256:8 | 295:12 296:1,4 | 324:17,23 |
| 220:19 222:24 | 256:21,23 | 296:6,16,20,24 | 325:2,12,23 |
| 223:2,16 224:9 | 257:8,17,21,24 | 297:1,5,9,17,23 | 326:2,6,14,14 |
| 224:13,17,17 | 258:3,10,12 | 298:6,11,18,18 | 326:23 327:14 |
| 225:6 226:8 | 259:2,11,18 | 299:7,17 300:2 | 327:24 330:2,4 |
| 227:9,17 228:7 | 260:5,7,15,18 | 300:7,10,19,25 | 330:6 331:3 |
| 228:11,14,21 | 261:4,8,22 | 301:3,7,14,17 | 332:9,13,16,20 |
| 228:21,21 | 262:4,6,17,21 | 301:19 302:4 | 332:24 333:2,7 |
| 230:6,17 231:1 | 263:3,9,11,25 | 302:10,20,25 | 333:13,16,24 |
| 231:1 232:5 | 264:2,15 265:5 | 303:9,19 304:2 | 334:6,9 335:1 |
| 233:1,24 234:9 | 266:3,5,8,12,14 | 304:6,22 305:5 | 335:9,20,22 |
| 234:15,20 | 266:19,25 | 305:8,12,17,25 | 336:2,14 337:2 |
| 235:10 236:10 | 267:6,9,15,18 | 306:6,12,16,18 | 337:9,14,14,25 |
| 237:8,13 | 267:24 268:2,8 | 306:23 307:1,7 | 338:20,25 |
| 238:11,16,25 | 268:12,20,24 | 307:21 308:5 | 339:5 340:12 |
| 239:3,15,19 | 269:2,8 270:8 | 308:13,21 | 341:8,22,25 |
| 240:6,11,18,23 | 270:12,15,22 | 309:15,21 | 342:3,13,19,19 |
| 241:15,20,25 | 270:25 271:3,5 | 310:6,10,10,19 | 342:24 343:3,7 |
| 242:5,10 243:3 | 271:9,20 272:1 | 310:21,24 | **okeechobee** |
| 243:7 244:4,7 | 272:14 273:1 | 311:2,13 | 1:10 |
| 245:14,17,25 | 274:10,21 | 312:12,16,21 | **oklahoma**  36:6 |
| 246:10,13,17 | 275:3,20,24 | 313:5,8,13 | **old**  23:7 165:12 |
| 246:25 247:4 | 276:6,20 277:5 | 314:8,19,22 | 165:19 247:5,6 |
| 247:10,20 | 277:10,16 | 315:4,14,24 | **older**  243:22 |
| 248:3 249:12 | 279:14,24 | 316:6 317:10 | **once**  13:23 |
| 249:18,25 | 280:4,7,22 | 317:14,16,20 | 42:25 119:10 |
| 250:7,13 251:6 | 281:3 282:9,12 | 317:23 318:4,7 | 165:17 183:25 |
| 251:12,18 | 282:20 283:12 | 318:15,23 | 208:21 209:10 |
| 252:1,11,19,21 | 284:9,19 285:5 | 319:1,5,11,11 | 215:12 231:25 |
| 252:24 253:1,7 | 285:8,12,16,25 | 319:14,17,22 | 232:1 233:9 |
| 253:12,14,18 | 286:3,9,15 | 320:1,6,10,18 | 234:10,10 |
| 253:22,24 | 287:14 292:20 | 320:24 321:4 | 258:8 290:16 |
| 254:1,4,10,14 | 293:7,11,19,22 | 321:15 322:14 | **ones**  24:3 60:1 |
| 254:24 255:1 | 294:13 295:4,7 | 323:9,21 | 67:6 96:4,6 |

103:4,8,18
123:5 202:23
202:24 203:3
221:2,5 251:12
**op** 16:19 79:24
80:2,12,24
82:19 86:10
87:2,5,11 88:2
89:21 90:16
232:18,22
250:20,22,25
272:20
**open** 28:5
149:15,15
253:21 286:15
315:9 343:8
**opened** 315:11
**openly** 46:2
**operated** 29:19
37:14
**operating**
311:7
**operation**
284:5
**operative** 22:24
23:1,21,22
28:11
**opinion** 108:10
**opportunity**
28:6
**opposed** 33:19
178:10 201:1
268:5

**opposite**
321:24
**optimum**
269:16 270:6
**oral** 57:7
309:20
**order** 24:12
38:25 113:20
149:5 159:12
163:17 210:18
220:10,16
291:3 295:1
301:11 311:22
**ordering**
346:14
**orders** 63:24
**organization**
56:14
**organize** 30:24
**organized**
28:25 97:3
**original** 59:15
81:1 85:12
91:9,14 116:2
251:22,25
252:2,3,4
269:1
**originally**
80:13 156:11
265:1 340:13
340:15,18
**outrageous**
143:7

**outside** 181:15
232:3 328:14
328:16,19,22
329:4 330:9
**overall** 244:22
**overbroad**
25:19
**overlap** 263:1
263:10
**overlapping**
326:13
**overlaps** 41:21
42:5
**overlooked**
45:15
**owe** 325:17
**owes** 328:23
**own** 7:15 16:14
16:22 64:4
87:22 121:24
145:7 146:4,12
169:18 197:8
199:8,16,21
210:22 212:21
213:1 261:24
286:20 294:24
295:16 304:17
308:4 318:6,7
318:11,12,14
329:6,6,9,15
330:19,21
335:15,24
336:2,9

**owned** 38:12
70:20 71:7
86:22,24 96:20
115:12 293:5,9
318:12
**owner** 76:17
77:7 310:21
314:16,16
318:17
**owners** 342:2,3
**ownership** 64:9
305:15
**owning** 115:9
115:20
**owns** 20:1
194:19 310:19
318:4

**p**

**p** 2:1,1 5:22
**p.m.** 1:13 140:2
140:7 204:10
204:16,21
255:20,25
327:4,9 343:14
343:17
**packages**
184:23
**packing** 189:21
**page** 3:11
17:17 18:1,4,5
18:5 66:6,14
66:17,19 67:25
68:2,3,9,14

75:22 76:1,3
78:16,21 79:1
79:2,12,15
85:10,11 91:10
91:21,23,24
93:7 95:17,22
95:22 99:24
100:1 116:18
116:21 117:8
117:12 118:7
118:11,13,17
118:19 119:14
119:19,20
122:16 133:5,7
151:23 152:1,2
156:22,22
161:17,20
168:23 178:15
181:12,14
187:6 190:1,2
194:5,24 195:4
196:13 197:14
205:22 225:9
348:4
**pages** 66:18,21
69:15 75:24
76:4,7,7
116:23 117:24
117:25 118:2,3
168:7 197:13
201:22 345:10
**pagination**
67:22

**paid** 36:9,11,21
36:22 37:1,11
37:22,25 38:5
51:13,19 55:6
55:8 72:4
95:15 121:8
196:7 287:3
288:18 291:13
291:13,16,24
292:6,7 312:21
312:24,25
313:8,13 314:7
314:7 315:15
316:21,21
323:19 325:4
330:14,17
331:16 335:3
338:5 342:10
**paint** 180:3
**painting** 180:3
**palm** 1:10,11
16:9,11 38:18
47:16 49:18
51:22,24,25
52:1,2,6,7,9
55:16 61:7
62:20 69:16
70:19 71:7
72:9 73:13
75:9 77:15
78:3 81:15
83:17 84:2,4
84:17 86:23
96:10 104:16

107:13,20
117:17 119:16
123:12 125:20
125:22 128:1
128:20,24
130:2,10
131:19,19
153:23 154:18
157:8 175:22
176:5,14,15,21
176:25 177:3,8
200:19 201:7
205:23 206:8
206:15 207:17
211:7 212:22
213:1,18
214:16 216:13
216:13 218:3
219:12,22
221:25 223:5,7
227:2,20
230:22 231:3
232:7 235:12
236:5,11
237:16 242:9
242:12,22
245:11,18
272:7,16,23
276:8 277:17
277:20 278:11
279:22 281:9
328:2
**paper** 29:3
331:1,2,4,7

**papers** 189:22
250:6,7 288:17
299:25 300:4
311:11
**paperwork**
155:14,15
158:6 185:3
**parcel** 267:17
268:4
**pardon** 11:7
37:5,23 69:23
110:8 167:13
173:25 202:20
205:18 243:9
306:8 317:3
329:8 333:25
336:4
**paris** 172:25
**part** 6:11 19:19
20:1 21:4
38:12 54:17
71:8 76:19,20
82:4 91:5,5
171:6 189:4,5
192:5 231:15
239:21 257:13
268:6 300:25
314:6,16
**partially**
197:21
**participated**
32:8
**particular**
161:3 219:2

220:24 230:20
307:21 312:14
**particularist**
166:22
**particularly**
15:17 50:14
113:22 166:20
190:6 280:25
**parties** 4:8
345:13,14
346:14
**partner** 19:20
19:24 20:3,4
20:22 318:13
**partners** 21:17
50:23 51:2,13
51:13,18 199:1
200:1 314:5
317:8,9 318:9
318:9,11,12,13
322:20 335:4
**parts** 278:4
**party** 160:21
**pass** 168:18
**passed** 49:13
**passport**
251:15 252:19
252:21,22
253:1,4,10
**password**
28:17
**past** 21:7 25:22
133:5 326:7

**pay** 41:13 42:2
51:5 64:17,20
90:15,17 91:3
118:15 121:5
195:23,24
267:4,4 268:15
270:6 271:1,5
271:7 272:8
288:6,6,7,11,11
288:15,19
292:5,10
298:19 305:21
315:6,7,12
316:20,20
319:16 321:16
321:19,24
322:9 323:4
324:2,3,14
330:19 331:8
331:12,12,13
332:18,19
334:17,22
339:9,10,16,18
339:20
**paying** 38:4
177:10 185:24
186:2 196:5
323:14,23
331:6 334:15
334:18 337:24
**payment**
331:14,15,19
331:22,25
332:9 334:19

338:11,14,16
338:18
**payments**
340:25
**pays** 332:16
333:14,15,16
333:19,24
334:1,6,9
**pbi** 201:9
**pc** 2:11 5:3
346:4
**peculiar** 92:9
**pen** 292:1,2,4
**pending** 25:11
27:25 87:14
148:14 217:3,9
**people** 8:7,10
22:12 23:19
25:23,24 34:2
36:6,17 39:13
44:17 48:10
52:16,18 58:6
58:15 59:3,5
81:5 83:5,6
142:24 165:20
165:20 208:17
232:4 263:20
263:21 265:9
278:14,16
279:6 280:2
301:11 334:22
**percent** 25:15
175:24 207:6,7
207:7,10 235:1

242:3,4 248:9
259:8 307:6
335:21
**perfect** 286:2
**perfectly**
111:16
**perform** 41:18
50:20
**performed**
339:5
**period** 37:13
50:5 71:7,12
71:23,23 73:10
74:3 84:16,20
86:18 93:20
99:16 137:10
168:12 169:4
176:24 191:13
209:4 211:23
215:6 231:5
232:14 233:20
233:21 246:17
248:16 258:25
259:3 294:25
295:9 309:4
332:4
**periods** 70:10
73:12,16
**perm** 237:6
**permanent**
64:24 71:19
77:17 78:2,8
80:10,14 81:11
82:4 94:14,16

[permanent - pinky]                                              Page 55

94:25 100:24
101:24 115:18
116:5 122:10
122:12,25
128:1,21 138:7
139:6,12
152:18 153:8
153:11 154:17
159:1 176:14
177:15 178:10
207:23 208:9
208:23,25
209:12 211:9
212:22 215:15
232:13,16
233:2,22 235:4
236:15,19,24
237:12,13
238:20 242:12
244:9 256:15
258:24 259:2,4
259:6,11
278:24,25
279:1,3,19
**permanently**
73:8 84:17
112:14 129:1
176:9 237:6,8
237:10 259:16
**permission**
145:20 274:4
275:13 295:11
295:21

**person**  20:13
40:10 48:24
53:12 54:3
56:2 110:25
167:16 269:18
291:9 311:23
326:3
**personal**  23:14
25:18 29:10,15
30:18,21 31:4
31:17 32:11,16
33:7,22 35:3
41:19,24 42:6
42:6,7 44:6,12
45:6 46:3
49:10 50:3
52:23 53:23
55:18 58:20
64:2 139:1,4,4
145:14,18
287:9 307:23
307:24 321:16
321:19 322:9
323:5,23 324:2
324:3 325:5
332:11
**personally**  42:2
59:6 96:25
109:12 125:23
161:11 184:23
187:23,24
189:2 268:24
269:4 308:7,18
321:25 339:23

