# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 24-cv-6563 (LJL)

RUBY FREEMAN and WANDREA' MOSS,

    Plaintiffs,

-vs-

RUDOLPH W. GIULIANI,

    Defendant.
_____/

                West Palm Beach Marriott
                1001 Okeechobee Blvd.
                West Palm Beach, FL 33401

                DATE: Friday, December 27, 2024
                TIME: 9:12 a.m. - 5:28 p.m.

      VIDEO DEPOSITION OF RUDOLPH W. GIULIANI

      Taken on behalf of the PLAINTIFFS before
Jennifer L. Bush, RPR, Notary Public in and for the State
of Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.

Page 2

```
 1           A P P E A R A N C E S
 2  APPEARING ON BEHALF OF THE PLAINTIFFS:
 3
        Aaron Nathan, Esquire
 4      Joanna Lamberta, Esquire
        Meryl Governski, Esquire
 5      Willkie Farr & Gallagher LLP
        1875 K Street NW
 6      Washington, DC 20006
        202-303-1016
 7      Anathan@willkie.com
 8
 9  APPEARING ON BEHALF OF THE DEFENDANT:
10
        Joseph M. Cammarata, Esquire
11      Cammarata & DeMeyer PC
        456 Arlene Street
12      Staten Island, NY 10314
        718-447-0020
13      Joe@cdlawpc.com
14  APPEARING ON BEHALF OF ANDREW GIULIANI:
15      Scott B. McBride, Esquire
        Lowenstein Sandler LLP
16      One Lowenstein Drive
        Roseland, New Jersey 07068
17      973-597-6136
18  Also Present:
19      Daniel Ragland, Videographer
20
21
22
23
24
25
```

Page 3

```
 1          INDEX OF PROCEEDINGS
 2
 3  VIDEO DEPOSITION OF RUDOLPH W. GIULIANI
 4  DIRECT EXAMINATION BY MR. NATHAN:        5
 5
    CERTIFICATE OF NOTARY PUBLIC         347
 6  ERRATA SHEET                         348
    CERTIFICATE OF OATH OF WITNESS       344
 7  CERTIFICATE OF REPORTER              345
    READ LETTER                          346
 8
 9
10
             GIULIANI EXHIBITS
11
     Number      Description         Page
12
   Exhibit 1   Defendant Rudolph W.Giuliani's   17
13              Pretrial Disclosures
   Exhibit 2   Interrogatories                 205
14
```

Page 4

 1      THE VIDEOGRAPHER:  We are now on the record
 2  on -- at 9:12 a.m. on December 27th, 2024.
 3      Please note that the microphones are
 4  sensitive and may pick up whispering and private
 5  conversations.
 6      Please mute your phones at this time.
 7      Audio and video recording will continue to
 8  take place unless all parties agree to go off the
 9  record.
10      This is Media Unit 1 of the video-recorded
11  deposition of Rudolph W. Giuliani, taken by
12  counsel for plaintiff in the matter of Ruby
13  Freeman versus (sic) Wandrea' Moss versus Rudolph
14  W. Giuliani.
15      My name is Daniel Ragland, the videographer
16  representing Veritext.  The court reporter is
17  Jennifer Bush from the firm Veritext.
18      Will counsel please announce their
19  appearances for the record, after which the court
20  reporter will swear in the witness.
21      MR. NATHAN:  Aaron Nathan, Willkie Farr &
22  Gallagher.  I am counsel for plaintiffs.
23      MS. LAMBERTA:  Joanna Lamberta, Willkie
24  Farr & Gallagher.  I am counsel for plaintiffs.
25      MS. GOVERNSKI:  Meryl Governski, Wilkie

