UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RUBY FREEMAN and WANDREA' MOSS,

        Plaintiffs,

-and-

GLOBAL DATA RISK, LLC,

        Plaintiff-Intervenor Applicant,

-against-

RUDOLPH W. GIULIANI,

        Defendant,

-and-

ANDREW H. GIULIANI,

        Intervenor-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

24-mc-00353-LJL

**DECLARATION OF ERIK LAYKIN**

        ERIK LAYKIN, declares the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

        1.    I am the Chief Executive Officer of Global Data Risk, LLC. I have personal knowledge of the facts contained in this Declaration, which I make in support of GDR's motion to intervene as a plaintiff in this judgment-enforcement proceeding action and to be appointed the receiver of defendant Rudolph Giuliani's New York cooperative apartment in place of plaintiffs Ruby Freeman and Wandrea' ArShaye Moss.

        2.    The motion should be granted, because Global Data Risk holds a first lien against each of the two most significant assets at issue in the proceeding: defendant Rudolph W. Giuliani's cooperative apartment in New York City and his condominium in Palm Beach, Florida. Those liens secure an administrative claim of $206,095.57 awarded to Global Data Risk in Giuliani's bankruptcy case, *In re Rudolph W. Giuliani*, Case No. 23-12055 (Bankr. S.D.N.Y., petition filed Dec. 21, 2023), based on the post-petition services GDR rendered for the benefit of both Giuliani and the plaintiffs. Though Giuliani and Freeman and Moss

assured Bankruptcy Judge Sean H. Lane the administrative claim would be promptly paid from the proceeds of the sale of those properties, they now propose to settle this action and a related declaratory judgment action, *Freeman v. Giuliani*, 24-cv-6563, without the selling either property and without making any allowance for the payment of the administrative claim. Rather, in contradiction of their representations to Judge Lane, so far as they are concerned, Global Data Risk must on its own resort to supplemental enforcement proceedings to have the administrative claim satisfied. Global Data Risk seeks to intervene to prevent the parties from flouting the protocols embodied in the orders made by Judge Lane to assure the prompt payment of the administrative claim.

**PROCEEDINGS IN THE BANKRUPTCY COURT**

**The Retention of Global Data Risk**

3. On December 21, 2023, Giuliani filed in the United States Bankruptcy Court for the Southern District of New York a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By Order dated April 19, 2024, Judge Lane granted the application of the Official Committee of Unsecured Creditors to retain Global Data Risk as specialized forensic financial advisor to the Committee. **Exhibit 1**. The three-member Committee included Wandrea' ArShaye Moss, who with Ruby Freeman holds a judgment of $146,206,113 against Giuliani. **Exhibit 2**.

4. Global Data Risk was well suited for the *Giuliani* case. GDR maintains a professional staff of former members of U.S. federal intelligence and law enforcement agencies, forensic accountants, international investigators, research analysts, financial crime specialists, forensic financial investigators, and computer forensic experts. Members of the Global Data Risk team assigned to the *Giuliani* case had served as forensic financial advisors in other bankruptcy cases, notably *In re Lehman Brothers Holdings, Inc.,* and had identified, located, traced and aided the recovery of assets around the world.

5. In accordance with the retention order, Global Data Risk conducted open source research, investigated, reviewed, and analyzed Giuliani's historical financial records and transactions, and traced assets. GDR drafted investigative reports and advised the Committee regarding Giuliani's assets, sources of income, and pre and post-petition transfers. The services rendered by GDR were necessary because, in the words of Judge Lane, "there was an alarming and inappropriate lack of financial transparency by the debtor, which led to the need for not only this work, but an extensive amount of work, much higher than normal amount of this work." **Exhibit 3** [at p. 21]. GDR's work benefitted the creditors by bringing transparency to Giuliani's assets.

### The Memorandum Decision Dismissing the Bankruptcy Case

6. On May 28, 2024, after months of Giuliani's obfuscation and recalcitrance, counsel for the Unsecured Creditors Committee, Akin Gump Strauss Hauer & Feld LLP, moved for the immediate appointment of a trustee. On July 8, 2024, in opposition to Giuilani's counter-application to convert his Chapter 11 case to a Chapter 7 liquidation case, counsel for Ruby Freeman and Wandrea' ArShaye Moss, Willkie Farr & Gallagher LLP, sought the outright dismissal of the bankruptcy case, which would allow them to enforce their judgment against Giuliani, especially against his New York cooperative apartment and his Florida condominium.