340:3 344:8
**peter**  49:13,14
**petition**  266:9
269:3 270:12
**phone**  20:13
22:14,18,20
23:15,18,19
28:10,15,18
42:12,18,21,24
44:3 229:2,9
**phones**  4:6
22:22,23 23:1
23:21 28:11,15
**photocopy**
154:1
**photograph**
151:24 181:8,9
181:11,20
182:9
**photographed**
109:21
**photographer**
180:19
**photographs**
63:7 178:14,18
178:21 179:7
179:14 181:1
181:14 202:18
202:21
**phrase**  284:9
**physical**  6:18
28:24 169:3
297:18 298:2

**physically**
53:17 294:4,14
294:19,23,25
295:15 296:7,9
296:14 297:10
305:9,13
**pick**  4:4 177:13
177:16,17
183:9 184:23
234:18 289:15
293:18
**picked**  110:3
234:16 299:25
**picture**  179:19
179:20 181:18
242:7 296:18
296:23 297:2,3
297:6,21,25
298:3 302:9,9
303:14,17
305:10 309:14
**pictures**  175:11
175:12 180:11
180:13 182:20
182:21 187:2
202:19,22
297:8
**piece**  158:16
**pieces**  29:3
153:20
**pierce**  344:12
**pin**  9:19
**pinky**  182:9,15
182:15

**pizza**   181:15
**placa**   49:4,7,16
  49:21 51:5,21
  51:22 52:6
  54:1
**place**   4:8 37:11
  40:22 60:11
  70:15 71:21,21
  72:1 77:25
  82:16,17
  101:24 113:18
  115:9 116:8,10
  128:19,20,23
  128:24 139:20
  151:14 152:18
  153:9,12 158:1
  158:7 160:22
  165:18 166:2
  176:13 181:15
  194:22 208:15
  228:8 232:22
  232:24 233:12
  233:13,15
  238:20 249:1
  256:15 258:24
  259:1,2,4,6,15
  264:3 284:6
  323:17 341:3
**placed**   131:14
  212:12
**places**   59:25
  82:20 83:6
  101:25 124:23
  125:17 169:11

232:12 235:22
249:6 251:17
257:6 263:24
**placing**   28:15
**plaintiff**   4:12
**plaintiffs**   1:4
  1:21 2:2 4:22
  4:24 5:1,8 13:3
  13:7,14 14:7
  17:6
**plan**   18:11
  59:15 60:7
  68:24 69:17
  77:21 81:14
  94:12 122:22
  135:20,21
  137:17,18
  152:14,14
  154:9 158:13
  176:5 178:19
  178:20,21
  188:17 197:24
  197:25 198:2
  267:4 268:6
**plane**   169:12
  193:6,6 240:25
  241:3,5,5,8,18
**planned**   78:3
**planning**
  190:11 212:17
**plans**   39:20
  59:12 60:15
  80:20 81:16,19
  84:17 86:9

90:9,12
**plaque**   287:19
  287:19
**play**   61:19,24
  61:25 62:4,4
**played**   31:14
  34:1,3,4 36:17
  39:5 61:20
**player**   288:8
**players**   288:9
**playoff**   61:24
  63:4
**playoffs**   61:21
  62:6,23
**plays**   56:15
**please**   4:3,6,18
  5:20 6:25 17:1
  41:2 53:6
  69:17 105:9,14
  146:18,24
  225:7 313:12
  346:12
**plenty**   277:16
**plug**   249:8
**plurality**   74:23
**podcast**   61:2
**podcasting**
  60:22,25,25
**point**   12:5
  36:15 41:15
  44:14 65:8
  81:11 83:23
  85:24 91:16
  95:1 116:12

157:16 174:10
175:22 177:6
191:13 195:25
207:16 208:6
209:19 232:19
232:21 249:18
251:21 255:12
286:20 293:4,8
294:19 335:9
337:19
**pointed**   120:25
**pointing**   78:22
**policy**   301:1
**political**   36:13
  62:8
**politician**
  288:18
**politics**   58:20
**polling**   158:1
**portable**
  172:11 237:11
**pose**   89:21
**position**   10:21
  142:20 249:16
**possess**   294:20
  294:24 295:15
**possessed**
  294:25 298:11
**possession**
  77:12 296:14
  300:12
**possibilities**
  110:4

possibility
  64:25
possible  64:21
  105:15 226:22
  261:16 271:1,2
  297:23 298:1,4
possibly  7:7
post  261:10,23
postal  260:19
  260:24
potential  18:2
  19:9
potentially
  23:22
powerful
  242:24,25
powers  49:13
  49:14
practical  238:1
practice  22:9
  22:11 43:20
  44:1 96:20
  184:16,24
  322:24
precedes
  306:17
precise  88:4
predominant
  128:25 275:10
prefer  23:20
  316:14 317:6
  317:10,17
preference
  177:3

preparation
  7:19,20 8:4,5
prepare  7:4
  92:13,16 240:8
prepared
  123:21,21
  169:7,8 175:18
  175:18,19
preparing  19:2
  32:8 33:22
prerecorded
  60:22
prescribed
  244:21
present  2:18
  273:1,4,5,8,10
  277:12
preserve  115:3
president  19:20
  21:8,13 29:21
  29:23 73:21,22
  161:12 248:21
  288:23 289:1,2
  291:15
presidential
  160:14,16
  307:19
press  288:21
  291:1,14,16,18
  307:17
pressure
  269:24 270:9
  270:11

pretrial  3:13
  17:5,10
pretty  20:10
  41:17,17 73:15
  143:7 145:1
  161:5 166:11
  166:13 177:1
  193:20 218:10
  233:3,3,14
  248:25 249:23
  269:23 270:2
  270:13,16,23
  326:13 332:8
prevent  6:19
previous  236:7
  236:8 239:6,11
previously
  235:14
priest  50:19
primaries
  161:4,5
primarily  71:3
  160:3
primary  114:3
  160:5
principal  32:20
  71:24 72:6
  73:11 74:4,16
  122:13 129:1
  164:6,24
  175:23
prior  21:8
  37:21 49:19
  55:2,17 86:22

144:6 145:11
  164:17 165:8
  220:8,17 238:1
  238:3,4 258:21
prisons  11:7
private  4:4
  96:20 162:10
privilege  27:18
  140:24 141:25
  143:9,19
  144:12 145:14
  145:14,15,17
  145:18 149:13
privileged
  25:17 140:17
  140:20,21
  142:19,21
pro  145:6
probably  21:14
  23:9 34:21
  38:23 43:21
  44:20 46:10
  48:2 49:10
  57:8 62:15
  63:16 70:19
  72:23 74:19,20
  74:21,25 75:16
  77:12 81:21
  83:14 84:24
  86:4 88:8
  94:18 97:21
  103:3 109:2
  136:2 142:18
  163:7 169:8

**[probably - provided]**                                      Page 58

| | | | |
|---|---|---|---|
| 173:12,13,22 | **proceeding** | 337:1 338:15 | 299:20 |
| 176:23,23 | 343:17 | 338:19 | **proposed** |
| 180:19 184:17 | **proceedings** | **profits** 312:17 | 117:13,14 |
| 185:15 187:25 | 3:1 268:13 | 312:20,24 | **proprietary** |
| 193:7,9 202:8 | 343:15 | 313:3,14 | 250:18,22 |
| 203:3 207:6 | **proceeds** 91:5 | 314:20 315:16 | **propriety** |
| 208:4 210:4,25 | 268:4 | 315:17 318:21 | 40:17 |
| 231:15,17 | **process** 59:18 | 318:24 319:18 | **prosecutor** |
| 236:9 238:2,6 | 73:18 80:8 | 336:14 337:6 | 291:8 |
| 238:6 243:5,23 | 81:10 94:23 | 338:2 | **prospective** |
| 247:3,6,12 | 111:22 112:13 | **progressively** | 60:11 |
| 248:17 249:10 | 207:13,14 | 77:16 | **prostate** 243:18 |
| 250:5 251:2,9 | 210:19,20 | **proof** 95:17,25 | 243:24 287:10 |
| 257:15 259:8 | 233:1 264:20 | 102:21,23 | **protected** |
| 262:9,11 263:2 | 271:17 | 105:14 161:14 | 107:20 211:15 |
| 264:13 265:2 | **produce** 163:13 | **proofs** 102:14 | 222:1 |
| 268:21 278:22 | 173:24 174:1 | 102:15 | **protection** |
| 282:2 288:16 | 175:1 186:22 | **proper** 25:25 | 212:7 218:5 |
| 290:17 292:2,3 | 189:6 253:19 | 114:12,22 | 223:7 266:15 |
| 292:19 295:17 | **produced** | 126:14 229:7 | **protective** |
| 299:23,24 | 174:6,8,12,17 | **property** 38:19 | 24:12 |
| 301:5,12 316:7 | 183:2 186:15 | 47:17 49:19 | **protonmail.c...** |
| 316:22 317:22 | 186:19 189:3,6 | 55:17 65:1 | 25:4 |
| 324:11 326:13 | 311:22 314:22 | 77:3,7 89:25 | **prove** 95:8 |
| 330:16 333:10 | 344:8 347:18 | 94:1,6 106:1 | 104:7 115:7 |
| 333:15 | **producer** 56:12 | 108:12 115:20 | 223:6 |
| **problem** | **produces** 56:17 | 117:14,16 | **proved** 291:16 |
| 244:14,20 | 56:18 | 118:3,4 119:20 | **proves** 163:18 |
| 288:21 331:11 | **producing** | 119:24 120:5 | **provide** 30:21 |
| **procedure** | 310:16 | 133:22 136:20 | 105:14 291:4 |
| 346:22,23 | **professional** | 193:16 194:16 | **provided** 13:14 |
| **proceeded** | 345:6,6 | 233:6 246:22 | 104:24 120:17 |
| 215:23 | **profit** 319:6,21 | 268:3 271:11 | 120:23 223:4 |
| | 319:23 320:11 | 271:15 292:17 | 324:24 |

**providing**
  223:3
**proving** 213:23
**provisional**
  157:16 158:5
**prudent** 320:19
  320:21
**prying** 25:19
  25:20
**public** 1:22 3:5
  166:10 307:8
  308:2 344:6,19
  347:1,21
**pulled** 209:4
  215:6
**purchase** 82:13
**purchased**
  69:19 70:3,18
  70:23,24,25
  71:1 84:3
**purchasing**
  82:2,8,11
  309:2
**purely** 42:6
**purple** 182:2
**purported**
  307:8
**purporting**
  307:23
**purports** 308:6
  308:17
**purpose** 21:24
  23:3 25:20,25
  38:4 57:12

127:2 146:14
198:21,21,23
242:15,16,18
**purposes** 36:12
  36:13 299:5
**pursuant** 1:23
**put** 29:6 62:1
  66:22 70:1
  77:24 78:9
  80:5,6 83:19
  83:19 103:5
  105:22,25
  106:21 112:16
  116:2 182:17
  185:9,15,19
  190:16,17,18
  194:21 208:1
  208:19 209:1
  209:10 210:3
  215:12 233:7
  234:24 243:25
  289:11,12
  290:13 307:13
  308:16 339:14
**putting** 185:14
  185:17 190:25
  208:2

**q**

**qualified** 267:2
**qualify** 271:22
**question** 6:22
  13:3 22:15
  24:17 25:7,11

25:14 26:2,11
26:14,16,18,22
27:4,7,9,11,11
27:13,18,22,25
28:3 35:25
40:17 105:11
105:21 114:17
126:25 134:3
141:7,14,15,18
144:3,13,21
145:8,10,22,24
146:4,5,22
147:2,8,13,14
147:19,20,22
148:2,14 149:7
149:9,19,24
150:16 151:3
153:3 155:9
158:16 159:3
164:1 168:9
175:16 187:15
196:20 206:16
216:22 217:3,8
217:10 218:17
221:4,22
222:16 224:5
229:16,22
230:2,4,13
247:1 258:19
265:18 272:5
274:16 277:19
278:8,10,18
280:1 281:2,3
282:14,25