Page 5

 1  Farr & Gallagher, also counsel for plaintiffs.
 2      MR. CAMMARATA:  Joseph Cammarata, Cammarata
 3  & DeMeyer PC, attorney for Rudolph W. Giuliani.
 4      MR. MCBRIDE:  Scott McBride, Lowenstein
 5  Sandler for intervener, Defendant Andrew Giuliani.
 6  WHEREUPON,
 7      RUDOLPH W. GIULIANI,
 8  called as a witness on behalf of the PLAINTIFFS, after
 9  having been first duly sworn, was examined and testified
10  as follows:
11      THE WITNESS:  I do.
12         DIRECT EXAMINATION
13  BY MR. NATHAN:
14      Q.  Mr. Mayor --
15      A.  Yes.
16      Q.  -- thank you for making time for us today.
17  I know you have done this before.  I apologize for the
18  boring introduction, but I've got to run through some
19  housekeeping.
20      Could you please state your full name for
21  the record?
22      A.  Rudolph, R-u-d-o-l-p-h, W., middle initial
23  for William, Giuliani, G-i-u-l-i-a-n-i.
24      Q.  Thank you.
25      You've been deposed before, right?

Page 14

1 active.
2    Q.   I understand. And you take each of them
3 seriously, right?
4    A.   As serious as I can, being inundated.
5 There are only 24 hours in a day.
6    Q.   When you get a discovery request from the
7 plaintiffs, you do your best to answer it completely and
8 fully?
9    A.   Yes, sir.
10    Q.   Okay. And you answered interrogatories in
11 this case under oath?
12    A.   If that's what it says.
13    Q.   Okay. When you receive a document that
14 asks for your responses under oath, you understand that
15 that means that your answers are sworn?
16    A.   Yes, sir. At the bottom when I sign it,
17 that's what it says, yeah.
18    Q.   Okay. And you answered the interrogatories
19 in this case truthfully?
20    A.   Yes, sir.
21    Q.   Okay. Whenever you are under oath, you
22 tell the truth?
23    A.   I do.
24    Q.   And generally when you testify in court,
25 you tell the truth?

Page 15

1    A.   Always when I testify in court. I tell the
2 truth to the best of my ability.
3    Q.   Okay. And when you testify in a
4 deposition, you tell the truth?
5    A.   Again, to the best of my ability.
6    Q.   When you file documents in court, you also
7 tell the truth?
8        MR. CAMMARATA:  Objection.
9        THE WITNESS:  Again, to the best of my
10    ability, yes.
11 BY MR. NATHAN:
12    Q.   When you say "to the best," is there a
13 reason that you would be unable to answer truthfully?
14    A.   Sure, I don't remember. I might remember
15 incorrectly. There are a thousand reasons why you could
16 testify incorrectly rather than untruthfully. You know
17 that. Particularly if you are testifying in sometimes
18 simultaneously five cases, six cases.
19    Q.   Okay. If you testified incorrectly, you'd
20 fix the mistake, right?
21    A.   When it is called to my attention, of
22 course.
23    Q.   Okay. And if you filed something in court
24 that was inaccurate in any way, you'd fix the mistake?
25    A.   Again, if it was called to my attention.

Page 16

1    Q.   Okay. You'd make an amended filing?
2    A.   Well, I would tell my -- I would tell my
3 lawyer if it came up. Usually somebody else would
4 discover it, and I would correct it.
5    Q.   Okay. All right. Well, as -- as we go
6 forward today, we're going to be talking a lot about two
7 different apartments. I just want to make sure we can
8 understand ourselves and each other clearly.
9        So if I say your Palm Beach condo or your
10 condo, will you understand that I'm referring to the
11 condo apartment at 315 South Lake Drive in Palm Beach,
12 Unit 5-D?
13    A.   Yes, sir.
14    Q.   Okay. And you don't own any other
15 condominium apartment in Florida?
16    A.   I do not.
17    Q.   Okay. If I talk about your New York
18 apartment, will you understand that I'm referring to the
19 co-op apartment at 45 East 66th Street, apartment 10-W in
20 New York, New York?
21    A.   Yes, sir.
22    Q.   And you don't own any other apartment in
23 New York?
24    A.   I do not.
25    Q.   Okay. So if we get mixed up or if you