7. In a Memorandum Decision dated July 12, 2024, Judge Lane ruled, "dismissal of this bankruptcy case with a one year bar to refiling is in the best interests of creditors." **Exhibit 4** [at pp. 3-4].

8. Judge Lane convened a status conference July 17, 2024 to discuss how to appropriately effectuate the dismissal. Two salient matters remained for disposition: the payment of fees owed to the United States Trustee and the payment of the administrative fees

and expenses owed to Global Data Risk. Both counsel for the Committee of Unsecured Creditors and counsel for Ruby Freeman and Wandrea' ArShaye Moss spoke in favor of having Global Data Risk paid promptly and in full. The most efficient way to dispose of both matters would have been for Giuliani to pay those debts from the cash in his bank accounts as of December 21, 2023, the day he filed his petition, but he had never fully disclosed this information. Counsel discussed with Judge Lane how Giuliani's real estate assets could be used to satisfy those debts.

9. Judge Lane expressed concern about his retaining jurisdiction after the dismissal of the bankruptcy case to compel the sale of those assets:

> So to just start with the pretty clear notion that bankruptcy courts retain jurisdiction to deal with ancillary matters after dismissal, such as an application for an award of attorney's fees or other applications. So it's pretty clear I have jurisdiction in this case to address the fee application of the committee's professionals. I think everybody was operating under that assumption. *** What other authority I have or whatever jurisdiction I have beyond that after dismissal is less clear. *** So it is not clear to me, and indeed, I'm inclined to think it is inappropriate for me to provide for a liquidating trustee in a dismissal order. There's no authority provided for me for that proposition, and the cases I've seen don't go there. And I've been sitting on the bench for fourteen years. I haven't run into such a request. *** I think liquidating the two apartments is that's what a Chapter 7 trustee would do or a Chapter 11 trustee would do. I don't really know of any authority that I have to do that.

**Exhibit 5** [at pp.14-15].

10. Rachel C. Strickland, of Willkie Farr & Gallagher LLP, counsel for Ruby Freeman and Wandrea ArShaye Moss, suggested the appointment of a limited administrative trustee, empowered to sell Giuliani's New York cooperative apartment and use the proceeds to pay the allowed fees and expenses of Global Data Risk:

> And one of the things that I would point Your Honor to is the Sinker case, which is 113 B.R. 34, 1990. It was a very similar case to the one that we are looking at. It was a dismissal. There were administrative expenses that were outstanding. And what the court ordered in that case was the appointment of a trustee to liquidate just a sufficient amount of the nonexempt unencumbered property to pay administrative expenses.

> And so we were asking for the exact same relief here.
>
> ***
>
> And we aren't looking to, outside of bankruptcy, conduct a liquidation of Mr. Giuliani's assets. We would note that he himself has offered up the New York apartment. The New York apartment has been on and off the market for a year. So what we were proposing as a variation of that is whatever sells first at reasonable value and as prudent, this limited administrative trustee, which Your Honor does have the authority to appoint could, in fact, liquidate that. The moment the admin is paid, there is no basis for that appointment to continue.

**Id.** [at pp. 19-20].

11.     Philip Dublin, of Akin Gump Strauss Hauer & Feld LLP, counsel for the Committee of Unsecured Creditors, "echo[ed] every one of Ms. Strickland's statements":

> We believe it is incumbent upon the debtor to satisfy the administrative expenses that have incurred in connection with the Chapter 11 case. Those really were down to the GDR fees, once allowed, as well as the U.S. Trustee fees.
>
> And while we are just like Ms. Strickland, uncertain of the amount of cash that is currently in the estate for the reasons that Ms. Strickland referenced, we do know, all of us know, that there are sufficient nonexempt unencumbered property that is available to satisfy all the administrative expenses. And we need to ensure, or we should ensure, that those administrative expenses are paid and that we're not looking at an ultimate race to the courthouse in various states *** with respect to the satisfaction of those obligations.