283:4,24 328:8
337:5 339:4
**questionnaire**
  221:10
**questions** 86:9
  104:19 106:6,8
  106:10 107:1,6
  108:5,11,15
  112:4 120:25
  143:6,8 148:7
  148:17,21
  149:3 153:22
  203:9 226:21
  269:12,13,17
  278:4,6 280:19
  281:6 282:18
  283:20,22
  338:22 342:25
  343:11
**quick** 69:5
**quickly** 269:17
**quitclaim** 76:6
  76:10 77:1
  84:13
**quite** 8:13 12:3
  39:16 50:5
  51:7 77:12
  80:7 166:9
  169:21 170:11
  170:20 208:16
**quote** 59:1
  128:25
**qux** 56:21

| r | | | |
|---|---|---|---|
| **r**  2:1 5:22 | 142:8 146:18 | 277:23 278:25 | 110:6,9 120:14 |
| **radio**  21:17,18 | 146:23,25 | 280:21 288:13 | 121:1 126:11 |
| 21:19 60:21 | 147:6 201:6 | 315:20,21 | 126:17,19,24 |
| 86:1,3 243:1,4 | 215:3 222:4,21 | 320:23 324:14 | 127:5 130:13 |
| 245:15 248:4 | 271:23 313:19 | 333:11 | 131:22,24 |
| 248:17 249:10 | 346:10 347:7 | **reason**  6:9,12 | 135:15 137:15 |
| **ragland**  2:19 | 348:23 | 6:15 15:13 | 160:1 173:10 |
| 4:15 | **reading**  154:3 | 36:1 83:13 | 174:7,8 187:16 |
| **ragusa**  29:5 | 219:17,20 | 95:5 107:5 | 190:7,9 192:21 |
| 54:11,12,13,19 | 292:16 | 111:25 126:21 | 195:7,17 196:7 |
| 55:6,13,18 | **ready**  91:7 | 127:21 130:20 | 212:12 225:4 |
| 56:4 184:22 | 286:24 | 138:25 149:15 | 225:13 226:17 |
| **rail**  242:8 | **reagan**  10:18 | 149:16 160:9 | 226:18,21 |
| **raise**  305:21 | **real**  88:20 | 161:3,10 | 227:14,16,17 |
| **ran**  50:15 | 119:24 272:5 | 163:13 165:2,4 | 248:3 249:22 |
| **randy**  288:24 | 290:18 | 183:13,16,18 | 251:22 262:2 |
| 288:25 | **reality**  209:3 | 186:21 197:10 | 262:11,12 |
| **ranking**  10:21 | **realize**  266:6 | 200:14 206:25 | 266:8 268:20 |
| 10:23 | **realized**  94:17 | 260:7 285:16 | 272:4 274:22 |
| **rarely**  42:15,15 | **really**  7:10 23:2 | 285:18,19,21 | 275:6,7,24 |
| **rather**  15:16 | 28:23 50:24 | 300:10 306:25 | 277:12 278:9 |
| 42:21 44:9 | 68:18 82:16 | 307:1 319:14 | 284:2,22 286:9 |
| 77:18 132:20 | 89:17 97:20 | 346:11 348:4 | 286:12 287:19 |
| 157:1 192:5 | 99:19 123:3 | **reasonable** | 287:20 294:11 |
| 206:13 207:25 | 138:3 150:17 | 346:16 | 296:17,22 |
| 207:25 236:15 | 170:3 172:16 | **reasons**  15:15 | 298:5,18 301:7 |
| 246:3 284:14 | 174:18 184:17 | 111:3 232:17 | 301:21,22,24 |
| 339:22 340:4 | 190:24 192:10 | 241:23 343:8 | 302:11,23,23 |
| **rays**  244:20 | 198:18 199:22 | **recall**  11:24 | 303:14 305:3 |
| **read**  3:7 107:17 | 210:10,10 | 39:19 48:2,3 | 309:20 322:12 |
| 108:5 112:2 | 218:23 226:8 | 48:11,15 51:9 | 328:9 332:13 |
| 137:23,23 | 228:24 230:17 | 76:15 81:7,23 | **recalled**  303:17 |
| | 238:22 247:15 | 86:6 88:1 | **recalling** |
| | 252:13 276:7 | 93:13 97:4,15 | 303:14 |

[receipt - regard]                                              Page 61

**receipt** 346:15
**receive** 14:13
  44:18 57:10
  131:16 150:14
  338:8,14
  341:23
**received** 131:8
  131:15,22
  132:2 135:10
  148:24 150:1
  150:21 152:11
  159:25 164:23
  262:22 263:2
  312:23 337:15
  337:19 338:11
**receiving**
  135:11,13
  159:21 340:24
**recent** 36:5
  203:14
**recently** 36:17
  61:19 87:25,25
  337:20,22
**recess** 65:16
  69:10 140:4
  204:18 255:22
  327:6
**recite** 255:5
  303:5
**recites** 255:2
**recognize**
  17:14 68:17,18
  124:2,4 128:20
  133:14 134:16

  135:7,17
  161:22 162:3
  259:18
**recollection**
  121:7 124:14
  125:7,14
  128:11 130:12
  131:8,13,25
  132:2 136:23
  137:13 169:16
  169:17,19
  175:19 186:10
  226:20 227:1
  297:9 305:1
  313:19 339:1
**recollections**
  7:6 339:1
**recollects** 53:9
**recommended**
  243:19,19
  244:19,23
**recommends**
  244:18
**reconfigured**
  85:24
**reconstruct**
  193:7
**reconstructed**
  169:24
**record** 4:1,9,19
  5:21 65:15,19
  69:9,12 115:2
  125:22 132:18
  139:22 140:3,7

  145:1 146:15
  146:17 147:5,9
  148:4,16 191:1
  204:17,21
  215:4 217:23
  229:25 248:12
  248:14,15
  249:4 252:7,8
  255:17,20,25
  317:16 319:3
  322:25 327:2,5
  327:9 338:10
  343:9 345:11
**recorded** 4:10
  125:19 126:5
  248:19 249:6
**recording** 4:7
  60:25 172:6
  248:16 249:2
**records** 33:4
  103:6 168:2
  169:12,25
  170:5 180:24
  193:6,6,9
  200:5 239:10
  239:11 240:10
  241:1 242:1
  250:10,12,15
  250:17 251:10
  251:16 275:4
  276:2 291:10
  324:23 325:8
**recreate** 169:9
  208:4 302:21

**recreated** 241:6
**red** 289:24
**redact** 198:13
**redacted**
  197:22
**redactions**
  162:4,6 198:12
**refer** 75:9
**reference**
  207:16
**referenced**
  346:8
**referred** 244:3
  244:5 264:16
**referring** 16:10
  16:18 29:25
  79:13 200:7
  201:8 212:20
  215:13 226:10
  257:22 312:5
**refers** 203:18
**reflected**
  211:10 236:19
  236:23 348:23
**refresh** 7:6
  121:7 136:23
**refusal** 27:22
**refuse** 28:3
**refused** 146:3
  148:1 248:10
**refusing** 144:3
**regard** 122:9
  346:16

**regarding**
21:14 328:8
**regardless**
143:12
**register** 94:20
155:23 158:19
159:16 210:18
212:4
**registered**
154:20 155:21
156:5,7,13,18
157:2,11,12,13
157:13,14,17
157:22 158:2
159:6,10,11,25
160:6,11 237:2
237:9 323:16
345:5
**registering**
211:5 227:6
**registration**
103:11 153:25
154:1,6 156:25
157:20,24
158:3,12
215:25 237:15
**regular** 7:17
22:9,11 62:15
72:13,14 73:18
**regularity**
319:5
**regularly** 35:18
43:6,7 44:15
44:16 46:8

49:25 50:2
53:14,15 99:8
**regulations**
321:11
**reimburse**
322:25 324:6
**reimbursed**
334:4,5,12,18
**rejected** 174:14
174:19,23
**relate** 7:11
62:10
**related** 44:19
85:13 91:9,14
177:9 225:16
**relates** 80:1
162:22
**relating** 123:17
227:1 277:12
314:23 326:2
**relationship**
164:21 165:11
244:12 314:12
314:15 321:3
**relationships**
184:11
**relative** 345:12
345:14
**relevance**
108:2 125:1,4
129:19 136:4,7
136:9,13
137:25 138:16
138:18,22

154:16 158:14
162:13 181:1
186:12 188:18
196:22 197:4
198:10 199:7
252:14
**relevancy**
175:8 199:22
**relevant** 84:16
84:19 85:3
103:4,20
158:15 174:19
189:3,3,7
197:4 199:17
204:3 280:1,17
281:8 283:13
283:25 284:21
285:20 286:10
310:6 328:1,10
**relied** 96:2
268:21
**relief** 135:12
**relocate** 39:20
48:12 59:12
60:12
**relocated** 53:17
**relocating** 39:2
**relocation**
38:17 47:15
49:17 52:15,19
55:15
**rely** 18:18 67:4
67:7,18 135:20
137:17 152:7

152:14 154:9
158:13 162:12
169:17 178:19
183:3 188:17
197:24
**relying** 226:20
**rem** 295:6
**remained** 87:5
**remaining**
89:21 294:14
296:9 297:12
297:18 298:2
**remains** 91:4
**remarkable**
243:23
**remarkably**
291:12
**remember** 7:9
11:23 15:14,14
21:18 32:25
34:25 39:22
43:18 44:13
48:9 51:8
54:24 62:12
68:19,20,20
81:25 84:25
85:4 87:20
97:10 108:18
108:20 109:1,1
109:15 112:25
119:7 123:24
125:10,10,11
125:14 128:9
129:5 130:19

131:2 132:25
133:1 159:9
162:19 168:15
169:15 171:23
187:21 189:8
191:16,18
193:13 226:3,6
231:18 244:11
247:6 250:11
266:10,10,12
266:14 270:20
272:18 273:6
273:13,14,14
273:18,21,21
273:22 274:13
275:10 280:6,9
280:10,15
281:23 284:8
285:20 290:4
290:21,24
292:16,21
294:1,2,12
295:2 297:8
301:9,9,13,15
302:1,2,4,7
303:1,6,9,11,13
303:13,14,19
303:20,22
304:6,16 308:9
309:10 312:15
319:4 323:12
**remembered**
112:11 202:4
302:7,18 303:3

303:4
**remind** 89:2
**reminded**
302:6,6,12
**reminding**
302:3
**remove** 88:2
**removed**
137:10
**removing** 87:9
190:25
**renew** 97:20,20
98:19
**renewed** 96:15
96:18
**rent** 70:13
171:24 238:22
258:23
**rented** 171:2,4
171:7,8,19,25
172:3 173:5
238:19 256:22
**renting** 173:10
173:18 238:25
**reorganization**
266:23
**reorganize**
268:7
**reorganized**
85:23
**repeat** 26:1,21
141:16 230:3
**rephrase**
150:16 151:17

247:1,24
265:18
**report** 167:2,7
167:12,14,17
167:20 168:4
345:8
**reported** 11:8,9
11:11,11
**reporter** 3:7
4:16,20 22:5
53:3,5 105:8
127:15 133:23
134:11 142:4
187:10 216:24
224:9,13
254:14 259:20
327:2 345:1,6
345:6,25
**represent**
306:23
**representation**
21:13
**representing**
4:16 137:4
144:18,23
145:4 189:10
248:21
**represents**
69:19 124:9
169:23
**reproduced**
251:7 253:15
253:16

**reproduction**
253:17 345:24
**republican**
172:24 263:20
**request** 14:6
45:20 135:11
**requested**
345:10
**requesting**
46:14 59:6
**requests** 13:2
13:23 174:2
**required**
219:12
**requirement**
127:8
**requirements**
95:9 118:6,9
211:14
**res** 158:23
**research** 50:17
51:4
**reserve** 198:20
**reside** 112:14
112:15
**resided** 128:18
**residence** 71:24
72:6 73:12
74:4,16 75:15
76:16 77:18
78:2,8 80:11
80:14 81:11,12
95:1,1,17,25
102:14,23

105:14 113:19
114:3 115:9,13
115:19 116:5
122:13,25
152:18 153:8
153:12 157:7
163:18,19
164:6 172:18
175:23 176:14
177:15 208:9
208:23,24,25
209:6,12
210:14 212:23
215:8,15
232:14,16
233:2,22 235:4
236:14,15,16
236:19,24
237:22 238:18
238:24 242:12
242:13 244:9
253:4 278:25
279:2
**residences**
82:23,24 107:8
113:23 114:2
115:7 122:3,6
151:18 233:17
**residencies**
101:19,21
**residency**
94:14,16 99:21
100:5,24,24,25
101:2,4,14,16

101:23,24
102:21
**resident** 82:4
101:25 138:7
139:6,13
158:24 159:1
173:6 178:10
178:10 251:14
279:19
**residents**
102:16
**resisted** 83:13
**resold** 291:24
**resolve** 315:25
**resolved**
275:17,17
**resources**
78:11 82:21
**respect** 276:8
308:22 316:11
341:9 342:14
**respond** 13:18
42:21,24,25
44:2 45:6,7
46:13 58:2,24
59:1
**responded**
12:10 13:2,6
44:4
**response** 59:6
174:1 206:25
226:22 227:19
**responses**
13:13,17 14:14