Page 17

1 don't understand what I'm talking about, please just ask
2 me to clarify.
3    A.   I will.
4    Q.   Okay. I'm going to hand you and mark as
5 Giuliani Deposition Exhibit 1, a set of pretrial
6 disclosures that were served on plaintiffs by your
7 counsel in this litigation.
8        MR. NATHAN:  Is this...
9        (Giuliani Exhibit 1, Defendant Rudolph
10    W.Giuliani's Pretrial Disclosures, was marked for
11    identification.)
12        MR. CAMMARATA:  Thank you.
13 BY MR. NATHAN:
14    Q.   Do you recognize this as a document served
15 in this litigation?
16    A.   I do.
17    Q.   And you see that on the front page it has
18 two docket numbers up in the case caption?
19    A.   I do.
20    Q.   Okay. It has both the docket numbers for
21 the 24-civil-6563 matter and the docket number for the
22 24- --
23    A.   I see two, yes.
24    Q.   -- mc-353 matter. Okay.
25        And you see that in Roman Numeral I

5 (Pages 14 - 17)

Page 18

1  starting on page 1 of this document, you've listed the
2  following potential trial witnesses for your -- that you
3  may offer at trial in this matter?
4      A.   Is that on page 1?
5      Q.   Page 1 and it continues on to page 3.
6      A.   I see that, yes.
7      Q.   Okay.  Did you review this document before
8  it was served?
9      A.   I did.
10     Q.   Okay.  Did you review it -- okay.  I would
11 like to review with you the witnesses that you plan to
12 call in this matter.  Are these all of the witnesses that
13 you may offer at trial in -- well, strike that.
14          When I talk about this litigation, unless I
15 specify, will you understand that I'm just talking about
16 the trial -- excuse me.  Strike that.
17          Are these all of the witnesses that you
18 intend to rely on at trial in either of the matters that
19 are scheduled for trial in January?
20     A.   I'm sorry?
21     Q.   Excuse me.  Are these all of the witnesses
22 that you intend --
23     A.   I don't know.
24     Q.   You don't know whether these are all the
25 witnesses that you intend --

Page 19

1          (Simultaneously speaking.)
2          THE WITNESS:  I'm not preparing for trial.
3  My lawyers are.
4  BY MR. NATHAN:
5      Q.   Okay.  You told me just now that you
6  reviewed this document before it was served.
7      A.   I did.
8      Q.   Okay.  And did you see that it says that
9  these are the potential trial witnesses for your case in
10 this matter?
11     A.   As of that date.
12     Q.   As of that date.  Okay.  Let's go to the
13 first witness.  I see you've listed yourself, Rudolph W.
14 Giuliani?
15     A.   Yes, sir.
16     Q.   Okay.  The next witness is Maria Ryan?
17     A.   Yes, sir.
18     Q.   Who is Maria Ryan?
19     A.   Maria Ryan is my part- -- I consider her my
20 partner.  She is technically the president of Standard
21 which is the company, and the CEO, I believe.  She runs
22 it would be the best way to describe it.  And she is in
23 charge of -- she's in charge of my business.
24     Q.   When you say "partner" -- excuse me.
25 Continue.

Page 20

1      A.   Yes, she owns part of the business and
2  she's in charge of it.
3      Q.   Okay.  When you say "partner," do you mean
4  business partner?
5      A.   Yes, I do.
6      Q.   Okay.  How long have you known her?
7      A.   Since, well, 2017.  I guess -- it would be
8  seven years.
9      Q.   How often do you speak to Maria Ryan?
10     A.   Pretty close to every day but not
11 necessarily every day.
12     Q.   Okay.  How do you communicate with her?
13     A.   In person, on the phone mostly.
14     Q.   Okay.  Do you ever exchange emails with
15 her?
16     A.   Yes.
17     Q.   And when you speak to her or communicate
18 with her, what do you talk about?
19     A.   Beyond this case?
20     Q.   Yeah.
21     A.   Everything.  The way you would with any
22 business partner.
23     Q.   Okay.  And you speak with her about --
24     A.   From who won the latest football game to
25 what the weather is to how our families are doing.  I