**Id.** [at pp. 21-22].

12.     Mr. Dublin criticized the order proposed by the United States Trustee for not providing for the fees and expenses of Global Risk Data to be paid:

> I think it's noteworthy, at a minimum, in connection with the U.S. Trustee's proposed form of order, that it seeks to satisfy the U.S. Trustee fees within ten days of entry of the order but leaves Global Data Risk unaccounted for with respect to ensuring their payments.
>
> So we're about fairness here, Your Honor, in ensuring that the professionals that provided services to the estate, which were recognized in pleadings filed by the debtor when they were looking to progress -- when the debtor was looking to progress the Chapter 11 cases as providing benefits to the estate, and reasons for, among other things, at the time, the requested extension of exclusivity be satisfied. And we know, again, that there are sufficient assets to satisfy those obligations.

**Id.** [at p. 22].

13. At the conclusion of the conference, Judge Lane, weary of hearing contrived excuses for Giuliani's failure to be fully transparent about his assets, directed a stern admonition to Giuliani's counsel:

> So I mean, listen, it's the same song over and over again that was laid out in the decision. But again, even a dismissal, which your client wants, you can't get out of your own way. So this can go -- I have a jurisdictional basis for requiring transparency into the assets as to getting this dismissal appropriately effectuated. So if your client persists in this course of action, which is essentially to stick his head in the sand, there are a lot of bad things that can happen, or a lot -- let me rephrase it. There are a lot of things that your client doesn't want to happen will happen. *** People have been trying to get all this kind of information for many months.
>
> ***
>
> And you're going to give me an update. And then I'm going to decide what order I want to enter and what that looks like. And I still have jurisdiction. I can dismiss the case. I can retain jurisdiction as it pertains to finding out what the assets are that are available to pay the administrative expenses in the case. *** There's a lot of ways for this to go. And a lot of them are the exact things that your client doesn't want to have to do, and that's why your client wants a dismissal. *** So I strongly, strongly urge you and your client to sit down and figure out what you really want the end game to look like here so –
>
> MR. FISCHOFF: Understood, Your Honor.

Tr. 42-43.

### The Dismissal of the Bankruptcy Case

14. Following the conference, the interested parties – Giuliani, Freeman and Moss, the Unsecured Creditors Committee, and Global Date Risk – conferred on how to have Giuliani's bankruptcy case dismissed in accordance with Judge Lane's Memorandum Decision of July 12, 2024. At that point, GDR had outstanding fees and expenses in excess of $300,000, which was to be treated as administrative claim in the bankruptcy case.

15. The attorneys at the Willkie Farr firm urged GDR to have its claim paid from the proceeds of the sale of Giuliani real estate assets, which they said was "imminent." They assured me they intended to "aggressively enforce" the judgment Freeman and Moss held against Giuliani. Once Giuliani's bankruptcy case was dismissed, they said, a foreclosure

-6-

against the Giuliani properties would immediately take place. In numerous meetings, attorneys from both the Willkie Farr firm and the Akin Gump firm told me GDR's administrative claim would be paid promptly from the first sale of either the New York cooperative apartment or the Palm Beach condominium. As they handicapped the situation, the cooperative apartment, with a value of $5-$6.5 million, would likely be the first liquidated.

16. I said if the administrative claim was going to paid from the sale of Giuliani's real estate, each property would have to be encumbered by a court-ordered first lien in favor of GDR. In addition, GDR would require an up-front payment of at least $100,000. Everyone readily consented to a lien on each property, but at first, Giuliani claimed he had no funds for an up-front payment. Eventually, he was somehow able, in the words of his counsel, "to scrape together" $15,000 then $35,000 then $50,000 and finally, mirabile dictu, $100,000.

17. Based on the clear and unambiguous assurances of the Willkie Farr and Akin Gump firms, GDR agreed with the other interested parties on a proposed order. **Exhibit 6**. By Order dated August 2, 2024, Judge Lane dismissed Giuliani's bankruptcy case, adopting the proposed order nearly verbatim. **Exhibit 7**.