75:8 205:12
286:5,11
**responsibility**
195:22
**responsible**
67:15 93:4
166:23
**rest** 289:17
**restaurant**
180:8,9
**result** 271:10
**resulted** 272:6
**retain** 126:16
**retained**
164:21
**retire** 71:5
**return** 44:2
166:8 167:21
167:24 168:9
168:10,16
289:3
**returned** 109:9
109:11,12
346:15
**returning** 35:2
170:25 178:6,8
196:17 203:19
**returns** 32:9,14
32:17,19 41:12
161:23 319:3
**revealed**
161:15
**revenue** 341:13
341:14

**reversed**
274:11 297:13
306:22
**review** 7:8,15
18:7,10,11
66:24 93:15
308:1 345:9
346:9
**reviewed** 7:5
19:6 241:9
269:6
**revocable**
254:4
**ricci** 31:25 32:2
32:3 33:7
34:14,19,22
324:21
**ridic** 299:14
**ridiculous**
282:25 283:4
288:14 291:5
292:6
**ridiculously**
299:2,3
**right** 5:25 8:17
9:4 12:2,19,24
14:3 15:20
16:5 28:1,7
32:25 33:18,18
33:20 35:1
38:10 39:23
41:3 43:11
51:21 52:15
58:11 62:22

64:16 66:1
67:14,21 68:9
71:25 73:20
75:21 76:2,3
79:8 81:8 85:6
86:16 91:7
94:7 98:22
99:5 100:9,10
101:3 102:24
104:16 109:6
111:10,13,22
116:3 117:13
117:19 118:10
119:17 120:13
120:18 121:3
122:15 123:15
124:19 125:18
129:11 133:4
133:19,21
134:6 136:10
139:17,19
140:25 145:15
149:16,25
150:5 151:22
152:3,4,8,11
156:21 162:2
163:10 166:7
166:25 167:19
168:22 169:1
170:5 171:2,9
172:21 175:8
177:6 181:10
182:9,18
189:22 191:10

191:10,11
194:2 195:11
195:12 196:9
198:20,22
199:13 200:13
200:21,23
201:4,19 202:2
202:3,7 203:8
205:1,12,13
208:21 210:16
225:22 226:6
226:12 230:24
232:12 233:11
234:5,25 238:9
240:25 246:18
249:5 250:18
253:8 254:13
255:11,14
257:11,20
267:21 269:14
269:21 270:23
271:2,17 272:3
276:2,13,14
279:5 280:12
280:14,16
281:12,14,17
284:12,23
286:14 287:8
292:25 294:5,7
294:15 295:16
296:12,15
297:13 300:17
300:17,17
301:2 303:16

305:11 306:18
313:2,16 314:8
314:10,17,21
318:16,19
326:16 329:1
334:21 339:14
340:11 342:5
**rightful** 158:7
**rights** 11:4
**ring** 181:23,24
182:8,8,10,12
182:12,13,14
182:14,15,15
182:16 190:5
194:18 287:1
288:9,20 289:4
289:6 290:6,23
291:17 298:15
301:9,16
**rings** 181:20,21
181:24 182:3
194:19 286:20
286:21 287:21
288:10 289:7
290:6,9 291:2
291:7,19,20
292:12,14,24
293:1,16 294:6
294:14,22
295:21 296:9
296:11 297:12
297:19 298:2,6
298:12,19
299:20 300:20

301:6,7,22,25
302:2,13 303:2
303:21 304:5
305:9,13,15
308:25 309:7
309:25 310:7
328:9,11
**ripped** 203:5
**road** 75:1
133:10 135:6
136:21,24
238:7,8,10,15
**robert** 90:20
**role** 10:5 21:5
31:14,19 33:9
34:2,3,4 35:2
36:18 39:5
41:16,16 56:16
288:23
**roles** 21:6,15
21:20 36:20
46:22 51:6
56:12
**roman** 17:25
66:9
**ronkonkoma**
194:19
**room** 65:13
194:21 208:11
**roseland** 2:16
**rosen** 92:19,22
108:25 109:10
109:14 124:10
124:11 126:3,5

126:9,16
136:21 137:4,7
**roughly** 73:3,5
**round** 231:18
231:22
**routine** 72:14
265:25
**row** 289:25
**rpr** 1:22 344:18
345:20
**ruby** 1:3 4:12
**rudely** 217:11
**rudolph** 1:6,15
3:3,12 4:11,13
5:3,7,22 17:9
19:13 38:17
47:15 49:17
55:14 65:18
133:9 135:6
140:6 156:7
204:20 255:24
327:8 343:16
344:7 345:8
346:3,6 347:6
347:14 348:25
**rule** 307:10
346:22,23
**rules** 40:12
214:24 217:13
218:8 235:8
346:16
**rumble** 56:20
**run** 5:18 63:4
89:25 305:20

306:3,4 307:18
**running** 73:22
291:15
**runs** 19:21
311:1,5
**ryan** 19:16,18
19:19 20:9
21:21,21 22:13
22:13 23:23
28:14,14 29:4
29:9,19 30:5
30:17 31:13
33:21 34:13
37:17,19,21,25
38:5,6,7,8,8,9
38:15,20 39:20
40:3,24 41:1,3
41:6 45:19,25
51:16 53:19
55:7,7,7,10,10
55:20 56:15
58:5 169:8,24
172:1 188:21
194:7 195:20
196:3 198:3,3
198:5 200:20
201:12 203:10
310:20 311:1
312:1,3,3,6
315:20,20,22
319:8 320:14
322:22 325:21
326:4,5,6,8,9
326:11 330:17

331:6 333:15
334:19 335:1
336:15,18,20
336:20,21,22
336:23,23,24
336:24 337:10
338:6,20,21,23
341:3,20
342:10
**ryan's** 35:2
36:20 38:16
259:24 260:3
**ryans** 312:4

**s**

**s** 2:1 156:8
**safe** 288:24
289:4
**safekeeping**
289:17 290:13
**safer** 260:11
**safest** 115:25
**safety** 21:10
51:1
**salaries** 41:13
51:11 341:23
**salary** 36:24
37:3,8,18
51:10 313:5
335:7,8,9
338:5 342:10
**sale** 77:24 78:9
79:20 88:7
89:13,17,22

112:16 116:2
208:1,2,19
209:11 215:12
234:25 272:20
272:23 309:8
**samaritan**
244:11
**sample** 278:15
**sandler** 2:15
5:5
**satisfied** 95:9
211:14
**satisfy** 90:10
91:5
**save** 204:4,8
**saved** 204:6
**saw** 184:25
191:2,6 192:19
192:25 242:7
329:18
**saying** 52:17
61:14 64:24
101:20,22
102:2 139:11
197:3 207:21
209:13 214:8
214:14 215:16
**says** 14:12,17
19:8 38:16
47:13 49:15
55:13 63:6
66:9 79:4,7
85:12 86:16
91:14 93:6,8

93:25 95:17
99:21 100:4,6
102:23 105:13
105:14 117:2
118:15,23
119:1,18
120:10 121:18
125:19 128:18
129:13 131:9
131:21 133:8,8
133:21 135:8,9
137:12 147:5
219:2 220:6,15
220:19 222:5,5
230:20 233:10
276:10 277:1,6
**scanned** 109:9
109:11
**schedule** 202:6
210:6 249:1
**scheduled**
18:19
**school** 9:1 49:9
135:12 181:23
182:10,12,13
**schumacher**
180:17,17
342:9,11
**scott** 2:15 5:4
**scroll** 141:8
**se** 145:6
**seal** 344:11
**search** 132:15
132:17,21

**searched** 133:1
**searching** 39:5
**season** 33:12
**seats** 288:15
**second** 38:14
56:19 75:18,19
118:3 119:13
144:4 175:13
180:9 181:8,9
191:18 206:17
228:7 236:16
238:7,10
282:13
**secretary** 31:4
31:4,17,17
244:18 291:11
**section** 205:25
**secure** 295:1
**security** 21:11
50:17,22 51:1
96:19,21 97:6
241:22 253:12
254:2
**see** 17:17,23,25
18:6 19:8,13
29:5 50:4
51:22 53:14
66:21 68:8
76:6,12 78:19
79:8,14 82:10
84:7 91:25
92:6 95:16
99:21 100:4
105:6,14 107:5

117:2 118:5,12
118:21 119:6,8
119:14,25
120:4,9 124:7
124:17 125:18
125:20 127:9
128:17 132:10
132:10,15
133:7 134:16
134:19,20
154:7 155:18
157:10 162:1,2
162:4,21
170:10 172:9
172:23 176:14
179:11,22
181:17,19
189:2 195:4,15
198:8,8,14
203:2 205:13
231:11 233:6
239:22 240:14
242:7 243:8,10
244:2 276:10
277:1 279:16
**seeing** 262:2
**seek** 268:12
271:10
**seeking** 142:22
143:2,21 144:5
144:8,16
145:25 147:3
149:10

**seem** 25:18
81:7 97:14
103:4 123:15
160:1 166:11
171:10 172:21
184:5 189:7
195:2,2 225:21
**seemed** 129:15
158:15 183:9
221:19 234:12
**seems** 77:11
100:11 103:17
106:6 127:19
138:6,21
147:15 170:9
170:21 171:11
192:24 193:19
199:5 200:12
214:3 221:19
275:14 295:6
**seen** 53:12
189:14 244:4
296:18
**select** 232:13
**self** 189:22
**sell** 39:1 60:8
80:11 81:8
86:9 88:11
116:3 208:7
232:19 267:16
267:20,21,21
272:16 273:6
273:15 292:8
292:11

**selling** 80:23,24
83:17,23
116:11 172:2
232:18 233:1,4
234:2 268:10
**senator** 58:19
**send** 34:22
42:19 43:13
44:1 59:5
60:25 150:2,5
164:13 174:25
176:19,20,25
177:7,14,17,18
263:17,18,20
263:21,24
264:3 308:5
**sending** 58:7
184:16
**sends** 55:11
**sense** 11:25
28:25 101:15
257:9 271:23
271:24 294:24
**sensible** 233:3
**sensitive** 4:4
250:15,16
**sent** 57:24 58:1
58:23 59:1
92:8 119:8
149:21 150:8
150:10,15
151:5,16,19
175:4,5 176:25
177:11 195:19

251:20 260:10
260:11,13,17
286:25 287:4
288:4 289:6
**separate**
121:24 134:7
149:2 205:4
254:8 339:7
**sept** 201:11
**september** 73:7
74:12 75:2
132:14 191:6,7
191:10,21,25
192:5,7 194:9
234:17,18
331:15
**series** 61:20
178:18 286:20
286:21 287:20
289:21,22,23
299:19 308:24
309:25 310:7
328:9,11
**serious** 14:4
80:23
**seriously** 14:3
49:1 54:9 56:7
63:22,24
**served** 9:6 17:6
17:14 18:8
19:6 198:12
**service** 11:6
184:16,16
242:24 245:9

260:19,24
**services** 50:21
**set** 17:5 61:3,9
61:12 62:16,18
62:18 196:10
243:1 248:17
258:25 259:12
311:23
**setting** 172:4
**settlement**
76:20 86:19
**settling** 83:24
**setup** 242:25
**seven** 8:20 20:8
53:20 312:19
**several** 39:7
51:7 73:16
96:1 112:2
115:7 125:17
220:16 223:13
224:18 288:9
**share** 314:19
335:15,20,24
336:2,6,9,12
**shared** 310:8
**shares** 87:5,12
88:2 250:25
**sharp** 6:16,16
285:22
**she'd** 40:4
169:15 316:13
**sheet** 3:6
346:11,13
347:10 348:1

**shock** 308:20
**shooting** 60:12
**shopping** 80:18
80:19 81:14
82:7 83:21
**short** 173:19
204:12 255:16
332:4
**shortly** 61:12
152:22 246:11
246:13,15
250:3
**show** 21:17
23:4,6 45:4
56:18 57:12
60:21 62:8
63:8 86:3
104:1 113:20
152:20 153:15
154:13 155:10
170:19 180:5
199:10 200:18
203:11 237:5
238:20 241:1
248:8,8,22
258:25 313:25
339:8
**showed** 95:14
225:4,5 293:17
302:9 303:17
330:12
**showing** 57:15
181:6 225:24
240:3

**shown**  199:25
241:8
**shows**  56:12,18
70:2 108:11
117:17 118:18
121:13 152:22
154:19,19
157:2,7 163:14
163:21 169:2
178:24 198:25
248:12,14
**shredding**
189:23
**sic**  4:13
**side**  133:19
**sign**  14:16
68:23 86:5
129:10 268:24
269:19 346:12
**signatories**
312:2
**signatory**  312:7
**signature**  91:25
128:17 158:4
269:10 344:17
345:19
**signed**  76:16
77:11 81:6,7
92:8,8 94:23
94:24 108:19
108:24 109:5,7
110:7 124:6,7
124:17 125:9
129:4 226:4