Page 21

1  mean, many things that have nothing to do with this case.
2      Q.   But you also speak to her about issues that
3  have to do with this case?
4      A.   Sure, yes, as part of everything else.
5      Q.   Okay.  Aside from her role at Standard USA,
6  LLC, what other business roles has she helped for you in
7  the past five years?
8      A.   Well, she was president of my prior
9  company, Giuliani Communications.  She worked with me as
10 a -- she did work for -- when I had it, Giuliani Safety
11 and Security.  That was consulting work.
12          She worked with me on the -- assisted me on
13 the representation of the president in the -- in the
14 litigation regarding the 2020 election.  Probably other
15 roles too.
16          We have done many things together as
17 partners.  We cohosted a radio show for three years on
18 WABC Radio, maybe four years, I don't remember.  And
19 we've cohosted specials on television and on radio.
20     Q.   Okay.  In any of her roles in connection
21 with your companies, did Ms. Ryan -- or Dr. Ryan, excuse
22 me, have access to your email?
23     A.   Yes.
24     Q.   For what purpose?
25     A.   To look at it for messages, to sometimes do

6 (Pages 18 - 21)

Page 22

1  a message for me. I get my email and the social media
2  confused. But sometimes I'll ask her to do it. Like if
3  I'm going to do a communication on X or -- I might ask
4  her to do it.
5       (Reporter asks for clarification.)
6       THE WITNESS: On X, formerly known as
7  Twitter. Or any of the others.
8  BY MR. NATHAN:
9       Q. Would you say that was a regular practice
10 that she --
11      A. Yeah, it's a regular practice with her and
12 with Ted Goodman and the people who came before them.
13      Q. Does Dr. Ryan -- has Dr. Ryan also had
14 access to your phone?
15      A. I'm not sure I understand the question.
16      MR. CAMMARATA: Objection.
17 BY MR. NATHAN:
18      Q. Do you have a cell phone?
19      A. I do.
20      Q. Do you have more than one cell phone?
21      A. I do.
22      Q. And does she have access to those phones?
23      A. She has access -- I have some cell phones
24 that are not operative, so nobody has access to them,
25 including me.

Page 23

1       Q. How many operative cell phones do you have?
2       A. Well, I have two really and then I have a
3  third one that's used for the purpose of calling in my
4  show, and only that.
5       Q. Okay.
6       A. So if you were to make a call into my show,
7  you would use that number and it is an old iPhone that's
8  dedicated to that. So everybody has access to that,
9  probably Ted Goodman has most access to that. But nobody
10 calls me on that.
11      Then I have an iPhone, that is the main
12 iPhone that I use for business mostly, because 24 hours a
13 day is mostly business, but also I would use it for
14 personal. I would call my children or -- then I have a
15 third cell phone that is used just for videoing, to
16 dedicated -- it's almost -- you almost consider it a
17 camera.
18      But since it has a phone number, somehow
19 people discover it and you get some phone calls on it. I
20 prefer not to because it would interrupt a broadcast.
21      So I have two operative cell phones and
22 third, a potentially operative, but I never use it.
23      Q. You told me just a moment ago that Dr. Ryan
24 has access to your email accounts.
25      Which email accounts does she have access

Page 24

1  to?
2       A. Well, I just have -- I just have one that
3  I -- that I use. I have some dormant ones but I never
4  use them.
5       Q. Which is the one that you use?
6       MR. CAMMARATA: Objection.
7       THE WITNESS: I'm not going to --
8       MR. CAMMARATA: I believe we have --
9  BY MR. NATHAN:
10      Q. You can answer.
11      MR. CAMMARATA: I believe we have a
12 protective order with that information.
13 BY MR. NATHAN:
14      Q. You can answer.
15      A. I'm -- instruction by counsel, I'm not
16 going to answer.
17      MR. CAMMARATA: You can answer the question
18 as to one email.
19      THE WITNESS: Well, I do have an email.
20      MR. CAMMARATA: That email.
21      THE WITNESS: I have one email -- I have
22 one email that I know of that I use. I've had
23 many emails over the years but I don't use them
24 anymore.
25