18. The dismissal order [at ¶ 3] directed Giuliani to transfer $100,000 to his counsel to hold "in escrow for the purpose of paying allowed professional fees and expenses of Global Data Risk LLC." The dismissal order [at ¶ 4] provided for the approved fees and expenses of Global Data Risk in excess of that $100,000 to "be paid from the proceeds" of the sale of Giuliani's cooperative apartment at 45 East 66th Street, 10W, New York, New York 10065, or his condominium at 315 South Lake Drive, Unit 5D, Palm Beach, Florida 33480.

19. Should the sale of either property occur prior to the approval of the final fee application submitted by Global Data Risk, the dismissal order [at ¶ 6] required Giuliani to transfer to the Clerk of the Bankruptcy Court proceeds sufficient to satisfy the balance of

GDR's fees and expenses. Should the sale of either property occur after the approval of GDR's final fee application, then Giuliani would pay the amount owed to GDR immediately upon the closing of such sale.

20. As security for the fees and expenses approved by the Bankruptcy Court, the dismissal order [at ¶ 7] granted to Global Data Risk "continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens" on the shares of stock allocated to Giuliani's New York cooperative apartment and on his Florida condominium. Those liens were declared to be "valid, automatically perfected, non-avoidable senior in priority and superior to any security, mortgage, collateral interest, lien or claim on" Giuliani's interests in those properties. Those liens would "remain valid and enforceable" notwithstanding the dismissal of his present bankruptcy case, and would remain so with respect to any successor bankruptcy case he might file.

21. A certified copy of the dismissal order was filed in the Office of the Clerk of Palm Beach County, Florida, August 15, 2024 and in the Office of the City Register of the City of New York August 26, 2024. **Exhibit 8**.

22. The dismissal order [at ¶ 11] required Giuliani to "list at least one of the properties for sale," and if the Freeman and Moss received proceeds from the sale of either property, they would pay what was still owed to Global Data Risk for its services in the bankruptcy case [id. ¶ 10].

### The Final Fee Application

23. The dismissal order [at ¶ 12] required Global Data Risk to file a final fee application within 20 days of entry, which GDR did. **Exhibit 9**. GDR had agreed to provide its services on a blended and discounted hourly basis, so GDR's final fee application presented two grand-total numbers: what the total fee would have been without the blended billing rate

[$642,343.75] and what the total fee came to be with the blended billing rate [$324,843.75]. **Id**, [at p. 23]. The fee based on the blended rate stood at basically half of what the fee would have been at standard rates.

24.     Judge Lane reduced the blended-fee total by 7.5 percent [$24,363.28] resulting in a total approved fee of $300,480.47. **Exhibit 3** [at p. 24]. The amount of the reduction included $7,562.50 Global Data Risk had voluntarily agreed to reduce in response to objections the United States Trustee had raised informally. **Exhibit 10** [at p. 4].

25.     The final fee application also requested reimbursement of expenses amounting to $6,854.29. **Exhibit 9** [at p. 25]. In response to objections the United States Trustee raised informally, Global Data Risk voluntarily reduced those expenses by $1,239.19. **Exhibit 10** [at p. 3].

26.     By Order dated October 3, 2024, Judge Lane awarded to Global Data Risk professional fees of $300,480.47 and expenses of $5,615.10. **Id.**

27.     On October 15, 2024, Giuliani paid Global Data Risk $100,000 against the administrative claim approved by Judge Lane. He has yet to pay the balance.

## PROCEEDINGS IN THE DISTRICT COURT

### The Judgment Enforcement Action

28. On August 5, 2024, following the dismissal of Giuliani's bankruptcy case, Ruby Freeman and Wandrea' ArShaye Moss registered in the United States District Court for the Southern District of New York a foreign judgment of $146,206,113 in their favor and against Giuliani that had been entered in the United States District Court for the District of Columbia. *Freeman v. Giuliani*, Case No. 24-mc-353-LJL.