269:1 329:14
346:18
**significance**
200:5,25 201:2
201:3,13
**significantly**
299:1
**signing**  109:3
125:14 129:5
269:4 270:4
313:23
**similar**  201:6
**similarly**
273:22
**simple**  283:24
**simplify**  59:5
**simulcast**
290:22
**simulcasting**
61:23
**simultaneously**
7:25 15:18
19:1 27:2
43:16 58:14
88:18 134:10
145:12 148:22
216:17 217:7
221:7 224:7
229:17
**single**  316:18
**singular**  76:16
**sir**  6:1,8,17,21
6:24 7:16 12:7
14:9,16,20

16:13,21 19:15
19:17 30:2
54:4 56:6,8
63:21,23 65:3
65:5 66:3 69:4
96:11 201:15
205:16 246:8
261:7 272:25
325:14 327:17
328:12,18
329:13 342:23
**sit**  124:25
151:4 156:17
183:24 232:2
287:8 289:8
316:3 327:14
343:4
**sitting**  127:5
131:3 181:18
198:24 202:8
202:10,13
203:4 226:25
227:15 240:6
264:11 276:21
278:7,9 280:12
280:14 281:14
305:2 327:25
328:3,9 332:6
343:4
**situation**
115:12 164:4
164:19 166:12
176:16,17

**six**  9:16 15:18
37:16 53:20
80:20 81:17
83:15 87:14
94:8 111:25
164:16 244:12
250:1 251:5
253:23 265:3
293:3 312:19
**size**  299:16
316:9 336:12
**skyline**  194:11
194:16
**slept**  237:5,20
**slightly**  73:24
**small**  171:2,4,7
171:8 278:15
**smoke**  83:7,8
232:3
**social**  22:1
253:12 254:2
**sofa**  189:24
**sold**  77:20,22
78:4 84:4
90:16 116:12
116:14 184:18
208:22 210:25
232:22 268:3
271:11,15,19
271:22 272:7
292:9
**sole**  33:7 77:6
318:17

| | | | |
|---|---|---|---|
| **solely** 89:9 | 85:17,18 89:1 | **source** 332:13 | 66:4 88:18 |
| **solutions** | 89:4,5 95:19 | 339:12 | 89:3 114:9 |
| 346:21 | 98:7 105:8 | **sources** 323:16 | 134:10 143:2 |
| **solve** 136:18 | 133:20 154:4 | 337:9 | 145:12 148:22 |
| **somebody** 16:3 | 155:19 182:11 | **south** 16:11 | 213:25 216:17 |
| 31:12 42:25 | 196:12,16,19 | 69:16,20 74:7 | 217:7 221:7 |
| 43:20 109:23 | 206:20 216:15 | 74:10 75:3,5 | 224:7 229:3,6 |
| 126:25 150:2 | 216:16 240:2 | 83:1 87:3 | 229:14,17,19 |
| 150:18,21 | 254:16,17 | 119:15 128:19 | 301:21,23,25 |
| 157:23 176:18 | 258:18 293:8 | 131:19 150:6 | **speaks** 137:20 |
| 177:13,16 | 324:21 332:17 | 151:6 157:8 | 137:21 147:9 |
| 184:1 241:25 | **sort** 42:23 | 162:18 163:14 | 148:4 |
| 258:3 260:8 | 60:22 61:25 | 163:22 179:24 | **special** 31:17 |
| 264:24,25 | 73:1 74:1 | 184:4,5 187:17 | 201:16 243:1 |
| 265:7,12 291:6 | 80:23 90:25 | 208:12,12 | 258:11 289:5 |
| 296:23 307:5 | 106:5 149:19 | **southern** 1:1 | 289:19 291:11 |
| **somebody's** | 176:2 177:5 | 9:7 12:15 | **specialists** |
| 258:9 | 197:5 208:4 | **sox** 289:24 | 291:20 |
| **someplace** | 232:25 242:13 | **span** 197:2 | **specials** 21:19 |
| 264:10 | 263:16 297:13 | **spans** 66:18 | **specific** 27:5 |
| **somewhat** | 300:25 311:10 | 68:9 76:7 | 34:25 48:15 |
| 41:21,22 | 324:9 | **speak** 7:18,21 | 50:7 126:19 |
| **son** 184:23 | **sotheby's** 78:21 | 7:24 8:3,4 20:9 | 303:9,11 |
| 296:25 | 79:4,7,19 80:8 | 20:17,23 21:2 | **specifically** |
| **son's** 292:11 | 81:4 84:10,13 | 36:7,12 43:12 | 48:7 76:14 |
| **soon** 77:19,22 | 94:24 | 48:1 57:1,3 | 169:3 231:12 |
| 78:4 112:21 | **sought** 152:23 | 307:20 314:1 | **specify** 18:15 |
| 115:23 | 273:23 298:9 | **speaker** 36:11 | **speculate** |
| **sorry** 9:18 | **sound** 194:13 | **speakers** | 136:12 |
| 18:20 46:7 | 306:18 | 316:18,25 | **speech** 36:6,14 |
| 47:13 53:3,4 | **sounds** 12:2 | **speaking** 7:25 | 203:20 |
| 59:4 64:7 | 61:14 98:22 | 19:1 27:2 36:8 | **speeches** 36:16 |
| 66:13 69:2,4,7 | 255:4 | 36:11 43:16 | 72:22 340:3 |
| 77:21 82:18 | | 48:11 58:14 | |

**spend** 60:5
71:13 170:11
236:4
**spending** 331:7
**spends** 317:8
**spent** 73:20
74:7,14,17,19
74:25 77:16
80:17 169:21
176:15 192:16
231:6 236:9
239:6,17
257:11,11,12
257:13,13
292:8
**split** 316:16,19
**spoke** 7:23,24
8:6 146:1
**spoken** 40:25
281:7
**sporadic** 29:8
70:12 73:6
132:20
**sporadically**
7:17 40:1
**spring** 160:2
286:22 287:17
**st** 344:4,12
345:4
**stab** 9:5
**stadium** 291:4
291:7
**staff** 10:2,9
43:7,8 44:17

44:20,21 45:13
45:19,25 46:8
46:13 83:4,4
**stake** 316:9
**stamp** 85:14
**stamped** 76:3
**stamps** 68:11
76:9
**stand** 110:17
**standard** 19:20
21:5 29:24
37:11,15,18,21
37:24 38:10
41:4 50:24,24
54:17,20,21
55:2,10 64:8,9
64:18,19
253:24 310:11
310:11,19,22
310:25 311:8
312:12,17,21
312:25 313:11
313:22 314:11
314:14,15,23
315:1,4,15,18
315:25 317:2,5
324:3 325:12
326:12 334:4
335:4,18 336:9
336:15 337:16
338:2,12 339:6
339:10,11,12
339:15 340:18
340:21 341:14

341:17 342:4,8
**star** 135:9,12
135:13
**start** 86:12
168:7 172:21
206:4 234:13
244:7 256:9
**started** 61:11
62:7 80:24
184:10 187:2
207:4 209:24
214:8 234:6
244:8 299:5
**starting** 18:1
164:20 170:21
232:14 239:23
295:13
**starts** 161:17
168:8 182:21
187:6 240:3
**state** 1:22 5:20
94:9 99:22
100:5 114:24
123:9 128:23
134:17 135:12
135:14 136:19
154:21,24
155:10 158:10
160:22 219:2,8
230:20 344:3,7
344:12,19
345:3 347:3
**stated** 343:8

**statement** 59:2
225:20 239:5
**statements**
151:5,9,10,16
182:22,25
186:12,15,18
186:19,22
187:16 196:11
197:2,12,21
199:25 241:8
347:8
**staten** 2:12
346:5
**states** 1:1 11:18
11:19 128:24
161:13 328:14
328:17,19,22
329:5
**stating** 209:21
**station** 249:10
**status** 54:14,14
221:16
**statute** 346:16
**stay** 70:12,20
72:17,19
171:16 239:1,2
275:11 308:11
**stayed** 171:15
171:18 173:15
**staying** 70:10
**steinbrenner**
286:25 287:17
**steinbrenner's**
289:1

**[stenographic - summarize]**                                           Page 72

stenographic
  345:11
stenographic...
  345:8
stents  243:25
step  223:11
  228:7,8
steps  88:2
  211:4 213:5,8
  214:22 215:24
  220:13 226:10
  226:12,16,17
  227:1,13,22
  235:24,24
  272:6 330:6
sterling  62:3
steve  342:10
steven  180:17
  180:17 342:9
  342:11
stick  79:2 209:9
  215:10
stone  299:12
stop  67:23
  255:13
stopped  290:1
  290:2
stopping  65:8
  255:12
storage  187:9
  187:11 188:16
  190:16,18,18
  190:25 194:11
  196:2,18

stored  194:16
story  228:15
  303:6 308:24
  309:6
straightened
  247:8
strange  171:11
streaming
  60:20 61:1,11
street  2:5,11
  16:19 79:20
  133:22,25
  137:9 157:14
  186:2 259:19
  259:23 260:13
  329:22 346:4
strengthened
  104:22
strike  18:13,16
  30:15 37:14
  43:4 47:11
  107:10 151:21
  160:10 169:22
  185:25 245:4
  255:3 268:9
  296:7 308:22
  314:24 325:3
  325:16 332:17
  333:2 334:16
strong  161:9
  222:18 284:7
studied  98:10
  112:2

studio  60:16,18
  61:4,4 62:17
  62:18 172:5,6
  172:7,10,11,12
  237:14 242:21
  242:22 248:17
  248:19,24
  249:1 279:3
studios  249:14
study  98:14
  111:4 231:10
studying
  110:12 209:24
stuff  189:16,18
  189:19
stupid  283:21
  324:14
subject  55:19
  218:9 303:13
subjective
  153:16 158:18
subjectively
  216:6
submit  98:9
  105:23 199:6
  260:23
submitted
  106:4,12
  108:20 128:13
  130:10,15
  135:23,24
  198:11,19
  221:10,14,23
  223:13 224:18

225:2 227:10
submitting
  130:13
subscribed
  347:16
subscription
  184:2 262:19
subsequently
  327:19
subsidiaries
  51:14
substance  66:2
  141:10 143:13
  147:11,23
  204:24 303:22
  348:23
substantial
  73:15 74:17
substantially
  142:23
substantive
  140:22 145:11
  200:13
sufficient  104:1
  223:6
suggest  204:12
suggested
  346:15
suggesting
  271:14
suit  291:23,24
  291:24
summarize
  207:20

**summation**
  282:3
**summer** 73:21
  124:22 169:16
  170:12,16
  171:1
**summers** 74:7
**summertime**
  258:23
**sunday** 203:20
  248:8
**supervise** 10:24
  11:17
**supervised**
  11:1,5
**supplement**
  168:13 286:4
  286:10
**supply** 261:9
**support** 107:12
  153:4,21
  308:23 309:6,9
  309:12,16,24
  310:4 340:6
**supported**
  102:16,25
**supporter**
  161:9
**supporting**
  161:5
**supposed** 278:5
  339:10
**sure** 11:22
  12:14 15:14

16:7 21:4
22:15 29:14
30:7 34:23
36:24 46:17,17
48:10 51:11
58:4 59:4 61:3
63:11 65:9
67:1 92:10
93:4,15,16,16
93:20,24 94:20
100:16 101:4
109:12 112:8
117:22 119:3
119:18 120:19
126:7,8 129:14
130:5 134:14
139:15 150:1
150:20 152:4
159:12 160:5
160:13 161:4,5
164:5,10,12,23
165:15 167:4
167:10,21,23
170:3 175:6
176:3,19 177:1
181:22 189:13
192:2 193:8
196:13 197:19
199:12 204:13
206:19 210:18
211:11 217:23
223:21 224:25
230:6,7 231:16
235:2 236:6

238:24 239:13
246:22 247:15
247:19 248:5
249:23 251:24
252:9 254:13
255:7,8,18
257:1 259:22
260:20,25
262:23 264:24
268:1 270:14
271:17 276:4
277:8 278:2,7
278:13 280:5
281:11 283:17
284:25 286:7
292:23 293:4,4
293:10 302:24
302:25 306:13
306:13 310:13
313:12 315:2,2
315:12 316:10
318:10,12,25
321:22 335:12
337:3
**surprise** 308:10
**surprised**
  106:11 113:25
**surprisingly**
  157:19
**surrounding**
  246:17
**suspect** 48:22
**swear** 4:20