Page 25

1  BY MR. NATHAN:
2       Q. Which is the email that you use?
3       A. I'm not -- I'm not going to disclose that.
4       Q. Is it truthandjusticeforyou@protonmail.com?
5       A. I'm not going to disclose it.
6       Q. Okay. Are you following your attorney's
7  instruction not to answer that question?
8       A. Yes, I -- yes.
9       Q. Okay. And --
10      MR. CAMMARATA: Take a break. There is no
11 question pending.
12 BY MR. NATHAN:
13      Q. On -- on what basis are you declining to
14 answer the question?
15      A. It could change -- 99 percent of it
16 contains matters that have nothing to do with this case
17 and a lot of them are privileged. A lot of them are
18 personal and it would seem to me that it constitutes
19 overbroad discovery, prying into things -- using this
20 litigation for the purpose of prying into things that are
21 frankly none of your business, that have been utilized in
22 the past for leaking, for giving information to other
23 people, so I don't give my email out generally anyway. I
24 give it out to people that I believe will use it for a
25 proper purpose.

7 (Pages 22 - 25)

Page 26

```
 1         MR. CAMMARATA:  Can you repeat the
 2     question --
 3         MR. NATHAN:  Yes.
 4         MR. CAMMARATA:  -- as to the email?
 5  BY MR. NATHAN:
 6     Q.   What email address -- what is the address
 7  of the email account that you currently use?
 8     A.   I will -- I will -- no, will not disclose
 9  it.
10         MR. CAMMARATA:  Hold on.  Can I do a
11     follow-up question?
12         MR. NATHAN:  Are you objecting?
13         MR. CAMMARATA:  Can I do a follow-up
14     question?
15         MR. NATHAN:  Are you objecting to the
16     question?
17         MR. CAMMARATA:  I'm objecting to the
18     question.
19         MR. NATHAN:  What's the basis of the
20     objection?
21         MR. CAMMARATA:  Can you repeat the
22     question?
23         MR. NATHAN:  What is the address of the
24     email account that you use?
25         MR. CAMMARATA:  Is it the -- I'm objecting
```

Page 27

```
 1     to the --
 2         (Simultaneously speaking.)
 3         MR. CAMMARATA:  I'm objecting to the
 4     question but is it the email address that -- you
 5     have to be more specific.  Is it the email address
 6     he communicated with your office?
 7         MR. NATHAN:  The question is for the
 8     witness and you can object if you'd like.  But the
 9     witness is going to need to answer the question.
10         MR. CAMMARATA:  You can answer the
11     question.  You can answer that question.
12  BY MR. NATHAN:
13     Q.   The question is:  What is the address of
14  the email account that you used?
15     A.   I will not disclose that.
16     Q.   Okay.
17         MR. NATHAN:  The only basis for the witness
18     not to answer this question would be a privilege
19     objection.
20  BY MR. NATHAN:
21     Q.   Is that the objection -- is that the basis
22  for your refusal to answer this question?
23     A.   I told you my basis.
24     Q.   Okay.
25         MR. CAMMARATA:  Is there a pending question
```

Page 28

```
 1     right now?
 2         MR. NATHAN:  Okay.  If you are -- if you
 3     are going to refuse to answer this question, then
 4     at the end of our time here today, I'll hold the
 5     deposition open to ensure that we have an
 6     opportunity to get your answer but I'll move on
 7     right now.
 8         MR. CAMMARATA:  Okay.
 9  BY MR. NATHAN:
10     Q.   You described two phone numbers on cell
11  phones that are operative.
12         You described one that you use only for
13  video and I'd like to know now, because we were
14  discussing Dr. Ryan, does Dr. Ryan have access to the two
15  cell phones that you use for placing phone calls?
16     A.   She has access to it, yes.
17     Q.   Okay.  She knows the password to each
18  phone?
19     A.   I believe she does.  You would have to ask
20  her but I believe she does.
21     Q.   Okay.  Do you maintain an electronic
22  calendar?
23     A.   Not really, no.
24     Q.   Do you maintain a physical calendar?
25     A.   Not in any organized sense, no.
```