29. By Notice of Motion dated August 30, 2024, Ruby Freeman and Wandrea' ArShaye Moss moved under Rule 69 of the Federal Rules of Procedure and sections 5225 and 5228 of the New York Civil Practice Law & Rules for a turnover order with respect to, inter alia, Giuliani's New York cooperative apartment and for an order appointing a receiver for his Florida condominium. **Exhibit 11**. Global Data Risk was not served with the motion papers; nor did the plaintiffs inform the District Court of the liens imposed by the Bankruptcy Court against Giuliani's real estate assets. In response to the motion, Giuliani "consent[ed] to the appointment of a receiver to effect the sale of the New York apartment." **Exhibit 12** [at p. 2]. He was silent on the appointment of a receiver for the Florida condominium.

30. In an Opinion and Order dated October 22, 2024, District Judge Lewis J. Liman ordered "the immediate turnover of and receivership for Defendant's 1,430 shares of stock in, and the proprietary lease for, Apartment 10W with 45 East 66th Owners Corp." **Exhibit 13** [at p.7]. Judge Liman appointed Ruby Freeman and Wandrea' Moss as receivers of the shares, the proprietary lease, "and other document entitling him to ownership and possession of such apartment." **Id.** [at p. 16].

31. I am advised by counsel that a receiver, as an officer of the court, is a trustee who owes fiduciary duty to all persons interested in the receivership estate.

**The Declaratory Judgment Action**

32. On August 30, 2024, the same day they moved for a turnover order and the appointment of a receiver, Ruby Freeman and Wandrea' ArShaye Moss filed a declaratory judgment action seeking the adjudication of the applicability of the Florida Homestead Provision to Giuliani's Florida condominium. *Freeman v. Giuliani*, 24-cv-6563-LJL. In that action, Freeman and Moss sought to "remove any doubt of Plaintiffs' authority" to have a receiver appointed and to sell the property without the interference of what they claimed to be a meretricious homestead claim by Giuliani. **Exhibit 14** [without exhibits].

33. Judge Liman scheduled a trial for January 21, 2025 but never reached the merits of the plaintiffs' claim.

**The Settlement**

34. In a joint letter dated January 16, 2025, the Freeman plaintiffs and Giuliani informed Judge Liman they had "executed a settlement agreement that, once certain conditions are met, would fully resolve all issues currently scheduled for trial … would result in the conclusion of all litigation currently pending between and among the Parties." They requested an adjournment of the trial to a date "on or after February 25, 2025, to permit the Parties to fully implement the Agreement." **Exhibit 15**. By memo endorsement, Judge Liman adjourned until March 3, 2025 the trial in both the judgment-enforcement action [24-mc-353] and in the declaratory judgment action [24-cv-6563]. **Id.**

35. Giuliani posted on X:

> I have reached a resolution of the litigation with the Plaintiffs that will result in **a satisfaction of the Plaintiffs' judgment**. This resolution does not involve an admission of liability or wrongdoing by any of the Parties. I am satisfied with and have no grievances relating to the result we have reached. **I have been able to retain my New York coop** and Florida Condominium and all of my personal belongings. No one deserves to be subjected to threats, harassment, or intimidation. This litigation has taken its toll on all parties. This whole episode was unfortunate. I and

-11-

the Plaintiffs have agreed not to ever talk about each other in any defamatory manner, and I urge others to do the same.

Emphasis added.

36. As reported by NBC News, Freeman and Moss said in a separate statement:

The past four years have been a living nightmare. We have fought to clear our names, restore our reputations, and prove that we did nothing wrong. Today is a major milestone in our journey. We have reached an agreement, and we can now move forward with our lives. **We have agreed to allow Mr. Giuliani to retain his property in exchange for compensation** and his promise not to ever defame us.

Emphasis added.

37. Neither side disclosed the nature nor the amount of the "compensation" Freeman and Moss would receive in satisfaction of their judgment. The specific terms of the Settlement Agreement will not be disclosed until February 24, 2025.