**switched**
  157:19,20,23
  158:4,4,6
  340:18
**sworn** 5:9
  14:15 344:9
**system** 340:19

**t**

**t** 217:13
**tab** 205:2
**table** 118:18,21
  118:25 120:1
  145:24
**tables** 119:14
**tag** 103:10
**take** 4:8 7:3
  14:2 25:10
  49:1 53:5 54:8
  56:7 57:10
  63:22,24 65:11
  69:2,5 82:25
  98:7,10,12,13
  110:12,14,19
  110:20,21
  111:20 117:21
  148:3 149:5
  167:5 175:14
  183:21 204:12
  209:25 213:4,8
  213:10 220:13
  226:11,16,18
  235:23,25
  243:19 255:16

**[take - television]**                                                    Page 74

272:6,20 288:5
289:14,15,16
301:18 312:16
313:5 319:6
320:11,16
324:7 326:15
326:19,21
330:6 334:9
347:19
**taken**  1:21 4:11
33:9 63:7
65:16 69:10
82:16,18 99:7
140:4 180:15
180:16,16
192:10 202:19
202:22 204:18
213:5,9 223:11
227:13,22
233:10,11
255:22 291:6,8
298:3 300:12
318:23 327:6
**takes**  284:6
**talent**  311:6
341:9 342:14
**talk**  12:25
16:17 18:14
20:18 33:11
48:13 50:7
85:20 143:8
148:12,15
171:15 178:14
307:13 316:3

**talked**  7:5
48:14 52:20,24
53:1,7,8,18,19
65:23 78:5
81:4 199:15
275:1 277:16
278:14
**talking**  9:17
16:6 17:1
18:15 59:22
75:23 86:18
122:1,2 148:10
226:7 230:23
237:24 293:14
302:2 313:20
324:21
**talks**  52:25
**tampa**  287:18
**tangible**  153:15
155:11,12
158:18
**tax**  32:8,14,14
32:17,17,19
33:19 41:12
85:13 89:25
91:5,9,15 95:8
95:10,14 96:3
96:9 102:10,17
103:1 104:9,15
104:23 105:1
105:13 106:3
106:23 107:4
112:5 117:1,16
117:18,18

118:4 119:2,4
119:20,24
120:12 121:3,9
121:11,14,15
123:10,12,14
123:17 127:18
129:23 130:8
130:14,15,16
131:6,9 132:3
135:8,10,12
159:22 161:22
162:9,9 166:8
166:12,13
167:21,24
168:9,10,16
221:14,15,24
222:12,13
223:5,17
224:21 225:11
225:16 226:1
227:11,11
292:10 319:3
323:11 324:6
**taxation**  134:17
**taxes**  33:22
72:4 117:14
118:3 162:9
**taxing**  130:10
221:11,16,23
223:4,24
**technical**  69:5
**technically**
19:20 38:3
58:3 207:12

297:14 318:10
320:13
**technological**
56:14
**ted**  22:12 23:9
29:4 36:15
37:10 41:6
42:18 44:23
45:3 55:8
56:11,11,22,23
56:24 57:1,10
57:11 58:8
59:3,5 60:20
60:22 61:9
62:6 110:2
169:9,24
175:11 179:16
180:10,15,22
193:7,8 200:22
203:10 241:16
241:17,18
244:24 261:3,5
331:9 332:16
332:18,19,22
333:13 336:2,6
336:9 337:5
341:20 342:3
**ted's**  332:20
**telephone**
35:12 45:7
**television**  21:19
189:24 243:2
245:15

**tell** 14:22,25
15:1,4,7 16:2,2
48:22 53:9
55:20,21 58:16
61:18 69:17
80:8 91:12,13
108:4 128:10
136:16 143:17
143:18 144:15
146:21 156:23
164:2,12
169:18 175:6
179:7,9,21
181:20,25
188:3 192:20
197:7 199:17
199:20 201:24
202:18,21,24
206:3 209:12
215:15 239:16
240:20 241:23
248:6 273:12
273:13 275:1
283:5 286:13
287:15 295:19
295:19,22,24
303:6 307:4
315:20,21,22
**telling** 131:25
229:23 263:17
274:11 276:21
284:22 302:2
317:6

**tells** 311:6
**temporarily**
256:18 258:23
**temporary**
172:4,4 173:7
178:9 257:24
**ten** 201:20
246:3 255:13
257:6 335:23
336:13
**tend** 316:14
**tennessee**
191:15
**tenth** 218:5
**term** 75:8
184:15
**terminate**
249:19
**terms** 35:3
112:10 339:20
**terribly** 170:9
**test** 98:8,8,10
98:12,13
110:12,14,20
110:20,22
111:19,20
210:1
**testified** 5:9
15:19 46:7
58:22,25 97:25
98:3 123:23
193:1 211:2
223:22 224:3
224:17 276:6

293:7,11,15,24
295:14 304:13
305:12
**testify** 14:24
15:1,3,16 40:3
40:4 47:14
48:21 49:16
54:5,6 55:14
56:4,5 63:7,10
63:19,20
123:17 179:17
180:11 199:14
**testifying** 15:17
122:4
**testimony** 6:6,7
6:10,13,20
38:17 43:25
65:22 66:2
123:22 140:10
140:10 142:8,9
142:10,16
144:6 145:11
146:13 147:11
147:23,25
148:25 152:25
156:13 180:23
204:24 211:14
215:4 225:6
274:21 282:7
285:20 294:13
313:15 323:3
327:12,15
337:14 342:21
346:10,15

**texas** 125:12
150:9
**text** 44:5
**thank** 5:16,24
17:12 63:5
75:21 80:1
86:8 122:19
123:12 155:7
205:8 226:8
231:1 292:22
337:8 343:12
343:13
**thanks** 8:15
**theodore** 56:9
56:10 310:20
**thing** 38:24
58:4 78:7
83:25 117:2
166:8 171:10
174:8 188:10
194:23 209:9
215:11 222:12
226:21 234:11
237:4 238:24
242:19 250:18
268:6 277:11
289:6 297:13
300:4 308:15
340:1 341:12
**things** 21:1,16
25:19,20 32:9
38:23 39:17
42:1 50:13
63:16 65:23

| | | | |
|---|---|---|---|
| 67:24 83:14 | 60:4 61:16,19 | 203:10 205:2 | 309:14 310:9 |
| 85:15,22 103:8 | 72:1 75:13 | 208:14 210:1 | 311:12,21 |
| 106:19,20 | 81:13 83:19 | 210:13,15 | 312:23 313:23 |
| 123:22,24,25 | 84:16 88:13 | 211:10,18 | 314:13,13,13 |
| 153:15 164:16 | 90:15 92:7,17 | 213:22 214:7 | 315:14 317:7 |
| 177:24 178:11 | 92:20 93:19 | 214:19 216:12 | 318:8,8 321:14 |
| 183:20 184:17 | 95:6 102:3,4 | 217:22 222:17 | 323:3 324:10 |
| 190:25 192:24 | 102:16 106:18 | 222:25 227:21 | 325:9 327:18 |
| 198:4 211:24 | 107:4,17 | 235:12 236:8 | 327:20 328:1,4 |
| 220:16 226:24 | 116:22 118:7 | 237:15 238:1 | 328:6 330:17 |
| 231:6 232:10 | 119:10 126:2 | 239:8 245:7,9 | 333:5 335:5,11 |
| 235:18,18 | 130:20 136:6 | 247:5 249:20 | 335:21 336:25 |
| 237:3 246:2 | 139:20 140:17 | 251:25 252:2 | 337:12,18,18 |
| 260:10,16 | 140:19 141:9 | 256:20 264:16 | 337:19,20 |
| 263:15,20,21 | 141:19,20 | 265:9,14,22 | 338:4,4,9,18 |
| 263:24 269:25 | 143:6,9,19 | 267:12,13 | 338:19 339:17 |
| 270:10,25 | 145:1 153:5 | 268:14 269:11 | 339:17 341:8 |
| 278:2,23 279:2 | 155:8 159:6,18 | 270:10,19,20 | **thinking**  82:3 |
| 280:6,6,8,10,19 | 159:19 160:5 | 273:3 275:21 | 185:18 208:17 |
| 281:6,23 | 161:2,2,3 | 277:19 278:14 | 209:25 220:25 |
| 282:19,21 | 164:14 165:22 | 278:21,22 | **third**  10:21,23 |
| 283:5,9,12 | 166:16,20,22 | 279:5,14,25 | 23:3,15,22 |
| 284:8 285:3 | 171:12 172:2 | 280:20,23,25 | 75:20,21 99:25 |
| 298:13,16,16 | 175:2 177:5,7 | 281:8,12,14,17 | 100:1 119:25 |
| 302:16,22 | 178:25 179:17 | 282:4 283:17 | 144:11 238:7 |
| 304:23 314:3 | 180:10 183:15 | 285:3,4,16 | 246:21 |
| 321:24 324:4,9 | 183:22 188:13 | 286:13 287:1,2 | **thought**  38:2 |
| 326:7 339:21 | 189:14 191:23 | 290:15,20,23 | 71:4 78:6 81:7 |
| **think**  7:6,16 | 191:25 192:4 | 291:2,6 293:7 | 83:18,18,23 |
| 32:6 34:10 | 194:23 195:24 | 295:14 298:8 | 85:17 86:15 |
| 36:5 38:4 42:4 | 196:4 198:15 | 298:10 300:22 | 94:8 98:7 |
| 48:24 51:20 | 198:21,22 | 302:21,24 | 104:6,21 |
| 56:1,2 57:20 | 199:22 200:13 | 304:12,20 | 106:16,18 |
| 58:13,22 59:19 | 201:8,19 | 305:12 307:19 | 108:1 112:9,10 |

| | | | |
|---|---|---|---|
| 116:3 188:9,11 | 296:11 297:12 | 86:2 93:18,21 | 236:4,9 238:19 |
| 208:2 210:8,9 | 297:19 298:2 | 93:22,23 94:23 | 239:6,17 246:5 |
| 233:17 264:6,9 | 299:19 300:11 | 94:23 96:17 | 247:10 252:5 |
| 271:25 272:12 | 305:9,13 309:7 | 97:21 98:24,25 | 252:15 253:3,9 |
| 272:19 279:8 | 309:25 315:25 | 101:21,25 | 255:19,24 |
| 279:19 291:5 | 330:13 331:13 | 102:17 103:1 | 257:13 258:22 |
| 301:18 316:19 | 331:16 | 105:9 115:15 | 258:25 259:3,8 |
| 316:20 326:23 | **throw**   204:3 | 116:1 118:11 | 264:4,5,6,8,12 |
| 327:22 330:11 | **tickets**   169:13 | 126:19 134:11 | 264:15 269:8 |
| **thousand**   15:15 | 200:19 240:25 | 140:2,7 141:19 | 269:16,16 |
| **thousands** | 241:4,5,8,18 | 144:11 146:9 | 271:8 279:4 |
| 12:13 282:21 | 288:18 | 151:21 154:3 | 287:2 288:16 |
| **threat**   241:23 | **time**   1:13 4:6 | 157:17 158:23 | 290:15,17 |
| **threats**   96:21 | 5:16 8:22 9:21 | 159:2 163:22 | 295:1,9,14 |
| **three**   9:17 | 28:4 30:8 | 165:7 166:11 | 297:24,25 |
| 21:17 33:9 | 31:18 32:23 | 167:22 168:12 | 301:10 303:8 |
| 40:1 59:25 | 36:9 37:17 | 169:21 170:11 | 303:10,14 |
| 70:19,22 76:7 | 38:11 39:7,16 | 176:6,15,24 | 309:3 316:24 |
| 117:24 124:1 | 39:23 40:22 | 177:7 183:10 | 317:8 319:25 |
| 147:20 156:1 | 48:18 50:6,16 | 183:25 184:10 | 327:4,9 329:17 |
| 164:8 197:16 | 53:6 54:17 | 191:2,6,13,18 | 330:1 343:1,14 |
| 200:5,8 207:22 | 56:23 57:8 | 192:1,19,25 | **timeline**   292:23 |
| 208:20 209:7 | 60:4,5 62:11 | 193:2,9,12,24 | **times**   9:17,18 |
| 215:9 232:12 | 62:14,15,20 | 196:1 204:16 | 13:22 35:21 |
| 233:20 235:21 | 63:3,18 64:23 | 204:21 207:21 | 39:4,14 45:11 |
| 238:19 240:22 | 65:14,19 67:7 | 208:16 209:4 | 46:20 64:13 |
| 247:9 249:2 | 69:8,11 70:10 | 210:7 211:23 | 112:2 113:8,11 |
| 259:14,16 | 70:13 71:2,8 | 212:4,17 214:5 | 121:6 144:13 |
| 262:15,21 | 71:12 72:21 | 215:6 216:24 | 146:10 147:14 |
| 263:12 265:23 | 74:15,18,19,21 | 217:25 220:7 | 147:21 164:9 |
| 280:10 285:3 | 74:23 75:1,16 | 220:16 224:8 | 177:17 184:2 |
| 287:5,20,24 | 76:23 77:14,16 | 228:5,23 231:6 | 201:1,20 208:3 |
| 290:6,7 294:6 | 78:15 80:6,17 | 231:7 232:14 | 214:12 223:25 |
| 294:14 296:9 | 82:2,5 84:23 | 232:21 235:20 | 224:2 230:2 |