Page 29

```
 1     Q.   Okay.  How do you keep track of your
 2  appointments?
 3     A.   I write them down on pieces of paper.
 4  Sometimes Dr. Ryan writes it down.  Sometimes Ted Goodman
 5  writes it down.  Sometimes Michael Ragusa, who you see
 6  here, and I put it close to my desk in -- that's how I do
 7  it.  And occasionally I'll do an entry in my -- in my
 8  iPhone or iPad but they are very sporadic.
 9     Q.   Okay.  Has Dr. Ryan ever had access to any
10  of your personal bank accounts?
11     A.   She has.
12     Q.   Which bank accounts has she had access to?
13     A.   Oh.  Well, she has access to all the
14  business accounts, for sure.  She has access to my
15  personal accounts if I ask her to do something for me --
16     Q.   Okay.
17     A.   -- in that account.
18     Q.   So for any of the businesses that you've
19  operated over the last five years, Dr. Ryan would have
20  had access to those business accounts?
21     A.   Well, since she's been president of the
22  company, maybe not the beginning.
23     Q.   You mentioned that she's president of
24  Standard USA, LLC.
25         Is that the company that you are referring
```

8 (Pages 26 - 29)

Page 30

1  to?
2     A.   Yes, sir, and the one before it, the one --
3     Q.   The one before that was Giuliani
4  Communications LLC.
5          And so Dr. Ryan would have had access to
6  Giuliani Communications' accounts as well?
7     A.   I'm not sure from the beginning but most of
8  the time, yes.
9     Q.   Okay.  Throughout the year 2024, would she
10 have had access to the Giuliani Communications business
11 account?
12    A.   This year.
13    Q.   This year?
14    A.   Yes.
15    Q.   Okay.  Does she also handle any -- strike
16 that.
17         Does Dr. Ryan assist you with any of your
18 personal financial affairs?
19    A.   She does.
20    Q.   Okay.  How does she do that?  What type of
21 assistance does she provide for your personal financial
22 affairs?
23    A.   She gives me advice about them, about it
24 and then helps me to organize it.
25    Q.   Does she help you manage financial issues?

Page 31

1     A.   Yes.
2     Q.   How does she --
3     A.   The way my -- anywhere from a way a
4  secretary, a personal secretary would, to the way in
5  which a financial advisor for Merrill Lynch would --
6     Q.   So --
7     A.   -- or from the -- from the...
8     Q.   -- she helps -- she assists you with
9  financial trans- -- she assists you with executing
10 financial transactions?
11    A.   Yes, but that's been true in my life for
12 25 years, that somebody does that.
13    Q.   And for the -- for how long has Dr. Ryan
14 played that role for you?
15    A.   I'd have to go back.  Not at the beginning,
16 somewhere along the way.  When I first met her, I had a
17 secretary, a personal secretary, and a special assistant
18 and they all did that.  Over time, that became less.  Her
19 role became more.  So it's hard to say.  So it evolved.
20    Q.   Okay.  This year --
21    A.   Oh, I -- also, I have an accountant,
22 changed accountants, but I've had an accountant all --
23 two of them actually, now one.
24    Q.   Who is your accountant now?
25    A.   Joe Ricci --

Page 32

1     Q.   How long --
2     A.   Joseph Ricci.
3     Q.   How long has Joseph Ricci been your
4  accountant?
5     A.   Oh, he's been the accountant for the
6  businesses, I think, from the beginning.  So that's 20 --
7  20 -- most of 24 years, he's been an accountant for the
8  business.  He also participated in preparing our tax
9  returns and things like that.
10    Q.   How long has he helped -- how long has he
11 been your personal accountant?
12    A.   For about a year and a half or two years.
13    Q.   Okay.  Did he assist you with filing of
14 your tax returns for the tax year 2023?
15    A.   Yes.
16    Q.   Did he assist you in filing your personal
17 tax returns for the tax year 2022?
18    A.   Yes, but he's assisted me for the filing of
19 my tax returns for the last approximately 20 years.  But
20 it was -- there was another principal accountant who
21 actually did it.
22    Q.   Who was that?
23    A.   That was Bob Gilbert for the longest time,
24 and then his assistant, and then the company whose name
25 escapes me.  Gosh, I don't know.  I can't remember right