## THE MOTION TO INTERVENE

### My Conversations with the Willkie Farr and Akin Gump Firms

38. Upon learning of the settlement, I tried reaching the Willkie Farr firm multiple times and was initially ignored. Finally, on Friday, January 24, 2025, I had a Zoom meeting with Aaron Nathan, who told me, "The fees to GDR are NOT part of the settlement," and "there is nothing we can do to help you." He would not disclose the terms of the settlement, stating only, "You will learn more after the 24th of February." The tenor of the conversation clearly conveyed the intention of the plaintiffs and their counsel to engage in a backdoor collusion with Giuliani to avoid paying GDR's court-approved administrative claim.

39. I subsequently met, by Zoom, with Phillip Dublin and Abid Qureshi of the Akin Gump. I reminded them of their firm's previous assurances to "see this through to the end" and "absolutely not rest until your administrative fees were paid." In contrast to their

firm's advocacy on behalf of Global Data Risk before the Bankruptcy Court, they displayed indifference to GDR's claim: "We can't help you and will not represent you on this matter," they said. They had no responsibility to GDR, because, "we are no longer representing the creditors committee as it has been disbanded." They gave me the brush-off with, "Sorry there is nothing we can do."

### The Adverse Effect of the Settlement Upon Global Data Risk

40. In the Bankruptcy Court, Giuliani's counsel represented that the New York cooperative apartment was "actively being marketed" by "Sotheby's," the court-approved broker. **Exhibit 5** [at p. 32]. I have recently browsed the website for Sotheby's International Realty [sothebysrealty.com] and have found no evidence of the listing. According to the StreetEasy website, the apartment was de-listed October 3, 2024 – a blatant violation of the Judge Lane's dismissal order. **Exhibit 16**.

41. It appears the parties would have Global Data Risk commence separate proceedings to recover what is indisputably owed. This is precisely what Judge Lane sought to prevent:

> But wait a minute. **Why should people have to wait if they are, in fact, liquid assets in an account somewhere?** *** So I'm trying to really stick to the regular way of wrapping up a Chapter 11 case that's being dismissed. So that's my goal. So if the debtor has certain issues and certain ways it wants things to unfold, it's a very much help-me-to-help-you situation, where, again, **I don't know that there's any justification for not paying liquid assets that are available.** *** But right now, the only thing that I understand that's been presented to me is the offer of a lien on the property, which someday will be sold. I don't know when that's going to be. I have this case that people want to dismiss today. **And so I don't know that a wait forever to pay an administrative expense in this case that everybody wants to dismiss today is sort of consistent with the regular practice.**

**Exhibit 5** [at pp. 31-33, emphasis added].

-13-

**The Expiration of the Stand-Still Period**

42. Judge Lane's dismissal order [at ¶ 9] imposed a six-month standstill period, beginning upon the entry of the order, during which Global Data Risk could not enforce any rights against Giuliani's New York cooperative apartment or his Florida condominium. Upon expiration of the standstill period, Global Data Risk would have the right to foreclose upon its liens and otherwise enforce all of its rights and remedies against those properties. **Exhibit 7**. The standstill period imposed by the dismissal order expired February 3, 2025.

43. Global Data Risk now seeks to intervene in this judgment-enforcement action to enforce its interest in Giuliani's New York cooperative apartment and thereby assure the satisfaction of its administrative claim approved by the Bankruptcy Court with the enthusiastic support of Ruby Freeman and Wandrea' ArShaye Moss, the Unsecured Creditors Committee, and Giuliani. Given Freeman and Moss apparently no longer wish to serve as receivers for the apartment, Global Data Risk should be so appointed.

44. I am advised by counsel that Global Data Risk LLC, in addition to intervening as of right, may intervene by permission as a plaintiff because GDR is a citizen of States other than New York, where Giuliani is actually a citizen, or Florida, where Giuliani now claims to be a citizen. GDR has two members: Erik Laykin and John Bass. I am a citizen of the State of California, and John is a citizen of the State of Virginia. I am advised by counsel that, for the purposes of determining diversity jurisdiction of a federal court, a limited liability company like GDR takes the citizenship of each of its members.

-15-

## CONCLUSION

45. Based on the facts in this Declaration, and for the reasons stated in the accompanying memorandum of law, the motion of Global Data Risk to intervene in this action should be granted.

I declare the foregoing is true and correct.

Executed at Los Angeles, California, February 11, 2025.

_____
ERIK LAYKIN