237:20 262:19
263:24 270:6,7
318:10 320:15
342:12
**tiny**  76:2
**title**  85:12
88:24 89:12
**titled**  91:8
117:13
**today**  5:16 6:6
6:10,13,16,20
8:9,12 16:6
28:4 65:22
87:11 124:25
127:5 131:3
140:23 151:4
156:17 182:4
198:24 199:15
226:25 227:15
240:6 264:11
274:22 276:21
278:9 280:13
282:7 284:13
284:17,18,20
285:1,11,15,15
285:17,21
305:2 327:15
327:25 328:3,9
332:6
**today's**  343:15
**together**  21:16
49:9 66:22
209:2 287:10
289:11 316:23

347:8
**told**  19:5 23:23
27:23 53:21,22
53:23 59:23
60:1 97:9
98:11 106:19
110:13 158:2
190:2,9 210:22
211:22 212:14
212:18,18
232:10 235:1
255:4 260:8
263:18 275:21
280:18 284:2
284:13,15,17
284:18,20
285:1 288:10
289:7 290:21
293:18,22
303:6,20
308:24 309:6
321:10 327:25
**tonight**  242:6
**took**  33:3 39:8
60:9,10 77:12
83:9 88:1
170:24 180:11
180:12,19
183:7,19 190:3
195:21 196:6
208:20 209:1
211:4 214:22
220:13 226:18
226:22 228:8

243:18,24
247:6 279:4
288:22 290:12
296:23 301:13
340:21
**top**  68:11 76:9
79:5,8 93:6,25
99:20,24 120:1
120:3 195:11
**topic**  38:15,20
47:22 49:22
**topics**  38:16
63:9 342:24
**torre**  287:9
**tortured**
161:15
**total**  292:24
293:1 298:23
298:24,25
**totally**  210:24
265:8 271:14
283:8
**touch**  58:7
163:3,6
**touched**  287:25
**tough**  160:22
**towers**  70:19
**track**  29:1
79:16 167:6
168:17 203:7
204:1,2 340:5
340:23
**trade**  82:19
83:25

**trading**  82:20
**traditionally**
153:22
**training**  287:17
**trans**  31:9
**transaction**
35:13
**transactions**
31:10 35:5
**transcript**
345:9,24 346:8
346:18 347:7
348:3
**transfer**  77:3
89:8 187:9,11
188:16 194:11
196:2,17
297:18 298:2
321:18
**transferred**
296:14 305:15
**transferring**
88:10
**transfers**  55:11
**transition**
297:17
**translates**  73:4
235:5
**transmit**  41:24
41:25 42:3,6
**transmits**  42:4
**travel**  35:20,22
35:24 36:2
59:25 60:2

**[travel - two]**                                                    Page 79

72:24 74:25
193:5 198:8
199:2,3,6,6,10
199:24 200:5
239:10 241:1
333:24 334:1
**traveled**  35:23
39:14 74:13
171:14 249:4,6
253:6 259:8
**traveling**  72:23
73:21 132:13
170:20,21
238:5
**travels**  150:18
**trial**  18:2,3,13
18:16,18,19
19:2,9 66:20
66:20,23 67:4
67:5,8 68:2,10
68:25 69:14,18
75:24 76:8
78:17 79:9,14
84:12 85:9,10
91:10 94:12
95:21 114:15
114:21 115:4
116:18 122:16
122:22 123:17
133:7 135:20
135:22 137:17
149:18 151:23
152:7,14,15
154:9 156:22

158:13 161:17
162:12 168:24
174:11 175:9
178:15,19
183:4,5 188:17
196:14 197:14
197:24 198:21
209:8 210:2
215:10 239:21
**tried**  251:16
272:8 274:22
**trip**  193:8
257:10,24
**trips**  60:6
72:17 170:13
170:24 201:17
231:11,18
**trucks**  190:3
**true**  31:11
41:22 129:6,6
129:7,8 149:1
213:23 227:23
269:23 270:2
308:13 328:25
345:11 347:10
**trump**  73:21
142:25 161:10
248:21
**trust**  11:3
254:4 307:5
317:22 339:3
**trustee**  11:18
11:20 306:4,14
306:15,19

**truth**  14:22,25
15:2,4,7 48:22
284:10,11,12
284:13,15,17
284:18,24
**truthandjusti...**
25:4
**truthful**  13:15
**truthfully**
14:19 15:13
40:4 54:6 56:5
63:20 205:17
205:19
**try**  58:7 88:2
105:11,17
166:24 169:9
203:11 208:7
270:25 308:11
308:11
**trying**  44:14
81:9 84:6
105:24 224:11
227:18 228:14
273:6 323:2
**tulsa**  203:19
**turn**  116:17,20
117:24 118:8
118:11 122:15
133:4 156:21
161:16 187:5
194:5,24 195:4
339:9,11
**turned**  111:4
182:14 242:13

292:17
**turning**  197:1
**twice**  191:16
288:25 299:16
316:22 324:25
**twitter**  22:7
**two**  9:17 10:2,9
12:16,18 16:6
17:18,23 23:2
23:21 28:10,14
31:23 32:12
54:25 56:18
60:19 66:18
70:22 72:21
74:20 82:23,24
91:22 96:22
97:1 101:25
114:2 116:22
118:1,2,3
122:3,5 123:5
124:1 148:7,17
148:21 149:2
151:17 155:25
155:25 160:17
171:2,3,6
172:3 173:8,9
180:15 181:20
201:18 206:18
207:24 209:25
210:6,21
231:18 233:17
233:20 235:21
237:20 238:19
238:19 239:4

243:16,16
245:1 247:8
258:8 259:7,14
259:16 263:1
265:23 282:3
285:2,3 290:18
291:14 295:6,8
299:6 304:16
304:23 305:22
305:22 312:4
316:18 324:4
342:12
**tyler** 10:9
**type** 30:20 85:2
85:2 93:12
167:19 269:18
**types** 185:1
280:7,7
**typical** 165:6

**u**

**u** 5:22,23
**u.s.** 260:19,23
**ubers** 334:9,10
**uh** 42:20 68:6,8
82:12 98:16
153:6 168:25
170:6 179:23
182:23 190:13
190:13 201:15
201:15 249:23
249:23 252:18
281:21 294:16
304:25,25

307:25 317:1
339:2
**ultimate** 60:7
**ultimately**
82:15 267:3
277:5,8
**un** 98:16
**unable** 15:13
**unbeknownst**
157:20 287:15
**unbelievable**
161:14
**unbelievably**
158:9
**unclear** 6:22
174:22 303:16
**uncommon**
165:19 177:14
**under** 6:4
14:11,14,21
107:14,21
146:17 205:15
211:15 218:5,8
219:13,13
221:17 222:1
226:12 230:23
233:11 243:5
247:7,20 254:6
254:9,9,22
260:13 269:24
270:3 271:13
271:13 345:24
346:16

**underlying**
170:5
**undersigned**
344:6
**understand** 6:2
6:4,6 12:8,16
13:22 14:2,14
16:8,10,18
17:1 18:15
22:15 40:16
43:24 45:15
58:6 102:2
107:19 117:22
127:1 207:15
209:2 216:8
227:9,18
228:15 230:7
235:10 265:5
271:9,21
**understandable**
265:9
**understanding**
94:3,4 102:12
107:7 113:24
114:18 115:5
115:10 129:3
146:17 153:19
169:5 196:2
197:8 220:9
221:13,22
222:7,8,11
223:2 266:19
267:6,9 268:2
269:9,22 270:4

270:5 271:16
276:7
**understated**
46:10
**understood**
43:15 106:1
178:5
**unfortunately**
160:15
**unit** 4:10 16:12
128:19 137:9
157:8 204:19
**united** 1:1
11:18,19
161:12 328:14
328:17,19,22
329:5
**untruthfully**
15:16
**unusual** 291:1
**upcoming**
203:7
**update** 188:11
247:24
**updated** 247:10
247:16
**upper** 125:18
133:19,21
**usa** 21:5 29:24
37:18,21,24
253:24 310:11
310:12,19,22
310:25 311:8
312:12,17,21

313:22 314:11
314:14,15,23
315:1,4,15,25
317:2,5 325:12
335:18 336:10
336:15 337:16
338:2,12 339:6
341:17
**use** 23:7,12,13
23:22 24:3,4,5
24:22,23 25:2
25:24 26:7,24
28:12,15 42:16
57:5 70:25
71:1,2 79:15
80:15,15 91:4
95:25 153:15
164:24 165:2
165:19 171:5,5
184:11 186:1
198:20 208:8
236:11 237:22
243:17 246:5
251:8 258:9
295:16,20
296:3 301:10
304:4,17
321:15,17
**used** 23:3,15
27:14 36:10
43:19 49:25
62:2 64:23
70:20 71:7
72:9 75:8,9

77:15 83:7,7
88:13 99:8
116:15 171:6
173:8 182:12
184:4,24
187:20 202:15
215:18 231:2
232:6,7 235:12
235:13 236:3
236:14,20
237:16 244:23
244:24 249:2
264:22 288:15
289:8 294:24
303:20 322:21
322:23 323:18
324:1,13
330:16,25
332:7 339:18
341:4,6 346:18
**useful** 281:2
**using** 25:19
184:9 207:15
214:7 243:17
290:3
**usual** 6:16
158:1 268:22
285:22 332:1,2
**usually** 16:3
35:12 44:7
45:7 72:15
115:9 253:10
289:19 297:8
319:20 321:23

334:12
**utilities** 95:15
177:10 331:18
**utilized** 25:21

## v

**vaca** 71:10
**vacation** 70:25
71:8,11,18
75:8,13,14
**vagabond**
124:23
**vague** 101:3
**valorem** 117:14
**valuations**
291:14 300:5
**value** 288:11
288:12 291:22
292:6 314:3
**valued** 291:21
321:5
**vanessa** 171:25
260:6
**varied** 72:13
**various** 263:23
**vast** 180:14
**vehicle** 103:10
110:16 153:25
154:1,2,6
155:21,23
156:5,7,12,18
**verbally** 293:8
**verify** 346:10

**veritext** 4:16,17
346:13,21
**veritext.com**
346:13
**version** 108:24
**versus** 4:13,13
12:15
**vice** 289:1
**video** 1:15 3:3
4:7,10 28:13
**videographer**
2:19 4:1,15
65:14,17 69:8
69:11 140:1,5
204:15,19
255:18,23
327:3,7 343:14
**videoing** 23:15
**view** 89:6
106:22,25
129:21,25
157:16
**viewed** 60:11
**views** 316:8
**violation**
141:24
**visas** 251:9
**visits** 39:13
73:7
**vividly** 303:18
**voice** 316:13
**voluntarily**
320:25 321:1

**[voluntary - way]**                                                    Page 82

**voluntary**
  321:2
**vote**  71:22
  77:18 94:20
  157:3,11,12
  158:20,21
  159:7,10,12,12
  159:13,15,16
  159:25 160:4,5
  160:6,12,12,14
  160:19,22,25
  161:1,2,2,7
  210:11,18
  211:5 227:6
  237:2,9
**voted**  72:2,4
  157:17 159:13
  160:17,18
  161:4
**voter**  103:11
  156:25,25
  158:12 215:25
  237:14
**voting**  113:19
  158:11 210:10
  210:14
**vs**  1:5 346:6
  348:2

| **w** |
| :---: |

**w**  1:6,15 3:3
  4:11,14 5:3,7
  5:22 16:19
  19:13 38:17

47:15 49:17
55:14 65:18
156:7 327:8
343:16 344:7
345:8 346:3,6
347:6,14
348:25
**w.giuliani's**
  3:12 17:10
**wabc**  21:18
  86:3 248:4
  249:19
**wait**  111:11
  116:13 282:13
  304:10 320:4
  320:21,23,23
**waited**  210:16
  210:16
**walked**  157:25
  158:1
**wall**  179:25
  329:18
**walnut**  259:19
  259:23 260:13
**wandrea**  1:3
  4:13
**want**  12:25
  16:7 36:24
  78:25 82:15
  84:8 85:20
  92:10 105:5
  114:8 133:4
  138:3 148:8
  163:3,5,25