Page 33

1  now.
2         MR. CAMMARATA:  Don't guess.
3         THE WITNESS:  If I took a break and checked
4     my records, I could get you the name.
5  BY MR. NATHAN:
6     Q.   Okay.  We can come back to that.  When did
7  Joe Ricci become your sole personal accountant?
8     A.   Well, certainly for the 2023 year.  He's
9  taken over more and more of that role for the last three
10 years.  Now he is, and he was for the last year.
11    Q.   And when we talk about the 2023 year,
12 that's the filing season that extends into 2024, is
13 that -- am I correct?
14    A.   Yes.
15    Q.   Okay.
16    A.   But it might have been sometime in 2023.
17    Q.   In the calendar year 2023 --
18    A.   Yes.  Right, right.
19    Q.   -- as opposed to tax year.  Excuse me.  All
20 right.
21         And did Dr. Ryan also assist you in
22 preparing your personal taxes?
23         MR. CAMMARATA:  Objection.
24 BY MR. NATHAN:
25    Q.   You can answer.

9 (Pages 30 - 33)

Page 34

1  A. Answer? To some degree. She played some
2  role, not -- I mean, in the way a number of people did.
3  Q. When you say, "she played some role," can
4  you describe the role that she played?
5  A. Well, she would get information that he
6  needed or wanted, as would others.
7  Q. Okay. And what would she do with that
8  information?
9  A. Give it to him.
10 Q. How do you think -- excuse me. How did she
11 give it to him?
12 A. Mostly mailing it.
13 Q. Mailing it. Did Dr. Ryan ever communicate
14 with Mr. Ricci by email?
15     MR. CAMMARATA: Objection.
16     THE WITNESS: You'd have to ask her that.
17 You'd have to ask her that.
18 BY MR. NATHAN:
19 Q. Did you ever communicate with Mr. Ricci by
20 email?
21 A. Probably but not often.
22 Q. Would Mr. Ricci send you emails?
23 A. I'm sure he did. I don't -- I --
24 Q. Okay.
25 A. I don't -- I just don't remember a specific

Page 35

1  one right now.
2  Q. Okay. Returning to Dr. Ryan's role in your
3  personal financial affairs. In the -- in terms of the
4  access she had to your financial accounts, did she need
5  your approval to make financial transactions on your
6  behalf?
7     MR. CAMMARATA: Objection.
8     You can answer.
9     THE WITNESS: Yes.
10 BY MR. NATHAN:
11 Q. Okay. And how did that work?
12 A. Usually I would get on the telephone and
13 say, yes, she can complete this transaction.
14 Q. Did she have access to your credit card or
15 to any of your credit cards?
16    MR. CAMMARATA: Objection.
17    You can answer it.
18    THE WITNESS: On occasion, not regularly.
19 BY MR. NATHAN:
20 Q. Okay. Did she -- did she travel with you?
21 A. At times she -- yes.
22 Q. Okay. When would she travel with you?
23 A. Whenever she traveled with me. I don't
24 know when she would travel with me. That's a very large
25 categorical question.

Page 36

1  Q. What would have been a reason for her to
2  travel with you?
3     MR. CAMMARATA: Objection.
4     THE WITNESS: Oh, that I was going to
5  give -- I think of the most recent, I was going to
6  give a speech in Oklahoma to a group of people
7  that invited me to speak to them.
8     I do a certain amount of speaking,
9  sometimes get paid for it. You know, at one time
10 I used to do 150 a year. Now I do a lot fewer but
11 I still do speaking. I'm a paid speaker.
12    I also speak for charitable purposes or for
13 political purposes. So it would depend on the
14 speech.
15    She -- at this point, she and/or Ted
16 Goodman would accompany me on those speeches
17 recently. There -- different people have played
18 that role over the last 20 years.
19 BY MR. NATHAN:
20 Q. Okay. In any of Dr. Ryan's roles, have you
21 paid her?
22 A. The business has paid her.
23 Q. How much?
24 A. You want a salary? I'm not sure.
25 Q. You don't know how much your business has

Page 37

1  paid her?
2  A. I would have to be approximating.
3  Q. Okay. Does she draw a salary from each of
4  your businesses?
5  A. Pardon me?
6     MR. CAMMARATA: Objection.
7  BY MR. NATHAN:
8  Q. Does she draw a salary from each of your
9  businesses?
10 A. I believe she -- I believe that she and Ted
11 and Mike are paid through Standard, from one place.
12 Q. Okay. And when Giuliani Communications --
13 during the period when Giuliani Communications was the
14 entity that operated -- excuse me, strike that.
15    How long has Standard been in existence?
16 A. Briefly. Six months. I'm guessing.
17 Q. Okay. And during that time, Dr. Ryan has
18 drawn a salary from Standard USA?
19 A. I mean, I don't -- Ryan Medrano would know
20 the answer. He makes out all the checks, including mine.
21 Q. Prior to Standard USA, how was Dr. Ryan
22 paid?
23 A. Pardon me?
24 Q. Before Standard USA existed, how was
25 Dr. Ryan paid?