164:2,5 187:5
196:19 198:20
199:7 204:13
208:13 214:13
217:22 219:10
229:13,18
230:3 238:17
244:16 246:22
267:12 275:17
287:23 288:1
289:15 292:23
319:2 322:1
326:19 333:11
**wanted**  8:11
  34:6 44:11
  45:18 71:2
  93:20,24 94:19
  94:20 105:23
  107:1 108:6
  110:17 111:4
  149:19 150:1
  150:12,20
  158:21 159:12
  159:13,14
  160:4,4,11
  161:3 165:14
  176:19 186:3
  210:11,15
  234:21 238:20
  239:5 240:23
  242:21 244:22
  246:23 272:19
  340:6,7

**wants**  58:17
**warehouse**
  194:11,12,16
  194:17,22
**warran**  68:15
**warranty**  68:6
  68:7,9,15
  69:15 75:23
**washington**  2:6
  9:16,20,22,23
  9:25 10:6,8
  60:5 210:2
  248:21 316:17
  316:24
**waste**  146:9
  217:25
**wasting**  224:8
**watch**  298:15
**watching**  62:5
**water**  74:8,9,10
  157:15 158:5
  233:11
**way**  7:17 8:16
  11:12 12:5
  15:24 19:22
  20:21 31:3,3,4
  31:16 34:2
  41:14 44:15
  45:24 55:7,8
  62:10 67:24
  75:9 77:15
  83:24 98:14
  108:1 112:25
  115:25 121:6

**[way - witness]** Page 83

| | | | |
|---|---|---|---|
| 130:21 131:4 | 331:8 | 285:2 | **willkie** 2:5 4:21 |
| 131:13 136:9 | **we've** 21:19 | **weight** 6:7 | 4:23 |
| 139:16 145:16 | 49:9 62:9 | 316:8 | **willkie.com** 2:7 |
| 147:16 155:16 | 79:23 86:18 | **went** 8:23 9:2 | **winning** 290:2 |
| 155:21 156:10 | 140:23 196:21 | 10:8 59:18 | **winter** 70:9 |
| 156:13 158:10 | 199:15 204:11 | 62:16 80:17,18 | 71:1,3,14 |
| 160:15 166:4 | 215:24 218:10 | 81:14 82:6 | 72:10,11 75:14 |
| 174:5,16 179:2 | 277:16 281:6 | 95:3,3 98:8 | **wire** 55:11 |
| 193:19 202:6 | 288:19,20 | 110:15,16 | **wisconsin** |
| 202:11 208:1 | 342:24 343:4,4 | 111:17,19 | 150:7 |
| 214:3 231:2 | **wear** 182:13 | 170:22 191:13 | **wish** 156:1 |
| 232:6,7 235:12 | 289:18,19,20 | 191:14,14,15 | **witness** 3:6 |
| 235:13 236:2 | 290:19 299:15 | 198:4 208:16 | 4:20 5:8,11 |
| 236:11,19 | 301:11 | 211:1 214:22 | 7:23 13:11 |
| 237:16,22 | **wearing** 181:20 | 217:12 235:6 | 15:9 19:2,13 |
| 241:14 245:4 | 182:4 290:1 | 244:20 264:13 | 19:16 22:6 |
| 258:12,16 | 299:16 | 264:13 287:5,9 | 24:7,19,21 |
| 261:1 276:1,9 | **weather** 20:25 | 291:20 304:4 | 27:8,9,17 33:3 |
| 276:23,23 | 170:19 249:3 | 328:5 335:12 | 34:16 35:9,18 |
| 279:15,16,16 | **wednesday** | 341:2 | 36:4 38:23 |
| 279:18 284:5 | 184:4 | **west** 1:10,11 | 40:7,16,21,23 |
| 286:14 295:23 | **week** 70:13 | 51:24,25 | 41:21 43:17 |
| 299:15 304:23 | 72:21 172:25 | **whispering** 4:4 | 45:22 46:16 |
| 309:5 315:9 | 173:1 248:9 | **white** 179:22 | 47:1,7,13 49:3 |
| 318:14,15,19 | 257:11,12 | 179:25 | 49:25 52:10 |
| 318:20 322:6 | 263:23 339:8 | **wife** 70:21 | 53:4,7,25 |
| 323:6,10 333:3 | **weekend** 70:13 | 71:13 74:13 | 54:11 56:3,9 |
| 338:7,20 | 74:13 | 75:15 82:20 | 58:15 59:9 |
| 342:22 | **weekends** | 246:21 247:8 | 63:6 65:9,12 |
| **wayne** 291:2 | 72:15,20 | 254:8 297:3,4 | 70:8 71:10 |
| **ways** 42:14 | **weeks** 74:14 | **wilkie** 4:25 | 79:4 84:6,23 |
| 214:8 235:11 | 203:15 206:18 | **william** 5:23 | 88:19 89:17 |
| 235:17 236:10 | 238:20 259:14 | **williams** | 103:23 104:12 |
| 237:16 258:20 | 259:15,16 | 287:11 | 104:18 107:16 |

**[witness - wow]** Page 84

107:23 108:14
108:22 109:19
109:25 111:13
112:8 113:5,11
113:17 115:5
122:9,24 126:2
126:24 127:16
128:3,9 129:13
130:5 132:6,23
134:21 135:3
136:12 138:3,6
138:21 139:4
139:24 141:2
141:17 142:5
143:6,16
144:10 145:1
145:13 146:8
146:18,23
148:9 150:4,23
154:13 159:24
166:16 167:10
167:16 168:1
170:18 171:18
173:22 174:14
176:8,23 178:2
178:8,23 181:4
185:7 186:5,25
187:13,19
189:13 193:19
199:19 204:13
205:9 207:20
211:18 212:10
213:4 214:3,18
217:8,11 219:1

220:12 221:2,5
221:9,19 222:4
222:21 223:10
224:8,14
226:14 227:5
230:3 231:5
232:10 234:23
235:16 236:14
237:1,19
239:13 243:12
246:8 254:17
254:19,21
256:14 257:5
259:6,14,22,24
260:1 261:12
261:20 262:1
264:19 265:22
266:17,22
267:12 270:19
272:11,18
273:12 274:1
276:4,17 277:3
277:8,23
278:21 281:11
281:17 282:24
283:8,21 286:7
298:21 299:23
300:15 302:15
305:20 312:10
316:3 319:8
320:13 321:22
322:12,16
323:25 325:8
325:20 326:19

326:23 329:17
333:22 334:12
335:3 337:18
339:25 341:2
342:17 343:12
344:1,11
346:10,11,12
346:17 347:18
**witnesses** 18:2
18:11,12,17,21
18:25 19:9
**won** 20:24
287:5,24
289:24
**wonderful** 83:5
83:6 139:24
**wondering**
84:15
**word** 214:7,19
215:18
**words** 41:23
154:5 166:5
192:10 303:11
303:20 304:17
307:13
**wore** 289:21,21
289:22,24
290:11 301:12
**work** 21:10,11
35:11 50:25
51:14 59:16,23
59:24 72:20
256:25 257:2
267:4 289:25

332:22,25
333:4,9 339:5
**worked** 21:9,12
39:12 50:6,16
54:16,19 55:3
55:4 82:21
256:24 257:3,8
257:9,21 258:4
258:13,15,21
292:10 307:16
307:17
**working** 43:21
86:3 290:2
321:2
**works** 6:2
54:15,16
180:17 203:11
245:4
**world** 61:20
75:6 249:11
286:20,21
287:5,20
289:20,22,23
299:19 308:24
309:25 310:7
328:8,11
**worried** 46:4
184:17,19
**worry** 184:19
**worth** 239:16
291:7,19,25
292:4
**wow** 146:2
191:6

**[wrap - years]**                                                                      Page 85

**wrap**   326:22
**write**   29:3
  42:22 43:3
  165:20,21
  348:3
**writes**   29:4,5
**writing**   43:3
  165:21 309:10
**written**   98:8
**wrong**   170:9
**wrote**   291:3
  311:3

**x**

**x**   22:3,6 56:20
  205:24 244:20

**y**

**yankee**   61:24
  62:1 181:24
  287:7,8 289:19
  290:22 291:4
**yankees**   61:19
  61:20 62:6
  63:4 286:21
  287:5,13
  288:10,12,24
  289:2 290:1
  299:10,19
**yanks**   299:9
**yeah**   7:12 9:13
  10:7 12:18
  14:17 20:20
  22:11 42:23
  44:4,23 45:14

45:22 47:24
52:3,12 53:15
57:12 61:8,18
62:24 63:1
64:18 66:16
67:6 68:4,8
71:10 72:8
73:6 74:5,19
75:12,19 76:1
76:12 79:23
81:18 82:12
86:8,15 87:13
87:17 90:2,4
91:24 94:8
96:4,5 97:17
98:22 100:7,11
109:7,7 111:3
115:14 116:22
122:14 133:11
133:12 134:15
148:12 154:7
156:20 161:25
162:1,19 163:1
164:14,17
166:6,6 167:10
170:6 172:7
173:19 174:18
175:2,24
179:10,15
180:1 181:14
181:16 182:5
183:1 192:2,9
192:24 194:9
195:13 196:15

196:20 197:7
199:3 201:10
201:24 205:5
206:10 211:9
211:19 217:2
224:1 234:23
239:13 240:16
242:3,23
243:12,12,15
245:13,21
246:14 248:5
250:24 252:18
253:25 254:5
254:15,15
255:7,15
256:20 257:14
258:17 261:18
262:1 263:19
266:13 268:5
269:11 275:5
284:14 295:22
297:7,11,20
298:1 300:9,13
303:5 304:9
307:20 308:19
317:12 319:13
319:13 321:1
321:14 324:22
324:25 329:2,3
330:1 331:2
338:23
**year**   9:13 30:9
  30:12,13 31:20
  32:12,14,17

33:8,10,11,17
33:19 36:10
54:22 55:1
60:19 61:9
72:22,23 73:12
73:17,19,19,23
80:21 87:25
88:3 93:22
97:15,16 98:21
98:21 102:11
116:1 117:18
118:23,23
120:5 121:3,15
161:2 165:8
168:4 202:16
204:7 207:4,7
231:18,22
233:20,20
235:4 238:3,4
238:9 239:6,9
239:11 247:16
247:18,18
248:18 249:20
249:21,24
262:10 263:17
295:6,8 299:2
324:5,6 325:5
325:13 335:10
335:14
**years**   8:20,21
  9:16 20:8 21:7
  21:17,18 24:23
  29:19 31:12
  32:7,12,19

| | | |
|---|---|---|
| 33:10 36:18 | 71:24 72:6,18 | 215:13 232:23 |
| 40:1 43:18 | 72:25 73:11 | 232:24,25 |
| 45:17 49:14 | 74:4,16,20,21 | 233:7,14,18 |
| 51:7 53:1,2,8 | 75:6 77:19,19 | 234:3,4,7,8 |
| 53:20,20,20 | 77:23 78:4,9 | 238:7,10 |
| 54:25 70:20,22 | 79:21,22,23,24 | 242:14,20 |
| 73:5 78:6 | 80:2,2 82:19 | 245:20 247:21 |
| 83:15,15 | 83:9,14 86:10 | 247:25 248:9 |
| 155:25 156:1 | 87:1,6,12 | 251:11,12,14 |
| 160:21 161:13 | 88:25 89:13 | 251:20 252:10 |
| 168:15 177:22 | 90:1 95:14 | 253:4 255:5,9 |
| 183:8 184:20 | 96:13,14 97:5 | 264:3,16,21 |
| 185:16 187:3 | 98:4,15,19 | 265:1,8,11,13 |
| 202:16 207:22 | 99:11 115:13 | 265:20 272:19 |
| 210:22 236:7,9 | 115:16 116:9 | 272:20 330:7,9 |
| 238:2,5 239:7 | 116:10 133:10 | **york's** 287:8 |
| 239:11 244:11 | 134:2,17 135:8 | **yorker** 9:12 |
| 244:12 246:3 | 135:10,12,14 | 264:21 |
| 250:11 252:25 | 136:19,22 | **youtube** 56:20 |
| 252:25 258:21 | 137:3,9 157:22 | **z** |
| 285:6 290:18 | 158:10 160:14 | **zoom** 69:6 |
| 291:8 307:18 | 160:17,18,19 | 273:4 |
| 322:19 324:11 | 162:15 176:11 | **ž** |
| 325:1,1 | 176:15,20 | **živile** 297:4 |
| **yep** 100:2 | 177:1,9,11,16 | |
| 120:7 225:13 | 177:18,24 | |
| 225:19 339:4 | 178:3,6 183:9 | |
| **york** 1:1 8:18 | 184:10,16,17 | |
| 8:20 9:3,9 | 190:8,23 191:9 | |
| 12:16 16:17,20 | 191:9,16 192:1 | |
| 16:20,23 38:18 | 193:3,17,25 | |
| 39:1 47:15 | 201:7,9 202:16 | |
| 49:17 54:13 | 203:5 207:25 | |
| 55:15 60:2 | 208:7 214:15 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.