Page 342

1 company?
2  A. They are both employees and owners.
3  Q. Okay. Ted and Maria are owners of
4 Standard?
5  A. Right.
6  Q. Are there any other --
7  A. No, Mike is just --
8  Q. -- employees of Standard?
9  A. -- an employee and Steven Schumacher is
10 a -- and -- and Ryan gets paid a salary. And Steve --
11 Steven Schumacher is -- which I guess you have to --
12 employed him as a consultant one or two times.
13  Q. Okay. But there is nobody else who you
14 describe as the talent with respect to either of these
15 companies?
16     MR. CAMMARATA: Objection.
17     THE WITNESS: No.
18 BY MR. NATHAN:
19  Q. Okay. Okay. Is there anything else -- I
20 know I asked this earlier but now that we're coming to
21 the end, is there anything else about your testimony that
22 you'd like to amend in any way?
23  A. No, sir.
24  Q. Okay. So of all the topics we've
25 discussed, you've answered my questions to the best of

Page 343

1 your knowledge at this time?
2  A. I have.
3  Q. Okay. And nothing has occurred to you
4 while we've sit -- while we've been sitting here that
5 would cause you to amend any of your answers?
6  A. No, nothing comes to mind.
7     MR. NATHAN: Okay. I'm going to hold the
8     deposition open for the reasons already stated on
9     the record.
10     And other than that, I have no further
11     questions.
12     THE WITNESS: Thank you.
13     MR. CAMMARATA: Thank you.
14     THE VIDEOGRAPHER: The time is 5:28 p.m.
15     This concludes today's proceedings and the
16     deposition of Rudolph W. Giuliani.
17     (The proceeding is adjourned at 5:28 p.m.)
18
19
20
21
22
23
24
25

Page 344

1 CERTIFICATE OF OATH OF WITNESS
2
3 STATE OF FLORIDA     )
4 COUNTY OF ST. LUCIE  )
5
6     I, the undersigned Notary Public, in and
7 for the State of Florida, hereby certify that RUDOLPH W.
8 GIULIANI personally appeared before me, produced ID and
9 was duly sworn.
10
11     WITNESS MY HAND and official seal in the
12 City of Fort Pierce, County of St. Lucie, State of
13 Florida this December 30, 2024.
14
15
16
17
18     _____
     Jennifer L. Bush, RPR, FPR, FPR-C
19     Notary Public
     State of Florida at Large.
20     My Commission: #HH 529563
     My commission expires: 9/20/28
21
22
23
24
25

Page 345

1 CERTIFICATE OF REPORTER
2
3 STATE OF FLORIDA     )
4 COUNTY OF ST. LUCIE  )
5     I, Jennifer L. Bush, Registered
6 Professional Reporter, Florida Professional Reporter, do
7 hereby certify that I was authorized to and did
8 stenographically report the deposition of RUDOLPH W.
9 GIULIANI; and that a review of the transcript was
10 requested; and that pages 1 through 348, inclusive, are a
11 true record of my stenographic notes.
12     I further certify that I am not a relative,
13 employee, attorney or counsel of any of the parties, nor
14 am I a relative or employee of any of the parties,
15 attorneys or counsel connected with the action, nor am I
16 financially interested in the action.
17
18     Dated this December 30, 2024.
19
20     _____
     Jennifer Bush, RPR, FPR, FPR-C
21
22
23
     The foregoing certification of the
24 transcript does not apply to any reproduction of the same
     by and means unless under the direct control and/or
25 direction of the certifying reporter.

87 (Pages 342 - 345)